**BETWEEN:**

(1)  **Low Tuck Kwong**
(2)  **GRANITO LIMITED**
**(a company incorporated in Samoa)**

Claimants/Applicants

And

**SUKAMTO SIA (SINGAPORE NRIC NO. S2599073J)**
**also known as**
**SER FUQIANG (SINGAPORE PASSPORT NO. E1588480L)**
**SIA HOCK KIAN**

Defendant/Respondent

---

**AFFIDAVIT OF LOW TUCK KWONG**

---

I, **LOW TUCK KWONG**, of 133 New Bridge Road, #18-09/30 Chinatown Point, Singapore 059413 make oath and say as follows:

**I.     THE PARTIES**

1.     I am the First Claimant.  I am an Indonesian national.  I am the assignor of the judgment debt described at paragraph 2(b) below.

2.     The Second Claimant is:

(a)  a company incorporated in Samoa; and

(b)  the assignee of a judgment debt under a judgment by the Court of Appeal in Singapore Suit No. 703 of 2008 ("**the Defamation Action**") in excess of $132 million Singapore Dollars granted in my favor against Sukamto Sia ("**Sia**") for defamation and malicious falsehood arising from the publication of various letters sent by Sia in Indonesia and

1

Singapore. Further background and particulars of the Singapore Defamation Action is set out in Section III below.

**Sec: Tab 1 – Deed of Assignment dated 26 July 2015**

3. The Defendant, Siu, is

   (a) a Singaporean citizen;

   (b) the judgment debtor in the Singapore Defamation Action, which remains wholly unpaid up to this date; and

   (c) believed to hold numerous bank accounts in various jurisdictions with bank balances totaling approximately USD124 million of which approximately USD7.1 million are held in bank accounts in the United States, specifically USD3.8 million in LCNB National Bank (formerly Eaton National Bank & Trust Co.) and USD 3.3 million in PNC Bank in Pittsburgh.

4. I am the director and a shareholder of the Second Claimant by which I have been authorized to make this affidavit. Unless stated otherwise, the matters deposed to herein are within my personal knowledge and true. Where matters are not within my personal knowledge, the matters deposed herein are derived from documents which I have reviewed and are true to the best of my information and belief.

**II. RELIEF SOUGHT AND BASIS FOR RELIEF**

5. This affidavit is sworn in support of the Claimants' application for an attachment order against the Defendant's assets in Pittsburgh. I shall in this affidavit address in turn the following matters relevant to the Claimants' application:

   (a) The Defamation Action granted by the Singapore Court of Appeal;

   (b) Background to the Defendant and the prior legal proceedings – including for contempt of court in Singapore and indictable offences in the United States – with which he has been involved;

Sing

1.

2.

2

(c) Evidence of the Defendant's assets in Ohio and Pittsburgh, United States;

(d) Enforcement Action taken by the Claimants' in other Jurisdictions; and

(e) Other matters relevant to this application of which the Claimants makes full and frank disclosure.

6.      As I shall explain below, I believe that an attachment order application is necessary based on the past conduct of Sukamto Sia in trying to evade responsibility for settlement of the Singapore Defamation Action granted against him, including conduct which caused him to be indicted by the U.S. prosecutorial authorities for, among others, 8 counts of bankruptcy fraud, 2 counts of wire fraud, 4 counts of bank fraud, money laundering and fasifying bank records

### III.     SINGAPORE SUIT NO. 703 OF 2008

Background Facts

7.      I commenced the Defamation Action against Sia in 2008 for defamation and malicious falsehood resulting from the publication of statements/claims made by Sia in various letters he sent in Indonesia and Singapore ("**the Letters**").  Sia in turn counterclaimed against me for, inter alia, breach of contract, proprietary estoppel, constructive trust, breach of fiduciary duty and money had and received.

8.      In the Letters, Sia alleged that I owed him 50% of the shares in PT Bayan Resources Tbk ("**PT Bayan**"), an Indonesian coal mining company. Sia claimed that I had induced him to invest in a coal mining business (now PT Bayan) some 13 years ago by paying SGD3 million in return for 50% of the shares of that business, which part of the bargain on which it was said that I later reneged.

9.      At the material time in or around July 2008, it was publicly known that PT Bayan was scheduled to be listed on the Indonesian Stock Exchange on 8 August 2008 by way of an initial public offering ("**IPO**"), and that I would be selling part of my shareholdings in PT Bayan ("**my PT Bayan Shares**") in the IPO. The Letters which were sent by Sia's lawyers to, amongst others, me, PT Bayan, the Indonesian Capital Market and Financial Institutions Supervisory Agency ("**BAPEPAM**") who are regulators for the Indonesian Stock Exchange and other parties involved in the IPO. Sia's motion in sending the letters, as later found by the Singapore Court of Appeal, was malice, and in my view, calculated to derail the IPO.

10.  As a self-confessed "corporate raider" and "prominent corporate investor", Sia appreciated the likelihood that BAPEPAM would be required to investigate the claim especially since it involved a claim which created uncertainty over the beneficial ownership of shares to be sold in the IPO and this would disrupt the IPO and may even cause the regulators to suspend the IPO.

11.  Indeed, as a direct consequence of the Letters sent by Sia, BAPEPAM informed PT Bayan that unless the dispute over the ownership of my PT Bayan Shares is resolved, they would not allow the IPO to proceed. Eventually, as a compromise, in order for BAPEPAM to allow the IPO to proceed, I agreed to withdraw my PT Bayan Shares from the IPO and PT Bayan agreed to publish announcement in various Indonesian newspapers to disclose Sia's claims and to include similar disclosures in the IPO documents which were distributed worldwide (including Singapore and Indonesia). I would add that this resulted in the re-publication of Sia's claims.

12.  As a result of the Letters, I lost the opportunity to sell any part of my PT Bayan Shares (totaling 375 million shares) in the IPO which would have produced sale proceeds of hundreds of millions, and also the profits from the reinvestment of the sale proceeds. It also caused a 4-day delay to the IPO of PT Bayan.I believe that the Letters was an action of retaliation, taken by Sia against me for partly funding the court proceedings brought by Dynasty Line Limited ("**Dynasty**") against Sia and Lee Howe Yong in Hong Kong ("**the Hong Kong Dynasty Action**"), which were ongoing at the time, as I shall explain further below, and in which a worldwide Mareva injunction had been granted against both of them. I would add here that the Hong Kong Dynasty Action was eventually stayed and Dynasty subsequently brought similar proceedings in Singapore ("**the Singapore Dynasty Action**")

13.  As I will elaborate below in Section IV, my belief that Lee and Sia had acted in breach of their fiduciary duties as directors of Dynasty and were liable to compensate Dynasty for the losses caused by their breach was vindicated when the Singapore Court of Appeal overturned the decision of the lower Court, ruling in favor of Dynasty, and finding that Lee and Sia was liable for the breaches.

Defamation Action – Liability

14.  On 22 November 2012, the High Court of Singapore handed down the judgment for the Defamation Action dismissing both my claims and Sia's cross-claims. The trial judge found that although the words in the Letters were defamatory, Sia was entitled to the defence of qualified privilege. The trial judge also found that I had not proved malice on the part of Sia.

4

See: **Tab 2 – Judgment of the Singapore High Court in the Defamation Action dated 22 November 2012.**

15.     I appealed against the trial judge's decision which was heard on 3 July 2013 but Sia did not appeal.

16.     On 8 November 2013, the Singapore Court of Appeal allowed my appeal in part, holding, amongst others, that:

    (a)     Sia's claim that there was a common understanding between me and Sia that Sia had given me S$3 million to invest and facilitate my establishment of an Indonesian coal mining business on the basis that if it was established, Sia would have a 50% share in the business and if not, I would return the amount (the "**Common Understanding**") was false and the Common Understanding did not exist;

    (b)     Given that there was no Common Understanding, the defamatory statements contained in the Letters were published with express malice and this defeated Sia's defence of qualified privilege;

    (c)     Accordingly, Sia is liable for defamation;

    (d)     I was entitled to general damages as liability for defamation has been made out;

    (e)     I was further entitled to aggravated damages given that:

        i.     Sia has not since making the publications apologized for them;

        ii.     The defamatory statements were false;

        iii.     Sia clearly knew that the defamatory statements were false;

        iv.     Sia was actuated by express malice in making the publications; and

        v.     Sia wrongly maintained the truth of his false allegations throughout the trial of the Defamation Action via his plea of justification and in the arguments made on appeal;

(f)  In the light of malice and falsity having been proven, and considering the causation of special damage in the nature of the loss of opportunity to invest the proceeds that I would have received had I been able to sell my PT Bayan Shares in the IPO having been established, liability for malicious falsehood is also proved.

17.  I would point out that the Singapore Court found that Sia's testimony was littered with "*incomprehensible inconsistencies*" and the Singapore Court of Appeal noted in their decision that "*[Sia]'s evidence on various occasions and on oath in court proceedings in Singapore and Hong Kong were inconsistent with his assertions in the Letters of an investment based on the Common Understanding*".

See: **Tab 3 – Judgment of Singapore Court of Appeal in Civil Appeal No. 173 of 2012 dated 8 November 2013.**

<u>Defamation Action – Damages</u>

18.  On 31 March 2015, the judgment for the assessment of damages payable by Sia under the Defamation Action was handed down by the Singapore High Court and Sia was ordered to pay the following:

(a)  S$200,000 for general damages and S$80,000 for aggravated damages for my claim for damages for defamation;

(b)  S$132,038,511 as damages for loss of opportunity for my claim for damages in respect of malicious falsehood;

(c)  Interest at the rate of 5.33% per annum for the sum of S$132,038,511 awarded as damages for malicious falsehood, such interest to run from 9 November 2013 until the date of payment; and

(d)  Costs of the assessment of damages.

See: **Tab 4 – Judgment for Assessment of Damages in Suit 703 of 2008 dated 31 March 2015.**

19.  The total amount that Sia was required to pay under the Defamation Action as at 31 March 2015 was therefore  S$132,318,511 plus interest and costs of the assessment of damages; the costs of the trial and also the appeal (the "**Singapore Defamation Judgment Debt**").

<u>Demand for Payment of Singapore Defamation Judgment Debt</u>

20.     On 14 April 2015, my Singapore solicitors, Drew & Napier LLC ("**D&N**"), sent a demand letter to Sia to demand payment of the Singapore Defamation Judgment Debt.  However, up to the date hereof, there has not been any attempt by Sia to pay the Singapore Defamation Judgment Debt and the debt remains wholly unpaid.

**See: Tab 5 – Demand letter from D&N to Sia dated 14 April 2015**

<u>Contempt Proceedings</u>

21.     As part of the evidence for the assessment of damages, I had filed a Supplementary Affidavit of Evidence in Chief ("**SAEIC**") which included a sealed bundle containing highly confidential information relating to me ("**Sealed Bundle**").  Pursuant to the Order of the Honourable Justice Belinda Ang dated 2 May 2015, Sia was required to return the Sealed Bundle to me.  However, Sia repeatedly ignored the requests from my lawyers to return the Sealed Bundle.

22.     As a result, I had no alternative but to instruct my Singapore lawyers, D&N, to seek leave to apply for an order of committal against Sia for failing or refusing to return the Sealed Bundle. On 20 July 2015, the Singapore High Court granted leave to apply for an order of committal against Sia in light of his persistent disregard of the Order of the Honourable Justice Belinda Ang dated 2 March 2015.

**See: Tab 6 – Order of Court made by the Honourable Justice Belinda Ang dated 20 July 2015**

23.     D&N has written to Sia on 22 July 2015 with a copy of Justice Ang's amended order dated 21 July 2015 and expressly drew his attention to the notice included in the said order which provides that:

> "*If you, the within-named SUKAMTO SIA (NRIC S2599073J) neglects to obey this Order of Court by the time therein limited, you will be liable to process of execution for the purpose of compelling you to obey the same*".

**See: Tab 7 – Letter from D&N to Sukamto Sia dated 22 July 2015**

24.     Notwithstanding repeated requests by D&N, it was only after leave was granted for the issuance of committal proceedings (which are quasi-criminal in nature) against Sia, that he finally deigned to comply with the court order and return the Sealed Bundle to me.

## IV.   BACKGROUND AND HISTORY OF SUKAMTO SIA

25.   In order for me to explain why I believe that it is necessary to seek an attachment order in Pittsburgh, it is necessary for me to refer to the various other Court proceedings involving Sia in the US, Hong Kong (i.e., the Hong Kong Dynasty Action) and Singapore (i.e., the Singapore Dynasty Action) which details Sia's history of fraudulent conduct which includes, amongst others, bankruptcy fraud and deliberately hiding assets from his creditors.

Court Proceedings in the United States

26.   On or about 6 November 1998, Sia filed a voluntary petition for bankruptcy relief in the United States under Chapter 11 of the United States Bankruptcy Code. The proceedings were subsequently converted into a Chapter 7 liquidation on 4 June 1999.  I shall refer to these proceedings as the "**US Bankruptcy Proceedings**".

27.   In connection with US Bankruptcy Proceedings, numerous complaints were made against Sia by creditors and also the trustee for Sia's bankruptcy ("**Sia's Bankruptcy Trustee**").

28.   Sometime between March 1999 and May 2000, 4 of Sia's creditors, namely Aspinall's Club Limited, Commerzbank (South East Asia) Ltd, London Clubs International, PLC, and Rio Properties, Inc., filed complaints against him asserting that certain debts should not be discharged i.e. that Sia would continue to owe these debts to the said creditors. The complaints filed by these 4 creditors alleged that Sia had, *inter alia*, (i) used false pretences, false representations and/or actual fraud to obtain, amongst others, extension of credit and credit and gaming privileges, and/or (ii) caused wilful and malicious injury to another entity or property of another entity. The United States Bankruptcy Court for the District of Hawaii ultimately entered 4 separate orders denying Sia a discharge of these debts.

See: **Tab 8 – Documents relating to Aspinall's Club Limited and London Clubs International PLC's complaints**
   a.   **Complaint to Determine Dischargeability of Debt dated 18 March 1999**
   b.   **Stipulated Judgment in Adversary No. 99-0027 dated 5 January 2001**
   c.   **Stipulated Judgment in Adversary No. 99-0028 dated 5 January 2001**

**Tab 9 – Documents relating to Commerzbank (South East Asia) Ltd's complaint**

8

    a. **Complaint to Determine Dischargeability of Debt dated 30 December 1999**

    b. **Order Granting Plaintiff's Motion for Summary Judgment and Directing Entry of Nondischargeability Final Judgment dated 3 October 2001**

    c. **Final Judgment dated 3 October 2001**

**Tab 10 – Documents relating to Rio Properties Inc's complaint**

    a. **Complaint to Determine Dischargeability of Debt dated 1 May 2000**

    b. **Final Judgment dated 13 April 2001**

29.    In or around February 2000, Sia's Bankruptcy Trustee filed a complaint (as amended in or around July 2000) against Sia alleging numerous counts of bankruptcy offences, including concealing and failing to keep financial information, engaging in fraudulent transfers and concealment scheme prior to filing for bankruptcy, engaging in the transfer, removal, or concealment of property of the estate after the date of filing for bankruptcy with the intent to hinder, delay or defraud creditors; knowingly and fraudulently providing false oath and accounts and withholding information. On account of Sia's alleged actions set forth in the complaint, Sia's Bankruptcy Trustee sought to deny Sia a discharge of all of his debts.

See: **Tab 11 - First Amended and Supplemental Complaint dated 13 July 2000**

30.    Although Sia entered into a stipulation where he voluntarily agreed that he would not receive a discharge of any debts, the stipulation also specifically provided that entering into the stipulation was not an admission of the validity of any of the charges asserted in Sia's Bankruptcy Trustee's complaint.

See: **Tab 12 – Stipulation for Entry of Judgment dated 13 October 2000**

31.    Sometime in 2001, Sia's Bankruptcy Trustee filed a Motion to compel Sia to execute consents for release of account information and for the imposition of sanctions on his brother, Suwardi Sukamto. Specifically, Sia's Bankruptcy Trustee alleged that Sia set up companies in the BVI in order to conceal the transfer of funds from his various accounts. Specific instances of transfers amongst related entities are set out on pages 1 – 2, including footnotes 1 – 4, of Tab 13, whereas page 5 contains a list of specific transfers and the dates such transfers were made.

See: **Tab 13 – Trustee's Motion to Compel dated 31 August 2000**

32.     After filing for bankruptcy, Sia was indicted in the United States District Court for the District of Hawaii for various counts of fraud. Specifically, the second superseding indictment, dated 16 May 2001, alleges, *inter alia*, the following counts:

   (a)     conspiracy to commit bankruptcy fraud (i.e. transferring and hiding assets from creditors);

   (b)     8 counts of bankruptcy fraud including, *inter alia*, knowingly and fraudulently transferring an amount in excess of $7 million of the proceeds of the sale of a Gulfstream jet (Gulfstream IV No. 10101) owned by Sia to entities he controlled; and knowingly and fraudulently concealing property belonging to the estate from the trustee charged with control of Sia's property and from the creditors and Sia's Bankruptcy Trustee;

   (c)     2 counts of wire fraud including, *inter alia*, devising and intending to devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretences, representations and promises;

   (d)     4 counts of bank fraud including, *inter alia*, devising a scheme and artifice to defraud the Bank of Honolulu and to obtain monies and funds owned by and under the custody and control of the Bank of Honolulu by means of false or fraudulent pretences, representations, and promises;

   (e)     money laundering conspiracy for, *inter alia*, conducting and attempting to conduct financial transactions with property that was the proceeds of bankruptcy fraud, bank fraud and wire fraud, knowing that the property represented the proceeds of some form of unlawful activity, while acting with the intent to promote bankruptcy fraud in violation of Title 18. United States Code, Section 1956 (a)(1)(A)(i); and transmitting and transferring funds from in the United States to places outside the United States with the intent to promote the carrying on of specific unlawful activity i.e. wire fraud, bank fraud, and bankruptcy fraud;

(f)      3 counts of money laundering for, *inter alia*, knowingly engaging and attempting to engage in monetary transactions with criminally derived property which properly belonged to Sia's Bankruptcy Trustee; and

(g)      falsifying bank records with the intent to defraud, amongst others, Sia's Bankruptcy Trustee and to deceive the officers of the First American Bank and the Federal Deposit Insurance Corporation.

**See: Tab 14 - Second Superseding Indictment dated 16 May 2001**

33.      Sia subsequently struck a plea deal where he pleaded guilty to 2 counts of bankruptcy fraud and one count of defrauding the Bank of Honolulu and to obtain money and property by false and fraudulent pretences.

**See: Tab 15a – Judgment from the United States District Court District of Hawaii for case no. 1:00CR00350-001 dated 22 March 2002**

34.      On 22 March 2002, Sia was sentenced to a term of 36 months in prison, followed by 5 years of supervised release and ordered to pay approximately US$3.1 million in restitution.

**See: Tab 15b – Newspaper articles from: (i) The Honolulu Advertiser dated 23 March 2002; and (ii) The Honolulu Star Bulletin dated 23 March 2002**

35.      On 6 February 2002, 2 of Sia's creditors, namely Aspinall's Club, Limited and London Clubs International, PLC, filed a Motion to hold Sia in contempt for ignoring the bankruptcy court's orders regarding discovery.

**See: Tab 16 – Plaintiffs and Judgment Creditors' Motion to Punish Defendant and Judgment Debtor Sukamto Sia for Civil Contempt of the Order entered by the United States District of Hawaii Bankruptcy Court on 6 December 2001**

36.      The US Bankruptcy Court ultimately found Sia to be in contempt of the Court's orders. In particular, the US Bankruptcy Court found that *"throughout the course of these adversary proceedings, and the underlying Bankruptcy proceeding, Mr. Sia has continually failed to produce documents or to respond to legitimate requests for information, from either the*

*Judgment Creditors or the Bankruptcy Trustee*". The US Bankruptcy Court further found that Sia "*was not in substantial compliance with the December 6 Order of this Court*" and that "*[a] citation of contempt is necessary to enforce the Order of this Court and to bring Mr. Sia into compliance therewith*".

> See: **Tab 17 – Findings of Fact and Conclusions of Law dated 13 June 200 re Plaintiffs and Judgment Creditors' Motion to Punish Defendant and Judgment Debtor Sukamto Sia for Civil Contempt of the Order entered by the United States District of Hawaii Bankruptcy Court on 6 December 2001**

37.    Sometime in or around July 2003, Sia's Bankruptcy Trustee moved to hold Sia in contempt for his actions in the bankruptcy proceedings for failure to obey two bankruptcy court orders for: (i) Sia to turn over US$2 million he hid from the court; and (ii) Sia to produce documents in connection with a discovery dispute.

38.    Sia's Bankruptcy Trustee asserted that the documents were necessary in order to analyze Sia's post-petition transfers and management of affairs. In support of the assertion, Sia's Bankruptcy Trustee provided specific allegations of how Sia set up shell companies to hold assets, and even used these shell companies to provide affidavits filed in his bankruptcy case in support of certain relief

> See: **Tab 18 - Trustee's Contempt Motion dated 28 July 2003**

39.    The US Bankruptcy Court ultimately found Sia to be in contempt of the court's orders. Sia appealed the foregoing rulings, but ultimately agreed to a settlement with the parties whereby the parties agreed to withdraw their contempt motions in exchange for Sia paying Sia's Bankruptcy Trustee the sum of US$2 million.

> See: **Tab 19 - Stipulation re Contempt Motions dated 27 August 2004**

40.    Upon information and belief, Sia was released in 2005 and subsequently deported from the United States.

Proceedings in Hong Kong and Singapore

41.    I now turn to the Hong Kong Dynasty Action and the Singapore Dynasty Action.

42. Both the Hong Kong Dynasty Action and the Singapore Dynasty Action arose from 7 share sale and purchase agreements all dated 5 February 1996 (the "**S&P Agreements**") entered into by Dynasty, which was Sia's corporate vehicle. Dynasty had two directors, namely Sia and Lee Howe Yong ("**Lee**"), although Sia was at all material times the sole shareholder of Dynasty.

43. Under the S&P Agreements, Dynasty agreed to acquire a total of 29,537,367 shares (the "**Sale Shares**") in a Hong Kong listed company China Development Corporation Limited ("**CDC**") from me and 6 other persons (collectively, the "**Vendors**").

44. The total purchase price of the Sale Shares was HK$230,391,463 (the "**Purchase Price**"). The unit price for each share was then HK$7.80, which represented a 36% premium on CDC's last closing price of HK$5.75. Under the S&P Agreements, Dynasty was required to pay the Purchase Price by instalments prior to the completion date of 2 May 1996 (the "**Completion Date**"), on which date the balance of the Purchase Price was to be paid and the share certificates and other documents of title for the Sale Shares exchanged.

45. However, at Sia's request, the Vendors agreed to deliver of the share certificates for all Sale Shares to Dynasty before the Completion Date and before the Purchase Price was fully paid. The total sum that Dynasty eventually paid to the Vendors was only HK$64,459,317.16, representing approximately 28% of the Purchase Price.

46. Unbeknown to the Vendors, shortly after the Vendors had delivered the share certificates to Dynasty, between April 1996 and November 1997, Dynasty entered into transactions with various financial institutions (collectively the "**Security Transactions**"), whereby the Sale Shares were pledged as security for loans granted to Sia, Sia's business associate Franklin Syah, and a company owned by Sia and Lee known as Beswil Investment Pte Ltd ("**Beswil**") as follows:

   (a) On 23 April 1996, Dynasty charged 12,032,302 CDC shares to Commerzbank (South East Asia) Limited ("**Commerzbank**") as security for facilities granted to Sia ("**Commerzbank Transaction**"), pursuant to a Charge over Securities Agreement and a Set-Off Agreement. Both agreements were signed by Sia and Lee on the Dynasty's behalf as its "officers" pursuant to a written board resolution dated 29 March 1996.

(b)     On 6 November 1996, Dynasty charged 5,600,000 CDC shares to Societe Generale (Labuan branch) as security for facilities granted to Beswil.

(c)     On 29 August 1997, Dynasty charged 48,822,700 CDC shares to KG Investments Asia Limited as security for facilities granted to Franklin Syah.

(d)     On 3 November 1997, Dynasty charged 10,702,625 CDC shares to Creditanstalt Bankverein as security for facilities granted to Sia.

47.     Sia and his associates subsequently defaulted on the loans advanced. The financial institutions exercised their right to sell the Sale Shares under the Security Transactions, and applied the proceeds in satisfaction of the debts owed.

48.     Sometime in or around June 1999, the Vendors commenced proceedings against Dynasty in Hong Kong HCA 9509/1999 for the unpaid Purchase Price. On 6 April 2001, after a 4 day trial, Waung J entered judgment against Dynasty for HK$113,633,160.51, being the unpaid balance of the Purchase Price of the Sales Shares along with pre-judgment interest for the period ending 6 April 2001 (the "**HK Judgment**").

See: **Tab 20 - Judgment of Waung J dated 6 April 2001**

49.     As Dynasty had no other assets, the HK Judgment remained unpaid.  Sometime in August 2007, I issued proceedings in Hong Kong to wind-up Dynasty and to appoint liquidators with a view to commencing proceedings against Sia and Lee for, inter alia, breaches of fiduciary duties concerning the Sale Shares and conspiracy to defraud. The Hong Kong Court appointed provisional liquidators ("**Provisional Liquidators**") who then subsequently commenced proceedings in Hong Kong under High Court Action NO. 2057/2007, i.e, the Hong Kong Dynasty Action. The Provisional Liquidators also obtained worldwide Mareva injunctions against Sia and Lee on an ex parte basis preventing them from removing or disposing of assets up to the value of HK$276,973,619.06.

See: **Tab 21 – Injunction Order of Beeson J dated 27 September 2007**

50.     Sia and Lee challenged the HK Court's jurisdiction and applied to stay the proceedings for forum non conveniens. By a judgment dated 13 June 2008, Deputy High Court Judge Carlson dismissed Sia and Lee's applications. Their application to discharge the Mareva injunctions for failure to make full and frank disclosure (including the reasons for the delay from 2001 when the HK Judgment was entered to 2007 when the winding up petition was presented and proceedings therein brought) was also dismissed.

See: **Tab 22 – Judgment of Deputy High Court Judge Carlson dated 13 June 2008**

51.     On 25 May 2009, the Court of Appeal overturned Deputy High Court Judge Carlson's Judgment, and ordered the action against Sia stayed, and the order granting service out against Lee and the service of the writ on Lee be set aside, on the ground HK was not the appropriate forum. The Mareva injunctions against Sia and Lee were consequentially set aside.

See: **Tab 23 – Judgment of Cheung, Yuen JJA and Burrell J dated 25 May 2009**

52.     Dynasty applied to the Court of Appeal and subsequently to the Court of Final Appeal for leave to appeal the Court of Appeal's decision but both applications were dismissed on  14 September 2009.  This effectively brought an end to the Hong Kong Dynasty Action.

See: **Tab 24 – Determination of Li CJ, Bokhary PJ and Ribeiro PJ dated 14 September 2009**

53.     On the advice of my legal advice, on 29 October 2009, I presented a petition in the BVI High Court to wind up Dynasty with a view to for the liquidators appointed to commence legal proceedings against Sia and Lee in Singapore for the same cause of action as in the Hong Kong Dynasty Action.

54.     On 22 December 2009, Dynasty was placed in liquidation and Mr William Tacon and Ms Lau were appointed its joint and several liquidators (the "**BVI Liquidators**").

See: **Tab 25 – Order of BVI High Court dated 22 December 2009**

55.     On 19 March 2010, the BVI Liquidators obtained leave from the BVI High Court to commence proceedings against Lee and Sia in Singapore.

See: **Tab 26 – Order of BVI High Court dated 19 March 2010**

56.     On 14 April 2010, the BVI Liquidators commenced Suit 256 of 2010 in the Singapore High Court against Lee and Sia for breaches of fiduciary duties to Dynasty while acting as directors under BVI law, ie. the Singapore Dynasty Action.  Sia made a counterclaimed against (i) me for breach of a settlement agreement and (ii) Dynasty, me and the BVI Liquidators for inter alia, conspiracy to injure him ("**the Counterclaim**"), also under BVI law.

57.     On 31 July 2013, judgment was handed down in the Singapore High Court Proceedings and both Dynasty's claims and Sia's counterclaims were dismissed.

See: **Tab 27 - Judgment of the Singapore High Court dated 31 July 2013**

15

58.    On 29 August 2013, Sia filed Civil Appeal No 103 of 2013 against the dismissal of his counterclaim. Dynasty cross appealed the next day in Civil Appeal No 105 of 2013 against the dismissal of its claim.

59.    By Judgment dated 29 April 2014, the Singapore Court of Appeal dismissed Sia's appeal but allowed Dynasty's cross appeal. The damages payable to Dynasty for breaches of fiduciary duties by Sia and Lee were ordered to be assessed.

60.    The Singapore Court of Appeal found that:-

(a)    Sia and Lee breached their fiduciary duties as directors:-

(i)    Sia knew or must have known that by pledging the Sale Shares as collateral for loans to him and third parties, he directly jeopardised or prejudiced Dynasty's ability to repay the liabilities owed to its creditors. Since the effect of the Security Transactions was to put Dynasty's sole asset at risk for no perceptible benefit to itself, Sia breached his fiduciary duty as a director by acting in total disregard of the interests of Dynasty's creditors.

(ii)    For the same reasons that Sia was liable for breach of fiduciary duties, the Court found that Lee was also in breach of fiduciary duties in signing the Commerzbank Transaction.

(b)    Dynasty's claim against Sia and Lee was not time-barred. The exception to the 6-year time bar in s.22 Limitation Act (Cap 163, 1996 Rev Ed) applied because Dynasty's claim was for fraudulent breach of trust.

(c)    Dynasty's claims against Sia and Lee were not defeated by laches or acquiescence. Although there was a delay of just over 6 years between April 2001 (the HK Judgment in HCA 9505) and August 2007 (when 1 commenced winding up proceedings against Dynasty in Hong Kong), such delay was not so unreasonable given my explanation that I had some health issues and financial difficulties, and the fact i would have needed time to : (i) take legal advice on the way forward and whether I needed also to commence proceedings against Sia and Lee for breach of fiduciary duties; (ii) commence winding up proceedings against Dynasty; (iii) select liquidators; (iv) settle my personal and financial issues. As for delay between August 2007 and April 2010 (when the Singapore Proceedings were commenced), this was mainly due to protracted litigation (including 2 rounds of appeals) over Sia and Lee's

16

applications to stay HK proceedings for forum non conveniens. In addition, there were no circumstances that made it practically unjust to grant a remedy;

(d) The defence of acquiescence failed because there was no evidence to suggest Dynasty stood by in such manner as to induce Sia and Lee to believe it consented to the Security Transactions.

(e) There was no conspiracy between me and the BVI Liquidators to cause loss and damage to Sia through the pursuit of stale and baseless claims in Singapore.

61. Further, in holding that the fraudulent breach of trust exception to the 6-year time-bar under section 22(1)(a) of the Limitation Act (Chapter 163, 1996 Rev Ed) applied to the facts of this case, the Singapore Court of Appeal also found that:

(a) Sia and Lee had dealt with Dynasty's property **in breach of the trust and confidence placed in them as directors**;

(b) Such breach of trust was **dishonest** in that *"their conduct would not have been countenanced by the ordinary standards of reasonable and honest people"* and was therefore **fraudulent**.

See: **Tab 28 – Judgment of the Singapore Court of Appeal dated 29 April 2014 (the "Dynasty Judgment")**

62. The hearing for the assessment of damages in the Singapore Dynasty Action concluded in Singapore on 23 June 2015 and parties are due to file closing submissions within 3 weeks.

**Sia's alleged impecuniosity**

63. During cross-examination under oath in Singapore Defamation Action on 15 August 2012, Sia claimed that his bankruptcy in 1998 in the United States caused him *"pain"* and *"had caused [Sia] to change [his] lifestyle"*.

64. However, according to Sia, because the worldwide Mareva injunction obtained by the Hong Kong Provisional Liquidators of Dynasty in September 2007 in the Hong Kong Dynasty Action was in respect of *"assets that [he] don't have much"*, he was only affected *"a little bit"*.

See: **Tab 29 – Transcript for Suit 703 of 2008 dated 15 August 2012, in particular pages 43 – 46.**

65.     Indeed in his affirmation filed in the Hong Kong Dynasty Line Proceedings to comply with his disclosure obligations under the Hong Kong Mareva Injunction, Sia disclosed minimal assets.

See: **Tab 30 – Third Affirmation of Sukamto Sia dated 28 July 2008 filed in Hong Kong High Court Action No. 2057 of 2007**

66.     However, I have now come to believe that Sia may in fact own substantial assets in various jurisdictions around the world, including the BVI, Cook Islands, Monaco, Switzerland and the United States according to information which has been provided to me, in the circumstances described below.

## V.      EVIDENCE OF DEFENDANT'S ASSETS IN OHIO AND PITTSBURGH

67.     On 24 July 2015, I arrived at my office in Jakarta at around 10am, which was later than usual, as I had a breakfast meeting that morning.  As is my usual routine, I started to read the mail that had come in while I was away.  My secretary's practice is to open my mail and place the letters in a stack on my desk, which she did on this day as well.

68.     As I went through the stack of mail on my desk, I came across a few sheets of papers that were paper-clipped together which immediately caught my attention. They had the names Sukamto Sia, Ser Fuqiang and Sia Hock Kian across the top of respectively each of the 4 sheets of paper, information apparently showing details of bank accounts and the amounts in each account.  The 4 sheets of paper caught my attention in particular because, in addition to "Suakamto Sia" they also included 2 other names which I knew were aliases of Sia, namely, "Ser Fuqiang" and "Sia Hock Kian".  There was also shown besides these names a passport number relating apparently to the relevant name.

69.     I knew "Ser Fuqiang" was an alias of Sia because this was the name on the copy of the passport Sia had included in the Court bundle that was used for the trial of the Singapore Defamation Action. Further, Sia's counsel had also confirmed at the trial of the Singapore Defamation Action that Sia's Mandarin name is Ser Fuqiang.

See: **Tab 31 – Copy of passport of Ser Fuqiang**

> **Tab 32 – Transcript from the Singapore Defamation Action dated 14 August 2012, pg 29 – 30.**

70.     As for the name "Sia Hock Kian", I had learned about this second alias by chance when I happened to travel on the same flight as Sia (who was travelling alone) from Jakarta to Singapore earlier this year in Feb 2015. Mr Sia was in first class and he disembarked first. As I was in business class, I was a little bit behind him. I saw Sia quite some meters ahead of me when I disembarked the plane. After I cleared customs, I saw Sia standing outside the DFS shop, talking on his mobile phone. As I walked by, Sia ended his call and approached me, calling my name. I stopped and turned around to face him. Sia said that he wanted to discuss the court case between us and how we can try to resolve it. For my part, I did not want to discuss anything with him as the assessment of damages hearing in the Singapore Dynasty Action was still 2 months away. During this exchange, Sia was standing fairly close to me and I was able to see his first class boarding pass / ticket tab which was sticking out of his suit breast pocket. In particular, I noticed the name, "Sia Hock Kian", printed on the ticket tab, which surprised me because I knew Sia had always gone by the name "Sukamto Sia" or "Sukarman Sukamto". On the way home, I made a mental note of this, and indeed the name has stayed with me so that when I saw the reference to "Sia Hock Kian" on one of the sheets of paper with the bank account information, it immediately caused me to connect the two events.

71.     When I looked at the information contained on the 4 sheets of paper, it also led me to recall that I had received a sheet of paper with similar information, and in a similar format, last year in around May. I vaguely remembered on that occasion there was a simple note sent with that sheet of paper indicating that the bank accounts in that list belonged to Sia. I had thrown away the cover letter as I thought it was not important then. But I did ask my assistant to send a copy of the list to the provisional liquidators of Dynasty Line in Hong Kong, just in case the information might be useful to them. I did not ask my own lawyers to do anything with this information at that time because the Court of Appeal had not yet then assessed the amount of my damages to be paid by Sia nor issued the formal order for him to pay me.

72.     I was surprised to receive a similar list again and realizing the importance of this list, I immediately asked my secretary for the envelope so that I could check if there was any cover note or other accompanying document that came with the 4 sheets which would allow me to

see who sent the letter. My secretary did manage to retrieve the envelope, but there was nothing else in the envelope.

73.    I could see from the envelope that the letter had been sent from Taiwan.  This was surprising since I do not have an office in Taiwan. However, I have, through the year, made significant donations to charitable organizations in Taiwan, including a USD 1 million donation to Fo Guang Shan (the Buddhist organization set up by Master Hsing Yun) in 2010.

74.    I did think about whether I should contact Fo Guang Shan to see if it was indeed they who sent it but ultimately decided not to because the letter was sent anonymously, which I took to mean that the sender was unlikely to want to be identified.  I also thought that making such inquiries with a religious organization might have caused an embarrassment.

75.    With those thoughts in mind, I thought the best thing to do would simply be to make the information available to my legal advisors and so I asked my secretary to scan the list and the envelop to my lawyer, Mr Wellington Chao, for his information and further action, as he had worked with the BVI Liquidators and the Provisional Liquidators of Dynasty on the first list.

       See: **Tab 33 – List of Assets (with envelop)**

76.    For the sake of completeness, I should mention that am, in this application seeking an attachment order against PNC Bank in Pittsburgh, rather than PNC Bank in the Cook Islands as reflected in the list of assets. This is because I understand from lawyers whom I have instructed in the Cook Islands that PNC Bank does not hold a banking licence in the Cook Islands, and does not appear to be trading in or from the Cook Islands. As PNC Bank is headquartered in Pittsburgh, I am informed that this would be an appropriate forum for an application against the Defendant's assets in PNC Bank.

## VI.   ENFORCEMENT ACTION BY THE CLAIMANTS IN OTHER JURISDICTIONS

77.    Apart from the United States, I am also currently taking steps to, amongst others, obtain disclosure orders and/or freezing relief against Sia in Monaco, Switzerland and the BVI in order to enforce the Singapore Defamation Judgment.

78.    I have successfully applied for and obtained: (i) a Mareva injunction against Sia restraining him from removing, disposing of, dealing with or diminishing the value of any of his assets situated in the BVI up to and including the value of USD 105,637,642.20; and (ii) an attachment order against Sia's assets in Switzerland.

79.    I have also applied for a freezing order against Sia's assets in Monaco and this application is currently pending before the Monaco courts.

## VII.    FULL AND FRANK DISCLOSURE

80.    I am mindful of the requirement for full and frank disclosure in ex-parte applications and I have set out below a list of various issues which may be relevant:

Allegations of conspiracy previously raised by Sia

81.    During the course of the proceedings of Singapore Dynasty Action, one of the claims advanced by Sia was the allegation that Dynasty, the BVI Liquidators and I had conspired together with the "*predominant purpose of causing loss and damage to Sia through the pursuit of stale and baseless claims in Hong Kong*".

82.    This spurious allegation was dismissed by the trial judge, whose decision was upheld and affirmed by the Singapore Court of Appeal on appeal. Significantly, the Singapore Court of Appeal noted that "*the predominant purpose of the Provisional Liquidators and the Liquidators in commencing HCA 2057 (in Hong Kong ) and the Original Claim respectively was legitimate; they were doing no more than discharging their duties as liquidators by attempting to recover Dynasty's losses and maximizing the assets available for distribution*".

Examination of Judgment Debtor in Singapore

83.    For completeness, I would like to explain why the Claimants did not consider other means of obtaining information from Sia on the availability of his assets to satisfy the Defamation Judgment Debt before commencing the present application for an attachment order in the United States.

84.    The Claimants are aware that they can apply for examination of Sia as a judgment debtor in Singapore to find out about the assets owned by Sia. The Claimants are also aware that there are provisions for committal proceedings to commit the judgment debtor to prison should the judgment debtor fail to show up for the examination.

85.   The Claimants understand that generally, there is a time lag of approximately two to three months between the time the order for examination is made against the judgment debtor and the time an arrest warrant is issued against the judgment debtor for failing to appear at the examination.

86.   Given Sia's history of defaulting on debts and past criminal conviction for bankruptcy fraud in the United States, the Claimants are of the view that it is highly probable that Sia would try and dissipate his assets so as to defeat judgment and prevent the Claimants from taking steps to enforce the Defamation Judgment Debt.

87.   The Claimants strongly believe that if an application for examination of judgment debtor were to be made in Singapore, it is likely to put Sia on notice that the Claimants intend to take steps to enforce the Defamation Judgment and may result in Sia taking steps (if he has not already done so) to move his assets beyond the reach of the Claimants. This is exacerbated by the fact that Sia effectively has a rather generous time frame of two to three months to move his assets before he can be stopped, for instance by way of the issuance of committal proceedings against him.

## VIII.   UNDERTAKING IN DAMAGES

88.   I am prepared to give an undertaking in damages if required by the Court to do so and have sufficient financial resources to do so.

89.   I am the majority and controlling shareholder of PT Bayan, a company listed on the Indonesian Stock Exchange. As at 29 July 2015, I hold 1,719,695,500 shares of Bayan Resources Tbk PT ("**PT Bayan**"). Based on the closing price of the shares PT Bayan on 29 July 2015 of Indonesian Rupiah 8125, the value of my shareholding in PT Bayan is worth approximately USD1.04 billion, using the conversion rate of USD1 = Indonesian Rupiah 13,4000.

**See Tab 34: Screenshot of PT Bayan from Bloomberg dated 29 July 2015**

90.    In addition to my interest in PT Bayan, I also have a substantial interest in Manhattan Resources Limited, a company listed on the Singapore Stock Exchange.


**SWORN AT**                     )
                                 )
                                 )
                                 )
this 6th day of August 2015    )

People's Republic of China )
Municipality of Beijing        } SS:
Embassy of the United
States of America            )


Sworn and subscribed before me by Mr. Low Tuck Kwong who was previously known to me or presented to me adequate identification on 6th August, 2015

Neil P. Finnegan
Vice Consul


American Embassy
Beijing, People's Republic of China


23