This is the exhibit marked "**LTK-3**" referred to in the affidavit of **LOW TUCK KWONG** sworn and subscribed before me by Mr. Low Tuck Kwong who was previously known to me or presented to me adequate identification on 6th August, 2015

Before me

IN THE COURT OF APPEAL OF THE REPUBLIC OF SINGAPORE

[2013] SGCA 61

Civil Appeal No 173 of 2012/A

Between

**LOW TUCK KWONG**

... *Appellant*

And

**SUKAMTO SIA**

... *Respondent*

In the Matter of Suit No 703 of 2008/X

Between

**LOW TUCK KWONG**

... *Plaintiff*

And

**SUKAMTO SIA**

... *Defendant*

# JUDGMENT

[TORT]---[Defamation]
[TORT]--[Malicious falsehood]

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................... 1

FACTS ...................................................................................................... 2

    THE PARTIES TO THE DISPUTE ........................................................... 2

    BACKGROUND TO THE DISPUTE ......................................................... 2

        *The 1st and 2nd Letters of 10 and 15 July 2008 respectively* ................. 3

        *The 3rd Letter of 21 July 2008* ........................................................... 5

        *The republications* ............................................................................. 8

        *The eventual IPO* ............................................................................. 10

THE PARTIES' RESPECTIVE CASES ................................................. 10

THE DECISION BELOW ....................................................................... 12

    THE JUDGE'S FINDINGS ON THE DEFAMATION CLAIM ................... 13

    THE JUDGE'S FINDINGS ON THE MALICIOUS FALSEHOOD CLAIM ... 18

THE PRESENT APPEAL ....................................................................... 19

THE ISSUES IN THIS APPEAL ............................................................ 20

WHAT IS THE NATURAL AND ORDINARY MEANING OF THE
WORDS COMPLAINED OF? ................................................................. 21

    THE THRESHOLD FOR APPELLATE INTERVENTION ........................ 21

    THE FIRST AND SECOND EXTENDED MEANINGS OF THE INDONESIAN
    PUBLICATIONS ................................................................................. 23

        *That the Appellant was seeking to mislead the public* ........................ 23

        *That the Appellant had committed a crime* ........................................ 27

    THE NATURAL AND ORDINARY MEANING OF THE REPUBLICATIONS ............. 29

*The republication of the 3rd Letter to Merrill Lynch Singapore in Singapore* ............................................................................... *30*

*The natural and ordinary meaning of the Indonesian and the Singapore Republications: the third defamatory meaning in Chase?* ..................... *31*

## WERE THE PUBLICATIONS AND REPUBLICATIONS MADE ON OCCASIONS OF QUALIFIED PRIVILEGE? .......................................... 37

IS THE SUBJECTIVE FRAME OF MIND OF THE RESPONDENT RELEVANT TO WHETHER QUALIFIED PRIVILEGE ATTACHES? ............................................... 37

REGARD TO A COUNTERVAILING DUTY ON THE RESPONDENT TO REFRAIN FROM PUBLICATION ...................................................................... 40

ARE THE COPIES OF THE 3RD LETTER SENT TO PARTIES OTHER THAN BAPEPAM PROTECTED BY QUALIFIED PRIVILEGE? .................................... 44

SUMMARY ................................................................................ 45

## ARE THE WORDS COMPLAINED OF FALSE AND WERE THEY PUBLISHED MALICIOUSLY? .......................................................... 46

ARE THE WORDS COMPLAINED OF FALSE? ................................................ 46

*Inconsistencies in the Respondent's assertions* ...................................... *49*

*The Respondent's inaction for 13 years* ................................................ *52*

*The evidence as to the circumstances of the alleged investment* ............ *53*

*Conclusion* ................................................................................ *54*

WERE THE WORDS COMPLAINED OF PUBLISHED WITH MALICE? .................. 54

EFFECT OF THESE CONCLUSIONS .............................................................. 57

## THE DEFAMATION CLAIM ....................................................... 58

CONCLUSION IN RESPECT OF LIABILITY FOR DEFAMATION ........................... 58

THE RELIEF AVAILABLE UNDER THE DEFAMATION CLAIM ........................... 58

*General damages and aggravated damages* .......................................... *58*

*Special damages* ...................................................................... *59*

*Injunction* .................................................................................................. 65

**THE MALICIOUS FALSEHOOD CLAIM** ............................................. 65

LIABILITY IN MALICIOUS FALSEHOOD ............................................................. 65

*Proving special damage* ................................................................................... 66

*Relying on s 6(1)(a) of the Defamation Act* .......................................... 71

ACTIONABILITY UNDER INDONESIAN LAW .................................................. 72

CONCLUSION IN RESPECT OF LIABILITY FOR MALICIOUS FALSEHOOD ........... 73

THE RELIEF AVAILABLE UNDER THE MALICIOUS FALSEHOOD CLAIM ............ 74

*Damages* ...................................................................................................... 74

*Injunction* .................................................................................................. 74

*Declaration* ............................................................................................... 74

**CONCLUSION** ............................................................................................ 77

> This judgment is subject to final editorial corrections approved by the court and/or redaction pursuant to the publisher's duty in compliance with the law, for publication in LawNet and/or the Singapore Law Reports.

## Low Tuck Kwong
v
## Sukamto Sia

### [2013] SGCA 61

Court of Appeal — Civil Appeal No 173 of 2012
Sundaresh Menon CJ, Chao Hick Tin JA and V K Rajah JA
3 July 2013

8 November 2013                                      Judgment reserved.

**V K Rajah JA (delivering the judgment of the court):**

**Introduction**

1       This is an appeal against the decision of the High Court, which is reported at *Low Tuck Kwong v Sukamto Sia* [2013] 1 SLR 1016 ("the Judgment"). The action was started by the appellant Low Tuck Kwong ("the Appellant") against the respondent Sukamto Sia ("the Respondent") following the publication of letters sent in 2008 by the Respondent in Indonesia to various persons and the subsequent republications of those letters in Indonesia and Singapore to other persons and various media. In brief, the contents of these letters alleged that the Appellant and the Respondent had sometime in 1995 or 1996 entered into an agreement whereby for the provision of some money, the Appellant would give to the Respondent half of the shares of the coal mining company he was intending to set up if he was successful in securing this deal. The Respondent therefore claimed ownership over 50% of

the shares of the Appellant's coal mining company and threatened legal action if his demands were not acceded to. These letters were published in the shadow of an impending Initial Public Offering ("IPO") of the Appellant's coal mining company. As a result, disclosures were made about the Respondent's claims to various parties involved in the IPO process and to the investing public, thereby causing republications of the Respondent's words.

2      The Appellant claimed against the Respondent in defamation and in malicious falsehood. The High Court judge ("the Judge") dismissed the Appellant's claims and it is from this decision that the Appellant appeals. A counterclaim brought by the Respondent against the Appellant for breach of contract, proprietary estoppel, constructive trust, breach of fiduciary duty and money had and received was also dismissed by the Judge. No cross-appeal was filed by the Respondent.

**Facts**

*The parties to the dispute*

3      The Appellant is the president commissioner and controlling shareholder of PT Bayan Resources Tbk ("PT Bayan"), a coal mining company listed on the Indonesian Stock Exchange ("the IDX"). The Respondent is a businessman. The two were close friends until 1997, after which they had an irreconcilable falling out.

*Background to the dispute*

4      In 2007, PT Bayan started preparing for its IPO on the IDX. In relation to the IPO, PT Trimegah Securities Indonesia Tbk ("PT Trimegah") was the domestic lead managing underwriter, Merrill Lynch (Singapore) Pte Ltd ("Merrill Lynch Singapore") (which was assisted by PT Merrill Lynch

*Low Tuck Kwong v Sukamto Sia*                                    [2013] SGCA 61

Indonesia ("Merrill Lynch Indonesia")) was the sole book runner and the lead international selling agent, and Macquarie Capital (Singapore) Pte Ltd ("Macquarie Singapore") was the co-lead manager and the international selling agent.

*The 1st and 2nd Letters of 10 and 15 July 2008 respectively*

5      On 10 July 2008, the Respondent's Indonesian lawyers, M/s Hotman Paris & Partners ("HPP") sent a letter to the Appellant and PT Bayan ("the 1st Letter).[1] This letter was in Bahasa Indonesia and a translation of it is as follows (where the translations provided by the Appellant and the Respondent differ materially, the Appellant's translation is in italics and in brackets while the Respondent's translation is underlined):

Law Firm

HOTMAN PARIS & PARTNERS

...

10 July 2008

To,

**PT BAYAN RESOURCES**          **Mr. Dato' Low Tuck Kwong**
[address]                       [address]

**Subject: LEGAL NOTICE**

Dear Sir,

We are acting on behalf of **SUKAMTO SIA** on the basis of a **Special Power of Attorney dated the 9 (Ninth) of July 2008.**

We herewith wish to **STRONGLY WARN Mr. DATO' LOW TUCK KWONG** and **PT BAYAN RESOURCES AND ITS COMPANY GROUP** to **SURRENDER AND RETURN** to our

---

[1]      Record of Appeal (Volume III) (Part B6) at pp 171–175; Record of Appeal (Volume III) (Part A5) at pp 254–257.

3

client the 50% (fifty percent) minimum of all the shares and interest in PT Bayan Resources and its company group.

This **LEGAL NOTICE** is based on the following **LEGAL FACTS**:

1.    In 1995 and at the beginning of 1996 Mr. Dato' Low Tuck Kwong was facing a financial crisis.

2.    After his financial failure, Mr. Dato' Low Tuck Kwong persuaded our client to <u>invest and facilitate</u> [*invest and provide facilities*] in the business of Coal Mining in Indonesia.

Mr. Dato' Low Tuck Kwong convinced our client that if our client <u>invests and facilitates the establishment of the coal mine</u> [*invested and provided the facilities for the coal mining establishment*], Mr. Dato' Low Tuck Kwong would guarantee that the investment would be worth a minimum of 500,000,000.00 USD (five hundred million US dollars) within 7 to 8 years, especially when the coal mining company was listed on the Indonesia Stock Exchange.

On the basis of that proposal, our client was persuaded by Mr. Dato' Low Tuck Kwong to <u>fund and facilitate the investment of the coal mine</u> [*invest and provide facilities for the coal mining business*] and Mr. Dato' Low Tuck Kwong did receive the money from our client to fund and to get the concession rights to the coal mine. Mr. Dato' Low Tuck Kwong promised that our client would get 50% (fifty percent) of all the shares in the coal mining company.

In light of their friendship and seeing Mr. Dato' Low Tuck Kwong's grave financial condition at the time, our client funded and facilitated the establishment of the coal mining company for Mr. Dato' Low Tuck Kwong, including acquiring the concession rights to the coal mine, which was then established under the name PT Bayan Resources.

Therefore, in accordance with the above legal facts, we **ARE DEMANDING THE RIGHT TO 50% (FIFTY PERCENT) OF THE SHARES IN PT BAYAN RESOURCES AND ITS ENTIRE COMPANY GROUP WITH THE CONSEQUENCES THAT IF OUR CLIENT'S RIGHTS ARE NOT DELIVERED IN THE NEAR FUTURE, OUR CLIENT WILL BRING A CIVIL AND CRIMINAL SUIT AGAINST MR. DATO' LOW TUCK KWONG, PT BAYAN RESOURCES AND ITS COMPANY GROUP.**

Thank you for your kind attention to this matter.

...

4

> [emphasis in bold in original; emphasis in italics and underline added]

6      PT Bayan's lawyers M/s Soenardi Richard Sekutu ("SRS") wrote back on 14 July 2008, asking for a copy of the Special Power of Attorney referred to in the 1st Letter ("the SRS Letter").[2] They received no response.

7      On 15 July 2008, HPP sent a second letter to the Appellant, PT Bayan and SRS ("the 2nd Letter"),[3] which was, save in one immaterial aspect, identical to the 1st Letter.

*The 3rd Letter of 21 July 2008*

8      On 21 July 2008, HPP sent a third letter to (a) the Chief of the Indonesian Capital Market and Financial Institutions Supervisory Agency ("BAPEPAM"), the Indonesian capital market regulator; (b) the Director in Chief of the IDX; (c) PT Trimegah; (d) Merrill Lynch Indonesia at a Jakarta address; and (e) PT Macquarie Securities Indonesia and PT Macquarie Konsultan at an Jakarta address identical to that of Merrill Lynch Indonesia ("the 3rd Letter").[4] This 3rd Letter enclosed the 1st Letter, the SRS Letter and the 2nd Letter. This 3rd Letter was likewise in Bahasa Indonesia and a translation of it is as follows (where the translations provided by the Appellant and the Respondent differ materially, the Appellant's translation is in italics and in brackets while the Respondent's translation is underlined):

---

[2]      Record of Appeal (Volume III) (Part B6) at pp 177–181; Record of Appeal (Volume III) (Part A5) at pp 259–263.

[3]      Record of Appeal (Volume III) (Part B6) at pp 183–188; Record of Appeal (Volume III) (Part A5) at pp 265–269.

[4]      Record of Appeal (Volume III) (Part B6) at pp 190–198; Record of Appeal (Volume III) (Part A6) at pp 4–24.

*Low Tuck Kwong v Sukamto Sia*                    [2013] SGCA 61

**Law Firm**

**HOTMAN PARIS & PARTNERS**

...

July 21, 2008

To

| | |
|---|---|
| **Capital Market Executive Agency(Bapepam)** [address] | **Indonesian Stock Exchange** [address] |

Att:    ...
         Chief
         [Head]

Att:    ...
         Director in Chief
         [Managing Director]

**Merrill Lynch**
Stock Exchange Building
Jakarta Tower I
18th Floor
Jenderal Sudirman St.
Kav. 52-53
Jakarta 12190

**Trimegah Securities Indonesia Ltd., Tbk**
[address]

**Macquarie Securities**
Stock Exchange Building Jakarta Tower I
8th Floor
Jenderal Sudirman St. Kav. 52-53
Jakarta 12190

[stamp]

**Macquarie Consultants**
Stock Exchange Building Jakarta Tower I
8th Floor
Jenderal Sudirman St. Kav. 52-53
Jakarta 12190

> **SUBJECT:**   **Request to restrain Bayan Resources Ltd. from going public (Initial Public Offering IPO) due to the ongoing dispute over ownership of Bayan Resources Ltd. with our Client**

Dear Sirs,

We are acting on behalf of **SUKAMTO SIA** on the basis of a **Special Power of Attorney dated 9 (Nine) July 2008**.

Through this letter, we are requesting that The Capital Market Executive Agency, the Indonesian Stock Exchange, Merrill Lynch Indonesia, Trimegah Securities Indonesia Ltd.,

Macquarie Securities, Macquarie Consultants **SUSPEND THE PROCESS OF GOING PUBLIC (INITIAL PUBLIC OFFERING) OF BAYAN RESOURCES LTD. BECAUSE AT THE PRESENT TIME BAYAN RESOURCES LTD. AND ITS ENTIRE COMPANY GROUP AS WELL AS MR DATO' LOW TUCK KWONG (THE OWNER OF BAYAN RESOURCES LTD.) ARE INVOLVED IN A LEGAL DISPUTE WITH OUR CLIENT** on the following grounds:

1.   Whereas, for your information, **OUR CLIENT IS THE PARTY THAT FUNDED AND FACILITATED** Mr. Dato' Low Tuck Kwong in establishing the coal mining company, including getting the concession rights to the coal, now called Bayan Resources Ltd.

2.   From the start, Mr. Dato' Low Tuck Kwong tried to convince our client that if our client invests and facilitates in the establishment of the coal mine, Mr. Dato' Low Tuck Kwong guarantees that the investment would be worth a minimum of USD 500,000,000.00 (five hundred million United States dollars) within 7 to 8 years, especially when the coal mining company is listed on the Indonesia Stock Exchange.

3.   Whereas, on the basis of that proposal, our client was persuaded by Mr. Dato' Low Tuck Kwong to <u>fund and facilitate the investment in</u> [*invest and provide facilities for*] the coal mining company and Mr. Dato' Low Tuck Kwong did receive the money from our client to fund and to get the concession rights to the coal mine. Mr. Dato' Low Tuck Kwong promised that our client would get 50% (fifty percent) of all the shares in the coal mine.

4.   Finally, in light of their friendship and seeing Mr. Dato' Low Tuck Kwong's grave financial condition at that time, our client <u>funded and provided facilities</u> [*invested and provided funds*] for Mr. Dato' Low Tuck Kwong to fund the development of the coal mining company, including to get the concession rights to the coal, which was then established under the name Bayan Resources Ltd. and its company group.

However, it turned out that Mr. Dato' Low Tuck Kwong **NEVER GAVE** the rights to 50% (fifty percent) of the shares in Bayan Resources Ltd. and its entire company group to our client, the investor and Mr. Dato' Low Tuck Kwong **NEVER INFORMED NOR ASKED PERMISSION** from our client pertaining to a plan for Bayan Resources Ltd. to go public.

7

*Low Tuck Kwong v Sukamto Sia*                                    [2013] SGCA 61

Whereas our client has issued a warning to Mr. Dato' Low Tuck Kwong through a Legal Notice No. 0175/0425.01/MA dated 10 July 2008, but as of now there has been no response from Bayan Resources Ltd. and Mr. Dato' Low Tuck Kwong, and we have only received a letter from Bayan Resource's Legal Counsel, which **DID NOT REPLY** in any material way to our Legal Notice.

On the basis of the above-mentioned facts, we wish to inform you that **IN THE NEAR FUTURE OUR CLIENT WILL SEEK ALL UNYIELDING LEGAL ACTIONS, IN CIVIL OR CRIMINAL LITIGATION VENUES AGAINST BAYAN RESOURCES LTD. AND ITS ENTIRE COMPANY GROUP, INCLUDING AGAINST MR DATO' LOW TUCK KWONG PERSONALLY.**

And

Therefore we are requesting that the Capital Market Executive Agency, Indonesia Stock Exchange, Merrill Lynch Indonesia, Trimegah Securities Indonesia, Ltd., Macquarie Securities and Macquarie Consultants **PROHIBIT BAYAN RESOURCES LTD. AND THE ENTIRE COMPANY GROUP FROM GOING PUBLIC (INITIAL PUBLIC OFFERING) SO AS NOT TO CAUSE ANY LOSSES TO A THIRD PARTY AND TO AVOID ANY LAWSUITS BY OUR CLIENT.**

Thank you for your kind attention to this matter.

...

**Attachment:**

- Legal Notice dated July 10, 2008 No.0175/0435.01/MA
- Legal Notice dated July 15, 2008 No.0177/0425.01/MA
- Legal Notice dated July 14, 2008 No.SRS/20-34/111/VII/2008

[emphasis in bold in original; emphasis in italics and underline added]

*The republications*

9       According to the Appellant, the 1st, 2nd and 3rd Letters (collectively, "the Letters" or "the Indonesian Publications") were, as a result of their primary publication by the Respondent, republished in Indonesia and in Singapore.

8

10      The Appellant averred that the extent of the republication in Indonesia was as follows:

> (a)     the 1st Letter and the 2nd Letter from PT Bayan to BAPEPAM on 18 July 2008[5] and the 1st Letter from the Appellant to BAPEPAM on 18 July 2008;[6]
>
> (b)     the 3rd Letter from Merrill Lynch Singapore to PT Bayan;[7] and
>
> (c)     the Letters or their summarised content in, but not limited to, two Indonesian newspapers, *Suara Pembaruan* on 5 August 2008[8] and *Bisnis Indonesia* on 6 August 2008,[9] and PT Bayan's Indonesian Final Prospectus ("the Indonesian Final Prospectus") dated 6 August 2008[10]
>
> (collectively, "the Indonesian Republications").

11      The Appellant further averred that the extent of the republication in Singapore was as follows:

> (a)     the 1st Letter from the Appellant to Merrill Lynch Singapore and the 3rd Letter from Merrill Lynch Indonesia to Merrill Lynch Singapore;[11] and

---

[5]     Record of Appeal (Volume V) (Part A1) at pp 37–55.

[6]     Record of Appeal (Volume V) (Part A1) at pp 27–36.

[7]     Appellant's Core Bundle (Volume 2) at p 137.

[8]     Record of Appeal (Volume V) (Part A1) at pp 107–108.

[9]     Record of Appeal (Volume V) (Part A1) at pp 109–110.

[10]    Record of Appeal (Volume V) (Part A1) at pp 111–116.

[11]    Appellant's Core Bundle (Volume 2) at p 137.

(b)     the Letters or their summarised content in PT Bayan's Pricing Supplement to the Preliminary Offering Memorandum and PT Bayan's International Final Offering Memorandum[12]

(collectively, "the Singapore Republications").

*The eventual IPO*

12      According to the Appellant, the immediate result of the 3rd Letter was that BAPEPAM informed PT Bayan's IPO advisors that they "would have to clear any disputes on the shares before the IPO could proceed".[13] The Appellant and PT Bayan were advised by the IPO advisors to remove his planned vendor shares offer and these were replaced by vendor shares offered by other shareholders. On 24 July 2008, PT Bayan accordingly informed BAPEPAM and IDX that the Appellant would withdraw his shares from the IPO vendor shares sale, and that other PT Bayan shareholders would sell more shares to make up the shortfall. On 4 August 2008, BAPEPAM issued an Effective Statement which allowed the IPO to proceed. The IPO was launched on 12 August 2008, four days later than originally planned and without the Appellant's vendor shares.

**The parties' respective cases**

13      The Appellant's claims in the court below were in the torts of defamation and malicious falsehood. It was the Appellant's case that the Indonesian Publications, the Indonesian Republications and the Singapore

---

[12]     Record of Appeal (Volume V) (Part A1) at pp 98–100.

[13]     Record of Appeal (Volume III) (Part A1) at p 5 (Affidavit of Evidence-in-Chief of Kwan Jenny Quantero affirmed on 17 July 2012 at para 8).

*Low Tuck Kwong v Sukamto Sia*                                   [2013] SGCA 61

Republications were defamatory. The Appellant's case as pleaded was that in their natural and ordinary meaning, the words complained of held the following meanings, *viz*, that the Appellant:[14]

(a)    having induced the Respondent to invest in a coal mining business, now known as PT Bayan, in return for 50% of the shares of that business, has reneged on his part of the bargain;

(b)    is seeking to mislead the public in relation to his shareholding in PT Bayan ("the first extended meaning"); and

(c)    has therefore acted dishonourably and has committed a crime ("the second extended meaning").

The Appellant's further and alternative claim in malicious falsehood was that the words complained of were false and that they were publish maliciously by the Respondent.[15]

14    It was claimed that as a result of the above:

(a)    the Appellant's reputation was damaged and he suffered hurt, distress and embarrassment;

(b)    the Appellant was not able to sell 375,000,000 vendor shares in the IPO at the price of 5,800 rupiah per share for 2.175 trillion rupiah; and

---

[14]    Record of Appeal (Volume II) (Part 1) at pp 10 *et seq* (Statement of Claim (Amendment No 6) at para 13).

[15]    Record of Appeal (Volume II) (Part 1) at pp 10 *et seq* (Statement of Claim (Amendment No 6) at para 20).

(c)   the Appellant lost the opportunity to use and invest 2.175 trillion rupiah.

15    The Respondent's pleaded case was essentially that there was a common understanding with the Appellant, to whom he had in 1995 given S$3m to "invest and facilitate" the Appellant's establishment of an Indonesian coal mining business, on the basis that if it was established, he would have a 50% share in the business and if not, he would return the amount ("the Common Understanding").[16] He thus denied the defamation and the malicious falsehood. It was also on the basis of the truth of this Common Understanding that he advanced his counterclaim for breach of contract, proprietary estoppel, constructive trust, breach of fiduciary duty and money had and received. As noted above, these counterclaims were dismissed by the Judge and no appeal has been filed in respect of them.

**The decision below**

16    As some of the torts alleged were committed in Indonesia, the action having been brought in Singapore, it was common ground that the double-actionability rule applied. In respect of the claims in defamation for the Indonesian Publications and the Indonesian Republications, and the claim in malicious falsehood, all of which were committed in Indonesia, the Judge held that the double-actionability rule in *Boys v Chaplin* [1971] AC 356 as applied in Singapore in *JIO Minerals FZC and others v Mineral Enterprises Ltd* [2011] 1 SLR 391 at [88] required that the Appellant show that they were actionable under both Singapore and Indonesian law. In respect of the

---

[16]   Record of Appeal (Volume II) (Part 1) at pp 101–102 (Defence and Counterclaim (Amendment No 5) at paras 8(e)–(f)).

Singapore Republications, the Appellant was only required to show that they were actionable in Singapore (see the Judgement at [16]). This meant that assuming the required actionability is made out, to avoid liability, the Respondent had to show, in respect of the Indonesian Publications and the Indonesian Republications, that he has a defence under either Singapore law or Indonesian law, and, in respect of the Singapore Republications, that he has a defence under Singapore law.

17     As is evident, there were many discrete issues which fell to the Judge to decide. These issues straddled both Singapore law and Indonesian law. Where the issues engaged questions of Indonesian law, the Judge heard expert evidence given by Indonesian lawyers who testified on behalf of the respective parties.

18     It is also relevant to state that the trial of the matter was bifurcated by an Order of Court dated 22 October 2009 pursuant to O 33 of the Rules of Court (Cap 322, R 5, 2006 Rev Ed) ("the Rules of Court") for damages to be assessed separately from liability. Consequently, the Judge only had to decide issues relating to liability and so did not address issues relating to the assessment of damages.

### *The Judge's findings on the defamation claim*

19     Given the nature of the present claim and the many factual and legal sub-issues which arise from it, the Judge's findings on the defamation claim are numerous. Where necessary, we will elaborate on the Judge's findings, but for the most part we only set out in a summarised and tabular form the findings of the Judge which are relevant for the purposes of this appeal. The Judge's findings were:

*Low Tuck Kwong v Sukamto Sia*                                      [2013] SGCA 61

(a)     In respect of actionability under Singapore law and Indonesian law and accordingly whether the double actionability rule is satisfied, the Judge found:

|  | Singapore Law | Indonesian Law | Result |
|---|---|---|---|
| *The Indonesian Publications* | Actionable[17] | Actionable[18] | Maintainable |
| *The Indonesian Republications* | Actionable[19] | Actionable[20] | Maintainable |
| *The Singapore Republications* | Actionable[21] | Not Applicable | Maintainable |

(b)     The Judge held that to an ordinary reasonable person using his general knowledge and common sense, and in the context of an imminent IPO, the defamatory meaning of the Indonesian Publications is that the Appellant and the Respondent had some private arrangement or understanding to account for and deliver 50% of PT Bayan's shares, which the Appellant had not performed, *viz*, the first pleaded meaning as advanced by the Appellant (see above at [13(a)]), and that this would tend to lower the Appellant in the estimation of right-thinking

---

[17]     Judgment at [18]–[24].

[18]     Judgment at [25]–[32].

[19]     Judgment at [37]–[39].

[20]     Judgment at [40]–[41].

[21]     Judgment at [42]–[44].

members of society generally or impute a lack of integrity.[22] The Judge rejected the first extended meaning, that is, that the Appellant was seeking to mislead the public in relation to his shareholding, *viz*, the second pleaded meaning as advanced by the Appellant (see above at [13(b)]).[23] The Judge did not deal with the second extended meaning, that is, that he had acted dishonourably and had committed a crime (see above at [13(c)]).

(c)     Having regard to the principle that "the antidote" must be taken with "the bane" (see *Lim Eng Hock Peter v Lin Jian Wei and another* [2009] 2 SLR(R) 1004 ("*Lim Eng Hock Peter*") at [92]), and having regard to the fact that most of the Indonesian Republications contained denials of and responses to the Respondent's claim, the Judge held that the Indonesian Republications (save for the republication of the 3rd Letter by Merrill Lynch Singapore to PT Bayan) carries a third level defamatory meaning as defined in *Chase v Newsgroup Newspapers Ltd* [2003] EMLR 218 ("*Chase*").[24] In other words, that there were reasonable grounds for investigating if the Appellant had an agreement or understanding with the Respondent which he had not performed, as alleged by the Respondent and as denied by the Appellant. As regard the republication of the 3rd Letter by Merrill Lynch Singapore to PT Bayan, the Judge was of the view that because this contained the full text of the 3rd Letter and nothing more, it carried the same defamatory meaning as the 3rd Letter. The Judge was of the view that

---

[22]     Judgment at [23].

[23]     Judgment at [24].

[24]     Judgment at [38].

the Respondent is responsible for the Indonesian Republications as they were the natural and probable result of the Indonesian Publications.[25]

(d)     As regard the Singapore Republication, the Judge held that there was no evidence that the 3rd Letter was sent to Merrill Lynch Singapore.[26] The Judge then found that the rest of the Singapore Republications (save for the republication of the 1st Letter by the Appellant to Merrill Lynch Singapore), carried the third defamatory meaning as defined in *Chase*.[27] The republication of the 1st Letter by the Appellant to Merrill Lynch Singapore was held to hold the same defamatory meaning as the 1st Letter, as it contained the full text of it without more.[28] Again, these findings were premised on the Judge's holding that these republications were the natural and probable result of the Indonesian Publications.[29]

(e)     On the applicability of the defences, the Judge found:

| | **Singapore Law** | **Indonesian Law** |
|---|---|---|
| Singapore Law Defences | | |
| *Justification* | Does not apply[30] | - |

---

[25]     Judgment at [39].

[26]     Judgment at [42].

[27]     Judgment at [44].

[28]     Judgment at [44].

[29]     Judgment at [44].

[30]     Judgment at [46]–[53].

*Low Tuck Kwong v Sukamto Sia*                              [2013] SGCA 61

| | | |
|---|---|---|
| *Absolute Privilege* | Does not apply[31] | - |
| *Qualified Privilege* | Applies[32] | - |
| Indonesian Law Defences | | |
| *Public Interest Defence* | - | Does not apply[33] |
| *Necessary Defence* | - | Does not apply[34] |

(f)      The defence of qualified privilege applied because the "duty-interest" test in *Adam v Ward* [1917] AC 309 at 334 ("*Adam v Ward*") was satisfied.[35] It was accepted that if it was shown that the publications were made by the Respondent with malice, this would defeat the defence of qualified privilege. In this respect the Judge found that the Respondent believed in the truth of his claim as alleged in the Indonesian Publications,[36] and that as a result of such honest belief on the Respondent's part, the Appellant did not satisfactorily prove the malice that would defeat the defence.[37]

Since the defence of qualified privilege in Singapore law applied to the Indonesian   Publications   and   Republications,   and   the   Singapore

---

[31]      Judgment at [54]–[61].

[32]      Judgment at [62]–[72].

[33]      Judgment at [74]–[75].

[34]      Judgment at [76].

[35]      Judgment at [62].

[36]      Judgment at [66].

[37]      Judgement at [70].

*Low Tuck Kwong v Sukamto Sia*                    [2013] SGCA 61

Republications, the Judge held that the claim in defamation failed and it was for that reason dismissed.

20      For completeness, the Judge also dealt with the issue of the heads of relief available to the Appellant for the tort of defamation under Singapore law and Indonesian law as follows:

|                    | Singapore Law | Indonesian Law |
|--------------------|---------------|----------------|
| *General damages*  | Yes           | Only to the extent it was caused by damage to reputation; therefore, excludes loss of profit/ opportunity[38] |
| *Special damages*  | Did not decide[39] | |
| *Aggravated damages* | No[40]      | Yes[41]        |
| *Injunction*       | No[42]        | Yes[43]        |

### *The Judge's findings on the malicious falsehood claim*

21      The Judge also found that the Appellant did not prove falsehood[44] and malice (for the same reasons explained at [19(f)] above)[45] required to found

---

38      Judgment at [85].

39      Judgment at [81].

40      Judgment at [80].

41      Judgment at [86].

42      Judgment at [82].

43      Judgment at [86].

44      Judgment at [92].

45      Judgment at [92].

the claim in malicious falsehood under Singapore law. Accordingly, the Judge did not consider whether the tort is actionable under Indonesian law. The claim in malicious falsehood was thus dismissed.

**The present appeal**

22      In Civil Appeal No 173 of 2012, the Appellant appeals against several aspects of the Judge's dismissal of his claim:

>       (a)      First, *vis-à-vis* the claim in defamation, the Appellant takes issue with the Judge's refusal to accept that the words complained of had the first and second extended meanings.

>       (b)      Second, he disputes that the defence of qualified privilege attaches to the Indonesian Publications, Indonesian Republications and Singapore Republications (collectively, "the Publications and Republications") and appeals against the Judge's rejection of his assertion that the Publications and Republications were published with actual malice which would defeat the defence. The issue of malice is relevant also to the Appellant's claim in malicious falsehood.

>       (c)      Third, the Appellant appeals against the Judge's finding that he had not proved falsity in respect of the Indonesian Publications and consequently in respect of the Indonesian Republications and Singapore Republications as well.

>       (d)      Fourth, the Appellant makes submissions on the issue of causation of special damage under both the defamation and the malicious falsehood claims. This issue was not addressed by the Judge.

(e)     Fourth, the Appellant appeals against the Judge's findings on the available heads of relief under both the defamation and the malicious falsehood claims. Under the defamation claim, the Appellant argues that he is entitled to aggravated damages and an injunction; under the malicious falsehood claim, he argues that he is entitled to an injunction and a declaration.

(f)     Fifth, the Appellant appeals against the Judge's finding under Indonesian law that in a claim in defamation, he is not entitled to damages for loss of opportunity. Two arguments are advanced for such purpose. One, it is argued that a claim in defamation can be brought in Indonesia under both Arts 1372 and 1365 of the Indonesian Civil Code, and not only the former, which was the finding of the Judge. Under Art 1365, the Appellant argues that he is entitled to damages for loss of opportunity. Two, it is argued that damages available under Art 1365 are also available in a claim under Art 1372.

(g)     Last, the Appellant submits that the tort of malicious falsehood is actionable under Indonesian law.

23     It bears mention that in response, the Respondent does not seek to reverse the aspects of the Judge's findings which are adverse to him. He only makes submissions seeking to uphold the aspects of the Judge's findings against which the Appellant has appealed.

**The issues in this appeal**

24     In our view, the main issues in this appeal may be summarised as follows:

(a)    What is the natural and ordinary meaning of the words complained of?

(b)    Were the Publications and Republications made on occasions of qualified privilege?

(c)    Are the words complained of false and were they published maliciously?

(d)    What are the reliefs available to the Appellant if his claims are made out?

## What is the natural and ordinary meaning of the words complained of?

### *The threshold for appellate intervention*

25    The parties took diametrically opposed views as to what the threshold for appellate intervention in respect of findings of a trial judge as to the natural and ordinary meaning of defamatory words should be. Quite unsurprisingly, the Appellant takes a more liberal view on the scope for appellate intervention and suggests that an appellate court is in as good a position as a trial judge in making such a determination. This is because, it is argued, it is simply a matter of reading the words and determining in the light of the well-established principles of interpretation the natural and ordinary meaning an ordinary reasonable person would understand the words to bear (citing *Evans on Defamation in Singapore and Malaysia* (Keith R Evans gen ed) (LexisNexis, 3rd Ed, 2008) ("*Evans on Defamation*") at pp 21–22). In contrast, the Respondent advocates a more restrictive approach. In *Skuse v Granada Television Limited* [1996] EMLR 278 ("*Skuse*") at 287, the English Court of Appeal, while recognising that this was not an exercise based on the assessment of the reliability of witnesses and that the material before the

appellate court is the same as that before the trial judge, held that an appellate court nevertheless ought not to disturb the trial judge's finding unless it was "quite satisfied [that] he was wrong".

26      In our view, the two contrasting positions put forth are much ado about nothing. A plain reading of *Evans of Defamation* understates the case, whereas the decision in *Skuse* does not in fact state the position as being quite so extreme. While in Singapore our judges are the sole deciders of fact and law, this does not mean that the distinction between the two no longer holds true. It is therefore incorrect to assume that an appellate court would be willing to interfere in this respect as readily as it would in respect of questions of law. It remains that a trial judge's finding on the natural and ordinary meaning of the words complained of is a finding of fact. We acknowledge the difficulties a trial judge faces in making such determinations. Salmon LJ put it quite candidly in *Slim and Others v Daily Telegraph Ltd and Others* [1968] 2 QB 157 ("*Slim v Daily Telegraph*") at 187:

> I am very conscious of the difficulty which a judge faces in trying to ascertain the meaning which the ordinary layman would attribute to words which he reads in his newspaper. Much of a judge's time is spent in construing statutes and legal documents—an apparently similar task to the one which now confronts us, but a task which, in reality, requires a different technique. There have been many differences of judicial opinion even on the question of what words are capable of meaning to the ordinary layman, see, e.g., *Lewis v. Daily Telegraph Ltd*. The principles are easy to formulate but difficult to apply. They were never better formulated than they were in *Capital and Counties Bank v. Henty* nor perhaps ever worse applied. It was there held that the words complained of were incapable of meaning to ordinary men that the bank was in financial difficulties, yet they caused a run on the bank whose customers, presumably, were ordinary men. If it is difficult to decide whether words are capable of a defamatory meaning, it is still more difficult to decide what they in fact are likely to mean to the ordinary layman.

27      Due deference should sensibly be accorded to a trial judge's finding as to the natural and ordinary meaning of the words complained of. Accordingly, it is not sufficient for an appellant merely to show that one meaning is *preferable* to another. An appellate court will not intervene and disturb a trial judge's finding in this respect unless it is satisfied that the he was wrong. On the other hand, the requirement plainly does not amount to the same high threshold as in the case where a factual finding is made by a trial judge on an assessment of oral evidence.

### *The first and second extended meanings of the Indonesian Publications*

#### *That the Appellant was seeking to mislead the public*

28      The Appellant contends that in addition to the Judge's finding that the Indonesian Publications bear the natural and ordinary meaning that there was a legal dispute between the parties relating to the PT Bayan shares, *ie*, that they had a private arrangement under which the Appellant was to account for and deliver 50% of the shares and the Appellant had not performed, the Judge ought also to have found that they carried the meaning that the Appellant was seeking to mislead the public in relation to his shareholding in PT Bayan. Reliance is placed by the Appellant on the context in which the Indonesian Publications were made. The Appellant argues that given the context of an imminent IPO, which is an initial public offering to the public in which the Appellant was represented to be the controlling shareholder of PT Bayan, the ordinary reasonable person would understand the Indonesian Publications to mean that the Appellant was seeking to mislead the public.

29      This meaning which the Appellant advances is not plain from the language of the Indonesian Publications themselves. The Appellant's argument must be that the meaning is derived by way of an inference, *ie*, on

the basis that "the ordinary reasonable reader ... can read between the lines
and draw inferences" (see *Chan Cheng Wah Bernard and others v Koh Sin
Chong Freddie and another appeal* [2012] 1 SLR 506 ("*Chan Bernard*") at
[18(c)]). This meaning was rejected by the Judge, albeit summarily, without
detailed reasons. Nevertheless, the Judge perhaps ought not to be faulted in
this regard, bearing in mind that the difficulties involved and realities of
making such a determination (see *Slim v Daily Telegraph*, above at [26]) and
given that such a determination is ultimately an exercise drawing on the
Judge's experience as to the workings of the mind of a layman. The
Appellant's arguments may, in the light of the fact that the letters were sent to
IPO professionals, appear convincing. IPO professionals, in this context, may
be more ready to infer the meaning that the Appellant is asserting, and most
certainly more readily than the ordinary reasonable person. That however, is
not the applicable test. The test here is what the *ordinary reasonable person*
would infer in the given context of an IPO.

30     At the hearing before us, counsel for the Appellant, Mr Davinder
Singh SC ("Mr Singh") sought to persuade us specifically that the 3rd Letter
(see above at [8]) held the extended defamatory meaning by emphasising two
particular aspects of it. First, it was emphasised that in the 3rd Letter, it is
stated that the Appellant had not obtained the authorisation of the Respondent
to proceed with the IPO. Second, in the 3rd Letter, the Respondent demands
that the addressees not proceed with the IPO, and threatens that he would
otherwise take legal action against them. On the basis of these specific words,
Mr Singh submitted that the Appellant's first extended meaning as pleaded is
"no more and no less" than what is stated in the 3rd Letter. We do not see how
Mr Singh's reliance on these specific words in the 3rd Letter adds anything.
Mr Singh's first point was that it could be inferred from the suggestion that the
Appellant had not obtained authorisation from the Respondent that the

Appellant had misled the public as to the true shareholding of the company because PT Bayan could only have reached that stage of the IPO thus far if the Appellant had the requisite shareholding to authorise it. We do not think that it is right to say that this is something an ordinary reasonable reader should be taken as capable of inferring. In so far as Mr Singh's reliance on the threat of legal proceedings against the addressees of the 3rd Letter should they fail to accede to the demand to halt the IPO process reinforces the first point, the same can be said of it.

31      It is apparent to us that much of the Appellant's argument on this issue rode, albeit subtly so, on the fact that the Indonesian Publications were sent to and read by persons familiar with the IPO context. If, however, this was his case, the claim would have been more plausible had he pleaded an innuendo instead of relying on the natural and ordinary meaning of the words. In pleading an innuendo, the Appellant would prove certain extrinsic facts and that these extrinsic facts were known to the readers. In the present context, these extrinsic facts may include the legal and regulatory context of an IPO, the documents already published in the IPO process up till the point in time that the Indonesian Publications were made, and also the specialised knowledge of IPO professionals. In our view, the extended meaning that the Appellant seeks to attribute to the Indonesian Publications requires the reader to have, amongst other things, the knowledge of these extrinsic facts. This, however, was not the Appellant's pleaded case.

32      In *Chan Bernard* (at [26]), this Court held that the context of the statements in question included previous annual general meetings of the Singapore Swimming Club and the issues discussed therein, as well as previous publications, and thus the ordinary reasonable reader was held to be a "reasonably interested Club member" [original emphasis omitted] with such

*Low Tuck Kwong v Sukamto Sia* [2013] SGCA 61

knowledge. Accordingly, it was held that the statement in question held the defamatory meaning that the plaintiff had deliberately misled club members. This raises the issue in the present case as to where the line between the context of a publication and extrinsic facts supporting an innuendo lies. Sir Brian Neill *et al, Duncan and Neill on Defamation* (LexisNexis, 3rd Ed, 2009) (*"Duncan and Neill"*) at para 5.20 notes that there are *dicta* suggesting that regard must be had to the particular class or group of people to whom the words were published. In our view, however, this goes towards the level of care and attention the reader would pay in reading and interpreting the words complained of. The knowledge of such class of persons is quite a separate consideration altogether. In *Gordon Berkeley Jones v Clement John Skelton* [1963] 1 WLR 1362 at 1370–1371, the Judicial Committee of the Privy Council explained what is meant by the natural and ordinary meaning:

> The ordinary and natural meaning of words may be either the literal meaning or it may be an implied or inferred or an indirect meaning: any meaning that does not require the support of extrinsic facts passing beyond general knowledge but is a meaning which is capable of being detected in the language used can be a part of the ordinary and natural meaning of words. ... The ordinary and natural meaning ***may therefore include any implication or inference which a reasonable reader guided not by any special but only by general knowledge*** and not fettered by any strict legal rules of construction would draw from the words. [emphasis added in bold italics and underline]

The test is whether what is being relied on can fairly be treated as part of the ordinary reasonable person's "general knowledge". We are of the view that the first extended meaning that the Appellant argues that the Letters bear is not a meaning which can be reached without, *inter alia*, an appreciation of the legal and regulatory context of an IPO, and this is not something which can be taken as within the "general knowledge" of the ordinary reasonable person even in the IPO context. For these reasons, we reject the Appellant's arguments for the

first extended meaning, that is, that the Appellant was seeking to mislead the public.

*That the Appellant had committed a crime*

33     As we have noted, the Judge did not, in the Judgment, deal with the Appellant's second extended meaning, that is, that the Appellant had acted dishonourably and committed a crime. To begin, it was not clear to us what the Appellant meant when he pleaded that the words held the meaning that he had committed a crime. It was unclear from the pleadings whether such crime referred to the alleged failure of the Appellant to honour the alleged promise, or whether it was the act of misleading of the public. When queried, Mr Singh clarified that it was the latter.

34     This meaning is likewise not express from the plain words of the Letters. For the same reasons we reject the first extended meaning that the Appellant was seeking to mislead the public, we would also reject this second extended meaning. We do not think that the ordinary reader would infer such a meaning. This meaning requires several logical steps. First, since the crime alleged is premised on the act of misleading the public, this meaning cannot be sustained because, as we have already explained above, we do not accept that the Letters carry the meaning of the Appellant having misled or seeking to mislead the public. Second, there needs to be an understanding of the fact that to so mislead the public is a crime. It is not apparent that an ordinary reasonable reader with only the appropriate general knowledge would come to this meaning. We were specifically referred by Mr Singh to that fact that in all three Letters, it is stated that the Respondent would seek to bring "criminal suit" against the Appellant if his demands were not acceded to. In our view, the mere mention of the words "criminal suit" does not necessarily impute the

meaning that a crime had been committed. The use of those words must be examined in the context of the entirety of each letter. The 1st Letter and the 2nd Letter were written as legal demands addressed to PT Bayan and the Appellant. In this context, we do not think that the fact that the words "criminal suit" are used at in the penultimate paragraph of the two letters plainly impute the meaning that a crime had been committed. The "criminal suit" is described as a possible consequence of the Appellant not acceding to the Respondent's request to deliver up 50% of the shares in PT Bayan. The mere statement that criminal suit will be brought against the Appellant does not mean that a crime *had been* committed. As regard the repetition of the same in the 3rd Letter, it also does not impute the meaning that the Appellant argues that it does.

35      Finally, the Appellant relies on a passage in the cross-examination of the Respondent at the trial below. When cross-examined by Mr Singh, the Respondent admitted that when he said he was going to start "criminal suit", he understood it to mean that a crime had been committed:[46]

> Q:    Then what do you mean when you say that you're going to start criminal litigation in this letter and the earlier letters when you said you will bring criminal suit?
>
> ...
>
> Court: What do you understand by "criminal proceedings"?
>
> ...
>
> A:     Criminal proceedings, that means you report to the police authority.
>
> Court: *That means a crime has been committed?*

---

[46]      Appellant's Case at para 37; Appellant's Core Bundle (Volume 2) at pp 21–22.

*Low Tuck Kwong v Sukamto Sia*                              [2013] SGCA 61

> A:      *Yeah, something like that, yes.*
>
> [emphasis added]

36      It is trite law in Singapore that the meaning intended by the publisher is irrelevant for the purposes of determining what meaning the words complained of bear. This is because the test is an objective one (see *Chan Bernard* at [18(b)]). This principle, founded on venerable authority (see *E Hulton & Co v Jones* [1910] AC 20 at 23, *Cassidy v Daily Mirror Newspapers, Limited* [1929] 2 KB 331 at 354), makes eminent sense. Just as a defendant is not allowed to defend himself by showing that he did not intend to defame, a plaintiff does not succeed in his claim for defamation merely because the defendant acknowledges an intention to defame. All depends on the words actually used. Diplock LJ in *Slim v Daily Telegraph* (at 172) explained:

> ... What is the "natural and ordinary meaning" of words for the purposes of the law of libel? *One can start by saying that the meaning intended to be conveyed by the publisher of the words is irrelevant.* However evil the imputation upon the plaintiff's character or conduct he intended to communicate, it does not matter if, in the opinion of the adjudicator upon the meaning of the words, they did not bear any defamatory meaning. However innocent an impression of the plaintiff's character or conduct the publisher of the words intended to communicate, it does not matter if, in the opinion of the adjudicator upon the meaning of words, they did bear a defamatory meaning. ... [emphasis added]

37      We therefore reject the contention that the Letters carried the meaning that the Appellant had committed a crime.

### *The natural and ordinary meaning of the republications*

38      At this juncture, we note that the reason the Respondent is responsible for the Indonesian and the Singapore Republications (if proven) even though they may not have been made by him personally is because they were the

29

*Low Tuck Kwong v Sukamto Sia*                                    [2013] SGCA 61

natural and probable consequence of the Indonesian Publications (see *Goh Chok Tong v Jeyaretnam Joshua Benjamin* [1997] 3 SLR(R) 46 at [127]) (see also the Judgment at [39] and [44]). This has not been challenged on appeal.

*The republication of the 3rd Letter to Merrill Lynch Singapore in Singapore*

39      We first deal with the finding of the Judge that the Appellant had not proven that there was a republication of the 3rd Letter from Merrill Lynch Indonesia to Merrill Lynch Singapore in Singapore (see the Judgment at [42]). The Judge said that there was no evidence of such republication. The Appellant pointed us to an email sent from Merrill Lynch Indonesia to Merrill Lynch Singapore[47] to substantiate its assertion. The Respondent, on the other hand, does not dispute that the email was sent, but instead argues that such an email should not be taken as a republication in Singapore because this was, he says, a mere "forwarding" of documents from one employee to another within a global organisation, with no distinction between the various Merrill Lynch offices located in different countries.[48]

40      We are unable to accept the Judge's holding that there was no evidence of such republication. The email cited is clearly such a republication. We therefore reject the Respondent's argument. In the law of defamation, each communication of a defamatory matter to a publishee is taken as a separate publication, such that if a letter is read by a series of persons in turn, in truth, a series of publications take place (see *The Duke of Brunswick and Luneberg v Harmer* (1849) 14 QB 185 and *Berezovsky v Michaels and Another* [2000]

---

[47]     Appellant's Core Bundle (Volume 2) at p 137.

[48]     Respondent's Case at paras 37–38.

*Low Tuck Kwong v Sukamto Sia* [2013] SGCA 61

1 WLR 1004 at 1012). *Duncan and Neill* (at para 8.07) observe that in practice, a plaintiff sues in respect of all the communications as though they constitute a single publication and the number of individual communications is taken as relevant to the issue of damages. The Respondent's argument that internal communication within a global entity cannot be considered a republication is inconsistent with this analysis. We cannot agree with the Respondent. Even within an organisation, each communication is in truth a publication in itself.

41     We therefore find that there was in fact a republication of the 3rd Letter to Merrill Lynch Singapore in Singapore. As this republication contained the full text of the 3rd Letter without more, its meaning must be that of the 3rd Letter itself.

*The natural and ordinary meaning of the Indonesian and the Singapore Republications: the third defamatory meaning in* Chase?

42     The Judge held that the Indonesian republication of the 3rd Letter by Merrill Lynch Singapore to PT Bayan and the Singapore republication of the 1st Letter by the Appellant to Merrill Lynch Singapore which comprised of the text of the 3rd Letter and 1st Letter respectively without more, hold the meanings of the 3rd and 1st Letters accordingly (see the Judgment at [38] and [44] respectively). We would say the same of the Singapore republication of the 3rd Letter from Merrill Lynch Indonesia to Merrill Lynch Singapore (see above at [41]). As for the other Indonesian and Singapore Republications (which we will refer to as "the republications in question"), the Judge held that they hold the third defamatory meaning in *Chase*, *viz*, that there are grounds for investigating whether the Appellant had an agreement or understanding with the Respondent which had not been performed (see the Judgment at [38]

and [44] respectively). In *Chase*, the English Court of Appeal held, *per* Brooke LJ (at [45]):

> The sting of a libel may be capable of meaning that a claimant *has in fact committed* some serious act, such as murder. Alternatively it may be suggested that the words mean that there are *reasonable grounds to suspect* that he/she has committed such an act. A third possibility is that they may mean that *there are grounds for investigating* whether he/she has been responsible for such an act. [emphasis added]

43     The Appellant argues for a higher level of defamatory meaning in respect of the republications in question than the third defamatory meaning in *Chase*. It is argued that these republications carried the first defamatory meaning in *Chase*, that is, that the Appellant had in fact committed what is stated. The Judge's determination was made after an application of the principle that a publication must be looked at as a whole (see *Chan Bernard* at [18(e)]) and that in considering the impression conveyed by the alleged libel, any "antidote" must be taken together with "the bane" (see *Lim Eng Hock Peter* at [92]). The republications in question contain denials of the allegations made by the Respondent. It was for this reason that the Judge held that they only bore the third defamatory meaning in *Chase*. To this, the Appellant contends that the "antidote" in this case was not sufficient to offset the "bane". According to the Appellant, this is because, in the ordinary course of things, the ordinary reasonable reader would expect PT Bayan and the Appellant to deny the allegations, and so the "sting" would not be attenuated by the denials.[49]

---

[49]     Appellant's Case at para 53.

32

44      We do not disagree with the Appellant that "the mere presence of a denial of a defamatory charge does not necessarily prevent the article being defamatory" (see *Gatley on Libel and Slander* (Patrick Milmo and WVH Rogers eds) (Thomson Reuters (Legal) Limited, 11th Ed, 2008) ("*Gatley*") at para 3.31). This approach, however, is not as straightforward as the Appellant seems to say it is. Samuels JA, sitting in the Court of Appeal of New South Wales in *Morosi v Broadcasting Station 2GB Pty Ltd* [1980] 2 NSWLR 418(n) at 419–420 lucidly explained how the antidote must be weighed up against the bane in such an exercise:

> ... But in a case such as this the material already contains a defamatory imputation; and the inquiry is to whether that effect is overcome by contextual matter of an emollient kind so as to eradicate the hurt and render the whole publication harmless.
>
> ... It follows that, in a case such as the present, what is involved is essentially the weighing up and comparison of bane and antidote, to repeat Baron Alderson's evocative formula [in *Chambers v Payne* (1835) 2 Cr M & R 156 at 159]. *It is a question of degree and competing emphasis. ... It may be easier to arrive at an answer where the publication contains an express disclaimer, as in* Stubbs Ltd v Russell *... , or where the antidote consists in a statement of fact destructive of the ingredients from which the bane has been brewed.*

[emphasis added]

45      Merely pointing out that the denials in the republications in question were made by PT Bayan and the Appellant is not sufficient to lead to the conclusion that these denials, as "antidotes", are completely ineffective in removing or ameliorating the defamatory sting of a statement. The court still has to embark on the exercise of carefully weighing what exactly was said. The fact that what is claimed as an antidote was said by the Appellant himself or by PT Bayan is *a* factor going towards is effectiveness, but in the final

*Low Tuck Kwong v Sukamto Sia*                                    [2013] SGCA 61

analysis, it is an evaluation of the actual words of the antidote which is of primary importance.

46      First, we examine the republication of the 1st and 2nd Letters by PT Bayan to BAPEPAM in Indonesia. Attached to these letters was a cover letter by PT Bayan. The relevant part of the letter reads:[50]

> 5.    It is known that BAYAN was established in 2004 and hereby BAYAN clearly states of absence of legal relationship, in written and verbal manner, with SUKAMTO SIA.
>
> 6.    BAYAN hereby also clearly states that none of the companies under BAYAN group has any connection, in written and legal manner, with SUKAMTO SIA.
>
> 7.    The information / data provided by BAYAN based upon the Registration Statement for Initial Public Offering of BAYAN as stated in Letter No.: [...], dated [...] is accurate and complete. Hence, BAYAN shall be fully and legally accountable for accuracy of the respective information / data as stated in the prevailing laws and regulation including but not limited to capital market regulations.

In this cover letter, PT Bayan denies the allegations made by the Respondent. On a close reading, it is apparent that in so denying, PT Bayan asserts that it has no connection with the Respondent and that it shall be legally accountable for the accuracy of the information it has provided.

47      Second, we examine the 1st Letter sent by the Appellant to BAPEPAM. Likewise, a cover letter was attached. It stated the following:[51]

> That I, Dato' Low Tuck Kwong hereby deny the accuracy of the claim stated in the WARNING LETTER [1st Letter] and I would

---

[50]    Record of Appeal (Volume V) (Part A1) at pp 37–55.

[51]    Record of Appeal (Volume V) (Part A1) at pp 27–36.

> take legal responsibility for my statement in accordance with
> the prevailing laws and regulations including but not limited
> to capital market regulations.

Not only does the Appellant deny the allegations in the 1st Letter, he further
states that he would take legal responsibility for the statements he had made
for the IPO thus far.

48      Third, we examine the republications in the two Indonesian
newspapers[52] and the Indonesian Final Prospectus.[53] In these republications,
there is a paragraph denying the allegations and also stating that PT Bayan did
not have any relations with the Respondent. The Indonesian Final Prospectus
also further explains the Appellant's history with the Respondent in respect of
their dealings in a Hong Kong company, the result of which was a judgment
given against the Respondent causing a worldwide freezing injunction to be
ordered against him. Last, the same is so in respect of the Singapore
Republications, *viz*, the statements made in Bayan's Pricing Supplement and
International Final Offering Memorandum.[54] In addition, it is stated that
PT Bayan and the Appellant intend to "vigorously defend [the Respondent's]
claims against him".

49      What is apparent from the above is that the denials in the
republications examined (at [46]–[48]) were more than "mere denials". The
text accompanying these republications all purport to provide at least some
factual basis or reason for denying the allegations. At the lowest, it is stated

---

[52]     Record of Appeal (Volume V) (Part A1) at pp 107–108; Record of Appeal (Volume V) (Part A1) at pp 109–110.

[53]     Record of Appeal (Volume V) (Part A1) at pp 111–116.

[54]     Record of Appeal (Volume V) (Part A1) at pp 98–100.

that PT Bayan has no relation to the Respondent. In others, they go so far as to provide a historical account of the relationship between the Respondent and the Appellant. The Indonesian Final Prospectus is a case in point, and what is said there could even be read as suggesting that the Respondent was actuated by some ulterior motive in making his allegations, thereby removing some of the sting of the defamatory words. The fact that PT Bayan and the Appellant have stated that they are prepared to bear responsibility for statements that they have made also go some way towards supporting the denials. To the extent that the denials in these republications were not mere bare denials, it can be concluded that (to use the language of Alderson B and Samuels JA (see above at [44])) the "antidote" is not completely ineffective in destroying the "ingredients from which the bane has been brewed".

50      We are also mindful that the Judge did not hold that the "antidote" in this case was to completely remove the defamatory sting. All the Judge held was that the republications in question carried a lower defamatory meaning, that is, the third and not the first defamatory meaning in *Chase*. In our judgment, the Appellant has not persuaded us that this finding of the Judge was wrong.

51      In this regard, the Appellant's appeal against the finding of the Judge that the relevant Indonesian and Singapore Republications carried only the third defamatory meaning in *Chase* is dismissed.

**Were the Publications and Republications made on occasions of qualified privilege?**

*Is the subjective frame of mind of the Respondent relevant to whether qualified privilege attaches?*

52      The essence of the first part of the Appellant's arguments in this respect is that the Respondent's state of mind is relevant to the question of whether the defence of qualified privilege attaches. The Appellant claims that the Respondent knew that the statements made in the Publications were false and so the defence of qualified privilege does not attach. It is clear in our view that the subjective state of mind of the Respondent would be a factor towards showing malice. The ordinary framework of analysis in this area of the law is to ask first, whether the publications were made on an occasion of qualified privilege, and, second, whether such defence is defeated by the plaintiff being able to show that the defamatory statements were made with express malice. The effect of proving express malice in the context of the defence of qualified privilege was described by Bankes J in *Smith v Streatfeild and Others* [1913] 3 KB 764 at 769–770 as such:

> ... The principle upon which the law of qualified privilege rests is, I think, this: that where words are published which are both false and defamatory the law presumes malice on the part of the person who publishes them. *The publication may, however, take place under circumstances which create a qualified privilege. If so, the presumption of malice is rebutted by the privilege, and ... the plaintiff has to prove express malice on the part of the person responsible for the publication. The effect of proving express malice is sometimes spoken of as defeating the privilege.* ... [A]lthough the occasion remains a privileged occasion, the privilege afforded by the occasion ceases to be an effective weapon of defence. ... Qualified privilege is a defence only to the extent that it throws on the plaintiff the burden of proving express malice. Directly the plaintiff succeeds in doing this the defence vanishes, and it becomes immaterial that the publication was on a privileged occasion. ... [emphasis added]

37

In the modern law of libel and slander, the concept of presumed malice no longer holds much sway, and today, it is simpler to just say that a defendant is liable for the publication of a defamatory statement without cause or excuse (see *Gatley* at para 17.2). Nevertheless, it remains that the issue of malice is one posterior to the issue of qualified privilege attaching. The Appellant's suggestion that the Respondent's subjective frame of mind when publishing the 3rd Letter is relevant to whether qualified privilege attaches seems to us to be conflating the two-step analysis.

53      In support of his suggestion, the Appellant relies on Simon Brown LJ's comment in *Fraser-Armstrong v Hadow* [1995] EMLR 140 ("*Fraser-Armstrong*") at 143. *Fraser-Armstrong* was a case involving the question of whether a statement made in a reply to a public attack was covered by the defence of qualified privilege. There, the claimant had made various allegations against his employer company. After he was dismissed, the first and second defendants wrote a letter to a magazine explaining that the claimant was dismissed because he was incompetent, had waged a personal vendetta against the company and had harassed and threatened the staff. The claimant sued the two defendants and the magazine for libel. It was argued that they could not rely on the defence of qualified privilege because their motives for publishing the comments were improper as they knew that his criticism of them was justifiable. Simon Brown LJ said:

> ... I cannot accept that anyone enjoys a privilege to protect himself against a justifiable attack upon his own character or conduct. If, therefore, the plaintiff can show that he was defamed by the defendants for the purpose of undermining what they knew to be his perfectly valid criticism of the first and second defendants' business, that would seem to me to destroy any question of privilege. *It would either demonstrate that no such privilege properly arises in the first place or it would defeat the defence by a successful reply of malice, it matters not which.* [emphasis added]

Simon Brown LJ's first rationalisation of his holding was that the privilege does not even arise because of the defendants' state of mind. It is this suggested analysis that the Appellant seeks to persuade us to apply. This suggestion, however, was roundly rejected by this Court in *Jeyasegaram David (alias David Gerald Jeyasegaram) v Ban Song Long David* [2005] 2 SLR(R) 712 at [45], which preferred the orthodox analysis that the defence of privilege is defeated by the proving of express malice. This Court was of the view (at [44]) that Simon Brown LJ's first rationalisation would create a possible chilling effect on self-defence generally, and would encourage future litigants to concentrate solely on the justifiability of the attack instead of considering other equally important aspects of the defence. The first rationalisation of Simon Brown LJ is also doubted by *Duncan and Neill* at para 16.22, footnote 5, in which it is pointed out that the test of qualified privilege is, in the first instance, an objective test.

54     It is unclear to us why the Appellant is relying on such an argument. The main point that the Appellant is making is that the Respondent knew that the statements he made were false. This is relevant to the issue of malice, so, in our view, there is no need for him to seek to conflate the two and to cloud the analysis. The second part of the Appellant's argument is that the Respondent had a countervailing duty to refrain from making the publications and therefore qualified privilege does not attach. This countervailing duty the Appellant seeks to rely on is, he says, a duty under Indonesian and Singapore law not to make false or misleading statements to the capital markets regulators negligently or knowingly. Reference was made to the relevant Singapore legislation and expert evidence was brought to prove such a duty under Indonesian law. Under this analysis, the Appellant again asserts that the Respondent knew that the allegations made in the Letters were false. It may be that the first part of the Appellant's argument merely segues to this second

39

part of his argument. If that is the case, it is unnecessary because that principle (if valid in Singapore law), is a standalone principle quite separate from the *Fraser-Armstrong* proposition. We now turn to consider that principle.

### Regard to a countervailing duty on the Respondent to refrain from publication

55      If a defendant has a countervailing duty to refrain from publication, does that take him out of the protection of the defence of qualified privilege? The Appellant argues that the Respondent has a duty under both Indonesian and Singapore capital markets law not to make false or misleading statements to the regulators knowingly or negligently. This would of course be dependent on the Appellant showing that the Respondent's 3rd Letter is false and misleading. He relies on two English Court of Appeal cases for the proposition that a countervailing duty not to publish would take a defendant outside the protection of the defence of qualified privilege.[55] These are the cases of *Wood v Chief Constable of the West Midlands Police* [2005] EMLR 20 ("*Wood*") and *Clift v Slough Borough Council and another* [2011] 1 WLR 1774 ("*Clift*"). The Respondent's attempt to distinguish these two cases as involving the application of, *inter alia*, the European Convention on Human Rights ("the ECHR") which does not apply in Singapore, while broadly correct, does not, with respect, fully address the legal issue at hand.

56      In *Wood*, a police officer wrote letters to people involved in the motor insurance business which were defamatory to the claimant (who was in the business of salvaging motor vehicles) as the letters carried the meaning that the claimant had aided and abetted in the commission of numerous criminal

---

[55]      Appellant's Case at paras 82–87.

*Low Tuck Kwong v Sukamto Sia*                                        [2013] SGCA 61

offences including stealing motor vehicles. This was done before the trial for the alleged offences had even been heard. In this regard, the English Court of Appeal, *per* May LJ (at [63]–[65]), considered that the duty of the police in England not to disclose damaging information other than for the purpose and extent necessary for the performance of their public duties, *ie*, the principle established in *Regina v Chief Constable of the North Wales Police and Others, Ex parte Thorpe and Another* [1999] 1 QB 396 (known as "the *Thorpe* principle"), and that to make such statements was in breach of the applicable police regulations. It was accordingly concluded that the defence of qualified privilege could not attach. In *Clift*, a local authority, after a less than pleasant telephone conversation with the claimant, entered her onto a "violent persons register" and forwarded it to employees and a number of (both public and private) partner organisations (at [7]). The English Court of Appeal, *per* Ward LJ, considered that in so doing, the local authority, being a public authority, was in breach of s 6 of the Human Rights Act 1998 (c 42) (UK) ("the HRA") read with Art 8 of the ECHR and so was actually precluded from making the publications it did. For that reason, it was held that there could be no foundation for a claim to qualified privilege.

57     In both *Wood* and *Clift*, the countervailing duties not to publish were owed by public bodies. The question thus is whether the principle is one confined in its application to public authorities (and even at that, it is one established under English law but has not fallen to be decided in Singapore yet), or whether it extends to private individuals in respect of private duties as well. A close reading of the two cases suggests that it does not extend to private individuals. May LJ in *Wood* (at [58]) took pains to emphasise that the duty in question on the police, *ie*, the *Thorpe* principle, was one resting "on a *fundamental rule* of good public administration *which the law must recognise*" [emphasis added]. In *Clift* (at [31]–[32]), Ward LJ was of the view that the

41

issue raised in *Wood* and *Clift* was special in that the defendants were "public authorities with public duties to perform" and accordingly distinguished the case of *Kearns v General Council of the Bar* [2003] 1 WLR 1357 where that was not the case. It is apparent that in applying the principle, the courts in both cases were motivated by a policy-driven need to support and uphold standards of good public administration. Because the matter is not before us, we express no view as to whether the principle has application in Singapore. Be that as it may, it is also possible to read the case of *Clift* even more narrowly. Ward LJ (at [46]) further founded his decision on the basis of s 6 of the HRA which he said obliged the *court itself* to act in accordance with an ECHR right. Therefore, the court had to give effect to Art 8 of the ECHR as it arose squarely in that case.

58    In our judgment, the Respondent's duty under Indonesian and Singapore capital markets law not to publish the statements (if it applies at all) cannot be a duty which would prevent him from relying on the defence of qualified privilege. First, there is no policy reason why this particular private duty, as opposed to a duty owed by public authorities underpinned by the policy of good public administration and the ECHR, should trump the social policy behind the defence of qualified privilege. As observed by Parke B in *Toogood v Spyring* (1834) 1 CM & R 181 at 193, the law recognises that certain statements "are protected for the common convenience and welfare of society". That the defence of qualified privilege is itself underpinned by social policy is also expressed by Lord Diplock in *Horrocks v Lowe* [1975] AC 135 ("*Horrocks*") at 149C–E:

> The public interest that the law should provide an effective means whereby a man can vindicate his reputation against calumny has nevertheless to be accommodated to the competing public interest in permitting men to communicate frankly and freely with one another about matters with respect

*Low Tuck Kwong v Sukamto Sia*                                   [2013] SGCA 61

> of which the law recognises that they have a duty to perform
> or an interest to protect in doing so. ... For in all cases of
> qualified privilege there is some special reason of public policy
> why the law accords immunity from suit—the existence of
> some public or private duty, whether legal or moral, on the
> part of the maker of the defamatory statement which justifies
> his communicating it or of some interest of his own which he
> is entitled to protect by doing so.

This conclusion is especially so given the standard under the capital markets laws the Appellant is relying on is, in his own submission, one of negligence at its lowest. To therefore apply it in this context would be inconsistent with the principle that carelessness in arriving at a belief in the words complained of is not malice capable of defeating privilege (see *Horrocks* at 150B–E; this proposition being derived from the social utility and policy of the defence itself). Second, it remains open to the capital markets regulators to take action against the Respondent if the statements were in fact in breach of such capital markets laws. Whereas in *Clift* the HRA imposed on the English court the obligation to give effect to Art 8 of the ECHR, there is nothing which obliges us to take up and exercise the prosecutorial powers of the regulators to give effect to such duty under such laws. Finally, the duties of the public authorities in both *Wood* and *Clift* were owed to the claimants. In the present case, the duty which the Appellant seeks to invoke is not one owed to him either directly or indirectly. If the Appellant cannot in the ordinary course outside of this defamation suit invoke such right against the Respondent, we do not think that there is justification in allowing him to take advantage of it here in what is a private proceeding between private individuals.

59      As we have alluded above, the Appellant's reliance on the Respondent's knowledge of the falsity of the statements in the Letters is a matter relevant to the issue of malice. There is nothing stopping the Appellant from relying on it as such. We will consider this matter further, below. At this

juncture, it suffices us to say that we do not think the Appellant's appeal against the Judge's finding that the defence of qualified privilege attaches, at least for the purposes of the first instance of the analysis, should be allowed.

### *Are the copies of the 3rd Letter sent to parties other than BAPEPAM protected by qualified privilege?*

60      The next part of the Appellant's argument is that in so far as the 3rd Letter was sent to IDX, PT Trimegah, the Jakarta office of Macquarie and the Jakarta office of Merrill Lynch Indonesia, these are not covered by the defence of qualified privilege because these entities do not or did not have any regulatory powers which could be invoked, so that they did not have a duty or an interest in receiving it.[56] This was because the 3rd Letter was sent for the stated purpose of procuring a suspension or prohibition of the IPO. In our judgment, the Appellant has adopted too formalistic a view of the duty-interest test in *Adam v Ward* ([19(f)] *supra*) at 334, *per* Lord Atkinson:

> [A] privileged occasion is ... an occasion where the person who makes a communication has an interest, or a duty, *legal, social, or moral*, to make it to the person to whom it is made, and the person to whom it is so made has a corresponding interest or duty to receive it. [emphasis added]

Whether the recipients had a duty or interest to receive the communication is not measured strictly by the legal powers they may exercise upon receipt. The Judge explained (at [67] of the Judgment) how each recipient of the 3rd Letter had an interest (not necessarily legal) in receiving it.

61      If the Appellant's contention is that in respect of these recipients other than BAPEPAM the letter ought not to have included a demand that the IPO

---

[56]      Appellant's Case at para 88.

process be suspended or stopped, we also do not accept such a contention. The authorities are settled in as much as the inclusion of irrelevant or unnecessary material in a communication would not take it out of the scope of qualified privilege; any excessive statement would simply be treated as evidence going towards showing malice and should be analysed as such (see *Nevill v Fine Arts and General Insurance Company, Limited* [1895] 2 QB 156 at 170, *per* Lord Esher and *Horrocks* at 151).

62      Finally, the Appellant remarks in passing an objection on the ground that the Indonesian office of Macquarie was not involved in the IPO. We do not think that this objection is persuasive. The law accepts that sometimes, in making a communication covered by qualified privilege, it may reach an audience without the necessary duty or interest in relation to the subject matter. In such a case, the question is whether such communication was reasonably warranted by the exigency of the occasion (see *Duncan and Neill* at para 16.19). The result is that an ancillary or incidental privilege attaches. The Judge made a finding of fact (at [67] of the Judgment) that in PT Bayan's Preliminary Offering Memorandum, "Macquarie" was described by only its logo and nothing more. In the circumstances, it was not unreasonable for the Respondent to have sent the 3rd Letter to the Indonesian office of Macquarie. The Appellant has not challenged this finding of the Judge in this appeal.

*Summary*

63      In summary, we do not find that there is occasion for us to disturb the Judge's finding that the Indonesian Publications were made on occasions of qualified privilege. This being so, the *prima facie* position is that the Respondent can rely on the defence in relation to the republications as well. The issue of malice defeating the defence will be dealt with further, below.

**Are the words complained of false and were they published maliciously?**

64     What is in issue here is the existence of the "Common Understanding" (see above at [15]) as alleged by the Respondent in the Letters. The Appellant seeks to show that there was no Common Understanding and so the words complained of were false. The falsity of the words complained of and whether they were published maliciously go to several different issues. First, falsity may be a factor towards proving express malice, which would defeat the defence of qualified privilege under the defamation claim. Second, falsity of the words and malicious publishing thereof, if made out, are elements under the tort of malicious falsehood under which the Appellant also claims.

*Are the words complained of false?*

65     The Judge held that on the evidence before him, he was unable to find one way or the other whether the case of the Common Understanding was either true or false (see the Judgment at [53]). As the Judge noted, the only piece of documentary evidence available was a cheque for S$3m issued by the Appellant to the Respondent dated 25 April 1996 ("the Cheque"). To begin, it is necessary to set out in some detail the Respondent's case. He says that sometime in 1995, the Appellant approached him for S$3m to facilitate the establishment of a coal mining business in Indonesia, with the representation that if the business was established, he would be given a 50% share of the shareholding, or, if it was not, the Appellant would return the money to him. He says that the Appellant issued the Cheque to him as "assurance" that he would get his money back. He says that the Cheque was actually issued in 1995 but post-dated to 1996. He was subsequently informed by the Appellant in early 1996 that the coal mining business did not take off and that he would return the money. It was only on 29 June 2008 when he overheard the Appellant's name being mentioned by a friend, one Mr Christopher Clower

*Low Tuck Kwong v Sukamto Sia*                                    [2013] SGCA 61

("Clower"), in relation to a prospective IPO that he made enquiries and learned that the Appellant has successfully set up PT Bayan. It was this which, he says, precipitated the sending of the Letters.

66     In contrast, the Appellant denies that he had received S$3m from the Respondent. The Appellant said that the Cheque was given to the Respondent to allow him to raise money to satisfy certain debts he owed various parties, including the Appellant. The Appellant accepts that the Respondent's failure to make out the justification defence (*ie*, the truth of the words complained of) does not *ipso facto* mean that he has made out falsity.

67     After a review of the record, we are of the view that the Appellant has satisfied his burden of proving on a balance of probabilities that the words complained of in the Letters as to the existence of the Common Understanding are false. We do not agree with the Judge's conclusion that on the evidence before him, the Common Understanding was neither true nor false (see above at [65]). Counsel for the Respondent, Mr Giam Chin Toon SC ("Mr Giam") sought to uphold the Judge's conclusion by arguing that under our law of evidence, a fact may either be proved, disproved, or not proved (see ss 3(3)– 3(5) of the Evidence Act (Cap 97, 1997 Rev Ed), respectively; *Loo Chay Sit v Estate of Loo Chay Loo, deceased* [2010] 1 SLR 286 at [20] and *Cooperatieve Centrale Raiffeisen-Boerenleenbank BA (trading as Rabobank International), Singapore Branch v Motorola Electronics Pte Ltd* [2011] 2 SLR 63 at [35]). In an action for defamation, the burden of proof lies on the defendant to prove the truth of the matter to make out the defence of justification. In this regard, the Judge found that the Respondent had not proven the existence of the Common Understanding (see the Judgment at [46]–[53]) for the purposes of his plea of justification. This, therefore, means that the falsity of the defamatory words is *presumed*, but this does not equate to *proof* of falsity. The

47

burden still lies on the Appellant, for the purposes of his claim in malicious falsehood, to prove falsity. It is on this analysis that, as a matter of *theory*, the Judge's conclusion is possible, *viz*, that the truth and the falsity of the matter both lie in the realm of being "not proved". We agree, however, with the recent observation of Tugendhat J in *Cruddas v Calvert & Ors* [2013] EWHC 2298 (QB), that from experience, the balance is seldom so finely tuned in these matters of burden of proof in this context. Tugendhat J noted in that case which involved claims in both defamation and malicious falsehood (at [200]–[201]):

> 200.   I have already held that all three meanings were untrue in the meanings which the Court of Appeal held they bore for the purposes of the claim in libel. I recall that in libel the burden of proving truth lies on the defendant, whereas in malicious falsehood the burden of proving falsity lies on the claimant. So *it would be theoretically possible for the Defendants to have failed in proving truth for the purposes of the libel claim, and for Mr Cruddas [the claimant] to fail in proving falsehood for the claim in malicious falsehood.*
>
> 201.   However, *it is the experience of judges in practice that the burden of proof is very rarely decisive of the outcome of an action.* In the present case it is not because of the burden of proof that I have decided that the defence of truth failed for the purposes of the libel action. I would have reached the same conclusion if the burden of proof had lain on Mr Cruddas. Mr Cruddas has more than satisfied me that the three meanings were all false.
>
> [emphasis added]

Put shortly, we disagree with the Judge's conclusion that the present case is such an exceptional case.

68     We now set out the reasons for our conclusion that the Appellant *has proven* on a balance of probabilities that the words complained of are false.

*Low Tuck Kwong v Sukanto Sia* [2013] SGCA 61

*Inconsistencies in the Respondent's assertions*

69     First, the Respondent's evidence on various occasions and on oath in court proceedings in Singapore and in Hong Kong were inconsistent with his assertions in the Letters of an investment based on the Common Understanding. These instances of evidence on oath both preceded and followed the Letters in time.

70     Sometime in early 1996, the Appellant and other shareholders in a listed company in Hong Kong known as China Development Corporation Limited ("CDC") sold their shares to Dynasty Line Limited ("Dynasty"), a company owned by the Respondent. The Respondent failed to meet certain payments for the shares and the Appellant started to press him for payments. Two handwritten letters from the Appellant to the Respondent dated 23 January 1997 and 6 November 1997 pressing for payments were produced by the Appellant.[57]

71     Action No 9505 of 1999 was subsequently filed in the High Court of Hong Kong by the Appellant and the other shareholders against Dynasty for the monies owing to them. On 13 June 2000, the Respondent filed a witness statement. In this witness statement, he says that "in late 1995, [he] advanced S$3,000,000 to [the Appellant] which was secured by a post dated cheque issued by [the Appellant] in [his] favour".[58] He annexed the said post dated cheque. The Respondent sought to offset this S$3m against the claim against Dynasty. Next, Companies Winding Up Proceedings No 382 of 2007 was

---

[57]     Record of Appeal (Volume III) (Part A4) at pp 292–295; Record of Appeal (Volume III) (Part A5) at pp 4–5.

[58]     Appellant's Core Bundle (Volume 3) at p 3.

brought by the Appellant in the High Court of Hong Kong to wind up Dynasty. In response, the Respondent made an affirmation on 14 January 2008. In this affirmation, he repeats the same story he stated in the 13 June 2000 witness statement that he had made a S$3m advance to the Appellant which ought to be set off against the monies owing.[59] What is highly pertinent to us is that in both these instances, there was no mention of the S$3m being part of an investment entitling him to a half-share in PT Bayan.

72     It was only in an affidavit affirmed 28 October 2008, after these proceedings had commenced, that the Respondent first tied the S$3m to being an investment in the coal mining business which entitled him to a half-share in PT Bayan.[60] This affidavit was filed to support his application for the present proceedings to be stayed on the ground of *forum non conveniens*. This account was also then repeated when he filed his defence and counterclaim. This in our view was in itself not particularly damning because the Respondent's explanation was that he had previously thought that the coal mining business never took off, and so he was previously under the belief that he was entitled to treat the S$3m as a loan (see above at [65]).[61]

73     However, in his response to Suit No 256 of 2010 brought by the liquidators of Dynasty against the Respondent for breach of his fiduciary duties as a director in the High Court of Singapore, the Respondent returned to his earlier version of events. In his defence in that action[62] and in an affidavit

---

[59]   Appellant's Core Bundle (Volume 3) at p 33.

[60]   Record of Appeal (Volume V) (Part B3) at pp 12–14.

[61]   Respondent's Case at paras 79, 81 and 83.

[62]   Appellant's Core Bundle (Volume 3) at pp 8–9.

dated 21 September 2010,[63] the Respondent again asserted that there was a S$3m sum he had advanced to the Appellant which ought to be offset against the purchase price of the CDC shares. Not only were these documents filed after he had allegedly learned of the existence of PT Bayan, they came after the affidavit and defence and counterclaim alleging the S$3m as an investment were filed in these proceedings. When queried by Mr Singh in the proceedings below as to why there was this inconsistency, the Respondent had no answer.[64]

74     During the hearing before us, Mr Singh further pointed out that the figure of S$3m was not mentioned in any of the Letters. Given the details the Respondent had thought to include in the letters, one could have expected that he would also include at least a mention of the S$3m figure there; that fact being such a central aspect of his claim. Mr Singh submitted that this showed that tying the S$3m figure and the Cheque to the alleged investment was conjured by the Respondent only after these proceedings were commenced against him.

75     Further, the Respondent's testimony on the source of the S$3m, which he says came in the form of cash kept in a safe in his office, was dubious, to say the least. When asked to produce the bank statement corroborating the withdrawal of this sum, the Respondent changed tack and asserted that he received the sum in cash from a "Peter Lim".[65] There was no receipt confirming this or evidence from this individual adduced. He subsequently

---

[63]     Appellant's Core Bundle (Volume 3) at pp 39–42.

[64]     Record of Appeal (Volume III) (Part C4) at pp 197–200 (Transcript of Proceedings (of 17 August 2012) at p 89 ln 8 – p 92 ln 16).

[65]     Appellant's Core Bundle (Volume 3) at pp 103–104.

changed his story again and claimed that the S$3m was spare cash lying around in his office. The Respondent was then unable to plausibly explain why he would have kept in his office such a large amount of cash.

76      In our view, these incomprehensible inconsistencies tended to suggest that there was no such investment and so more likely than not no Common Understanding.

*The Respondent's inaction for 13 years*

77      Secondly, as pointed out by the Appellant, the Respondent's inaction for a period of 13 years is difficult to accept. Even on the basis that the Respondent was labouring under the impression that the coal mining business did not materialise and so the S$3m was to be taken as a loan, he did not for 13 years seek to recover it. This was despite coming under severe financial pressure in the many proceedings against him over the years, starting from the two letters written by the Appellant in 1997 and the law suits which followed. In addition, bankruptcy proceedings were brought against the Respondent in the late 1990s which resulted in him filing for bankruptcy protection in Hawaii, USA. Pertinently, the S$3m was not listed in the statements he had to make declaring his assets and liabilities.

78      In respect of enforcing the Common Understanding itself, *viz*, to his share of 50% of the shareholding of PT Bayan, the Respondent's case is, of course, that he was simply not aware that the coal mining business had been successfully established and that he instructed his Indonesian lawyers to do so

*Low Tuck Kwong v Sukamto Sia*                                    [2013] SGCA 61

immediately upon learning about it in 2008.[66] The problem with this is that it is difficult to imagine that the Respondent, a sophisticated investor, could be ignorant of PT Bayan for so many years.[67] In our view, this is especially so given the Respondent was embroiled with the Appellant in continuing legal disputes over many years over the sale and purchase of certain shares and it was not as if they had each disappeared from one another's lives. Given such a relationship between the parties, it is hard in our view to conclude that the Respondent did not know of the existence of PT Bayan between 1997 and 2008. That he sat on the alleged Common Understanding for so many years without seeking to enforce his alleged rights under it suggests it did not really exist.

*The evidence as to the circumstances of the alleged investment*

79      Finally, we find the manner in which the Respondent said he came to give the Appellant the S$3m with the latter agreeing in return to give him a half-share of a coal mining business also inherently implausible.

80      To begin, the Respondent said that all that happened was that the Appellant had asked him for the S$3m and offered the half-share in the coal mining business and that he readily agreed because they were good friends at the time. To our minds, it was strange that for such an important investment, the Respondent had not made any inquiries into what exactly he was investing in. Neither was there any evidence of any discussion as to the details of the coal mining business which the Appellant was going to set up and the nature

---

[66]     Respondent's Case at para 88.

[67]     Appellant's Case at para 167.

of the coal mining concession he was going to acquire in Indonesia. The Respondent sought to explain that given the extremely good terms he was on with the Appellant, he would have lent the money without question. He also said that the Appellant had orally assured him that the coal mining business would be worth some US$500m. This may be so, but this on the other hand raises questions from the Appellant's point of view. It is difficult to believe that the *quid pro quo* for the Respondent investing S$3m could imaginably be a half-share of something envisaged to be worth half a billion US dollars. Further, the Respondent's account of the Common Understanding was that if the coal mining business did not pan out, the investment would instead be treated as a loan and the Appellant would have to return him the S$3m. This was in essence an agreement under which the Respondent had very little to lose and much more to gain than reasonably imaginable.

*Conclusion*

81     For these reasons, we find that the Judge erred in failing to accept that the Appellant had proven on a balance of probabilities that the words complained of, *viz*, the existence of the Common Understanding, are false.

**Were the words complained of published with malice?**

82     The Appellant submitted that in the present case, the falsity of the words complained of is highly probative of knowledge of falsity on the part of the Respondent.[68] Knowledge of falsity or lack of belief in the truth of the words complained of in turn proves express malice (see *Horrocks* at 149–150 ; *Hytech Builders Pte Ltd v Goh Teng Poh Karen* [2008] 3 SLR(R) 236 at [39]).

---

[68]     Appellant's Case at paras 107 and 120.

*Low Tuck Kwong v Sukamto Sia*                                   [2013] SGCA 61

83      However, the Judge found that the Respondent "believed that he had a claim against [the Appellant] and that his claims in the Indonesia Publications were true" and so found no malice (see the Judgment at [66] and [70]).

84      The Appellant's argument must be that given the nature of the facts in issue, the Respondent's assertion of belief in the words complained of is so unreasonable that the court must reject his contention that he holds it. Such an analysis is not without support and is endorsed by *Gatley* (at para 17.18), in which the editors cite to Lord Herschell's speech in *William Derry, JC Wakefield and others v Sir Henry William Peek, Baronet* (1889) 14 App Cas 337 at 375–376 (which was a case involving the tort of deceit) on this issue of belief:

> I can conceive many cases where the fact that an alleged belief was destitute of all reasonable foundation would suffice of itself to convince the Court that it was not really entertained …

Further, in *Greers Ltd v Pearman and Corder Ltd* (1922) 39 RPC 406 at 417, *per* Scrutton LJ (a case on malicious falsehood) (cited in *Gatley* at para 21.8):

> Honest belief in an unfounded claim is not malice. *But the nature of the unfounded claim may be evidence that there was not an honest belief in it.* **It may be so unfounded that the particular fact that it is put forward may be evidence that it is not honestly believed.** [emphasis added in italics and bold italics]

85      As we have noted, the first obstacle for the Appellant to surmount is the Judge's finding that the Respondent held an honest belief in the truth of his claim. The Judge relied on (a) his actions in instructing Singapore and Indonesian lawyers and acting on the latter's advice to make the Publications; (b) his issuance of a Power of Attorney to HPP; (c) his meeting with Clower in 2008 wherein he first discovered the existence of PT Bayan; (d) his further independent enquiries including obtaining a copy of PT Bayan's draft

prospectus dated July 2008; (e) instructing HPP to make the Publications; and (f) his conduct and demeanour under cross-examination (see the Judgment at [66]). Unfortunately, we agree with the Appellant that the Judge's reasoning was plainly wrong.[69] These facts (save for the point on the Respondent's conduct and demeanour under cross-examination) are not unequivocal of an honest belief in the truth of the claim by the Respondent. That a person instructs lawyers to advance a claim does not necessarily prove his honest belief in it. Even taken together, these factors listed by the Judge do not, with respect, lead to the conclusion he reached. It is trite that an appellate court will give due deference to a trial judge's assessment of a witness's conduct and demeanour. But, in the present case, if the Appellant is right that the claim was false and of a nature such that to believe it was so unreasonable, then the proper inference that the court must draw must be that the Respondent did not hold any honest belief in the truth of it, no matter how convincing he may have seemed on the stand to the Judge.

86      As the Respondent was *directly involved* in the events relating to the Common Understanding, the Appellant is correct in asserting that this was "not a case where there was the realistic possibility of a faulty but honest recollection of the alleged event in question".[70] The Common Understanding either *existed* or *did not exist*. If there was no Common Understanding, which was something between the Appellant and the Respondent solely, there is no reason for the Respondent to believe it to exist. The Respondent's objection to this analysis on the ground that this means that mere proof of falsehood leads

---

[69]     Appellant's Case at paras 123 *et seq*.

[70]     Appellant's Case at para 107.

*Low Tuck Kwong v Sukamto Sia*                                   [2013] SGCA 61

to the conclusion of malice[71] overstates the case. We make this conclusion only on the facts of this case given the nature of the subject matter in the words complained of. This does not create any independent legal principle of general application contrary to the accepted principle that mere proof of falsity is not sufficient to establish malice. As described by *Gatley* (at para 21.8), "the law here merely follows the normal approach to drawing inferences about a person's knowledge, belief or intention".

87      We accordingly find that the Appellant had established that the words complained of were published by the Respondent with express malice.

### *Effect of these conclusions*

88      At this juncture, we pause to take stock of what our above findings mean to the Appellant's claims against the Respondent in this appeal. Given that we find that the words complained of were false, and that they were published by the Respondent with express malice, it follows that:

(a)     the defence of qualified privilege is defeated in respect of the Publications and the Republications; and

(b)     if causation of special damage is made out (see below at [103] *et seq*), the tort of malicious falsehood is also made out under Singapore law.

---

[71]     Respondent's Case at para 70.

57

**The defamation claim**

*Conclusion in respect of liability for defamation*

89     On the basis of the above, we make the following determinations on the Appellant's claim in defamation:

> (a)     we reject the appeal against the Judge's findings in relation to the meanings held by the words complained of;

> (b)     we allow the appeal against the Judge's finding that there was no Singapore republication of the 3rd Letter to Merrill Lynch Singapore in Singapore and hold that the content of this republication bore the same meaning as the 3rd Letter itself; and

> (c)     we allow the appeal against the Judge's finding that the defence of qualified privileged was defeated by express malice.

Accordingly, the Respondent is liable for defamation.

*The relief available under the defamation claim*

*General damages and aggravated damages*

90     It follows from our finding that liability for defamation has been made out that the Appellant is entitled to general damages. These would comprise the recognised heads of damage claimable as general damages, *viz*, for injury to reputation, injury to feelings, and for vindication (as set out in *Arul Chandran v Chew Chin Aik Victor* [2001] 1 SLR(R) 86 ("*Arul Chandran*") at [53]). These will fall to be assessed by a High Court judge.

91     The Judge's conclusion that no aggravated damages for the claim in defamation should be granted even if defamation was made out was largely

premised on the basis that the publications were not made with malice and that they were not false (see the Judgment at [80]). We would note that the Respondent has not since making the publications apologised for them. We have found that the words complained of were false, that the Respondent knew they were false, and that he was actuated by express malice in making the publications. Further, the Respondent wrongly maintained the truth of his false allegations through the trial of the matter via his plea of justification and now in the arguments made on appeal. These are all matters of a defendant's conduct and state of mind which the court will consider in deciding whether aggravated damages ought to be awarded (see *Koh Sin Chong Freddie v Chan Cheng Wah Bernard and others and another appeal* [2013] SGCA 46 at [51] and *Arul Chandran* at [55], citing *Gatley on Libel and Slander* (Patrick Milmo & WVH Rogers eds) (Sweet & Maxwell, 9th Ed, 1998) at pp 212–213). The Respondent does not proffer any other reason for the refusal of relief in the form of aggravated damages.[72] We thus find that the Appellant is entitled to aggravated damages (as a component of general compensatory damages). These will also be assessed by a High Court judge.

*Special damages*

92     The Appellant claimed special damages to be assessed under his claim in defamation. He said that he suffered these when he was not able to sell 375,000,000 vendor shares in the IPO at a price of 5,800 rupiah per shares (amounting to 2.175 trillion rupiah). He thus claimed:[73]

---

[72]    Respondent's Case at para 148.

[73]    Record of Appeal (Volume II) (Part 1) at pp 38–39 (Statement of Claim (Amendment No 6) at paras 19A–19D).

(a)     the sum of 2.175 trillion rupiah or its equivalent sum in Singapore dollars at the rate of exchange on 12 August 2008 at 6,505 rupiah to S$1, amounting to S$334,358,186.01;

(b)     further and/or alternatively, interest on 2.175 trillion rupiah or S$334,358,186.01, pursuant to s 12 of the Civil Law Act (Cap 43, 1999 Rev Ed);

(c)     further and/or alternatively, damages for currency exchange loss on the sum of 2.175 trillion rupiah; and

(d)     further and/or alternatively, damages for the loss of opportunity to use and/or invest 2.175 trillion rupiah, including the loss of opportunity to buy back his shares.

93      The Judge held that special damages may be awarded in an action for defamation (see the Judgment at [81]) and the Respondent did not and does not now on appeal dispute this.

94      We accept as a general proposition that a plaintiff is not precluded from claiming special damages in an action for defamation; the authorities say that an award for special damage may be made on top of that for general damage. However, the availability of such an award is not as wide as the Appellant's pleadings allege it to be, *ie*, all consequential pecuniary loss. What is meant by "special damage" in this context must be properly understood. As long ago as in the case of *Ratcliffe v Evans* [1892] 2 QB 524 ("*Ratcliffe v Evans*") at 529, Bowen LJ declared the use of the term "special damage" as one "which, intelligible enough in particular contexts, tends, when successively employed in more than one context and with regard to different subject-matter, to encourage confusion in thought". It is true that to constitute special damage the loss must be pecuniary, *ie,* it must be loss capable of

estimation in money's worth, but the converse is not true: not all manner of pecuniary losses fall within the scope of special damage. This appears to be a conceptual misunderstanding on the part of the Appellant in the present case.

95      In *Ratcliffe v Evans*, Bowen LJ explained that in actions such as the present, where the wrong is actionable *per se*, special damage is used to denote the particular damage which a claimant suffers beyond general damage (at 528):

> At times (both in the law of tort and of contract) it is employed to denote **that damage arising out of the special circumstances of the case which, if properly pleaded, may be superadded to the general damage which the law implies in every breach of contract and every infringement of an absolute right**: see *Ashby v. White*. In all such cases the law presumes that *some* damage will flow in the ordinary course of things from the mere invasion of the plaintiff's rights, and calls it general damage. **Special damage in such a context means the <u>particular damage</u> (beyond the general damage), which results from the particular circumstances of the case**, and of the plaintiff's claim to be compensated, for which he ought to give warning in his pleadings in order that there may be no surprise at the trial. [emphasis in original in italics; emphasis added in bold italics and underline]

96      That special damage in this context is so limited and does not extend to all manner of consequential loss also explains the observation in Harvey McGregor, *McGregor on Damages* (Sweet & Maxwell, 18th Ed, 2009) ("*McGregor on Damages*") at para 39-034, that an award of special damages in an action for libel while possible is somewhat extraordinary:

> Again apart from the three regular heads of injury to reputation, injury to feelings and vindication, there is pecuniary loss. This is a clear head of damage but it cannot be said to be a regular one in this field. There are a few old cases. In *Evans v Harries*, an action for slander of the claimant in his business of an innkeeper, the claimant recovered for a general falling off of custom, while in *Harrison v Pearce*, an action for libel upon the proprietors a newspaper, damages were

> awarded in respect of the resulting general decline in the newspaper's circulation; and more specific losses, as of particular contracts, particular employments, particular hospitality, may also be allowed if properly pleaded and proved. ***However, modern libel cases where pecuniary loss is specifically claimed are virtually impossible to find, the tendency being to claim simply for damage to reputation*** tout court ***in the hope, frequently, of a very large general award.*** [emphasis added in bold italics]

The propensity of claimants to claim simply for damage to reputation *tout court* stems from the fact that any special damages which are claimable in an action for libel must, in our judgment, be in any case losses referable to the damage to reputation; in other words, it refers to particular damage in the nature of those recognised as claimable as general damage. What is meant by special damage ought properly be called 'particular' or 'actual' damage, this being in contradistinction to the 'presumptive' damage the court awards when one claims general damage.

97     Limiting what may be claimed as special damage in this context is both commonsensical and supported by policy. The old English case of *William Allsop and Hannah, his Wife v Thomas Allsop* (1860) 5 H & N 534 ("*Allsop v Allsop*") is instructive. The claim in *Allsop v Allsop* was for damages relating to a married woman's illness which resulted from her being slandered. These were held by the court to be too remote to be recoverable. We agree with *McGregor on Damages* (at para 6-082) in that the first two bases upon which the case was decided were under the law at the time accepted but no longer hold water today: first, that psychiatric injury as opposed to physical injury were too remote to claim, and second, that the damage in that case was too remote because it depended upon the peculiarities and temperament of the particular individual. However, the third basis remains relevant. This was the ground that loss through ill health was not within the scope of protection of tort in question, even though it resulted in a pecuniary loss. Particularly,

*Low Tuck Kwong v Sukamto Sia*                    [2013] SGCA 61

Martin B remarked (at 539) that "[t]he law is jealous as to actions for mere words". *McGregor on Damages* (at para 6-082) explains this third basis as such:

> What was at the back of the court's mind seems to have been *the need to confine such slander actions within strictly defined limits*, so that resulting ill health did not ground recovery because it was not an interest protected by the tort. Whether this conclusion was sound, in view of the fact that the loss was a pecuniary one, may be doubted; but *it is basically a matter of policy*, and this remains the one ground upon which *Allsop v Allsop* could be supported today. [emphasis added in bold italics]

98    We agree. The tort of defamation is not one which protects all kinds of interests and so not all kinds of losses are recoverable. By their nature, certain kinds of losses are, as a matter of policy, simply too remote to be recovered in an action for defamation. The tort of defamation primarily protects a person's reputation (see *Gatley* at para 1.1) and so grants relief for damage to a plaintiff's reputation, the injury to his feelings and also provides a vindicatory effect. Where therefore the loss resulting from the publication of the words complained of is not referable to such protected interests, such loss is not claimable even if the publication was factually causative of it; it therefore does not include *all* consequential pecuniary loss.

99    In the present case, the Judge had found, and we agree, that given the Publications and Republications held the meanings they were found to hold, they would tend to lower the Appellant in the estimation of right-thinking members of society generally or impute a lack of integrity. It was not this lowering of the Appellant in the estimation of right-thinking members of society generally or the imputation of a lack of integrity, *ie*, the damage to his reputation, which caused the Appellant not to be able to sell his vendor shares in the IPO. Rather, it was because of the concerns which the capital markets

regulators had with the *allegations* found *in* the 3rd Letter which led to the Appellant having to, he says, remove his vendor shares from the sale. This is not a loss, even if it can be proven, which is protected by the tort of defamation. It would be a different matter in a case where defamatory materials were published calling a trader dishonest (whether in the way of his trade or otherwise). He may as a result suffer a fall in custom because of customer shunning him having heard of his reputation of being dishonest. In such a case, the plaintiff may either claim for a loss of reputation generally, or, if he can specifically prove so, the fall in custom resulting from the damaged reputation as special damages, such loss being the particular loss he suffered in his circumstances. Significantly, the Appellant also seeks to claim such loss in his action for malicious falsehood. It may well be that such losses are more appropriately claimed under that separate tort which protects a different interest from the tort of defamation; to allow recovery in the action for defamation would also obviate the need of the Appellant to show that he satisfies the conditions on which he can claim in the tort of malicious falsehood. We will examine this claim again when we discuss it in the context of malicious falsehood (see below at [103] *et seq*).

100     We accordingly find that under Singapore law, the Appellant is not entitled to the special damages he seeks. Given our judgment in this regard, the issue relating to whether such special damages of the sort the Appellant is claiming are claimable under Indonesian law in an action for defamation for the purposes of satisfying the double actionability rule (see above at [16]) is moot. This was a major bone of contention between the parties and their expert witnesses on Indonesian law in the proceedings below. We appreciate the extensive submissions made by the parties in their respective written cases on this specific issue, but as there is no necessity for us to decide this issue, we make no comment on it or on the Judge's findings in this respect.

*Low Tuck Kwong v Sukamto Sia*                                        [2013] SGCA 61

*Injunction*

101    The Judge concluded that even if defamation had been made out, there was no need for the court to grant an injunction restraining "any repetition of the slander or of similar imputations" because there was no evidence to give rise to any apprehension of further publication by the Respondent (see the Judgment at [82]). The Appellant's case seems to be that because the Respondent was actuated by malice, there are *ipso facto* grounds to fear further publications and so a real risk that he will do so.[74] The Appellant's arguments are unsupported by authority. In addition to the fact that there was no evidence of the danger of further publications, it may also be noted that there is no evidence that in the four years since the Publications and Republications, the Respondent had made further publications of the same. We therefore do not think that it is necessary to order an injunction in the present case.

**The malicious falsehood claim**

*Liability in malicious falsehood*

102    Given we have found that the elements of falsity and malice have been made out by the Appellant (see above at [81] and [87] respectively), his claim in malicious falsehood in Singapore law will be established if special damage is proven, this being an element of the tort without which the claim cannot stand (see *WBG Network (Singapore) Pte Ltd v Meridian Life International Pte Ltd and others* [2008] 4 SLR(R) 727 ("*WBG Network*") at [74]).

---

[74]    Appellant's Case at para 247.

*Low Tuck Kwong v Sukamto Sia*                                    [2013] SGCA 61

*Proving special damage*

103    The Appellant pleaded the following in respect of special damage for the purposes of his malicious falsehood claim (mirroring the claim for the same under the tort of defamation (see above at [92])):[75]

> 23.    Further, as a result of [the Respondent's] malicious and false publication of the Words (in the Defamatory Letters), [the Appellant] was not able to sell 375,000,000 shares in PT Bayan Resources at the Initial Public Offer Share Price of Rp5,800. [The Appellant] would have received a total amount of Rp 2.175 trillion (Indonesian Rupiah). As such, [the Appellant] suffered loss and damage, which include *inter alia,* special damage of Rp 2.175 trillion (Indonesian Rupiah) or the equivalent sum in Singapore dollars at the rate of exchange on 12 August 2008 at 6,505 Rp to S\$1 amounting to S\$334,358,186.01.
>
> 24.    Further, and/or alternatively, [the Appellant] claims interest on the special damage of Rp 2.175 trillion (Indonesian Rupiah) or the equivalent sum in Singapore dollars at the rate of exchange on 12 August 2008 at 6,505 Rp to S\$1 amounting to S\$334,358,186.01, pursuant to Section 12 of the Civil Law Act (Cap. 43).
>
> 25.    Further, and/or alternatively, [the Appellant] claims damages for currency exchange loss on the sum of Rp 2.175 trillion (Indonesian Rupiah).
>
> 26.    Further, and/or alternatively, such loss and damage include the loss of opportunity to use and/or invest Rp 2.175 trillion (Indonesian Rupiah) which [the Appellant] would have received if he was able to sell 375,000,000 of his shares in PT Bayan Resources at the Initial Public Offer Share Price of Rp5,800. Such loss of opportunity to use and/or invest include, *inter alia,* the loss of opportunity to buy-back his shares.

104    Whereas such losses are not claimable as special damage under the tort of defamation (see above at [99]), they are claimable in an action for malicious

---

[75]    Record of Appeal (Volume II) (Part 1) at pp 43–45 (Statement of Claim (Amendment No 6) at paras 23–26).

*Low Tuck Kwong v Sukamto Sia*                                  [2013] SGCA 61

falsehood. The tort of malicious falsehood as it is commonly known today is of an entirely different character from an action for defamation. W Blake Odgers and Robert Ritson, *A Digest of the Law of Libel and Slander and of Actions on the Case for Words Causing Damage* (Stevens and Sons, Limited, 6th Ed, 1929) at p 66 describes such actions thus:

> We pass [from the preceding discussion on defamation] now to words of an entirely different character—to words, that is, which are not defamatory of any individual, which do not injure the reputation of any one, either personally or in the way of his profession or trade, but *which were intended to cause, and which did cause, pecuniary loss to some one.* No action of libel or slander will lie for such words. But *when a defendant either knows or ought to know that special damage will happen to the plaintiff if he writes or speaks certain words, and he writes or speaks those words, desiring and intending that such damage shall follow, or recklessly indifferent whether such damage follows or not, then, if the words be false, and if such damage does in fact follow directly from their use, an action on the case will lie.* And in such an action on the case it is the plaintiff who must prove that the words are false, that they were published by the defendant with some degree of malice, and that actual damage has ensued. [emphasis added]

It has been said that the "true legal aspect" of the tort may be described as being an "[action] for *unlawfully causing damage*" [emphasis added]; and it is for this reason that "damage is the gist of the action" (see *The Royal Baking Powder Company v Wright, Crossley & Co* (1901) 18 RPC 95 at 104, *per* Lord Halsbury LC, and see also *Ratcliffe v Evans* at 527).

105    In the Appellant's statement of claim (at paras 23–25, see above at [103]), the Appellant pleaded as special damage the *entire value* of the PT Bayan shares which were withdrawn from the IPO.[76] In respect of these

---

[76]    Record of Appeal (Volume II) (Part 1) at pp 43–45 (Statement of Claim (Amendment No 6) at paras 23–35).

pleaded heads of special damage, we dismiss the claim in malicious falsehood because causation of such loss has not been made out. It quite simply cannot by any stretch of the imagination be shown that a direct and natural consequence of the false words was that loss amounting to the *entire value* of the shares would be suffered by the Appellant. This was as though the false words caused the shares to become worthless. Quite aside from the fact that we cannot accept that such loss as pleaded is a direct and natural consequence of the publications, it was also disclosed in the evidence brought below that the Appellant was in fact able to sell his shares in a private sale not long after the IPO. Approximately 300m shares were sold by the Appellant to another shareholder.[77] This clearly showed that the publication of the false words did not cause the shares to become worthless.

106    In our view, the Appellant's real loss, if any, was what was pleaded in para 26, *ie*, the loss of opportunity to invest in the money he would have gotten had he sold his PT Bayan shares at the IPO as planned.[78] The crux of the contention between the parties is whether the Respondent's acts had caused such loss. The Judge declined to address this issue, taking the view that this was a matter which was to be decided at the assessment of damages stage of the proceedings (see the Judgment at [81]). The parties are not in dispute that this was a matter on which the Judge ought to have made a determination. This was not least because special damage is, as we have noted, an element of the tort of malicious falsehood, without which the tort cannot stand and

---

[77]    Record of Appeal (Volume III) (Part B5) at p 149 (Affidavit of Evidence-in-Chief of Sukamto Sia affirmed on 17 July 2012 at para 178).

[78]    Record of Appeal (Volume II) (Part 1) at pp 44 (Statement of Claim (Amendment No 6) at para 26).

liability cannot be held to have been made out. Given the Judge did not undertake the task of evaluating the evidence relating to this issue and did not make any determination thereon, it is incumbent on us to do so now.

107     The Appellant's case is that following the Publications to BAPEPAM, BAPEPAM informed PT Bayan that it would have to "clear" any dispute over the shares of PT Bayan before the IPO could proceed.[79] As a result of this, the Appellant says he had "no choice" but to withdraw his vendor shares from the IPO. It was on this basis, he says, that BAPEPAM issued the Effective Statement which allowed the IPO to proceed.[80] The Respondent, on the contrary, argued that there was no causal link between the Publications and the special damage alleged because BAPEPAM did not impose on the Appellant and PT Bayan the requirement that he removed his vendor shares. Instead, he says, this was done on his own accord or by PT Bayan's management on the advice of its IPO underwriter PT Trimegah.[81]

108     The test of causation of special damage in the tort of malicious falsehood is simply that such damage must have been the natural and probable (or, in different parlance but meaning the same thing, direct and natural) result of the words (see *Palmer Bruyn & Parker Pty Limited v Keith Parsons* (2001) 208 CLR 388). In this regard, we find that the Appellant has established the necessary causal link in the present case. Kwan Jenny Quantero ("Quantero"), a director and shareholder of PT Bayan, gave evidence as to the events which

---

[79]     Record of Appeal (Volume III) (Part A1) at p 5 (Affidavit of Evidence-in-Chief of Kwan Jenny Quantero affirmed on 17 July 2012 at para 8).

[80]     Appellant's Case at para 232.

[81]     Respondent's Case at paras 141–143.

*Low Tuck Kwong v Sukamto Sia*                                    [2013] SGCA 61

followed the publications.[82] On 21 July 2008, representatives from PT Bayan, PT Trimegah, PT Bayan's lead managing underwriter, which was responsible for liasing with BAPEPAM, and PT Bayan's lawyers met with representatives of BAPEPAM. They informed BAPEPAM that the Appellant had assured PT Bayan that the Respondent's allegations were false, and that PT Bayan was not connected in any way to the Appellant. They were informed by BAPEPAM that they would have to clear any disputes on the PT Bayan shares before the IPO could proceed. PT Trimegah met with the representatives of BAPEPAM a second time and PT Trimegah then advised that the only way for the IPO to proceed was for the Appellant's shares to be removed from the vendor shares offering. This advice was acted upon.

109    We accept the evidence put forward by the Appellant and find that the publication of the false words was the natural and probable cause of the need to remove the Appellant's vendor shares from the IPO. The Respondent suggests that the Appellant and PT Bayan could have taken other courses of action than to remove the Appellant's vendor shares to assuage BAPEPAM's concerns for BAPEPAM to allow the IPO to proceed. These are, however, nothing more than speculative suggestions on his part. We accept the evidence that from the meetings with BAPEPAM, Quantero, the IPO advisors and in particular PT Trimegah understood that BAPEPAM would only allow the IPO to proceed if they took the course that they did.

110    In the light of all of the above, we find that the Appellant has made out the causation of special damage in the present case. As we have noted, this is

---

[82]    Record of Appeal (Volume III) (Part A1) at pp 4–5 (Affidavit of Evidence-in-Chief of Kwan Jenny Quantero affirmed on 17 July 2012 at paras 5–11).

*Low Tuck Kwong v Sukamto Sia*                                [2013] SGCA 61

confined to the Appellant's pleading that as a result of the false words, he was not able to sell his vendor shares at the IPO and that he suffered a loss of opportunity to use and/or invest in the money he would have otherwise gotten.

*Relying on s 6(1)(a) of the Defamation Act*

111    In the alternative, the Appellant seeks to rely on s 6(1)(a) of the Defamation Act (Cap 75, 1985 Rev Ed) which reads as follows:

> 6.—(1) In any action for slander of title, slander of goods or other malicious falsehood, it shall not be necessary to allege or prove special damage —
>
> > (a)    if the words upon which the action is founded are calculated to cause pecuniary damage to the plaintiff and are published in writing or other permanent form ...

112    The question in the present case is whether the words complained of were "calculated to cause pecuniary damage to the plaintiff". The words "calculated to" have been interpreted by the Singapore High Court in *DHKW Marketing and another v Nature's Farm Pte Ltd* [1998] 3 SLR(R) 774 ("*DHKW Marketing*") at [39] to mean "likely to produce the result" (see also *Gatley* at para 21.13). We agree with the High Court's interpretation of this phrase in *DHKW Marketing*. We would further note by way of observation that in *Customglass Boats Ltd and Another v Salthouse Brothers Ltd and Another* [1976] RPC 589 ("*Customglass Boats*") at 603, Mahon J in the Supreme Court of New Zealand interpreted s 5 of the New Zealand Defamation Act 1954 (NZ), which is *in pari materia* to our s 6 and the original s 3 of the Defamation Act 1952 (c 66) (UK). Mahon J similarly interpreted and held that "calculated" is equivalent to "likely". The New Zealand legislation has since been amended and now speaks of the same in more direct terms (and consistently with the judicial interpretation in *Customglass Boats*). Section 5 of the Defamation Act 1992 (NZ) states:

71

> In proceedings for slander of title, slander of goods, or other malicious falsehood, it is not necessary to allege or prove special damage if the publication of the mater that is the subject of the proceedings is *likely to cause* pecuniary loss to the plaintiff. [emphasis added]

113    If the provision applies, a plaintiff would not need to prove specific pecuniary loss but instead the court will infer the existence of such loss. The result is that the damages will be "at large" (see *McGregor on Damages* at para 40-013). In other words, even if the plaintiff is unable to bring evidence to prove that he has *actually* suffered the loss, that does not mean that he can recover only nominal damages as that would be to render s 6(1) nugatory (see *Joyce v Sengupta and Another* [1993] 1 WLR 337 at 346–347 and *WBG Network* at [86]).

114    For the same reasons we have adopted above (at [105]), we cannot conclude that the words complained of in the present case were likely to produce the result that the Appellant's shares would be rendered worthless. However, we accept that the sending of the Letters is one which was likely to produce the result of pecuniary loss as pleaded at para 26 of the Appellant's statement of claim (see above at [103]). We come to this conclusion bearing in mind, among other things, the context of the listing exercise, the content of the Letters, and the fact that they were sent so close to the proposed launch date of the IPO. In the circumstances, we are satisfied that the Appellant's claim in malicious falsehood in so far as it relates to para 26 of his pleadings falls within s 6(1)(*a*) of the Defamation Act.

*Actionability under Indonesian law*

115    Whether the tort of malicious falsehood is actionable under Indonesian law for the purposes of the double actionability rule was not determined by the

*Low Tuck Kwong v Sukamto Sia*                    [2013] SGCA 61

Judge in the light of his conclusion that the tort was not made out under Singapore law.

116     Mr Giam in the court below expressly conceded in the course of cross-examining the Appellant's expert witness on Indonesian law, Dr Frans Hendra Winarta ("Dr Winarta"), that what is known as malicious falsehood in Singapore is actionable under Indonesian law.[83] Despite this, in his closing submissions below, the Respondent attempted to argue otherwise. In the light of counsel's concession, and the fact that as a result, Dr Winarta was not cross-examined on his expert opinion on this issue, we do not think that it is appropriate for the Respondent to now attempt to row back from the position taken and argue that it is not actionable under Indonesian law. We accordingly accept the conclusion that the tort of malicious falsehood is actionable under Indonesian law.

### Conclusion in respect of liability for malicious falsehood

117     In the light of malice and falsity having been proven by the Appellant, and considering the causation of special damage in the nature of the loss of opportunity to invest the money the Appellant would have had had he been able to sell his vendor shares at the IPO having been established, or, in the alternative, on the application of s 6(1)(*a*) of the Defamation Act, we find that liability for malicious falsehood is made out.

---

[83]     Appellant's Case at para 291; Appellant's Core Bundle Volume 4 at pp 89–90 (Transcript of Proceedings (of 24 August 2012) at p 66 ln 18 – p 67 ln 21).

*Low Tuck Kwong v Sukamto Sia*                                    [2013] SGCA 61

### The relief available under the malicious falsehood claim

#### Damages

118    The Appellant is entitled to the special damage as pleaded in para 26 of its statement of claim. In the alternative, such damage in para 26 may be inferred pursuant to s 6(1)(*a*) of the Defamation Act and the Appellant is entitled to an award on this basis. However, recovery is only allowed to the extent these claims do not overlap: there should not be double recovery. These damages will be assessed by a High Court judge.

#### Injunction

119    For the same reasons we decline to order an injunction for the Appellant's claim in defamation (see above at [101]), we also do not think it necessary to order it under the claim in malicious falsehood.

#### Declaration

120    The Appellant seeks, in respect of his claim in malicious falsehood, a declaration that the words complained of were false. Specifically, he seeks a declaration that:[84]

> the [Respondent] did not give money to the [Appellant] in 1995 or 1996 for investment in the coal mining business as alleged by the [Respondent] in the Defamatory Letters, and the [Respondent] is therefore not entitled to any shares in PT Bayan Resources.

---

[84]    Record of Appeal (Volume II) (Part 2) at p 3–95 (Statement of Claim (Amendment No 6) at p 39 para (2)).

74

This issue was not dealt with by the Judge. The correct question to ask first, in our view, is whether the relief of a declaration is available under Singapore law in a claim such as the present.

121    The issue of whether a declaration of falsity can be granted in a libel action was considered by the English High Court in *Loutchansky v Times Newspapers Ltd (No 6)* [2002] EMLR 44 ("*Loutchansky*"). Gray J concluded in the negative. The facts of *Loutchansky* may be relevant to understanding the decision. There, the claimant, Mr Loutchansky, sued for libel and the defendant's defence was that of qualified privilege, specifically, the *Reynolds* privilege (*ie*, that established in English law in *Reynolds v Times Newspapers Ltd and others* [2001] 2 AC 127). He thus sought to amend his particulars of claim to seek a declaration that the words complained of were false, saying that he had no interest in concerning himself with the matters arising from a consideration of the *Reynolds* privilege, but rather, wanted to establish falsity to vindicate his reputation. Gray J (at [3]) gave four reasons refusing permission to amend the particulars of claim. First, a declaration may be granted only in respect of *an existing legal right* (citing *Nixon v Attorney-General* [1930] 1 Ch 566). Contrary to Mr Loutchansky's argument, there is no legal right to a good reputation. Accordingly, there was no legal right to sustain the grant of a declaration. Second, to grant a declaration of falsity even where the defendant succeeded in their defence would subvert the balance sought to be maintained by the defence. Third, there would be an opening of the floodgates, such that newspapers would need to consider whether they, other than pleading the *Reynolds* privilege, ought also to expend monies defending a claim of falsity. Last, the court would be loath to grant a declaration which may be used worldwide where evidence in relation to the truth or falsity would not have been fully considered.

122    It is Gray J's first reason which is relevant to the analysis because the Appellant is seeking the declaration of falsity on the basis of his claim in malicious falsehood and not defamation. It is the position in Singapore as well that declaratory relief can only be granted in respect of *legal rights* (see *Salijah bte Ab Latef v Mohd Irwan bin Abdullah Teo* [1995] 3 SLR(R) 233 ("*Salijah*") at [17], as approved by this Court in *Karaha Bodas Co LLC v Pertamina Energy Trading Ltd and another appeal* [2006] 1 SLR(R) 112). If under the tort of defamation the Appellant cannot obtain a declaration of falsity because there is no legal right to good reputation, we likewise do not see how the Appellant can contrive a legal right capable of supporting a grant of declaratory relief in a claim in malicious falsehood. In *Jameel (Yousef) v Dow Jones & Co Inc* [2005] QB 946, the English Court of Appeal came to the same conclusion as the High Court in *Loutchansky*. Lord Phillips of Worth Matravers MR (at [67]) thought that at the end of a libel action, an award of substantial damages provides vindication to the plaintiff, and so the court does not have to make a declaration that the words complained of were false. This reasoning in the context of defamation extends, in our view, to the tort of malicious falsehood as well. The Appellant, succeeding in his claim in malicious falsehood, a tort concerned with remedying the unlawful causing of damage (see above at [104]), is fully compensated, leaving nothing requiring the grant of a declaration of falsity. It is simply not sufficient for the Appellant to say that declaration should be granted "to make clear to the world" that what the Respondent alleged happened in 1995 or 1996 did not happen and that the Respondent was not entitled to shares in PT Bayan.[85] The Appellant's reliance on *Loudon v Ryder (No 2)* [1953] 1 Ch 423 ("*Loudon*") where a

---

[85]    Appellant's Case at para 252.

declaration was granted in an action for slander to title does not assist his case, as there, in the specific context of slander to title (which is a specific species of action and not the general action for malicious falsehood), the *legal right* in question was the *title to property*, and it was that which supported the grant of a declaration.

123    At common law, no such declaratory relief is available in a claim for malicious falsehood generally.

124    Because declaratory relief is a discretionary remedy, the court may not grant it where it will not give "relief" in the real sense (see *Salijah* at [17]). Therefore, in addition to the above, it may be useful to consider that there are several factors pointing towards the court *not* granting declaratory relief in any event. First, as noted, the Appellant's reputation will be vindicated by an award of damages for the torts of both defamation and malicious falsehood. Secondly, in making out his claim in malicious falsehood, there is already a determination of falsity by the court. Last, the Respondent's counterclaim against the Appellant for the shares in PT Bayan has already been litigated in this action below and no appeal against the Judge's dismissal of it was filed, and so is *res judicata*, such that there is no need to further protect the Appellant by way of a declaration of falsity to make clear that the Respondent is not entitled to shares in Bayan. In contrast, in the case of *Loudon*, the court found (at 428) that the defendant was going to continue to make false assertions that the plaintiff did not have title to her property – it was this which required the court to make a declaration.

**Conclusion**

125    For all the reasons we have set out above, we allow the appeal in so far as we find that the Respondent is liable in the tort of defamation. However, we

*Low Tuck Kwong v Sukamto Sia*                    [2013] SGCA 61

reject the appeal against the Judge's findings as to the natural and ordinary meanings of the words complained of. We also find liability in malicious falsehood. The damages available to the Appellant, under these two torts, to the extent that we have found are claimable, will be assessed by a High Court judge. Taking into account the conduct of these proceedings, we award the costs of the appeal and the costs of the trial to the Appellant. These are to be taxed if not agreed. There will also be the usual consequential orders.

Sundaresh Menon
Chief Justice

Chao Hick Tin
Judge of Appeal

V K Rajah
Judge of Appeal

Davinder Singh SC, Tony Yeo, DK Rozalynne PG Dato Asmali and Meryl Koh Junning (Drew & Napier LLC) for the appellant; Giam Chin Toon SC, Tan Hsuan Boon, Lim Meng Ern Kevin and Tang Suen Sim Jacqueline (Wee Swee Teow & Co) for the respondent.

Certified true copy

Private Secretary to Judge
V K Rajah JA
Supreme Court, Singapore

- 9 NOV 2013