This is the exhibit marked "**LTK-27**" referred to in the affidavit of **LOW TUCK KWONG** sworn and subscribed before me by Mr. Low Tuck Kwong who was previously known to me or presented to me adequate identification on 6th August, 2015

Before me

IN THE HIGH COURT OF THE REPUBLIC OF SINGAPORE

**[2013] SGHC 146**

Suit No 256 of 2010/Y

Between

## DYNASTY LINE LIMITED (IN LIQUIDATION)

... *Plaintiff*

And

1. **SUKAMTO SIA**
2. **LEE HOWE YONG**

... *Defendants*

And

Between

### SUKAMTO SIA

... *Plaintiff in Counterclaim*

And

1. **DYNASTY LINE LIMITED (IN LIQUIDATION)**
2. **LOW TUCK KWONG**
3. **WILLIAM TACON**
4. **LAU WU KWAI KING LAUREN**

... *Defendants in Counterclaim*

---

# JUDGMENT

---

[Companies] – [Directors] – [Duties]
[Tort] – [Conspiracy]

This judgment is subject to final editorial corrections approved by the court and/or redaction pursuant to the publisher's duty in compliance with the law, for publication in LawNet and/or the Singapore Law Reports.

# Dynasty Line Ltd (in liquidation)
v
## Sia Sukamto and another

### [2013] SGHC 146

High Court — Suit No 256 of 2010
Lai Siu Chiu J
16 – 17, 21– 25, 31 January 2013, 1, 4 – 5 February 2013; 20 March 2013

31 July 2013                                        Judgment reserved.

**Lai Siu Chiu J:**

**Introduction**

1      These proceedings consist of a claim ("the Original Action") and a counterclaim ("the Counterclaim"). The Original Action involves a claim by Dynasty Line Limited ("Dynasty") as the plaintiff against Sukamto Sia ("Sia") and Lee Howe Yong ("Lee") for breaches of fiduciary duties owed to Dynasty while they were its directors. The Counterclaim involves Sia suing Low Tuck Kwong ("Low") for an alleged breach of the terms of a settlement agreement, and against Dynasty, Low, William Tacon ("Tacon") and Lau Wu Kwai King Lauren ("Lauren") for, *inter alia,* conspiracy to injure him.

2      The expert witnesses who testified on foreign law were:

(a)     Simon Edward Lawrenson ("Lawrenson") as an expert on British Virgin Island ("BVI") law for Dynasty;

*Dynasty Line Ltd v Sia Sukamto*                              [2013] SGHC 146

      (b)      Ian Mann ("Mann") as an expert on BVI law for Low;

      (c)      Timothy Nixon Prudhoe ("Prudhoe") as an expert on BVI law for Lee; and

      (d)      Adrian Bell SC ("Bell") as an expert on Hong Kong law for Low.

**The Background**

3      Dynasty, a company now in liquidation, was incorporated under the laws of the BVI in 1994. Sia and Lee were appointed directors of Dynasty on 6 May 1996. At all material times, Sia was the sole shareholder of Dynasty although Lee was promised 20% of the profits of Dynasty without any equity contribution from him.

4      Dynasty served as a corporate vehicle for Sia's investments. It did not have any business operations nor did it engage in any trading. The only investment made by Sia through Dynasty was the acquisition of 29,537,367 shares ("the Sale Shares") in China Development Corporation Limited ("CDC"), a company listed on the Hong Kong Stock Exchange and which was formerly known as Sum Cheong International Limited. Those shares were acquired from Low and the following parties (the "Remaining Vendors" and collectively the "Vendors") under seven sale and purchase agreements (the "S&P Agreements") dated 5 February 1996:

      (a)      Johnny Tsao Yue Hwa;

      (b)      Yap Han Hoe;

      (c)      Swanny Sri Sujanty Setyono;

*Dynasty Line Ltd v Sia Sukamto*                    [2013] SGHC 146

    (d)    Lau Kang Thow;

    (e)    Evelyn Ong Suat Tay ("Ong"); and

    (f)    Low Cheng Lum ("CL Low").

5    The total purchase price of the shares was HK\$230,391,463 (the "Purchase Price"). However, the total sum paid by Sia was only HK\$64,459,317.16. Prior to the intended completion date on 2 May 1996, the Vendors voluntarily transferred all their shares to Dynasty between March 1996 and May 1996.

6    Between April 1996 and November 1997, Sia, on behalf of Dynasty, entered into transactions with various financial institutions (collectively the "Security Transactions"), pursuant to which the Sale Shares owned by Dynasty were pledged as security for loan facilities granted to Sia and other third parties as follows:

    (a)    On 23 April 1996, Dynasty charged 60,161,510 CDC shares to Commerzbank (South East Asia) Limited ("Commerzbank") as security for facilities granted to Sia ("Commerzbank Transaction");

    (b)    On 6 November 1996, Dynasty charged 28 million CDC shares to Societe Generale (Labuan branch) as security for facilities granted to Beswil Investment Pte Ltd, which is a company owned by Sia and Lee ("Societe Generale Transaction");

    (c)    On 29 August 1997, Dynasty charged 48,822,700 CDC shares to KG Investments Asia Limited ("KGL") as security for facilities granted to Franklin Syah ("KGL Transaction"); and

(d)    On 3 November 1997, Dynasty charged 10,702,625 CDC shares to Creditanstalt Bankverein as security for facilities granted to Sia ("Creditanstalt Bankverein Transaction").

7      Sia and the other two borrowers subsequently defaulted on the loan facilities whereupon the financial institutions exercised their right to sell the Sale Shares under the Security Transactions and applied the proceeds towards the satisfaction of the debts owed to the respective financial institutions by Sia and the other borrowers.

8      After the above event of default, the following actions were instituted in Singapore, BVI and Hong Kong:

(a)    Suit 960 of 1998 in Singapore;

(b)    HCA 10075 of 1998 in Hong Kong;

(c)    Suit 2333 of 1998 in Singapore;

(d)    HCA 9505 of 1999 in Hong Kong;

(e)    HCA 2057 of 2007 in Hong Kong;

(f)    HCCW 382 of 2007 in Hong Kong;

(g)    BVI Application No 2009/0376; and

(h)    the Original Action.

***Suit 960 of 1998***

9      On 17 June 1998, Low filed Suit 960 of 1998 ("Suit 960") against Sia seeking payment of HK$71,836,580.31, being the alleged unpaid balance of the Purchase Price of the Sale Shares due to him under the S&P Agreements.

Dynasty was not a party to Suit 960. Low's claim was that Sia had orally guaranteed full payment of the Purchase Price. Low settled this claim with Sia on 5 November 1998.

### HCA 10075 of 1998

10      On 19 June 1998, Sia, through Dynasty, brought an action in HCA 10075 of 1998 ("HCA 10075") against Low and the Remaining Vendors for misrepresentation in relation to the Sale Shares. Dynasty claimed that Low and the Remaining Vendors had made various misrepresentations to Dynasty relating to the business, affairs and financial position of CDC and its subsidiaries. This action was struck out on 16 December 1998 as Dynasty lacked the funds to continue the proceedings.

11      On 22 December 1998, five of the Remaining Vendors sued Sia in Suit 2333 of 1998 ("Suit 2333") for the alleged unpaid balance of the Purchase Price of the Sale Shares owed to them under their respective S&P Agreements. Suit 2333 was discontinued on 26 May 1999.

### HCA 9505 of 1999

12      On 10 June 1999, Low and the Remaining Vendors commenced fresh proceedings against Dynasty in HCA 9505 of 1999 ("HCA 9505") for the alleged unpaid balance of the Purchase Price of the Sale Shares due to them under the S&P Agreements. The Hong Kong High Court entered judgment against Dynasty for the sum of HK$113,633,160.51, being the unpaid balance of the Purchase Price of the Sales Shares along with interest (the "HK Judgment").

*Dynasty Line Ltd v Sia Sukamto*                        [2013] SGHC 146

### HCCW 382 of 2007

13      On 23 August 2007, Low presented a petition in the Hong Kong High
Court in HCCW 382 of 2007 for the appointment of provisional liquidators,
pursuant to which Lauren and Kennic Lai Hang Hui ("Lai") were appointed as
joint provisional liquidators of Dynasty (the "Provisional Liquidators").

### HCA 2057 of 2007

14      On 27 September 2007, the Provisional Liquidators commenced
proceedings on Dynasty's behalf against Sia and Lee in HCA 2057 of 2007
("HCA 2057") for, *inter alia*, alleged breaches of fiduciary duties in relation to
the Sale Shares. The Provisional Liquidators also obtained a Mareva
injunction against Sia and Lee by way of an *ex parte* application. The Hong
Kong Court of Appeal allowed Sia's application (in CACV 184 of 2008) to
stay Dynasty's action on the ground that Hong Kong was not the appropriate
forum.

15      Dynasty's appeal against the decision of the Hong Kong Court was
dismissed (in FAMV 39 of 2009).

### BVI Application No 2009/0376

16      On 29 October 2009, Low filed a petition in the BVI High Court (via
BVI Application No 2009/0376) to wind up Dynasty and to have liquidators
appointed. On 22 December 2009, Low's application was granted and Tacon
and Lauren were appointed as joint liquidators of Dynasty (the "Liquidators").

*Dynasty Line Ltd v Sia Sukamto*                    [2013] SGHC 146

**The Original Action**

17      On 14 April 2010, the Liquidators commenced the Original Action against Sia and Lee for, *inter alia*, alleged breaches of fiduciary duties owed to Dynasty. Sia responded by filing the Counterclaim along with his defence (see [19] below) while Lee filed defences which were similar to Sia's.

**The issues before the court**

18      The issues to be decided in the Original Action are as follows:

(a)      Are Dynasty's claims in the Original Action time-barred ("Issue 1")?

(b)      Are Dynasty's claims in the Original Action defeated by delay, laches, and/or acquiescence ("Issue 2")?

(c)      Did Sia and Lee breach any fiduciary duties owed to Dynasty ("Issue 3")?

19      With regard to the Counterclaim, the issues are:

(a)      Did Low act in breach of the settlement agreement ("Issue 4")?

(b)      Did Low and Lauren conspire and combine together with the predominant purpose to cause loss and damage to Sia through the pursuit of stale and baseless claims in Hong Kong ("Issue 5")?

(c)      Did Low, Lauren and Tacon conspire together with the predominant purpose to cause injury to Sia through the pursuit of stale and baseless claims in Singapore ("Issue 6")?

7

*Dynasty Line Ltd v Sia Sukamto*                                   [2013] SGHC 146

**The court's decision**

*Issue 1: Is Dynasty's claims in the Original Action time-barred?*

*Application of a time bar*

20      Sia and Lee both argued that Dynasty's claims are time-barred by
reason of ss 6 and 24A of the Limitation Act (Cap 163, 1996 Rev Ed).  Section
6 of the Limitation Act states:

> **Limitation of actions of contract and tort and certain
> other actions**
>
> **6.**—(1) Subject to this Act, the following actions shall not be
> brought after the expiration of 6 years from the date on which
> the cause of action accrued:
>
>> (a) actions founded on a contract or on tort;
>>
>> (b) actions to enforce a recognizance;
>>
>> (c) actions to enforce an award;
>>
>> (d) actions to recover any sum recoverable by virtue of
>> any written law other than a penalty or forfeiture or
>> sum by way of penalty or forfeiture.
>
> (2) An action for an account shall not be brought in respect of
> any matter which arose more than 6 years before the
> commencement of the action.
>
> ...
>
> (7)  Subject to sections 22 and 32, this section shall apply to
> all claims for specific performance of a contract or for an
> injunction or for other equitable relief whether the same be
> founded upon any contract or tort or upon any trust or other
> ground in equity.

21      Section 24A of the Limitation Act states:

> **Time limits for negligence, nuisance and breach of duty
> actions in respect of latent injuries and damage**
>
> **24A.**—(1) This section shall apply to any action for damages
> for negligence, nuisance or breach of duty (whether the duty
> exists by virtue of a contract or of a provision made by or

8

under any written law or independently of any contract or any such provision).

(2) An action to which this section applies, where the damages claimed consist of or include damages in respect of personal injuries to the plaintiff or any other person, shall not be brought after the expiration of —

> (a) 3 years from the date on which the cause of action accrued; or

> (b) 3 years from the earliest date on which the plaintiff has the knowledge required for bringing an action for damages in respect of the relevant injury, if that period expires later than the period mentioned in paragraph (a).

(3) An action to which this section applies, other than one referred to in subsection (2), shall not be brought after the expiration of the period of —

> (a) 6 years from the date on which the cause of action accrued; or

> (b) 3 years from the earliest date on which the plaintiff or any person in whom the cause of action was vested before him first had both the knowledge required for bringing an action for damages in respect of the relevant damage and a right to bring such an action, if that period expires later than the period mentioned in paragraph (a).

(4) In subsections (2) and (3), the knowledge required for bringing an action for damages in respect of the relevant injury or damage (as the case may be) means knowledge —

> (a) that the injury or damage was attributable in whole or in part to the act or omission which is alleged to constitute negligence, nuisance or breach of duty;

> (b) of the identity of the defendant;

> (c) if it is alleged that the act or omission was that of a person other than the defendant, of the identity of that person and the additional facts supporting the bringing of an action against the defendant; and

> (d) of material facts about the injury or damage which would lead a reasonable person who had suffered such injury or damage to consider it sufficiently serious to justify his instituting proceedings for damages against a defendant who did not dispute liability and was able to satisfy a judgment.

*Dynasty Line Ltd v Sia Sukamto*                                    [2013] SGHC 146

...

(6) For the purposes of this section, a person's knowledge includes knowledge which he might reasonably have been expected to acquire —

    (a) from facts observable or ascertainable by him; or

    (b) from facts ascertainable by him with the help of appropriate expert advice which it is reasonable for him to seek.

22    I am of the view that s 6 applies to Dynasty's claims against Sia and Lee. As noted by the Court of Appeal in *Yong Kheng Leong and another v Panweld Trading Pte Ltd and another* ("*Yong Kheng Leong*") [2013] 1 SLR 173 at [69], the effect of s 6(7) is that the entire s 6 applies to all claims for equitable relief, whether these are founded upon contract, tort, a trust or other grounds in equity. Dynasty's claims are caught by s 6(7) because its claims are essentially for an account of misappropriated property, which is an equitable relief, founded upon allegations of breaches of fiduciary duty owed by Sia and Lee to Dynasty, which are grounded in equity. Section 6(2) expressly imposes a six-year time bar on actions for an account.

*Exceptions to a time bar*

23    Dynasty argued that even if a time bar under the Limitation Act did apply, Dynasty's claims against Sia and Lee fell within the time bar exceptions provided by s 22 because they, as directors of Dynasty, had trustee-like responsibilities for the Sale Shares. Section 22 of the Limitation Act states:

**Limitations of actions in respect of trust property**

**22.**—(1) No period of limitation prescribed by this Act shall apply to an action by a beneficiary under a trust, being an action —

10

*Dynasty Line Ltd v Sia Sukamto*                                    [2013] SGHC 146

> (a) in respect of any fraud or fraudulent breach of trust to which the trustee was a party or privy; or
>
> (b) to recover from the trustee trust property or the proceeds thereof in the possession of the trustee, or previously received by the trustee and converted to his use.
>
> (2) Subject to subsection (1), an action by a beneficiary to recover trust property or in respect of any breach of trust, not being an action for which a period of limitation is prescribed by any other provision of this Act, shall not be brought after the expiration of 6 years from the date on which the right of action accrued.
>
> ...

24     The question to be answered is whether a disposal of company property in breach of fiduciary duties to the company is a "breach of trust" for the purpose of s 22 of the Limitation Act. It was recognised in *Yong Kheng Leong* at [36] and [44] that there are two distinct types of constructive trusts for the purposes of the applicability of limitation defences, such as those in s 22(1) of the Limitation Act. The first category (referred to as "Class 1 constructive trusts" or "Class 1 constructive trustees" when referring to the trustees) may potentially be denied any limitation defence, whereas those in the second category (referred to as "Class 2 constructive trusts" or "Class 2 constructive trustees") generally may avail themselves of any defence of limitations. It was held in *Yong Kheng Leong* at [44] that a director who disposes of company property in breach of his fiduciary duties is treated as having acted in breach of trust, and more specifically, is a Class 1 constructive trustee.

25     In the present case, Sia and Lee were, as directors of Dynasty, lawfully able to deal with Dynasty's assets in accordance with their fiduciary duties. If Sia and Lee were found to have disposed of Dynasty's assets unlawfully in breach of their fiduciary duties to Dynasty, they will come within Class 1

11

constructive trustees because they would have dealt with that property in breach of the trust and confidence that had been placed on them as directors. As was held in *Yong Kheng Leong* at [49], the limitation regime that applies to claims against an express trustee is applicable to claims against Class 1 constructive trustees. Therefore, s 22 of the Limitation Act relating to "any fraud or fraudulent breach of trust" would be relevant in such a case.

26      Assuming that Sia and Lee are Class 1 constructive trustees (because they are found to have disposed of Dynasty's assets unlawfully in breach of their fiduciary duties to Dynasty), s 22(2) of the Limitation Act imposes a time bar of six years for claims, unless the exceptions in s 22(1) apply. The concept of fraud in s 22(1)(a) was elaborated on in *Yong Kheng Leong* at [52]:

> 52      ... Turning first to s 22(1)(a), the concept of fraud in the context of the English equivalent of our s 22(1)(a) was discussed by the English Court of Appeal in *Gwembe Valley* (at [131] and [132]):
>
>> 131 In *Armitage v Nurse* ... [1998] Ch 241 at 251, 260 Millett LJ held that, in this context, a breach of trust is fraudulent, if it is dishonest. He accepted counsel's formulation that dishonesty—
>>
>>> ... connotes at the minimum an intention on the part of the trustee to pursue a particular course of action, either knowing that it is contrary to the interests of the company or being recklessly indifferent whether it is contrary to their interests or not.
>
> and added:
>
>> 'It is the duty of a trustee to manage the trust property and deal with it in the interests of the beneficiaries. If he acts in a way which he does not honestly believe is in the interests of the beneficiaries then he is acting dishonestly.'
>
>> 132 The correctness of this guidance was not in issue before us. We were also referred to the recent decision of the House of Lords in *Twinsectra Ltd v Yardley* ... [2002] 2 AC 164. Lord Hutton, giving the leading

*Dynasty Line Ltd v Sia Sukamto*                    [2013] SGHC 146

speech, emphasised the objective and subjective aspects of the 'combined test' ... :

> 'which requires that before there can be a finding of dishonesty it must be established that the defendant's conduct was dishonest by the ordinary standards of reasonable and honest people and that he himself realised that by those standards his conduct was dishonest.'

27    Thus, the meaning of "fraudulent breach of trust" in s 22(1)(a) is a broad one. If Sia and Lee, in disposing of Dynasty's assets, are found to have breached their fiduciary duties to Dynasty because they did not act honestly and in good faith in the best interests of Dynasty, their conduct will by that very finding be considered fraudulent under s 22(1)(a).

28    Looking at the wording of s 22(1) of the Limitation Act, I am of the view that Dynasty merely has to allege a fraudulent breach of trust for the exception to apply. Therefore, no period of limitation prescribed by the Limitation Act applies to Dynasty's action against Sia and Lee. In any case, if Sia and Lee were found to be Class 1 constructive trustees, it would necessarily follow that they were fraudulent under s 22(1)(a), and the exception would apply.

**Issue 2: Is Dynasty's claims in the Original Action defeated by delay, laches, and/or acquiescence?**

*Sia's case*

29    Sia argued that the doctrine of laches and/or acquiescence apply to disentitle Dynasty from pursuing its claims in the Original Action. Dynasty's claims were founded on events which took place more than sixteen years ago. By entering into a settlement agreement with Sia in Suit 960, Low led Sia to believe that any dispute between him and the Vendors in relation to the Sale Shares had been fully and finally disposed off. It was therefore unconscionable

13

for Low to initiate and maintain a lawsuit against Sia in relation to the Sale Shares through Dynasty and the Liquidators. By not adding Sia as a defendant to HCA 9505 and pursuing similar claims as in the Original Action, the Vendors led Sia to believe that they would not make any claim against Sia in relation to the Sale Shares. Sia was prejudiced as he no longer had in his possession most of the documents dating back to 1994; memories had also faded. Lastly, Low had acquiesced in the pledge of the Sale Shares because he knew from the outset that Sia would be pledging the Sale Shares and he benefitted from the pledge.

*Dynasty's case*

30      Dynasty contended that it could not pursue its claims against Sia and Lee earlier because Dynasty was under the effective control of Sia until the appointment of the Provisional Liquidators on 23 August 2007, after which the Provisional Liquidators and Liquidators had acted expeditiously. Moreover, any prejudice complained of by Sia and Lee was exaggerated because lawyers acting for Dynasty in HCA 9505 accepted that there was little or no documentary evidence available to support the defence. Lastly, Sia and Lee ought to be precluded from raising the equitable defence of laches and acquiescence because they have not come to court with "clean hands", having not acted honestly in causing injury to Dynasty.

*The applicable legal principles*

31      It should be noted at the outset that even if Dynasty's claim is not time-barred, it can still be barred by acquiescence and laches because s 32 of the Limitation Act preserves a defendant's right to raise such a defence: *Re Estate of Tan Kow Quee* [2007] 2 SLR(R) 417 at [27]–[31]. Section 32 of the Limitation Act states:

*Dynasty Line Ltd v Sia Sukamto*                    [2013] SGHC 146

**Acquiescence**

**32.** Nothing in this Act shall affect any equitable jurisdiction
to refuse relief on the ground of acquiescence, laches or
otherwise.

32      In essence, the doctrine of laches operates as an equitable defence to a
claim where there has been a substantial lapse of time coupled with
circumstances where it would be practically unjust to give a remedy. A
succinct summary of the principle was given in *Cytec Industries Pte Ltd v
APP Chemicals International (Mau) Ltd* [2009] 4 SLR(R) 769 at [46], cited
with approval in *eSys Technologies Pte Ltd v nTan Corporate Advisory Pte
Ltd* [2013] SGCA 27 at [37]–[38]:

> Laches is a doctrine of equity. It is properly invoked where
> essentially there has been a substantial lapse of time coupled
> with circumstances where it would be practically unjust to
> give a remedy either because the party has by his conduct
> done that which might fairly be regarded as equivalent to a
> waiver thereof; or, where by his conduct and neglect he had,
> though perhaps not waiving that remedy, yet put the other
> party in a situation in which it would not be reasonable to
> place him, if the remedy were afterwards to be asserted
> (*Sukhpreet Kaur Bajaj d/o Manjit Singh v Paramjit Singh Bajaj*
> [2008] SGHC 207 at [23]; *Re Estate of Tan Kow Quee* [2007] 2
> SLR(R) 417 at [32]). This is a broad-based inquiry and it would
> be relevant to consider the length of delay before the claim
> was brought, the nature of the prejudice said to be suffered by
> the defendant, as well as any element of unconscionability in
> allowing the claim to be enforced (*Re Estate of Tan Kow Quee*
> at [38]).

33      As to the defence of acquiescence, I refer to *Tan Yong San v Neo Kok
Eng and others* [2011] SGHC 30 at [112]–[114]:

> 112      The defence of acquiescence is described in the
> following manner in *Halsbury's Laws of England* vol 16 (4th
> Ed Reissue) at para 924, which was cited by the Court of
> Appeal in *Genelabs (supra)* at [76]:
>
>> The term acquiescence is... properly used where a
>> person having a right and seeing another person about
>> to commit, or in the course of committing an act

15

infringing that right, stands by in such a manner as really to induce the person committing the act and who might otherwise have abstained from it, to believe that he consents to its being committed; a person so standing-by cannot afterwards be heard to complain of the act. In that sense the doctrine of acquiescence may be defined as quisence under such circumstances that assent may reasonably inferred from it and is no more than an instance of the law of estoppel by words or conduct...

113    Acquiescence is frequently pleaded together with the defence of laches because both defences are based on the inaction of the party against whom the defence is invoked. As a result, some cases have tended to conflate both concepts. However, they are separate and distinct defences with different consequences. This is explained more fully by Patten LJ in *Lester v Woodgate (supra)* at [21]–[22]:

> 21    The word laches is also sometimes used to denote the type of passive conduct which can amount to acquiescence and so found an estoppel when it can be shown that the party standing by has induced the would-be defendant to believe that his rights will not be enforced and that other party has, as a consequence, acted in a way which would make the subsequent enforcement of those rights unconscionable.
>
> 22    But where the conduct relied on consists of no more than undue delay, it operates only to bar the grant of equitable relief such as an injunction. It does not extinguish the claimants' legal right or bar its enforcement by, for example, the award of common law damages.

114    Thus, laches in its strict sense refers only to delay on the part of the plaintiff coupled with prejudice to the defendant. As explained above at [96]–[100], laches can only be used as a defence against a claim for equitable relief. Acquiescence on the other hand is premised not on delay, but on the fact that the plaintiff has, by standing by and doing nothing, made certain representations to the defendant in circumstances to found an estoppel, waiver, or abandonment of rights: see *Orr v Ford (supra)* at 337–338. Unlike laches, the defence of acquiescence is not limited to resisting claims for equitable relief.

*Dynasty Line Ltd v Sia Sukamto*                              [2013] SGHC 146

*The present facts*

34      Although there was substantial delay on the part of Low, I find that it would not be practically unjust to give a remedy if Dynasty's claims are made out. Hence, Dynasty's claim is not barred by laches.

35      Sia argued that the settlement agreement (see below at [85]) between Low and himself effectively led him to believe that any dispute between him and the Vendors in relation to the Sale Shares had been fully and finally disposed off. It suffices to state at this stage that I find (at [93]) that Low did not agree to "not commence or continue with any other proceedings in connection with or in relation to the facts and/or subject matters of [Suit 960]". Low merely agreed to discontinue Suit 960 while Sia agreed not to claim costs on the condition that Low was not to commence related actions. Should Low commence related actions, Sia would be at liberty to claim for costs in Suit 960, nothing more. Therefore, the settlement agreement could not have reasonably led Sia to believe that any dispute between him and the Vendors in relation to the Sale Shares had been fully and finally resolved.

36      Sia also contended that Low's failure to add him as a defendant to HCA 9505 effectively led him to believe that Low would not make any claim against Sia in relation to the Sale Shares. I disagree. In HCA 9505, Low and the Remaining Vendors commenced proceedings against Dynasty for the alleged unpaid balance of the Purchase Price of the Sale Shares. The current claim of breach of fiduciary duties arose from the Liquidators' discovery of the alleged wrongdoings of Sia and Lee, which flowed from Low's enforcement of the judgment debt via winding up proceedings. Such claims of breaches of fiduciary duties against the former directors of companies by liquidators are not uncommon, and hence not unforeseeable. I find that Low

17

was entitled to obtain judgment against Dynasty for the balance of the Purchase Price before enforcing the judgment against Dynasty. Low's decision not to add Sia as a defendant to HCA 9505 could not reasonably have led Sia to believe that Low would not make any claim against him in relation to the Sale Shares.

37      Sia then argued that because of the long lapse of time, he is now prejudiced in his defence under the Original Action. Specifically, Sia asserted that there was a "lack of documents", and there are "various supervening events" and "fading memories". However, Sia did not state clearly how his defence had been seriously prejudiced because of the passage of time. I am not persuaded that Sia suffered significant prejudice.

38      Sia argued that Low knew from the outset that Sia would be pledging the Sale Shares. Moreover, Low benefited from the pledging of the Sale Shares to pay off his own liabilities to Societe Generale. The short answer is that even if I accept that Low knew before he transferred the Sale Shares to Sia, that Sia would pledge the Sale Shares, there is no evidence to suggest that Low knew that Dynasty was insolvent or on the verge of becoming insolvent.

39      As will be shown below at [80]–[84], I find that the pledging of the Sale Shares to secure borrowings of Sia was not improper *per se* under BVI law and under Dynasty's Memorandum of Association and Articles of Association. The pledging of the Sale Shares would only be improper if it was in breach of the fiduciary duties owed by Sia and Lee as directors, *ie*, if the pledging was done when Dynasty was insolvent, or of doubtful solvency, or on the verge of insolvency (see below at [50]–[51]). The alleged wrongful act is hence the pledging of the Sale Shares when Dynasty was insolvent or on the verge of insolvency. It follows that Low had to know that Dynasty was

insolvent or on the verge of insolvency, for it to be said that Low had acquiesced to the pledging of the Sale Shares.

40      Therefore, I hold that Dynasty's claim is not barred by laches, and the defence of acquiescence does not apply.

### Issue 3: Did Sia and Lee breach any fiduciary duties owed to Dynasty?

*Dynasty's case*

41      Dynasty claimed that, by pledging the Sale Shares, Sia and Lee did not act honestly and in good faith in the best interests of Dynasty. While it is not necessary for a particular transaction to bring benefit to the company, the directors must honestly and in good faith form the view that the transaction is in the company's best interest. If a company becomes insolvent or is near insolvency, the directors cease to owe their duties to the shareholders. Instead, they owe their duty to the creditors, being the persons who are beneficially entitled to the company's assets. In such a situation, it was in the company's interest to retain its assets so as to meet its liabilities.

42      A balance sheet analysis should be used to determine the solvency of Dynasty. Dynasty was insolvent because the realisable value of the Sale Shares were substantially less than the value of its debts owed to its creditors, and the Sale Shares were fully encumbered when pledged to secure borrowings of Sia and his proxies. By pledging the Sale Shares, Sia and Lee did not act honestly and in good faith in the best interest of the creditors. Therefore, Sia and Lee had breached their fiduciary duties owed to Dynasty.

*Sia's and Lee's case*

43      A plain reading of Dynasty's Memorandum of Association and Articles of Association reveals that Dynasty was permitted to pledge the Sale Shares to secure the liabilities of any person, firm or company, irrespective of any corporate benefit. The material provisions in Dynasty's Memorandum and Articles of Association are standard provisions in BVI articles. The effect is that the interests of a BVI company are in fact synonymous with the interests of its majority shareholder. The best interests of Dynasty at the time the Sale Shares were pledged were the best interests of Sia.

44      At the time the Sale Shares were pledged, the test for solvency was enshrined in s 116 of the BVI Companies Act 1884 (Cap 285) (the "1884 Act"). Applying this test for solvency, Dynasty was not insolvent at the time the Sale Shares were pledged because there was no statutory demand served on Dynasty for the payment of a debt, there was no execution or other process issued on a judgment by any creditor remaining unsatisfied, and it was not proved to the satisfaction of the BVI Court that Dynasty was then unable to pay its debts. Moreover, Dynasty was able to obtain funding from Sia, who was financially strong, whenever required. Further, Sia had the *bona fide* belief that the Vendors were not entitled to payment due to the various misrepresentations made by Low and the collateral contract between Low and Sia.

45      Lee argued that even if Dynasty was insolvent at the time the Sale Shares were pledged, he did not know and had no reason to suspect that the Sale Shares were not fully paid for or that Dynasty had any creditors. In any case, the pledge documents signed by Lee were dated prior to his appointment

*Dynasty Line Ltd v Sia Sukamto*                              [2013] SGHC 146

as director of Dynasty, and there was no evidence that Lee had already been appointed at the time he signed the documents.

*The applicable legal principles on directors' duties*

46     Since Dynasty was incorporated on 18 January 1994 under the BVI International Business Companies Act 1984 ("IBCA 1984"), the relevant law to be applied in determining the existence and scope of the directors' duties is BVI law: *Focus Energy Ltd v Aye Aye Soe* [2009] 1 SLR(R) 1086 at [31]. The legal system in the BVI is founded on the English legal system. BVI law is not only written in statutes, but also derived from the (English) common law and equitable principles. Section 11 of the West Indies Associated States Supreme Court (Virgin Islands) Act (Cap 80) provides that:

> The jurisdiction vested in the High Court in civil proceedings, and in probate, divorce, and matrimonial causes, shall be exercised in accordance with the provisions of this Ordinance and any other law in operation in the Territory and rules of court, and where no special provision is therein contained such jurisdiction shall be exercised as nearly as may be in conformity with the law and practice administered for the time being in the High Court of Justice in England.

47     The doctrine of judicial precedent applies in the BVI such that the courts interpret BVI legislation in accordance with precedents of their own courts, including decisions of the Privy Council on appeal from those courts. Precedents from the courts of England and Wales and other Commonwealth jurisdictions are persuasive.

48     The starting point for determining what duties a director owes to a company is s 54 of the IBCA 1984, which states:

> **54**—(1) Every director, officer, agent and liquidator of a company incorporated under this Act, in performing his functions, shall act honestly and in good faith with a view to the best interests of the company and exercise the care,

*Dynasty Line Ltd v Sia Sukamto* [2013] SGHC 146

diligence and skill that a reasonably prudent person would exercise in comparable circumstances.

(2) No provisions in the memorandum or articles of a company incorporated under this Act or in any agreement entered into by the company relieves a director, officer, agent or liquidator of the company from the duty to act in accordance with the memorandum or articles or from any personal liability arising from his management of the business and affairs of company.

49     The duties enshrined in s 54 of the IBCA 1984 are not exhaustive of a director's fiduciary duties, which include other duties such as the duty of not putting himself in a position where his duty and his interest may conflict. However, for the purposes of this present case, we are mainly concerned with the duty in s 54(1), namely, a director's fiduciary duty to act honestly and in good faith with a view to the best interests of the company. The expert witnesses agree that this involves a subjective test and the BVI courts will consider the director's state of mind, *ie*, whether the director believed that he was acting in the best interests of the company.

50     A director owes his duties to the company as a whole and not to individual shareholders: *Percival v Wright* [1902] 2 Ch 421. As confirmed by Mann, the interests of a BVI company were in fact synonymous with the interest of its majority or sole shareholder.

51     However, where a company becomes insolvent, the directors cease to owe its duties to the shareholders. Instead, the directors have a duty to act in the best interests of the creditors, being the persons who are beneficially entitled to the company's assets: *Liquidator of West Mercia Safetywear Ltd v Dodd & Anor (1988) 4 BCC 30*; and see Harney Westwood & Riegels, *British Virgin Islands Commercial Law* (Colin Riegels and Ian Mann gen ed) (Sweet & Maxwell, 2012) (*"British Virgin Islands Commercial Law"*) at para 7.009. There are even suggestions that directors may owe duties to act in the best

22

*Dynasty Line Ltd v Sia Sukamto*                                    [2013] SGHC 146

interests of the creditors when their company is near insolvency or of doubtful solvency (*British Virgin Islands Commercial Law* at para 7.009).  Indeed, the English High Court in *Colin Gwyer & Associates Ltd and another v London Wharf (Limehouse) Ltd and others Eaton Bray Ltd and another v Palmer and others* [2002] All ER (D) 226 held at [74] that the directors owe its duty to act in the best interests of the creditors not only when a company is insolvent, but when the company is of doubtful solvency or on the verge of insolvency:

> 74      The tests referred to above apply when the company is solvent and a going concern. Where a *company is insolvent or of doubtful solvency or on the verge of insolvency* and it is the creditors' money which is at risk the directors, when carrying out their duty to the Company, must consider the interests of the creditors as paramount and take those into account when exercising their discretion. This principle has been recognised by the Court of Appeal in *West Mercia Safetywear v Dodd* [1988] BCLC 250 at 252 to 253 per Dillon LJ, applying the reasoning of Street CJ in *Kinsela v Russell Kinsela Pty Ltd* (1986) 4 NSWLR 722 at 730 (CA, NSW). It was also applied in the Court of Appeal in *Brady v Brady* [1988] BCLC20 at 40g-41c per Nourse LJ where he stated that the interests of the company in this context are in reality the interests of the existing creditors alone. [emphasis added]

*The applicable test for insolvency*

52      At the time of the Security Transactions, the BVI Insolvency Act 2003 had not come into force. Accordingly, Prudhoe opined that the statutory test of solvency was that enshrined in s 116 of the 1884 Act. For easy reference, sections 115 and 116 of the 1884 Act are set out here:

> **Winding Up By Court**
>
> **Circumstances under which company may be wound up by Court.**
>
> **115.** A company under this Act may be wound up by the Court under the following circumstances, that company may be is to say –

*Dynasty Line Ltd v Sia Sukamto*                                    [2013] SGHC 146

> (a) whenever the company has passed a special resolution requiring the company to be wound up by the Court;
>
> (b) whenever the company does not commence its business within a year from its incorporation, or suspends its business for the space of a whole year;
>
> (c) whenever the members are reduced in number to less than five;
>
> (d) whenever the company is unable to pay its debts;
>
> (e) whenever the Court is of opinion that it is just and equitable that the company should be wound up.

**Company when deemed to be unable to pay its debts**

**116.** A company under this Act shall be deemed to be unable to pay its debts:

> (a) whenever a creditor, by assignment or otherwise, to whom the company is indebted, at law or in equity, in a sum exceeding two hundred and forty dollars then due, has served on the company, by leaving the same at the principal place of business of the company, or by delivering to the secretary or some director or principal officer of the company, or by otherwise serving the same in such manner as the Court may approve or direct, a demand under his hand requiring the company to pay the sum so due, and the company has, for the space of three weeks succeeding the service of such demand, neglected to pay such sum or to secure or compound for the same to the reasonable satisfaction of the creditor;
>
> (b) whenever execution or other process issued on a judgment, decree, or order obtained in any Court in favour of any creditor, at law or in equity, in any proceeding instituted by such creditor against the company, is returned unsatisfied in whole or in part;
>
> (c) whenever it is proved to the satisfaction of the Court that the company is unable to pay its debts.

53    Put simply, a company will be shown to be deemed to be unable to pay its debts if it is shown that:

*Dynasty Line Ltd v Sia Sukamto*                                    [2013] SGHC 146

(a)     a statutory demand had been served on the company for the payment of a debt in excess of $240 and that the debt remained unpaid for three weeks (s 116(a)); or

(b)     any execution or other process issued on a judgment by any creditor remains unsatisfied in whole or part (s 116(b)); or

(c)     it was proved to the satisfaction of the court that the company was then unable to pay its debts (s 116(c)).

54      Having considered arguments from both sides, I agree with Prudhoe that the test for solvency is that provided by s 116 of the 1884 Act. The test in s 116 has to be read together with s 115(d), which sets out one of the grounds for winding up of a company, namely, whenever the company is unable to pay its debts. Section 116 then provides a test for determining when this ground is satisfied. Because of this, Dynasty had argued that s 116 provides the test for determining when a company may be deemed to be insolvent for the purpose of winding up of companies, in contradistinction to the purpose of determining when the directors owe its duties to act in the best interests of the creditors instead of the shareholders. I see no reason to make such a distinction. In the absence of any contrary authorities from the BVI providing alternative tests for determining solvency, it is my view that the same test applies for determining when a company may be deemed to be insolvent for the purpose of winding up, and for determining when the directors have a duty to act in the best interests of the creditors.

55      After all, insolvency denotes a situation where creditors of a company have the right to wind up the company and appoint a liquidator. Under the 1884 Act, the right of a creditor to wind up the company arises when any of the situations in s 115 subsists. Specifically, s 115(d) provides that the

25

creditors have the right to wind up a company whenever the company is unable to pay its debts. Accordingly, for the purpose of the insolvency regime governed by the 1884 Act, the company's inability to pay its debts is synonymous with the company's insolvency. Therefore, the test for solvency, whether for the purposes of winding up a company or for the purpose of determining when the directors have a duty to act in the best interests of the creditors instead of the shareholders, is that provided by s 116 of the 1884 Act.

56     I accept Prudhoe's evidence that the applicable test of insolvency does not look to the future in terms of either the ability to pay or debts falling due for payment. The court only looks at a snapshot in time to decide whether the debts can be paid off at the time of someone suggesting an insolvent situation. In other words, the relevant test is a snapshot variant of the cash-flow solvency test. I therefore reject Dynasty's argument that the balance sheet test for insolvency should apply.

57     Dynasty had sought to rely on *Re Cheyne Finanace pc (in receivership) (No 2)* [2007] EWHC 2402 (Ch) ("*Cheyne Finance*") for the proposition that in considering whether the company is unable to pay its debts, the test included considering whether a company would be unable to pay its creditors in the future. A company would be considered insolvent in such a case, even if at the time of someone suggesting an insolvent situation, it was able to meet its current obligations.

58     I accept Lee's submission that Dynasty's reliance on *Cheyne Finance* is misplaced. *Cheyne Finance* was decided under s 123(1)(e) of the UK Insolvency Act 1986, which deems a company to be insolvent "if it is proved to the satisfaction of the court that the company is unable to pay its debts as they fall due". The phrase "as they fall due" is absent from s 116(c) of the

1884 Act, and was only introduced in the BVI Insolvency Act 2003. As stated by Prudhoe, "as they fall due" is a future anticipated event. Therefore, *Cheyne Finance* has no application to the insolvency regime we are concerned with.

59     For completeness, I should mention that the test for insolvency in the BVI has changed pursuant to the passing into law of the Insolvency Act, 2003. *British Virgin Islands Commercial Law* provides at para 7.006 that:

> For the purposes of British Virgin Islands Law, a company will be regarded as insolvent in any of the four following circumstances:
>
> (1) Cash-flow insolvency. If a company cannot pay its debts as they fall due.
>
> (2) Balance sheet insolvency. If the value of a company's liabilities exceeds the value of its assets.
>
> (3) Technical insolvency. Irrespective of the true financial position, a company will be deemed to be insolvent if either:
>
> > (a) it fails to comply with the requirements of a valid statutory demand, or
> >
> > (b) execution on a judgment or other order of a British Virgin Islands court in favour of a creditor of the company is returned wholly or partly unsatisfied.

60     On s 116(c), Sia argued that for Dynasty to establish that it was insolvent at the time the Sale Shares were pledged, it had to be proven to the satisfaction of the BVI Court that Dynasty was then unable to pay its debts. Since there was no claim filed before the BVI Court at the time the Sale Shares were pledged wherein it was established to the satisfaction of the BVI Court that Dynasty was at that time unable to pay its debts, Dynasty had not proven that it was insolvent at the time the Sale Shares were pledged.

61     I disagree with Sia's interpretation of s 116(c). As stated by Prudhoe in his expert opinion (at para 75), whether Dynasty could have paid its debts is a

question of fact. This question of fact will be answered by this court, and the burden is on Dynasty to prove that Dynasty was in fact unable to pay its debts at the material time. Sia's suggested interpretation is untenable because it flies in the face of the whole enterprise of applying foreign law for dispute resolution in appropriate cases.

*Was Dynasty insolvent at the time of the Security Transactions?*

62     The question then is whether Dynasty was unable to, or on the verge of being unable to, pay its debts at the time the Sale Shares were pledged.

Letters of demand

63     Lauren testified (as the provisional liquidator) that she did not see any demands or claims for payment by Low or the other vendors in 1996 and 1997.

64     Low tendered two copies of letters dated 26 May 1997 and 21 August 1997 which CL Low had purportedly sent to Dynasty demanding payment of the sum of HK$62,400 alleged to be then due and owing to CL Low. Those letters had not previously been disclosed in the discovery process. However, there was no evidence that proved that those letters were at any time served on Dynasty or Sia. The following extract of Low's evidence in cross-examination is pertinent:

> MR CHACKO: While that's being sorted out, perhaps I can move on. Mr Low, can I ask you to look at P2. This is a document that you tendered earlier this morning.
>
> A:     Yes.
>
> Q:     You say this is a letter that was sent by Mr Low Cheng Lum to Dynasty Line Limited on 26 May 1997. Is that your evidence?
>
> A:     Yes. Yes, Cheng Lum wrote this letter to them.

*Dynasty Line Ltd v Sia Sukamto*                                    [2013] SGHC 146

Q:      *Do you have any evidence that this letter was actually sent to Mr Sia?*

A:      *I don't. That's all that he gave me.*

Q:      You see the address that's set out for Dynasty Line. This letter is sent to a PO box in the British Virgin Islands, isn't it?

A:      Yes.

Q:      As at the date of this alleged letter, you would know where Mr Sia lives, wouldn't you?

A:      I was not the one who sent out this letter. It was my elder brother who sent out this letter in private.

Q:      Then let's look at the next page, which is a letter that you say your brother sent on 21 August 1997. Being?

A:      Yes.

Q:      Again, this letter is sent to a PO box in the British Virgin Islands. This time this letter is copied to you.

A:      Yes.

Q:      Do you recall receiving a copy of this letter on or around August 1997?

A:      It's been too long. I don't recall.

Q:      *Do you have any evidence showing that this letter was in fact sent out to Mr Sia, in or around August 1997?*

A:      *No. I only got hold of these documents this time round.*

Q:      When you say "this time round", when do you mean?

A:      You asked me for evidence and that's when I dig out these documents. I just asked them to look for the documents and the evidence.

Q:      So the first time that you actually saw this document was either yesterday or today?

A:      I really don't remember.

Q:      My instructions are, Mr Low, and I'm afraid I'm going to have to put this to you, that these letters at P2 were never sent to Mr Sia. You can either agree or disagree.

A:      Disagree.

[emphasis added]

29

*Dynasty Line Ltd v Sia Sukamto*                                    [2013] SGHC 146

65     Low also asserted that he had sent a handwritten letter in Chinese dated 6 November 1997 to Sia demanding payment or settlement of the balance sum of the Purchase Price of the Sale Shares. Again, there was no evidence that such a letter had been sent.

66     The evidence was that in a letter of demand dated 23 May 1998, the Vendors, through their then Singapore lawyers Khattar Wong & Partners, demanded payment of the alleged balance of HK$166,042,909 of the Purchase Price. This demand letter was only sent six months after the last of the Security Transactions in November 1997. Hence, it did not fulfil the requirements under s 116 for Dynasty to be deemed to be unable to pay its debts.

*Ability of Dynasty to pay its debts*

67     Although the S&P Agreements had contained a schedule providing for the payment of the consideration in tranches and for the delivery of the Sale Shares to be carried out on completion, against payment of the final tranche of monies, the parties agreed to a variation of this agreement. The parties agreed that the Sale Shares would be delivered, prior to completion, without the need for the full consideration to be paid. The Sale Shares were so delivered between 7 March 1996 and 27 May 1996.

68     I agree with Sia that there was a collateral agreement between Low and himself that save for the payment of the 1% of the Purchase Price to the other Vendors, the subsequent payments would be made to Low or his nominees, and the other Vendors would look solely to Low for their respective shares of the balance of the Purchase Price. Accordingly, Sia made payments totalling HK$64,348,525.81 to Low between 2 February 1996 and 11 November 1997. I accept Sia's evidence that the payments did not follow the schedule in the

*[handwritten margin note: Was there Entire Agreement clause ?]*

*Dynasty Line Ltd v Sia Sukamto*                    [2013] SGHC 146

S&P Agreements as Low and Sia intended for flexibility in the payment of the Purchase Price of the Sale Shares as well as to facilitate the setting-off of monies owed by Low to Sia. The fact that there were no documents evincing demands for the balance of the Purchase Price at the time the Security Transactions were entered into is consistent with the existence of this collateral agreement. Therefore, I find that there was no debt due and payable at the time the Security Transactions were entered into because there was flexibility in the payment dates. Hence, Dynasty was not then insolvent.

69      I also find that Dynasty was neither on the verge of insolvency, nor was its solvency doubtful. Because the collateral agreement provided for flexibility in the payment of the Purchase Price, I find that there was no date by which the parties had agreed to the Purchase Price being due and payable. Instead, Sia was to pay Low on an *ad hoc* basis. Although the Vendors' lawyers Khattar Wong & Partners sent a letter of demand dated 23 May 1998 for the alleged balance of HK$166,042,909, that was more than 6 months after the last of the Security Transactions on 3 November 1997. Since there was no debt that was payable and due before 23 May 1998, I find that Dynasty was not on the verge of being unable to pay its debts at the time of the Security Transactions.

70      There is however the question of issue estoppel that should be addressed here. It is arguable that Sia is estopped from arguing that there was a collateral agreement between himself and Low because the court in HCA 9505 had found that there was no such collateral agreement. At [2] of the judgment in HCA 9505, it was held that:

> ....Although Mr Kat for the defendant said that there was no formal concession on the defence or the counterclaim, the net result of the aforesaid election by the defendant was that the case of the defendant on misrepresentation and collateral

31

*Dynasty Line Ltd v Sia Sukamto*                    [2013] SGHC 146

> contract collapsed. The only live issue left for the court to
> decide (after the plaintiffs indicated that they had abandoned
> the resulting trust point) was the claim of the plaintiffs for
> declaration of equitable lien. ...

71     In the amended Defence and Counterclaim of Dynasty in HCA 9505,
the collateral agreement was described at para 6(4) as follows:

> It was orally agreed between Mr. Sia acting on behalf of the
> Defendant [Dynasty] and the First Plaintiff [Mr Low] acting on
> behalf of all the Plaintiffs that in the event of the sale of the
> said shares to the Defendant:
>
>> (a) save that the deposits for the purchase of the
>> Company's shares would be paid by Mr. Sia on behalf
>> of the Defendant directly to each of the Plaintiffs;
>>
>> (b) the balance of the purchase price for all of the said
>> shares would be paid to the First Plaintiff, and the
>> Second to Seventh Plaintiffs would look solely to the
>> First Plaintiff for payment of their respective shares of
>> the said balance; and
>>
>> (c) payment of said balance could be made by either
>> the Defendant or Mr. Sia on behalf of the Defendant, to
>> either the First Plaintiff or his nominee(s).

72     It should be noted that the collateral agreement pleaded in HCA 9505
was a narrow one, namely, that the alleged balance of the Purchase Price was
to be paid to Low instead of the Remaining Vendors. I have found that the
collateral agreement is wider in that it provided for flexibility in the payment
of the Purchase Price, and that Sia was to pay Low on an *ad hoc* basis.

73     In my view, Sia is not estopped from arguing that there was a collateral
agreement between himself and Low. First, the court in HCA 9505 did not
decide whether there was a collateral agreement. The court merely noted that
Dynasty's case on the collateral agreement "collapsed" and it was not a "live
issue" for the court to decide because of Dynasty's election not to call Sia to
give evidence and not to cross-examine Low. In effect, the court did not

32

decide on whether there was a collateral agreement because Dynasty had in substance abandoned such a claim.

74     Second, the finding of whether there existed such a collateral agreement was not necessary for the decision in HCA 9505. I refer to *Halsbury's Laws of Singapore* vol 6(2) (LexisNexis, 2009) where Professor Yeo Tiong Min stated at para 75.199:

> A foreign judgment could also be raised in local proceedings for the purpose of issue estoppel, ie, to estop one party from denying a question of fact or law already decided by the foreign court. Aside from the standard requirements that the judgment is from a court of competent jurisdiction that is final and conclusive on the merits of the case, there are two other requirements. The parties in the local proceedings must be the same parties (or be privy to the parties) in the foreign proceedings. The issue decided in the foreign court must be identical to the issue before the court of the forum. *Further, the decision on the issue must have been necessary for the decision of the foreign court; it cannot be collateral or incidental.* [emphasis added]

75     I agree with the learned author that for an issue estoppel to apply, the decision on the issue must have been necessary for the decision of the foreign court. In HCA 9505, the decision that Dynasty's case of a collateral agreement "collapsed" was not necessary to the judgment. In that case, the Vendors commenced proceedings against Dynasty for the alleged unpaid balance of the Purchase Price of the Sale Shares, and the court ruled in favour of the Vendors. The finding of whether there existed such a collateral agreement, as pleaded by Sia in that case (see [71] above), was not necessary for the decision in favour of the Vendors because Dynasty and Sia did not pay the alleged balance of the Purchase Price to either Low or the Remanding Vendors. The fact remained that the alleged balance of the Purchase Price was not paid. It was not a case where Sia had paid the alleged balance of the Purchase Price to Low and the Remaining Vendors were claiming against Sia because they did

not receive any payment from Low. Therefore, it was not necessary to the decision to determine whether there was indeed such a collateral agreement for the alleged balance of the Purchase Price to be paid only to Low and not to the Remaining Vendors.

76      Third, the injustice of not allowing the issue to be relitigated outweighs the hardship of Low in having to relitigate the point. I refer in this regard to *Arul Chandran v Chew Chin Aik Victor JP* [2000] SGHC 111 at [289]–[290] where the judge held:

> 289. Firstly I observe that there are three fairly strict requirements to be satisfied before the estoppel can arise. On occasions, these requirements have been narrowly construed, where for instance the estoppel principle may be held inapplicable when the same party acts in a different capacity. A fortiori, where either party to the subsequent proceeding is a stranger, no issue estoppel against either party should operate because the second requirement stated by Lord Brandon in The Sennar is not met. Even if all the strict requirements are satisfied and the estoppel has arisen, it does not appear to me that the estoppel doctrine, even as between parties, is necessarily applied very rigidly without considering the factual circumstances in each case, since fresh matters, new factual materials, subsequent substantial changes in the interpretation of the law showing that the earlier decision to have been wrong, and differences in the standard of proof even where the issues are identical, may well preclude an issue estoppel from operating.
>
> 290. I will therefore respectfully adopt the approach taken by Sir Nicolas Browne-Wilkinson, VC in Arnold & Others v National Westminster Bank plc [1988] 3 All ER 977, Ch D, where he held that:
>
>> Res judicata, whether cause of action estoppel or issue estoppel, is based on the fundamental principle that it is unjust for a man to be vexed twice with litigation on the same subject matter coupled with the public interest in seeing an end to litigation. So far as cause of action estoppel is concerned, the rule is absolute: You cannot sue twice for the same relief based on the same cause of action even if new facts or law have subsequently come to light. But it is clear that the rule as to issue estoppel is different as the authorities

*Dynasty Line Ltd v Sia Sukamto*                    [2013] SGHC 146

which 1 have quoted demonstrate; there are circumstances in issue estoppel where the injustice of not allowing the matter to be relitigated outweighs the hardship to the successful party in the first action in having to relitigate the point.

The rules applicable to issue estoppel and the proper exceptions to it are in the course of development: see *Carl-Ziess-Stiftung v Rayner & Keeler Ltd (No 2)* [1966] 2 All ER 536 at 554, [1967] 1 AC 853 at 917. The authorities show that the exception applying to 'special circumstances' is designed to ensure that where justice requires the non-application of issue estoppel, it shall not apply: see *Yat Tung Investment Co Ltd v Dao Heng Bank Ltd* [1975] AC 581 at 590; [1975] 2 WLR 690 at 696-697. In the *Carl-Zeiss case* [1966] 2 All ER 536 at 573, [1967] 1 AC 853 at 947 Lord Upjohn said:

> 'All estoppels are not odious but must be applied so as to work justice and not injustice, and I think that the principle of issue estoppel must be applied to the circumstances of the subsequent case with this overriding consideration in mind.'

77     In HCA 9505, Dynasty elected not to cross-examine Low or call Sia to give evidence. In effect, Dynasty had abandoned its claim in that suit that there was in fact a collateral agreement – the issue was never tried.

*Did Sia and Lee breach their fiduciary duty to Dynasty?*

78     Given the above findings that Dynasty was neither insolvent, nor on the verge of being insolvent, nor was its solvency doubtful at the time of the Security Transactions, Sia and Lee, as directors of Dynasty, owed their duties to the shareholders and not the creditors of Dynasty.

79     As was stated earlier at [3], Sia was the sole shareholder of Dynasty and Dynasty served as a corporate vehicle for his investments; it did not have any business operations or engage in any trading. Accordingly, the interests of Dynasty were those of Sia.

35

*Dynasty Line Ltd v Sia Sukamto*                                    [2013] SGHC 146

80      Section 9(1) of the IBCA 1984 expressly allowed a company under its jurisdiction to perform all acts and engage in all activities necessary or conducive to the conduct, promotion or attainment of the objects or purposes of the company irrespective of corporate benefit:

> 9(1) Subject to any limitations or provisions to the contrary in its memorandum or articles, this Act or any other law for the time being in force in the British Virgin Islands, a company incorporated under this Act has the power, *irrespective of corporate benefit*, to perform all acts and engage in all activities necessary or conducive to the conduct, promotion or attainment of the objects of the company, including the power to do the following —
>
> ...
>
>> (h) *guarantee a liability or obligation of any person* and to secure any of its obligations by mortgage, pledge or other charge, of any of its assets for that purpose;
>
> ...
>
> [emphasis added]

81      Dynasty's objects in its Memorandum of Association included the undertaking of liabilities of any person, the provision of credit to any person, and the securing of liabilities of any person without Dynasty receiving any consideration or advantage. The relevant object clauses in Dynasty's Memorandum of Association are as follows:

> 4. The Objects for which the Company is established are to engage in any act or activity that is not prohibited under any law for the time being in force in the British Virgin Islands including but not limited to:-
>
> (1) To purchase or otherwise acquire and undertake the whole or any part of the business, goodwill, assets and liabilities of any person, firm or company; to acquire an interest in, amalgamate with or enter into partnership, joint venture or profit-sharing arrangement with any person, firm or company; to promote, sponsor, establish, constitute, form, participate in, organise, manage, supervise and control any corporation, company, syndicate, fund, trust, business or institution.
>
> ...

36

*Dynasty Line Ltd v Sia Sukamto*                                    [2013] SGHC 146

(4) To enter into, carry on and participate in financial *transactions and operations of all kinds.*

...

(28) To lend and advance money and grant and *provide credit* and financial or other accommodation to *any person,* firm or company.

...

(30) *To guarantee* or otherwise support or secure, either with or without the Company receiving any consideration or advantage and whether by personal covenant or by mortgaging or *charging all or part of the undertaking, property,* assets and rights (present and future) and uncalled capital of the Company or by both such methods or by any other means whatsoever, *the liabilities and obligations of* and the payment of any moneys whatsoever (including but not limited to capital, principal, premiums, interest, dividends, costs and expenses on any stocks, shares or securities) *by any person,* firm or company whatsoever including but not limited to any company which is for the time being the holding company or a subsidiary of the Company or of the Company's holding company or is otherwise associated with the Company in its business, and to act as agents for the collection, receipt or payment of money, and to enter into any contract of indemnity or suretyship (but not in respect of fire, life and marine insurance business).

...

(41) To have all such powers as are permitted by law for the time being in force in the British Virgin Islands, *irrespective of corporate benefit,* to perform all acts and engage in all activities necessary, conducive or incidental to the conduct, promotion or attainment of the above objects of the Company or any of them

82    Article 98 of Dynasty's Articles of Association authorises directors of

Dynasty to charge its assets to secure any debt of any third party:

98. The directors may by resolution of directors exercise all the powers of the Company to borrow money and to mortgage or *charge its undertakings and property* or any part thereof, to issue debentures, debenture stock and other securities whenever money is borrowed or *as security for any debt, liability* or obligation of the Company or *of any third party.* [emphasis added]

37

*Dynasty Line Ltd v Sia Sukamto*                              [2013] SGHC 146

83      Although seemingly surprising, the above provisions are standard provisions in BVI articles, which may account for the widespread and universal use of BVI companies as corporate investment vehicles or holding companies.

84      In the circumstances, I find that the pledging of the Sale Shares to secure borrowings of Sia was not improper and was done in the interests of Dynasty. Accordingly, Sia and Lee had acted honestly and in good faith with a view to the best interests of the company and had not breached any fiduciary duties as directors of Dynasty. Given this finding, Dynasty fails in its claim against Lee for breach of his duty to exercise reasonable skill, care and diligence to supervise the activities of Sia.

**Issue 4: Did Low act in breach of the settlement agreement?**

85      The terms of the settlement agreement, as set out in the letter dated 5 November 1998 from Lee & Lee, Sia's former solicitors, to Khattar Wong & Partners, Low's former solicitors ("Lee & Lee's letter"), are as follows:

> We confirm that our respective clients have agreed to settle this matter on the following terms:
>
> > (i) your client will discontinue this action (i.e. Suit No. 960 of 1998) ("Term 1");
> >
> > (ii) you will file the Notice of Discontinuance on or before 9 November 1998 ("Term 2");
> >
> > (iii) our client will not claim costs for the discontinuance on the condition that your client does not commence or continue with any other proceedings in connection with or in relation to the facts and/or subject matters of this action ("Term 3"); and
> >
> > (iv) if your client breaches the condition to term (iii), our client will be at liberty to have the costs incurred by him in this action taxed, and to recover the taxed costs from your client ("Term 4").

*Dynasty Line Ltd v Sia Sukamto*                                    [2013] SGHC 146

*Sia's case*

86      Sia had argued that Low was/is the controlling mind and *alter ego* of
Dynasty because the Sale Shares were owned by Low while the Remaining
Vendors were his nominees. All the lawsuits filed in relation to the Sale
Shares were initiated on behalf of Low and funded by him; the Remaining
Vendors had no real interest in the outcome of any of the lawsuits.

87      The express words of Lee & Lee's letter in [85] show that Low agreed
not to commence "any other proceedings" in connection with or in relation to
the "facts and/or subject matters" of Suit 960. The statement of claim filed in
Suit 960 included the sale of the Sale Shares by the Remaining Vendors.
Given that Low was at all material times the true owner of the Sale Shares, it
must have been intended and understood by both Low and Sia that the
settlement constituted a full and final settlement of all claims in relation to all
the Sale Shares.

88      Accordingly, Low acted in breach of the settlement agreement when he
procured five of the Remaining Vendors to institute Suit 2333. Similarly, he
acted in breach of the settlement agreement when he procured Dynasty to
commence HCA 2057 of 2007 and the Original Action.

*Low's case*

89      Low argued that he was/is not the controlling mind and *alter ego* of
Dynasty because there was no evidence that he had any influence over the
Liquidators' decision-making. Moreover, it was not improper for creditors to
fund litigation of a company to recover assets of the company. It was also not
improper for David Chu ("Chu") to act as solicitor for both Low (as the
petitioning creditor) and the Liquidators at the same time. There was no

*Dynasty Line Ltd v Sia Sukamto*                                    [2013] SGHC 146

evidence that Chu communicated instructions of Low to Lauren or Tacon. The Liquidators' conduct did not show that they were not acting independently.

90      HCA 2057 of 2007 and the Original Action did not fall within the scope of the settlement agreement. Suit 960 related to the sale and transfer of the Sale Shares from Low to Dynasty and an alleged oral representation from Sia to Low that Sia would stand as a guarantor for Dynasty's debts; the subject matter was Sia's liability to Low as a guarantor for Dynasty's liabilities in respect of the balance of the Purchase Price. HCA 2057 of 2007 and the Original Action on the other hand related to the manner in which Sia and Lee dealt with the Sale Shares after the sale and delivery of those shares, and the subject matter was the liability of Sia and Lee to account to Dynasty for breaches of fiduciary duties owed to Dynasty as directors.

91      Lastly, Lee & Lee's letter did not impose an absolute prohibition on Low against the commencement of proceedings, but merely set out the condition for Sia's waiver of his costs for Suit 960.

*Construction of Lee & Lee's letter*

The applicable legal principles on contractual interpretation

92      I refer to the relevant principles on contractual principles stated by the Court of Appeal in *Zurich Insurance (Singapore) Pte Ltd v B-Gold Interior Design & Construction Pte Ltd* [2008] 3 SLR(R) 1029 at [131]:

> *The aim of construction*
>
> First, the aim of the exercise of construction of a contract or other document is to ascertain the meaning which it would convey to a reasonable business person.

40

*Dynasty Line Ltd v Sia Sukamto*                    [2013] SGHC 146

### The objective principle

Secondly, the *objective principle* is therefore critical in defining the approach the courts will take. They are concerned usually with the expressed intentions of a person, not his or her actual intentions. The standpoint adopted is that of a reasonable reader. [See in this regard the earlier discussion at [125]–[127] above].

### The holistic or 'whole contract' approach

Thirdly, the exercise is one based on the *whole contract* or an *holistic approach*. Courts are not excessively focused upon a particular word, phrase, sentence, or clause. Rather the emphasis is on the document or utterance as a whole.

### The contextual dimension

Fourthly, the exercise in construction is informed by the surrounding circumstances or external context. Modern judges are prepared to look beyond the four corners of a document, or the bare words of an utterance. It is permissible to have regard to the *legal, regulatory, and factual matrix* which constitutes the background in which the document was drafted or the utterance was made.

### Business purpose

Fifthly, within this framework due consideration is given to the commercial purpose of the transaction or provision. The courts have regard to the overall purpose of the parties with respect to a particular transaction, or more narrowly the reason why a particular obligation was undertaken.

### Lawful effect

Sixthly, a construction which entails that the contract and its performance are lawful and effective is to be preferred.

### Contra proferentem

Seventhly, where a particular species of transaction, contract, or provision is one-sided or onerous it will be construed strictly against the party seeking to rely on it.

### Avoiding unreasonable results

Eighthly, a construction which leads to very unreasonable results is to be avoided unless it is required by clear words and there is no other tenable construction.

[emphasis in original]

41

*Dynasty Line Ltd v Sia Sukamto*                                        [2013] SGHC 146

My decision

93      1 find that Low did not agree to "not commence or continue with any
other proceedings in connection with or in relation to the facts and/or subject
matters of [Suit 960]". 1 now set out my reasons.

94      First, the express wording of Lee & Lee's letter does not show that
Low agreed to "not commence or continue with any other proceedings in
connection with or in relation to the facts and/or subject matters of [Suit 960]".
At the outset, it should be noted that there was no such express term providing
for such an agreement. Low merely agreed to discontinue Suit 960, while Sia
agreed not to claim costs. 1 accept Low's submission that Term 3 does not
impose an absolute prohibition on Low against the commencement of
"proceedings in connection with or in relation to the facts and/or subject-
matters of [Suit 960]". Instead, the non-commencement of related proceedings
by Low is merely the condition for Sia to waive his costs for Suit 960. This is
supported and clarified by Term 4, which provides that should Low commence
related proceedings, Sia will be at liberty to claim the costs incurred by him in
Suit 960.

95      Sia argued that he and Low intended to settle all claims they may have
had against one another in relation to the Sale Shares. Hence, this was a
broader agreement than what the express words reveal. In particular, Sia's
position was that he was induced to enter into the S&P Agreements on
Dynasty's behalf and to acquire the Sale Shares at a significant premium based
on various representations made by Low. The representations which turned
out to be false included:

(a)    that the Sale Shares were owned and/or controlled by Low and that Low had other friends who could be persuaded to sell their shares in CDC to Sia;

(b)    that Sia could gain immediate control of CDC upon Dynasty's acquisition of all the Sale Shares;

(c)    that CDC was well-managed, financially sound and profitable; and

(a)    that CDC was prepared for and would be listed on the Singapore Stock Exchange.

96     Indeed, Sia, through Dynasty, brought an action in Hong Kong in HCA 10075 of 1998 against Low and the Remaining Vendors for the alleged misrepresentations in relation to the Sales Shares. Even assuming that Low did make the alleged representations, I note that it was not a term of Lee & Lee's letter that Sia would discontinue his action in HCA 10075 of 1998. Unlike the specific mention in Terms 3 and 4 which provided for the consequence that Sia would be at liberty to claim for costs if Low were to commence related proceedings against him, there was no mention of Sia's claim in misrepresentation by Low. I find that it is unlikely that the parties had intended for Low to divest himself of all rights to claim the balance of the Purchase Price in exchange for Sia's agreement not to claim costs in Suit 960 when the quantum of Low's claim was more than HK$71m. It should be noted that Term 3 is worded very broadly to cover "*any* other proceedings *in connection with* or *in relation to* the *facts and/or subject matters* of [Suit 960]*". If Sia's interpretation is to be adopted, it would mean that Low had not only agreed not to commence any proceedings relating to the alleged oral representation made by Sia to Low that Sia would stand as a guarantor for

43

*Dynasty Line Ltd v Sia Sukamto*                                    [2013] SGHC 146

Dynasty's debts (which was the subject matter of Suit 960), but Low had also agreed not to commence any proceedings which related to the unpaid balance of the Purchase Price, such as the alleged breach of fiduciary duties by Sia and Lee in pledging the Sale Shares (which was the subject matter of HCA 2057 of 2007 and the Original Action).

97      It is more likely than not that Low had merely agreed to discontinue Suit 960 (Term 1), which dealt with Sia's liability to Low as a guarantor for Dynasty's liabilities in respect of the balance Purchase Price. Low may well have decided that it was easier to claim the balance of the Purchase Price by claiming an account based on Sia's and Lee's alleged breach of fiduciary duties in pledging the Sale Shares, than to claim against Sia based on Sia's alleged oral representation as to the guarantee.

98      Sia argued that Low had conceded in cross-examination that he had settled his claims with Sia and he was not entitled to pursue any claims against Sia. Sia relied on the following extracts from Low's evidence during cross-examination:

> Q:    Yes. I'm going to go back to agreed bundle volume 1, just a few more questions and then perhaps we can stop there. 1AB volume 1, page 170.
>
> A:    Yes.
>
> Q:    That is a letter which sets out the terms of settlement of your Singapore suit.
>
> A:    Yes.
>
> Q:    You had basically agreed not to pursue Mr Sia in relation to the CDC shares.
>
> A:    *I said I'm not pursuing Mr Sia. I'm not saying that I don't pursue the CDC shares.*
>
> Q:    I'll leave your answer for what it's worth. I'll just move on. Mr Low, the reason why, in November 1998, you agreed to discontinue these proceedings without

*Dynasty Line Ltd v Sia Sukamto*                                        [2013] SGHC 146

> receiving any payment, is because you knew that Mr Sia had paid you all that you were entitled to in relation to the CDC shares. You can either agree or disagree.

A:       I disagree.

[emphasis added]

99      I do not accept that Low had made such a concession. At best, Low's answer was ambiguous. Sia's reliance on it was misplaced. Further, Low's answer was consistent with his position that he had merely agreed to discontinue Suit 960 which only dealt with Sia's liability to Low as a guarantor for Dynasty's liabilities in respect of the balance Purchase Price; Low did not agree not to commence any proceedings which related to the unpaid balance of the Purchase Price, such as the alleged breach of fiduciary duties by Sia and Lee in pledging the Sale Shares (which was the subject matter of HCA 2057 of 2007 and the Original Action).

100     The above finding is sufficient to dispose of this issue. However, for completeness, I will address Sia's other arguments.

*Was Low the controlling mind and alter ego of Dynasty?*

101     Sia sought a declaration that Low was the *alter ego* of Dynasty in commencing and directing the Original Action. Sia also sought an injunction to restrain Dynasty, Low, Tacon and Lauren from pursuing any claims against Sia in relation to the Sale Shares. Since Suit 2057 and the Original Action are actions by Dynasty and not Low, Sia has to establish that Low is the controlling mind and *alter ego* of Dynasty for the injunction to apply to Dynasty. On the other hand, if Sia's interpretation of the settlement agreement is adopted, Sia only has to show that Low applied to wind up Dynasty and procured the Liquidators and Provisional Liquidators to commence HCA 2057

45

*Dynasty Line Ltd v Sia Sukamto*                                    [2013] SGHC 146

of 2007 and the Original Action, in order to show that Low acted in breach of the settlement agreement. In such a case, Sia need not show that Low was the controlling mind and *alter ego* of Dynasty to prove that Low had breached the settlement agreement.

The applicable legal principles

102    In arguing that Low was the *alter ego* of Dynasty, Sia essentially requested for the corporate veil of Dynasty to be lifted to unveil Low as the true controller of Dynasty. Since Dynasty was incorporated under the IBCA 1984, the relevant law to be applied in relation to the issue of separate legal personality as a consequence of incorporation should be BVI law. Foreign law has to be proved as a fact. In this regard both parties had not proven BVI law. As stated above at [46], the legal system in the BVI is founded on the English legal system and BIV law is derived from the English common law, upon which much of Singapore's company law is based. Therefore, I find that it is not unjust to apply the presumption of similarity of laws. I refer to *D'Oz International Pte Ltd v PSB Corp Pte Ltd and another appeal* [2010] 3 SLR 267 at [25]:

> Turning to the second issue which pertains to the presumption of similarity of laws, it is only necessary to observe that the presumption is a rule of convenience which the courts may resort to unless it is unjust and inconvenient to do so. It is a rule that is not free from exceptions. Whether a common law court will presume foreign law to be the same as the lex fori in any case where foreign law is not pleaded or not proved (if pleaded) depends on the circumstances of each case. The question that is ordinarily asked when the presumption is invoked is whether, in the circumstances of the case, it would be unjust to apply it against a party so as to make him liable on a claim subject to foreign law when the claimant has failed to prove what the foreign law is and how liability is established under that foreign law (see Richard Fentiman, Foreign Law in English Courts (Oxford University Press, 1998) at pp 60–64 and 143–153, cited in Tamil Nadu Electricity Board v ST-CMS Electric Company Private Ltd [2008] 1 Lloyd's Rep 93 at 113).

46

> In the New South Wales Court of Appeal case of Damberg v
> Damberg (2001) 52 NSWLR 492, Heydon JA examined
> extensively, inter alia, case law from Australia, England,
> Canada and South Africa, and academic writings on the
> subject, and concluded that "[t]o state exhaustively when a
> court would not assume that the unproved provisions of
> foreign law are identical with those of the lex fori would be a
> difficult task" (at 522). In the present case, it is just as well
> that it is not necessary for me to undertake this arduous task.

103    As a starting point, it is well established that a company has a legal
personality of its own apart from the persons who comprise it: *Aron Salomon
(Pauper) v A Salomon and Company, Limited* [1897] AC 22. In limited
circumstances, courts have ignored this separation and lifted the corporate
veil. I refer to *Walter Woon on Company Law* (Tan Cheng Han, SC gen ed)
(Sweet & Maxwell, 2009) ("*Walter Woon on Company Law*") at paras 2.50 –
2.51 for a concise summary:

> 2.50 Incorporation of a company casts a veil over the true
> controllers of the company, a veil through which the law will
> not usually penetrate. However, in certain situations a court
> will ignore the separate legal personality of a company and
> look to the members or the controllers of the company. This is
> colourfully referred to as 'lifting the veil'. The situations in
> which the veil may be lifted are exceptional. In general, the
> courts will respect the company's modesty and decline to lift
> the veil.
>
> 2.51 It is suggested that there are essentially two justifications
> at common law for lifting the veil of incorporation. The first is
> that the company is in fact not a separate entity. This requires
> evidence. If the evidence does not establish that the company
> is run as a mere extension of its controllers' affairs, the veil of
> incorporation should remain firmly in place. However, if it can
> be proven that the company is in fact not a separate entity
> from its controllers, a court might be persuaded to lift the veil
> in the appropriate circumstances. The second is that the
> corporate form has been abused to further an improper
> purpose and not for a bona fide, usually commercial,
> transaction.

104    One instance where the courts have lifted the corporate veil is where
the separate personality of a company has been used to enable a person to

47

evade an existing contractual duty. I refer to the helpful summary provided by *Walter Woon on Company Law* at para 2.60:

> **Company used to evade legal obligations or to commit fraud**
>
> 2.60 No court will lend its aid to a fraudulent scheme. The separate personality of a company has often been used as a cloak to disguise a fraud or to enable a person to evade his legal obligations. In such cases, the court is not obliged to be blind to reality. Thus, if a person uses a company as a device to evade an existing contractual or statutory duty, the court may disregard the company's notional separateness. In *Lim Kar Bee v Duofortis Properties (M) Sdn Bhd*, Peh Swee Chin SCJ said, '... it is well settled that the courts have a discretion to lift [the corporate veil] for the purpose of discovering any illegal or improper purpose'. The learned judge cited the two following cases as authority.
>
> > **Gilford Motor Co v Horne [1933] Ch 935 (Court of Appeal, England)**
> >
> > Horne was formerly the managing director of the plaintiff company. He covenanted not to solicit customers of the company after the termination of his employment. However, when he left the plaintiff's employment he set up JM Horne & Co Ltd, through which he solicited the plaintiff's customers. The court granted an injunction against both Horne and his company, having held that he had breached his covenant.
> >
> > **Jones v Lipman [1962] 1 WLR 832 (High Court, England)**
> >
> > Lipman agreed to sell a house to Jones. For some reason he changed his mind. To avoid having to transfer the house, Lipman set up a company called Alamed Ltd and transferred the house to it. Alamed Ltd was wholly owned and controlled by Lipman. His solicitors then wrote to Jones' solicitors offering to pay damages for the breach of contract. Jones sought an order of specific performance. The defence was raised that Alamed Ltd was not a party against whom specific performance could be ordered. Russell J declined to accept this. He stated that Alamed Ltd was 'a creature of [Lipman's]', a device and a sham, a mask which he holds before his face in an attempt to avoid the eye of

48

equity'. Both Lipman and the company were ordered to specifically perform the contract to sell the house.

105    In *Win Line (UK) Ltd v Masterpart (Singapore) Pte Ltd and another* [1999] 2 SLR(R) 24 at [38]–[39], it was held that the courts would pierce the corporate veil where it was merely a device, facade or sham. In this connection, a sham referred to acts done or executed by parties to the sham that were intended by them to give to third parties the appearance of creating between the participating parties legal rights and obligations which were different from the actual rights and obligations which the participating parties intended to create.

## My decision

106    I had found above at [93] that Low did not agree to "not commence or continue with any other proceedings in connection with or in relation to the facts and/or subject matters of [Suit 960]". Assuming that Low did agree to "not commence or continue with any other proceedings in connection with or in relation to the facts and/or subject matters of [Suit 960]", Low would have a contractual obligation not to apply to wind up Dynasty and procure the Liquidators and Provisional Liquidators to commence HCA 2057 of 2007 and the Original Action. If Low had control over the Provisional Liquidators and Liquidators, he would be using the separate personality of Dynasty to evade his existing contractual duty. In such a case, the corporate veil of Dynasty will be lifted to reveal Low as the true controller of Dynasty. Therefore, the key enquiry is whether Low has control over the Provisional Liquidators and Liquidators such that he is the controlling mind and *alter ego* of Dynasty. This enquiry is closely tied to Sia's counterclaim on conspiracy, namely, that Low, Lauren and Tacon had combined and conspired together to institute claims

*Dynasty Line Ltd v Sia Sukamto*                                [2013] SGHC 146

against him. Hence, it would be neater to subsume this enquiry under my analysis of Sia's Counterclaim.

107    It suffices to state that I find that Low, Lauren and Tacon did not combine and conspire together to institute claims against Sia. Accordingly, Low had/has no control over the Provisional Liquidators and Liquidators, and he is not the controlling mind and *alter ego* of Dynasty (see [113]–[120 ] and [150]–[151 ] below).

108    For completeness, I shall now deal with Sia's argument relating to the issue of whether Low is the *alter ego* of Dynasty in commencing and directing the Original Action.

109    Sia argued that the Sale Shares were owned or controlled by Low with the Remaining Vendors being his nominees who did not have any real or beneficial interest in the Sale Shares. I agree. Quite a number of the Remaining Vendors in [4] are related to Sia. Ong was Low's personal assistant while CL Low is Low's elder brother and Lau Kang Thow is Low's uncle. The fact that the cheques Sia gave to Low in favour of CL Low and Lau Kang Thow for the initial 1% purchase price of the Sale Shares were never presented for payment despite there being sufficient funds suggests that Low did not hand the cheques over to the two vendors because they were not the true owners of the Sale Shares. In fact, Johnny Tsao had expressly declared that he held the Sale Shares on behalf of Low. Lastly, the Remaining Vendors lack any interest in the Sale Shares because Low admitted to paying off all the Remaining Vendors for the Sale Shares and was entitled to keep whatever monies recovered from Sia.

*Dynasty Line Ltd v Sia Sukamto*                    [2013] SGHC 146

110    It was not disputed that Low applied for the winding up of Dynasty, the appointment of the liquidators, and was the main financier of Dynasty's liquidation. Such actions were those a creditor in Low's position would have taken. However, they are not sufficient to show that Low was the controller of Dynasty.

**Issue 5: Did Low and Lau conspire together with the predominant purpose to cause loss and damage to Sia through the pursuit of stale and baseless claims in Hong Kong?**

*The applicable legal principles*

111    Sia's claim against Low and Lauren was founded on the tort of conspiracy by lawful means. The elements of the tort are:

> (a)    a combination of two or more persons and an agreement amongst them to do certain acts;
>
> (b)    the predominant purpose of the conspirators to cause damage or injury to the plaintiff;
>
> (c)    acts performed in furtherance of the agreement; and
>
> (d)    damage suffered by the plaintiff (see *Nagase Singapore Pte Ltd v Ching Kai Huat and others* [2008] 1 SLR(R) 80 at [23]).

112    As to the "predominant purpose" of a conspiracy, two points are worth mentioning. First, the focus of the enquiry is the intention of the alleged conspirators, not the natural or resulting consequence of their act: *Crofter Hand Woven Harris Tweed Company, Limited, and others v Veitch and another* [1942] AC 435 at 445. Hence, the knowledge of the alleged conspirators that the injury will be caused *per se* does not suffice to establish a

51

*Dynasty Line Ltd v Sia Sukamto*                    [2013] SGHC 146

predominant intention to cause injury: *Beckkett Pte Ltd v Deutsche Bank AG and another* [2008] 2 SLR(R) 189 at [116]. Second, where the alleged conspirators' actions serve their own commercial purpose, the infliction of loss on the plaintiff will not be the predominant purpose: *Quah Kay Tee v Ong and Co Pte Ltd* [1996] 3 SLR(R) 637 at [50].

*Was there a conspiracy or agreement between Low and Lau?*

113    Essentially, Sia had argued that there was an agreement between Low and Lauren with regard to the commencement and conduct of HCA 2057 of 2007.

The Engagement Letter

114    Sia referred to an engagement letter of 7 May 2007 ("the Engagement Letter") by which Low and Chu engaged Lauren and Lai as Provisional Liquidators in Hong Kong. Sia argued that the Engagement Letter was evidence of the agreement with regard to the commencement and conduct of HCA 2057 of 2007. Specifically, Sia contended that a paragraph in the Engagement Letter showed that Low's principal aim in presenting the winding up petition was to commence proceedings against Sia through Dynasty. Lauren agreed to render services to achieve this principal aim by accepting instructions from Low through Chu, who was Low's solicitor. The relevant paragraph of the Engagement Letter states:

> **Background**
>
> ...
>
> In view of an unsatisfied judgment which your client obtained against Dynasty Line Ltd in Hong Kong in 2001, it is contemplated that winding up proceedings against Dynasty Line Ltd will be commenced shortly. The Company does not have any assets, therefore the principal aim of the winding up is to bring misfeasance and other proceedings against the

*Dynasty Line Ltd v Sia Sukamto*                    [2013] SGHC 146

Company's directors. It is possible that separate proceedings will be taken in BVI in tandem with the Hong Kong proceedings.

115     The Engagement Letter expressly provides that Lauren was to receive instructions from Chu:

> We understand that Mr. David Chu of Heller Ehrman who is authorised to act as your representative will be our regular contacts for instructions and that he is authorized to make all relevant decisions concerning the matter.

116     In my view, Sia's argument of the existence of such an agreement is unpersuasive. It should be noted that the scope of services contemplated under the Engagement Letter were as follows:

> **Scope of service**
>
> It is anticipated that our scope of work may include the following:
>
> 1. collect and review books and records, bank statements, signed contracts and other documents of [Dynasty] and liaising, as required, with [Dynasty's] BVI Registered Agent and/or BVI liquidators;
>
> 2. appoint solicitors and obtain legal advice on merits of:
>
>> (a) bringing misfeasance and other proceedings against the [Dynasty's] directors, Messrs Sukamto Sia and Lee Howe Yong;
>>
>> (b) seeking injunctive relief against Messrs Lee and/or Sia to preserve assets against which any judgment obtained against the directors could be preserved;
>
> 3. write to Messrs Lee and/or Sia to request further information;
>
> 4. interview Messrs Lee and/or Sia to ascertain and obtain further information/documents;
>
> 5. review the financial position of [Dynasty] if financial records or documents are obtained;
>
> 6. conduct Section 221 examinations of Messrs Lee and/or Sia and others in relation to the relevant affairs of [Dynasty]; and
>
> 7. general care and conduct of the liquidation.

117    All the Provisional Liquidators had agreed to was to review the relevant documents and seek legal advice on the merits of commencing proceedings against Sia and Lee. Nowhere in the Engagement Letter was it unequivocally stated that the Provisional Liquidators had agreed to commence proceedings against Sia and Lee. Sia's reliance on what seems to be a general paragraph setting out the context of the case under the "Background" section of the letter is misplaced.

118    Sia relied on the provision in the Engagement Letter, which provides that Lauren was to receive instructions from Chu, to suggest that Low was the actual decision-maker behind the commencement and conduct of HCA 2057 of 2007. In my view, the reliance is again misplaced. It should be noted that the Engagement Letter was executed on 7 May 2007, prior to the appointment of the Provisional Liquidators in Hong Kong. At that time, Chu was indeed acting for Low. That was why Low authorised Chu to be his point of contact with the Provisional Liquidators. However, subsequent to their appointment as Provisional Liquidators, Lauren and Lai engaged Chu as their solicitor. At this point in time, Chu had ceased to act for Low, as seen from the fact that Low was represented by a different solicitor from a different firm in his petition to wind-up Dynasty and his application to appoint the Provisional Liquidators. Both Lauren and Low testified that following Chu's appointment as the Provisional Liquidators' solicitor, Chu ceased acting for Low.

No direct evidence of instructions from Low

119    It should be noted that there is no direct evidence showing that Low actually gave Lauren instructions whether directly or indirectly regarding the commencement and conduct of HCA 2057 of 2007. Lauren testified that the Provisional Liquidators commenced HCA 2057 of 2007 based on their own

*Dynasty Line Ltd v Sia Sukamto*                    [2013] SGHC 146

professional judgment with the benefit of independent legal advice. Lauren categorically denied to have done so simply on Low's direction.

120    Therefore, I find that there was no agreement between Low and Lauren with regard to the commencement and conduct of HCA 2057 of 2007.

*Was the predominant purpose of the agreement to cause damage or injury to Sia?*

121    Sia raised two main arguments to show that the predominant purpose of the agreement to commence and conduct HCA 2057 of 2007 was to cause him damage or injury:

> (a)    There was no legitimate commercial benefit for Dynasty to pursue the claims in HCA 2057 of 2007 because the claims were obviously time-barred, barred by laches and acquiescence, and wholly devoid of any basis in law or fact.

> (b)    The manner in which Lauren conducted her role as the Provisional Liquidator showed such a predominant purpose to cause damage or injury to Sia:

>> (i)    Lauren deliberately engaged Chu, who was the *alter ego* and representative of Low in HCA 2057 of 2007, as the solicitor for Dynasty in its claims against Sia;

>> (ii)    Lauren failed to obtain appropriate independent legal advice prior to instituting claims against Sia;

>> (iii)    Lauren applied for a Mareva injunction for an inflated amount against Sia when she had no basis or justification for doing so;

*Dynasty Line Ltd v Sia Sukamto*                                    [2013] SGHC 146

(iv)     Lauren failed to make any enquiries with Sia and the other creditors;

(v)      Lauren commenced proceedings against Sia and Lee barely over a month after her appointment and without having had sufficient time to conduct a proper review and investigation into the affairs of Dynasty;

(vi)     Lauren refused to effect payment of costs ordered in favour of Sia in HCA 2057 of 2007 until compelled by an order of this court to do so; and

(vii)    Lauren permitted Chu to file an affidavit scandalising the Singapore judicial system to resist the stay applications filed by Sia and Lee and to avoid litigating against them in Singapore.

122    The short answer to Sia's arguments is that the claims in the Original Action are not time-barred or barred by laches and acquiescence or wholly devoid of any basis in law or fact. I have ruled (at [28]) that the Original Action is not time-barred and not bared by laches and acquiescence (see above at [40]). Although I found at [84] that Sia and Lee did not breach their fiduciary duties in entering into the Security Transactions, the issue was by no means clear cut and the claim is not wholly devoid of any basis in law or fact. I accept Lauren's evidence that it seemed clear to the Provisional Liquidators that Sia and Low had breached their fiduciary duties on the face of it, without understanding the flexibility BVI law afforded directors. I note that in dismissing Sia and Lee's application to stay proceedings before the High Court of Hong Kong, Justice Carlson found that Dynasty had "at the very least, been able to make out a good arguable case based on the way the matter

56

*Dynasty Line Ltd v Sia Sukamto*                              [2013] SGHC 146

is pleaded in the statement of claim". The Court of Appeal of Hong Kong did not disagree with Justice Carlson's observation, when it allowed Sia's appeal on the basis that Hong Kong was not the appropriate forum. Therefore, even if there was an agreement between Low and Lauren with regard to the commencement and conduct of HCA 2057 of 2007, their predominant motive was to serve their own commercial purpose of recovering losses which they thought Dynasty and Low were entitled to from what appeared to be breaches of fiduciary duties, so as to maximize the assets available for distribution. Such a claim was not wholly devoid of any basis. Accordingly, the predominant purpose was not to cause damage or injury to Sia.

123    However, for completeness, I shall examine the other arguments raised by Sia.

Engagement of Chu as solicitor for Dynasty

124    Sia argued that instead of exercising independent and impartial judgment in the exercise of her duties as a liquidator, the engagement of Chu as solicitor for Dynasty showed that Lauren allowed herself to be a hired hand for Low in the commencement and conduct of HCA 2057 of 2007. Chu represented Low as early as 1999 in HCA 9505 and in 2007 when he acted for Low in issuing a statutory demand against Dynasty and negotiating the engagement of the Provisional Liquidators. Sia also argued that since a solicitor is the *alter ego* of his client, Lauren had in effect appointed Low to advise her on the claims when she appointed Chu as the solicitor of Dynasty. As confirmed by Mann, this situation was compounded by the fact that Chu was also the party engaging Lauren and the person authorised to instruct Lauren, as evidenced by the Engagement Letter.

57

*Dynasty Line Ltd v Sia Sukamto*                                    [2013] SGHC 146

125     Both Lauren and Low testified that following Chu's appointment as the Provisional Liquidators' solicitor, Chu ceased acting for Low. At the outset, 1 note that such an arrangement, where lawyers who had previously represented the petitioning creditor then represents the liquidator, is not uncommon in Hong Kong. 1 accept Bell's evidence that such an arrangement is not improper in Hong Kong if there is no conflict of interests. I accept that the engagement of Chu as the Provisional Liquidators' solicitor was reasonable because Chu had intimate knowledge of the relevant facts given his previous involvement in HCA 9505. There was a need for the Provisional Liquidators to act quickly to preserve Dynasty's assets, and Lauren found Chu to be a competent lawyer, having previously worked with him in other cases. I accept that any conflict of interests in the appointment of Chu was not insurmountable because the interests of the liquidators and Low were aligned. The first phase in liquidation is the asset gathering phase where the liquidator sets out to recover the assets of the company in liquidation, while the second phase concerns the calling of proofs of debt from the creditors, adjudicating the claims, and distributing the assets that have been recovered to the various creditors.

126     I find that the second phase in liquidation has not commenced as the liquidators are only looking to gather the assets of Dynasty, by seeking an account from Sia and Lee for allegedly entering into the Security Transactions wrongfully. I accept Mann's evidence that at the first phase in liquidation, the interests of the creditors and the liquidators are aligned. Therefore, I find that the appointment of Chu as the liquidators' lawyer was not improper and it did not compromise Lauren's duty to act independently and impartially, provided that Chu had ceased acting for Low since the date of his appointment.

127     Sia argued that the fact that detailed updates which included legal submissions and authorities were provided by Chu to Low's personal assistant,

58

*Dynasty Line Ltd v Sia Sukamto*                              [2013] SGHC 146

and the fact that Chu flew to Singapore to attend the trial of Suit 703 (where Low sued Sia for defamation) suggested that Chu continued to act for Low after becoming the solicitors of the Provisional Liquidators. 1 do not believe it is improper for Low as a funding creditor, to receive updates on the steps being taken by the Liquidators. Furthermore, the correspondence did not suggest that Chu had received any instructions from Low's personal assistant. However, I do note that the updates were very detailed as it contained legal submission and authorities, in contradistinction to merely periodic updates on the legal fees incurred. Moreover, Low was invited to contact Chu if he wished to discuss the preparation of the written submission.

128    Although Low testified that he did not know why Chu attended the trial of Suit 703, 1 do not believe him as Chu had represented Low on matters which involved Sia previously. Be that as it may, it should be noted that it is not inconceivable that Chu was present at the trial as solicitor for the Liquidators to listen to Sia's evidence, as Sia is a defendant in the Original Action commenced by the liquidators through Dynasty. On a balance of probabilities, I find that it has not been established that Chu was still acting for Low after Chu's appointment as the Provisional Liquidators' solicitor.

129    Lastly, I note that Lauren did not decide to commence and conduct HCA 2057 of 2007 solely on Chu's advice. Rather, it was based on the advice of her counsel Thomas Au.

130    Therefore, I find that Sia has failed to establish that the engagement of Chu as solicitor for Dynasty shows that Lauren allowed herself to be a hired hand for Low in the commencement and conduct of HCA 2057 of 2007.

Failure to obtain appropriate independent legal advice

131    Sia argued that the fact that Lauren failed to obtain appropriate independent legal advice before commencing HCA 2057 of 2007 (even though it is an express term of the Engagement Letter) shows a dereliction of her duty as Provisional Liquidator and a predominant purpose to institute claims against Sia to cause injury and loss to him. The issues that required evidence on BVI law included whether Dynasty's Memorandum of Association and Articles of Association permitted Sia to enter into the Security Transactions. Mann agreed that it would have been prudent for a provisional liquidator to obtain advice on BVI law on such matters in writing. Had Lauren had obtained such legal advice, she would have realised that the alleged breaches of fiduciary duties were without merit. Chu would not be qualified to advise Lauren on BVI law.

132    I find that Lauren did obtain independent legal advice, although not on BVI law. I accept that she discussed with Chu, her solicitor, and obtained written advice on 3 September 2007, before commencing HCA 2057 of 2007. As I have noted at [125], following Chu's appointment as the Provisional Liquidators' solicitor, Chu ceased acting for Low, and in any case, the interests of the liquidators and Low were aligned at the first phase in the liquidation. Accordingly, advice from Chu constituted independent legal advice.

133    In any case, even if the independence of Chu is impugned, I accept that Lauren had commenced the action because she held the belief that Dynasty appeared to have a clear claim against Sia and Lee for breach of fiduciary duties. Under cross-examination, her evidence was as follows:

*Dynasty Line Ltd v Sia Sukamto*                    [2013] SGHC 146

Q:     Did you not think that it would be prudent for you to
       get independent legal advice on the cause of action
       that you should adopt?

A:     In terms of taking the actions after I was appointed,
       there was counsel advice as well. It was not just Mr
       David Chu, on the way forward, in conducting the --
       the recovery of assets for the company.

Q:     Can you tell us which counsel?

A:     It's a counsel in Hong Kong.

Q:     Obviously. But his name, please?

A:     It's Thomas Au.

Q:     Thomas Au would have been engaged by Mr David
       Chu?

A:     He would have been engaging by David Chu.

Q:     Both Mr David Chu's costs, as well as Mr Thomas Au's
       costs, are being paid for by Mr TK Low?

A:     Correct.

Q:     You saw no issue with that, you didn't feel it necessary
       to get independent legal advice?

A:     I don't really see issues there, because the cause of
       action in the case, really based upon the breach of
       fiduciary duties by the directors. *And it's very clear to
       me, from reading the facts and the relevant documents,
       that the directors of the company pledged the only
       assets of the company to financial institutions for the
       benefit of themselves and other third parties. So clearly,
       to me, this is a breach of fiduciary duties.* Now, my view
       was being supported by counsel advice. What David
       Chu is going to do is to take legal steps to enable the
       case to be brought to the court for a fair trial. So he's --
       to me, his role is not telling me I should be doing this, I
       should be doing that; rather, he's assisting me to take
       the cause so that the case can put in front of the court
       for a fair trial.

Q:     In short, you didn't see any need for you to take
       independent legal advice?

A:     No. *Because the case itself is pretty clear.*

[emphasis added]

61

134     Lauren relied on the HK Judgment to come to her view that there was a basis for the claim. As stated above at [122], I accepted Lauren's evidence that it could seem clear to the Provisional Liquidators that Sia and Low had breached their fiduciary duties on the face of it, without understanding the flexibility BVI law afforded directors. Therefore, even if Lauren failed to obtain appropriate independent legal advice before commencing HCA 2057 of 2007, that does not show a predominant purpose of instituting claims against Sia to cause him injury and loss.

Application for a Mareva injunction

135     Sia had also contended that the fact that Lauren applied for a Mareva injunction against him in HCA 2057 of 2007 for an inflated amount when she had no basis or justification for doing so, showed a dereliction of her duty as Provisional Liquidator and a predominant purpose of instituting claims against him to cause injury and loss. Mann testified that it was unusual for a Mareva injunction to be sought without reference to Sia's Trustee in Bankruptcy. Lauren admitted that she had no evidence to show any risk of dissipation of assets on the part of Sia. Moreover, the HK$276m claimed against Sia in the application for the Mareva injunction was grossly inflated because Lauren did not give credit for the HK$64m that Dynasty owed Sia, which was undisputed. Further, there was no justification for Lauren to claim interest from 1997 to 2007 on the full value of the Sale Shares because the claim made by Dynasty was for a breach of fiduciary duties, which is distinct from the judgment in HCA 9505, which was for the balance of the Purchase Price.

136     I accept Bell's opinion that Lauren had a duty to protect Dynasty's assets, which extended to assets of Sia and Lee which Dynasty may have potential recourse to as part of Dynasty's claim against them. Even though

Lauren had admitted to having no evidence to show any risk of dissipation of assets on Sia's part, her view that there was a risk of dissipation of assets is not entirely without merit when considered as a whole. In coming to her view, she took into account the following facts:

> (a)     Lee appeared to be no longer resident in Hong Kong, and was in the process of selling his house in Hong Kong.

> (b)     There was a *prima facie* case against Sia and Lee for dishonest or fraudulent breaches of fiduciary duty.

> (c)     Sia had admitted to fraudulent conduct in the state of Hawaii in the United States, and was imprisoned and deported thereafter as a result.

137     As stated above at [125], Lauren was only at the first phase of liquidation, which is the asset gathering phase, and not at the adjudication phase. The focus was to realise as many assets as possible. There was no need to precisely quantity Dynasty's claims and liabilities at that stage. It is understandable that Lauren did not give credit to Sia for the HK$64m he alleged was owing to him from Dynasty.

138     Therefore, the application for a Mareva injunction did not mean that there was a predominant purpose to cause damage or injury to Sia.

*Failure to make any enquiries with Sia and the other creditors*

139     Sia argued that the fact that Lauren failed to make any enquiries of him or his Trustee in Bankruptcy before commencing HCA 2057 of 2007, even though it was an express term of the Engagement Letter, showed a dereliction of her duty as Provisional Liquidator and a predominant purpose of instituting

claims against him to cause injury and loss. Mann agreed that enlisting the assistance of the Trustee in Bankruptcy would not only have been a cost effective means of pursuing any claims against Sia, but would also be necessary in investigating the validity of the claim.

140     Sia further argued that had Lauren made enquiries of him, she would have realised that Sia had a claim against Low for alleged misrepresentation by Low which induced Sia to enter into the S&P Agreements and that the HK Judgment was not obtained on the full merits of the case (as Dynasty did not call any witnesses and had elected not to cross-examine Low). Her omission, he contended, showed a dereliction of her duty as Provisional Liquidator and a predominant purpose to cause him injury and loss by instituting claims against him.

141     Sia also argued that the fact that Lauren took no steps, after her appointment as Provisional Liquidator, to verify whether the Remaining Vendors were owed any amounts by Dynasty in respect of the Sale Shares, similarly showed a dereliction of her duty as Provisional Liquidator. Had Lauren made enquiries with the Remaining Vendors, she would have realised that most, if not all, of the Remaining Vendors were not owed any amounts in relation to the Sale Shares.

142     I disagree. As Mann explained, there was no requirement to enquire with Sia and Lee to show good practice. Moreover, I accept Bell's opinion that there only needs to be sufficient facts for the Provisional Liquidators to decide to commence proceedings. There was no need for every fact to be available before the Provisional Liquidators could act. As I held at [136], Lauren's view that there was a risk of dissipation of assets was not entirely without merit. I also held at [122] that I accept that Lauren was entitled to hold the view that it

64

seemed clear that Sia and Low had breached their fiduciary duties. In the circumstances, I find that it was not improper of Lauren to not make any enquiries with Sia or his Trustee in Bankruptcy before commencing HCA 2057 of 2007.

### Commencing proceedings barely over a month after the appointment

143    Sia then argued that the fact that Lauren commenced HCA 2057 of 2007 barely over a month after her appointment, and had only discussed with Chu, showed a dereliction of her duty as Provisional Liquidator and a predominant purpose of instituting claims against him.

144    I disagree. Since Lauren's perception of a risk of assets being dissipated was not entirely without merit, I accept that it was logical for Lauren to act quickly to protect the assets.

### Refusal to pay costs ordered in favour of Sia

145    Sia argued that the fact that Lauren refused to effect payment of costs awarded to him in HCA 2057 of 2007 until compelled by an order of court showed that Lauren preferred Low's interests to Sia's. Sia complained he had incurred substantial costs and expenses in defending HCA 2057 of 2007. It was within Lauren's means to ask Low for funding as a condition for Lauren to continue acting as the Provisional Liquidator.

146    The evidence revealed that Lauren did not ask Low to pay the costs because she was of the view that the costs should be paid out of the company assets, of which there were none, and that she would pay such costs as and when the company recovered assets. I accept that this is a reasonable explanation.

*Dynasty Line Ltd v Sia Sukamto*                                    [2013] SGHC 146

Affidavit scandalising the Singapore judicial system

147     Sia argued that the fact that Lauren allowed Chu to file an affidavit in
HCA 2057 of 2007 scandalising the Singapore judicial system showed that:
(a) Lauren was controlled by Chu; (b) that there has been a dereliction of her
duty as Provisional Liquidator; and (c) a predominant purpose of instituting
claims against him to Sia's detriment. The allegations were made by Chu in an
attempt to dissuade the Hong Kong courts from granting Sia's application for
a stay of proceedings so as to avoid having to pursue Dynasty's claims against
Sia and Lee in Singapore. Lauren was unable to provide any credible basis for
allowing Chu to make such statements on her behalf.

148     I am not persuaded by Sia's argument. Although the scurrilous
statements made by Lauren and Chu are to be condemned, I find that they
were insufficient to show a predominant purpose to cause injury and loss to
Sia.

Totality of the evidence

149     I accept that even if each of Sia's arguments may show a predominant
purpose to cause him damage or injury, the totality of the circumstances as a
whole did not show a predominant motive to cause injury to Sia. Even if
Lauren could have conducted aspects of the liquidation better, Lauren's
conduct can be explained by oversights and misjudgements. I am not
persuaded that she had a predominant purpose to cause damage or injury to
Sia.

*Dynasty Line Ltd v Sia Sukamto*                          [2013] SGHC 146

**Issue 6: Did Low, Lauren and Tacon conspire together wrongfully with the predominant intention to cause injury to Sia through the pursuit of stale and baseless claims in Singapore?**

*Was there a conspiracy or agreement between Low, Lauren and Tacon?*

150     Sia argued that flowing from the agreement regarding the commencement and conduct of HCA 2057 of 2007, there was an agreement between Low, Lauren, and Tacon with regard to the commencement and conduct of the Original Action. Lauren confirmed that there was no other engagement letter. Tacon testified that he was engaged by Lauren and was content not to make any detailed enquiries but to allow Lauren to take the lead in the conduct of the liquidation and the institution of claims against Sia. Sia argued that these facts showed that there was an agreement between Low, Lauren and Tacon with regard to the commencement and conduct of the Original Action, with the principal aim of Low's presenting the winding up petition being to commence proceedings against Sia through Dynasty, and that Lauren and Tacon agreed to render services to achieve this principal aim.

151     The findings I had made earlier at [119] apply equally here. I accept Tacon's testimony that the Liquidators' decision to commence the Original Action was based on independent advice obtained from BVI lawyers (Forbes Hare), and from Singapore lawyers (Premier Law LLC). Given my earlier finding that there was no agreement between Low and Lauren with regard to the commencement and conduct of HCA 2057 of 2007, and the lack of evidence proving that Low actually gave Lauren or Tacon instructions directly or indirectly regarding the commencement and conduct of the Original Action, I find that there was no agreement between Low, Lauren and Tacon with regard to the commencement and conduct of the Original Action.

*Dynasty Line Ltd v Sia Sukamto*                                   [2013] SGHC 146

*Was the predominant purpose of the agreement to cause damage or injury to Sia?*

152    Sia essentially repeated the arguments pertaining to his claim in conspiracy against Low and Lauren stated above at [121], while adding Tacon as an additional defendant with regard to his involvement in the Original Action. In this regard, Sia alleged:

> (a)    There was no legitimate commercial benefit for Dynasty to pursue the claims in the Original Action because the claims were obviously time-barred, barred by laches and acquiescence, and wholly devoid of any basis in law or fact.

> (b)    The manner in which Tacon and Lauren conducted their role as the Liquidators showed such a predominant purpose to cause him damage or injury as:

>> (i)    Tacon had failed to call the creditor's meeting as required by BVI law;

>> (ii)    Tacon had failed to pay costs that were ordered in Sia's favour in HCA 2057 of 2007;

>> (iii)    Tacon and Lauren had appointed Chu as Dynasty's solicitor in the liquidation, and disregarded their obligations to avoid any conflicts of interest;

>> (iv)    Tacon and Lauren failed to obtain BVI law advice on Dynasty's Memorandum of Association and Articles of Association;

>> (v)    Tacon failed to make enquiries before the Original Action; and

> (vi)    Tacon and Lauren deliberately refused to accept service of Sia's defence and counterclaim.

153    Similarly, I am not persuaded by Sia's arguments because even if it is assumed that there was an agreement between Low, Lauren and Tacon with regard to the commencement and conduct of the Original Action, their predominant purpose was to serve their own commercial purpose. This was to claim for losses which they thought Dynasty and Low were entitled to, based on what appeared to be breaches of fiduciary duties, so as to maximize the assets available for distribution.

154    I repeat my finding at [122] that it seemed clear to the Provisional Liquidators that Sia and Low had breached their fiduciary duties on the face of it, without understanding the flexibility BVI law afforded directors. Therefore, I find that the predominant purpose was not to cause damage or injury to Sia.

155    However, for completeness, I go on to consider Sia's other arguments.

*Failure to call a creditor's meeting*

156    Sia argued that Tacon and Lauren failed to call a creditors' meeting, in breach of ss 179(1) and 183 of the BVI Insolvency Act 2003. For easy reference, the relevant provisions are set out below:

> **179.** (1) Subject to section 183, the liquidator of a company shall call a meeting of the creditors of the company (the first creditors' meeting) to be held within 21 days of the date of his appointment.
>
> > (a) by sending a notice of the meeting to every creditor not less than seven days before the date upon which the meeting is to be held; and
> >
> > (b) by advertising the meeting.
>
> ...

> (5) A liquidator who contravenes subsection (1), (2) or (3) commits an offence.
>
> ...
>
> **183.** A liquidator appointed by the Court is not required to call a meeting of creditors under section 179 if
>
> > (a) he considers that, having regard to the assets and liabilities of the company, the likely result of the liquidation of the company and any other relevant matters that it is not necessary for a meeting to be held;
> >
> > (b) he gives notice to the creditors stating
> >
> > > (i) that he does not consider it necessary for a meeting to be held,
> > >
> > > (ii) the reasons for his view, and
> > >
> > > (iii) that a meeting will not be called unless 10 per cent in value of the creditors give written notice to the liquidator within ten days of receiving the notice, that they require a meeting to be called; and
> >
> > (c) no notice requiring a meeting to be held is received by him.

157     Given that Tacon was appointed a joint liquidator on 22 December 2009, Sia argued that Tacon and Lauren breached their statutory obligation by failing to call for a first creditors' meeting by 12 January 2010 at the latest, or give notice of their intention not to call a first creditors' meeting before 12 January 2010. It was only between 12 and 22 January 2010 that Tacon and Lauren published notices in newspapers in the BVI, Australia, Hong Kong and Indonesia that they would not be calling a first creditors' meeting.

158     Sia also argued that Tacon and Lauren breached their obligations under s 183 of the BVI Insolvency Act 2003. Section 183(c) provides that a liquidator is only entitled not to call a creditors' meeting under s 179 if "no notice requiring a meeting to be held is received by him". Sia argued that in breach of their statutory obligations, Tacon and Lauren failed to convene a

first creditors' meeting despite Sia giving notice on 29 January 2010, within 10 days of receiving notice of the Liquidators' appointment, of his intention for a creditors' meeting to be held. Sia argued that these facts showed that the Liquidators' predominant intent was not to properly discharge their statutory obligations, but to cause him injury and harm.

159     I disagree. Mann recognised there can be a dispute between the liquidators and the person alleging to be a creditor as to whether he is a genuine creditor. In the present case, the Liquidators did not refuse to hold a creditors' meeting. I accept their evidence that they were entitled to be satisfied that Sia was indeed a 10 percent creditor by asking Sia to complete a form which he did not. I accept Tacon's evidence that he was entirely neutral on whether the creditors' meeting took place, and had Sia complied with the form filling requirement, he would have been able to conduct investigations with the other creditors as to whether Sia was indeed a 10 percent creditor.

160     Although the Liquidators failed to adhere strictly to the 14-day time period, Sia did not suffer any prejudice because Sia did in fact receive real and effective notification. This was shown by the fact that he did request the Liquidators to convene a meeting. I note that the Liquidators had gone beyond what was legally required of them, in that they had advertised their intention in Australia, Singapore, Hong Kong and Indonesia in addition to the BVI.

Failure to pay costs that were ordered in Sia's favour

161     Tacon accepted that the costs ordered in Sia's favour in HCA 2057 of 2007 should have been paid. However, he took no steps to ensure that they were in fact paid. Sia argued that this showed Tacon's disregard of Sia's legitimate interests in preference to Low's interests thereby evidencing

*Dynasty Line Ltd v Sia Sukamto*                                   [2013] SGHC 146

Tacon's and Lauren's predominant ill-intent to cause him injury instead of properly discharging their duties as Liquidators.

162     As stated above at [146], I accept Lauren's explanation in this regard to be reasonable.

Appointment of Chu as Dynasty's solicitor in the liquidation

163     Sia repeated his arguments set out at [124] that the appointment of Chu by Tacon and Lauren as Dynasty's solicitors in the liquidation was improper and evidenced that the real person directing and controlling the liquidation is in fact Low.

164     I repeat my finding at [125]–[130] in this regard and reject Sia's arguments as baseless.

Failure to obtain advice on BVI law

165     Tacon testified that although he accepted that obtaining BVI law advice prior to commencing the Original Action was an "important factor", he did not do so. Instead, he only obtained such advice subsequent to the commencement of the proceedings. Sia argued that this showed Tacon's and Lauren's ill-intent against him.

166     I am not persuaded by Sia's argument for the reasons set out in [134].

Failure to make enquiries before the Original Action

167     Tacon had testified that he only had general discussions with Lauren and did not make any detailed enquiries of the case. He left it to Lauren to handle the case because of her previous involvement in the matter. Tacon also

*Dynasty Line Ltd v Sia Sukamto*                                    [2013] SGHC 146

admitted to not having made any enquiries with the Vendors. Hence, he was not in a position to determine if Dynasty was in fact indebted to the Vendors. Sia argued that this again showed Tacon's and Lau's predominant ill-intent against him.

168    I am again not persuaded by Sia's argument. At best, this omission only showed a lack of diligence on the part of Tacon.

Refusal to accept service of Sia's defence and counterclaim

169    Sia argued that Tacon and Lauren deliberately refused to take steps to facilitate the quick service of Sia's defence and counterclaim on them. They could have instructed Dynasty's solicitors to accept service on their behalf when requested. Because of their refusal, Sia had to incur the additional costs involved in serving his defence and counterclaim out of jurisdiction. The trial was also delayed by almost a year. Sia contended that such conduct was not that of an independent and impartial liquidator, but showed that Tacon and Lauren intended to injure him by compelling him to incur unnecessary costs and delay.

170    Even if Lauren and Tacon did not take steps to facilitate service and even if Tacon and Lauren intended to injure Sia by compelling him to incur unnecessary costs and delay, this did not prove that the predominant purpose of the agreement to commence and conduct the Original Action was to cause damage or injury to Sia.

**Conclusion**

171    Although each and every one of Sia's arguments did not show a predominant purpose to cause damage or injury to Sia, the totality of the

*Dynasty Line Ltd v Sia Sukamto*                                        [2013] SGHC 146

circumstances as a whole may show such a predominant purpose. On the totality of the evidence however, such a predominant purpose to cause damage or injury to Sia did not exist.

172    Accordingly, I find that neither the Original Action nor the Counterclaim has been proven. Consequently, I dismiss both the Original Action and the Counterclaim with costs to be taxed on a standard basis unless otherwise agreed.

Lai Siu Chiu

Judge

Philip Jeyaretnam SC, Siraj Omar, Alexander Lee and Patrick Wong (Rodyk & Davidson LLP/ Premier Law LLC) for the Plaintiff (in the Main Action);
Samuel Chacko, Angeline Soh and Christopher Yeo (Legis Point LLC) for the First Defendant (in the Main Action) and Plaintiff (in the Counterclaim);
Alvin Yeo SC, Joy Tan, Adeline Ong and Yin Juon Qiang (WongPartnership LLP) for the Second Defendant (in the Main Action);
Siraj Omar and Alexander Lee (Premier Law LLC) for the First, Third and Fourth Defendants (in the Counterclaim); and
Celeste Ang, Liu Zeming and Jennifer Fong (Wong & Leow LLC) for the Second Defendant (in the Counterclaim).

Certified true copy

Jane

Private Secretary to Judge
Lai Siu Chiu, J
Supreme Court, Singapore

74