This is the exhibit marked "**LTK-29**" referred to in the affidavit of **LOW TUCK KWONG** sworn and subscribed before me by Mr. Low Tuck Kwong who was previously known to me or presented to me adequate identification on 6th August, 2015

Before me

Wednesday, 15 August 2012

(10.25 am)

MR SUKAMTO SIA (on prior oath)

MR GIAM: Good morning, your Honour. Before my learned friend continues with his cross-examination, may I, with your permission, present the old passport of my client which I was supposed to produce yesterday but inadvertently I left it in the office, for which I apologise.

Can I pass this passport to the witness to identify it, and then --

COURT: You just want to establish on the record that he had to leave the Hong Kong proceedings to go to the US on that particular date?

MR GIAM: Yes.

COURT: Fine. (Handed.)

MR GIAM: He had to leave on that day, but he managed to leave the next morning. He will give you the --

Further examination-in-chief by MR GIAM

MR GIAM: Witness, is that your passport? If you look at the first page, your name is Sukamto Sia and -- your Honour --

A. Yes.

MR GIAM: -- we have copies of that and for the convenience of my learned friend perhaps he can refer to the

10:26 defendant's supplementary bundle of documents at page 55. That is the first page of the passport.

You will see there your name, Sukamto Sia, and the passport was issued on 22 May 1998 and expires on 22 May 2008.

A. Yes.

Q. Then if you would turn to page 49 of that passport -- and that is page 79 of the bundle -- and there's a stamp there, 19 July 2000. Look at your old passport.

A. Yeah.

Q. It says "Departed Hong Kong". Can you see that?

A. Yes.

Q. Yes, and that's on page 49 of the passport.

A. Yes.

Q. Then turn to the next page, page 50, and there's a red stamp there. It says, US Immigration, admitted 19 July 2000 until 18 October 2000.

A. Yes.

MR GIAM: May we have that marked, your Honour? D6. Your Honour can look at the passport, if you like. (Handed.)

Thank you very much, your Honour. My learned friend can cross-examine.

MR SINGH: Good morning, your Honour. Your Honour, before I resume my cross-examination, I would like to give your Honour an update on the position in relation to the

10:29 second batch of documents that Merrill Lynch has, through Allen & Gledhill, produced pursuant to the subpoena that was served on Merrill Lynch.

In relation to this second batch, we had written to my learned friends to ask if their client accepts, without us having to call Merrill Lynch to give testimony, that on 21 July 2008 a copy of the third letter, which is dated 21 July 2008, was sent from Merrill Lynch Indonesia to Merrill Lynch Singapore, and my learned friends have replied to confirm that that is correct.

I'm obliged to my learned friend for that.

Your Honour, with your permission, I'll resume my cross-examination.

Cross-examination by Mr Singh (continued)

MR SINGH: Good morning, Mr Sia.

A. Good morning, counsel.

Q. Mr Sia, yesterday you gave evidence that in early 1996 Dato Low, the plaintiff, informed you that the coal mining business did not happen. Do you remember that?

A. Yes.

Q. I asked you to try to pinpoint the date and you said you couldn't, but you felt that it might have been some time in February or March. Correct?

A. Yes.

10:30 Q. I believe that your evidence yesterday was that having been told by the plaintiff that the coal mining business did not happen, you asked him to repay the $3 million, but he was unable to do so.
A. Yes.
Q. Would I be right in understanding your evidence to be that?
A. Yes.
Q. Thank you. From then on, therefore, according to your evidence, the plaintiff was indebted to you for $3 million, and never repaid that $3 million; correct?
A. Yes.
Q. Would it be right, therefore, according to you, that when he told you that the coal mining business did not happen, he had therefore updated you on the business?
A. No -- at that time, you mean?
Q. Yes.
A. No.
Q. I'm talking about February or March. Do you agree that when he told you that it did not happen, he was updating you on the business?
A. Yes.
Q. Thank you. I would like you to pick up an affidavit that you filed in these proceedings -- it's your 15th affidavit -- and it is an affidavit that you filed in

10:32 support of your application to amend your defence and counterclaim. I'm going to hand that to you, as well as a copy to the learned judge.

I wonder whether my learned friend has a copy. If not, we will of course arrange one. It's the 15th affidavit, 27 January 2011.

This affidavit, so that you are acquainted with it, or reacquainted with it, was signed by you at page 7?

A. Yes.

Q. You would have signed it after reading and understanding the contents of this affidavit?

A. Yes.

Q. And after satisfying yourself that the contents are true; is that right?

A. Yes.

Q. If you would go with me, please, to page 3, paragraph 13, this is what you said:

"After I handed the $3 million to the Plaintiff in late 1995 to invest and facilitate the establishment of a coal mining business, he never subsequently updated me on the coal mining business, or what he did with the $3 million. It is my contention that the circumstances in fact show that the Plaintiff concealed the existence of the coal mining business from me."

In that affidavit you said that the plaintiff never

10:34 updated you, after you gave him the $3 million, about the coal mining business, but yesterday and today your evidence was and is that he did update you in February or March 1996, so one of those versions is not correct; isn't that right, Mr Sia?

A. No. I disagree. Can I explain?

Q. Certainly.

A. Can I explain, your Honour? Basically, when he told me the mining is not working, it's his business that's ongoing. I asked him, he says it's not taking off, is dead. He never report to me, so I don't know why you said that -- if updating is ongoing updating, he has his business for the next so many years, he only told me once, in the 1996.

Q. Mr Sia, in your affidavit you said he never updated you; in other words, not even once.

A. I never said not even once. I said never updated me.

Q. Mr Sia, have you ever raped a woman -- "yes" or "never"?

A. Never.

Q. So does that mean not even once?

MR GIAM: Your Honour, I'm not sure that this is a fair way of questioning the witness.

MR SINGH: Your Honour, the witness --

COURT: The question is well placed.

MR SINGH: Thank you, your Honour. I am challenging

10:36 the witness's attempt to give a new definition to the word "never".

You know that "never" means "not even once"; correct?

A. Depend, you know, how you put it.

Q. We tend to have only one version of the truth, Mr Sia, and that's what I'm trying to get at. I'm going to ask you now again, do you agree that "never" means "not even once"?

A. Yes.

Q. Thank you. So in your affidavit you said, and signed, to that effect, that Dato did not update you on the coal mining business, not even once; correct?

A. I said never. I expect him to, you know, tell me more because that time our relationship is still there.

Q. So by saying he never updated you, you meant not even once; correct?

A. But at this time --

Q. "Yes" or "no", then you can explain.

A. Yes, okay, let me explain. At this time he never update me --

Q. You agree with the answer?

A. Yes. Yes.

Q. Okay, go ahead.

A. And he never updated me. I asked what happened. Okay?

10:37 Q. So --
A. It's not that volunteer and tell me.
Q. Mr Sia --
A. Yes.
Q. -- if he never updated you, not even once, and if that evidence is true, then what you have told this court on the stand is false.
A. No. I asked him. It's not that he updated me.
Q. So is it your evidence now that although he never updated you, you asked him?
A. Yes, it's always like that.
Q. When you --
A. Update -- you keep changing the words.
Q. When you asked him, did he update you?
A. He answer me.
Q. And he said, according to you, that the coal mining business did not happen; correct?
A. Yes.
Q. And you agreed with me earlier --
A. I never agreed with you earlier. What did I agree with you earlier?
Q. If you will be patient, you will find out. You agreed with me earlier that when he said it did not happen, he was updating you.
A. No, he was answering my question.

10:39 Q. So, having regard to your earlier evidence that he had updated you by telling you that it had not happened, how is that consistent with your affidavit which said that he never updated you?
A. It's not consistent. He never updated me. I asked him.
Q. Thank you.
A. Thank you.
Q. So it would appear that, based on your own affidavit, there was no such discussion in February or March; do you agree? Based on your own affidavit. If you don't understand my question --
A. I don't know -- I don't understand your question. Please repeat that. What kind of discussion?
Q. On the basis of what you said in your affidavit at paragraph 13, that "he never subsequently updated me", just on the basis of that paragraph, there couldn't have been a discussion in February or March; do you agree?
A. No. We had a conversation then, yeah.
Q. And based on your affidavit which I have just referred you to, if there was no subsequent updating, then your entire evidence of what you meant in your June 2000 affirmation yesterday is false. If you don't understand that, I will take you to that affirmation.
A. Sure.
Q. Please go to 2AB, page 482. Do you remember we were at

10:41 paragraph 4 yesterday?

A. Page 482?

Q. Page 482, paragraph 4.

A. Page 481?

Q. Yes.

A. Okay.

Q. Would you like to re-read this or do you remember it?

A. Let me go through it quickly. Yes.

Q. I drew your attention, at page 482 yesterday, to that portion which said:

"... in late 1995, I advanced [S$3 million] to the First Plaintiff ... secured by a post dated cheque ..."

Despite what you said there, you claimed on the stand that what you meant was that from February or March, when he told you that the coal mining business did not happen, it became an advance. Do you remember that?

A. I treat it as a offset.

Q. Right. Do you remember what I just said to you? Let me put this to you. I said to you that on your own affidavit you were talking about the situation in late 1995 and had described the transaction in 1995 as an advance and one of the things you said was, "No, I was talking about what happened in February when he told me that it did not happen, so it became

10:43 an advance." Do you remember saying that?
A. Yes.
Q. If, as you yourself said in your other affidavit that I showed you this morning, there was no February discussion or March discussion, then the evidence you gave yesterday, when you tried to explain what you meant in paragraph 4, is also false.
A. No. Disagree. Do you want me to explain?
COURT: Explain.
A. Yes, because at those time, your Honour, the plaintiff come to my office all the time, and we were close friend, I can tell you that of course today he denied that we ever close friend, and he never even knew that I changed my name. He always know even my Sukamto Sia name, eight or ten years before that, I changed my name. And of course, yesterday I went to my office a little bit, I look at certain things that I do know him, and he said --
MR SINGH: Would you answer the question and explain the answer?
A. Yeah, I try to explain.
Q. I'm not asking about your name or -- (unclear -- simultaneous speakers) --
A. I know, okay -- I know, okay.
Q. You asked for permission to explain so explain your

10:44 answer.

A. That's why I try to --

COURT: Carry on. Carry on.

A. -- ask your Honour to explain. Your Honour need to know a little bit background about relationship of the plaintiff and me. That's why we are here.

COURT: He has not asked you that question. He asked you to clarify.

A. Yes, I know, I know. That's why I ask your Honour --

COURT: Carry on.

A. -- to clarify that. So told me that we never had any business yesterday -- if your Honour, you know, remember yesterday the plaintiff said we never had any business and then he remembered that he sold me a CDC share, and then yesterday I give -- ask the impression that that's it, never done anything with me and never knew about my name, I mean, as a friend for so many years, but he know, he predict that I am going to change my name to "Sukamto Sia" one day.

Yesterday I went back after court and to my office, if your Honour may let me show you some evidence, something that I found out that we have relationship, we done business before, and --

COURT: Your counsel will be able to do that when he re-examines.

10:45 A. Yeah, but I'm not allowed to talk with the counsel.

COURT: No, later, when he re-examines, if you wish to present anything new in response to the questions that have been raised, you will have an opportunity to do that.

A. Okay. So?

MR SINGH: Do you wish to say anything further by way of elaboration of the answer that you gave to my question?

A. I'm sorry. About your question, can you refresh that again, please?

Q. Certainly. Let me scroll upwards and I'll get it for you. I had put to you that based on your own affidavit, where you say he never subsequently updated you, the evidence that you gave yesterday, that, oh, in February it became an advance because he told me it didn't happen, was false.

A. No, I --

Q. You disagreed.

A. Disagree, yes.

Q. Do you need --

A. Yeah, the reason why he comes to me all the time so what is subsequent, you mean updating me, he came, talk to me, asked him what happened, nothing happened to the coal mining business. It's true that time still close friend and he just leave it. I have advances in many,

10:46 many times before that.

COURT: Mr Sia, I think look at paragraph 13.

MR SINGH: This is the affidavit.

A. Yes, my -- my affidavit, yes.

COURT: You say:

"He never subsequently updated me on the coal mining business or what he did with the $3 million."

A. Yes.

COURT: Counsel is just asking you what does that mean, "never"?

A. "Never", I mean when he came to me --

COURT: I know you said there was a discussion in February/March 2006.

A. Came to me, he visit me all the time, so we just talk about it one time, that time. So you call that updating or report?

COURT: What do you understand by "updating"?

A. When you update me, you know, you tell me what's going on, what happen, and if the thing still happening, you tell me. He don't stop updating me. I asked you, only tell me one time, is that updating for the whole businesses? That's my understanding. If you update, you continue update me. If you don't -- tell me only once when I ask, I don't consider as an update.

MR SINGH: All right. Is that all?

10:48 A. Yes.
Q. So when you say "never updated", you mean not more than once?
A. Not continuously, yes.
Q. All right.
A. And the first one also, not a purpose of update. He just -- happened to ask and got the answer.
Q. Yes, and the answer was, according to you --
A. Yes.
Q. -- there is no business, so that's the end of the matter. What further updates were required?
A. Okay. That is told me business is dead, you know, it's not happening.
Q. So he's told you there is no business --
A. So I believe him. That's what he told me, yes.
Q. Would you listen to my question?
A. Mm-hmm.
Q. If he told you, as you claim, that there was no business, that's the end of the matter, and then it only became a question of repaying the $3 million; correct?
A. Yes.
Q. So what further updates did you want?
A. I didn't expect any update that time, because I didn't know until today the business is still ongoing. That's why we are here. Right?

10:49 Q. I put it to you, Mr Sia, that you know that you had made this statement in June 2000 in Hong Kong, you know that you had described the transaction in late 1995 as a loan, so you have contrived this story of Dato Low coming to you and saying it's not happening --
A. I never said 1995 to -- as a loan, though. I don't know how you get that.
Q. Can I finish my question?
A. Sure.
Q. I'm going to repeat it in case you forget it. I put it to you that you know that you had made this statement in June 2000 in Hong Kong, you know that you had described the transaction in late 1995 as a loan, and --
A. 1995 as a loan?
Q. You'll have to let me finish.
A. Okay. Sorry.
Q. Since this is the second time you are asking me that question, I'm going to ask you to pick up page 482 of that bundle, 2AB. I'm going to read to you what you yourself said, the second line of page 482:
"For example, in late 1995, I advanced [S$3 million] to the First Plaintiff ..."
Do you see those words?
A. Yes.
Q. Now I'm going to put my question to you. Mr Sia,

10:50 because you knew that you had called it an advance in late 1995 in this affirmation of June 2000 and needed to find a way out of it, you have fabricated this story of a February discussion, even though that story flies against your own affidavit where you said there was never any subsequent updating. You can agree or you can disagree.

A. Disagree.

Q. Right.

A. Okay, let me explain? May I explain or --

COURT: Yes.

A. Okay, thank you. You have to know that why I say that, because I -- at that time, in year 2000, when this affidavit done, I already found out in 1996 the coal mining business doesn't work. That's why I never mentioned any more, but I just gave example, I do advance him on his business transaction. So that's why I never think that it's necessary to put the $3 million and the coal mining business -- it has failed.

COURT: In these proceedings here --

A. Yes, your Honour.

COURT: -- the gist of your case is in paragraph 24 of your AEIC and paragraph 25.

A. Yes, your Honour.

COURT: If this is your case, counsel is taking you through

10:52 what else you said, both in Hong Kong and here, and whether it is consistent.

A. Okay. I think it's consistent. I mentioned it since year 2000 I did give advancing the money, and I say it again in this case.

COURT: Yes, but it will turn on, as counsel has taken you through, what you mean by "advance", what you mean by "investment and facilitating". He took you through yesterday what exactly do those mean and how they are consistent with your case.

A. Okay. Consistent in that I did give him the money to start the coal mining business.

COURT: One, "I gave him the money".

A. Mm-hmm.

COURT: S$3 million.

A. Yes.

COURT: That's one.

A. Yes.

COURT: For what? What is the nature of that transaction? Is it a loan, is it an advance?

A. No -- okay, let me explain --

COURT: Is it an investment? That was what we spent the whole of yesterday trying to understand, so it may be helpful to you if you clarify your understanding of what you say in paragraphs 24 and 25.

10:54 A. Okay.

COURT: Notwithstanding the words, because the words seem to be slippery in terms of what they mean.

A. Okay, basically, in 1995, the plaintiff came to me telling me that, you know, his business is -- was bad, and Mr Sudwitkatmono from Indonesia, the then-President Suharto's stepbrother asked him to move back to Indonesia to start the coal mining business, and he told me, you know, the future of the coal mining business, it will be good, and if he work, move back in seven, eight years, he will worth at least 500 million when it get listed in the Indonesian Stock Exchange and -- all he need to start is $3 million. I actually told him, I mean, why do you commit to me for $3 million because the person, Mr Sudwitkatmono has all the means of money to give you, and he told me if he tells Mr Sudwitkatmono that he doesn't have the $3 million to start, he will probably lose face and all that, and if I can help him to give him that money. That is my understanding from since 1995 -- late 1995. Yeah.

COURT: The difficulty is the question of understanding. You said "I have an agreement" and then you say "/common understanding". Your counsel presumably will take it up but what I want to understand now is very simple: In this affidavit in these proceedings here right now, in

10:55 paragraphs 24 and 25 you say what your position is, and counsel is taking you through to clarify what exactly does it mean, given what you have said previously.
A. Yes.
COURT: That's all he is doing right now.
A. Yeah. But on this procedure, it's all because based on the 1995 -- you know, call it understanding, or agreement, it's all basically it's just started from there.
MR SINGH: Do you stand by paragraph 4 of your affirmation of June 2000?
A. Where is that?
Q. Pages 481, 482.
COURT: Where you say advanced $3 million.
A. Yes.
MR SINGH: Let's move on. I don't accept, so that there is no doubt about the matter, that there was any such transaction or discussion in February, but I'm asking you questions on the basis of the evidence that you have given. You said that some time in February or March, Dato Low told you that the coal mining business did not happen. Right?
A. Kind of. I should have said that, you know, I asked him and he told me that -- he answer me that it didn't happen.

10:57 Q. Let me give you a timeframe so that it might help you remember when this discussion took place. On 5 February, Dynasty bought or entered a series of agreements to buy shares in CDC. Do you remember that?
A. Yes.
Q. Was this discussion with Dato that you say took place in February or March before or after that series of agreements on 5 February?
A. It's around the same time.
Q. You --
A. Because he see me quite a few times, maybe twice a day, I mean, or wait in the office all day, so ...
Q. But try to remember. It's very important.
A. It's -- I cannot remember the time and the date, but those few days.
Q. Before or after, sir?
A. Around those few days. I cannot remember.
Q. Let me ask you it this way -- was there any connection between that discussion where Dato said that the coal mining business did not happen and the agreement by Dynasty to buy the CDC shares?
A. Around the same time, as I said, and also by that time --
Q. My question is, so that you understand my question, and you'll be given an opportunity to answer, was there any

10:58 connection between the two?

A. I don't remember whether it's the same or a different conversation. Also at that time, he came to me and asking -- I don't know, I think before that for another 1.5 million.

Q. Mr --

A. Before we signed the S&P.

Q. Let me put my question this way so that you will have as little misunderstanding of the position as is possible -- according to you, at or around the time of the 5 February series of agreements, Dato told you that the coal mining business did not happen. Correct?

A. Yes.

Q. According to you, you asked Dato for the return of the $3 million; correct?

A. Yes.

Q. According to you, Dato then said he couldn't pay you the $3 million; correct?

A. Yes.

Q. And then what happened? Did you say, "When are you going to pay me back?"

A. He just assure me that, you know, he would pay me back one day.

Q. So, according to you, Dato assured you that he would pay you the $3 million one day; correct?

11:00 A. Mm-hmm.
Q. And what was your response to that?
A. I said it's fine, I've been advancing, you know, him --
COURT: Mr Sia, I think you earlier said that there was a discussion in February --
A. Yes.
COURT: -- with Mr Low.
A. Yes.
COURT: Right?
A. Mm-hmm.
COURT: At which he told you that the coal mining did not happen.
A. Yes.
COURT: It might help you if you look at Mr Low's affidavit, paragraphs 39 and 40, to understand the context of counsel's questions to you.
MR SINGH: Thank you, your Honour.
COURT: He is saying in paragraph 41 that you gave him a cheque for HK$7 million, 2 February.
A. Yes.
COURT: The S&P is signed on 5 February.
A. Yes.
COURT: And the payment terms are there and then the first round of cheques, 16 February. It's in that context that counsel is asking you, do you recall whether the

11:01 conversation was before or after these matters?

A. As I said, you know, your Honour, I think around those time, I cannot actually remember he told me he needs another -- (unclear -- simultaneous speakers) --

COURT: Do you understand why he's asking the question?

A. Yeah, yeah, I understand he asked me when or --

COURT: Do you understand why he's asking the question?

A. No, I don't know why he asking me. No, I don't. I just know that he asking me whether which date -- I mean, when this conversation. I don't know why he's asking me that.

MR SINGH: I'm not asking you the date. I'm asking you before or during--

COURT: Whether before, during or after.

A. During or before, I think, you know. Must be. Yeah. Probably, you know -- I don't say probably, but I really don't remember. Maybe during this informal conversation -- (unclear -- simultaneous speakers) --

COURT: You don't remember, you don't have to --

A. Yeah.

COURT: -- but it's a significant question.

A. Mm-hmm.

COURT: Carry on.

MR SINGH: Thank you, your Honour.

So Dato said, according to you, he couldn't pay you,

11:02 and he assured you that he will pay it back; right?
A. Yes.
Q. What was your response to that?
A. It's fine.
Q. So do I understand your evidence, and please be as clear as you can be, that the position in February, at the end of that conversation with Dato, was that it was kept open as to when he would repay the $3 million.
A. Yeah, it's like our advances before, like, when he came to me for CDC shares, the same thing. He knows --
Q. The answer to my question, "yes"?
A. Yes.
Q. Thank you. Did you, in that discussion, also talk about the CDC transaction?
A. I don't remember which, as I said earlier. It's around --
Q. I didn't ask you whether it's earlier or later. I'm now just focused on that discussion which you said took place.
A. There's a discussion -- no, he came to me about the CDC -- to purchase the CDC share from him, yes.
Q. I didn't ask you that question.
A. I try to explain to you.
Q. Mr Sia, could you please listen to my question?
A. Yeah, but I try to explain to you, too. So.

11:04 Q. If you listen --
A. I do listen, yes.
Q. -- then you will answer my question.
A. Yeah, but -- okay.
Q. I'm going ask you one more time -- in that discussion that you had with Dato about the repayment of the $3 million, was there any discussion relating to the CDC shares, in that same discussion?
A. Yes, possible.
Q. What was that discussion about then?
A. Discussion that, you know, they don't pay me back, we just will offset, you know -- I could offset the -- you know, our advances and -- and also CDC share price -- not share price, I mean the purchase and the payment.
Q. That doesn't make any sense, with respect, Mr Sia. A few moments ago, you told us that you left it open for Dato to repay the $3 million.
A. Yes.
Q. Now you are saying in that same discussion you were talking about offsetting the $3 million. Which is which, Mr Sia?
A. Okay, okay, counsel, please, if you let me explain -- if you let me explain --
Q. First you tell us --

11:05 A. Don't change -- I know --
Q. First you tell us, Mr Sia, which is which, and then you explain.
A. What do you mean, which is which?
Q. On the one hand, you say Dato said, "I can't pay" --
A. Yes.
Q. -- and you said -- listen to me, please, Mr Sia.
A. Yes.
Q. On the one hand, you say Dato said, "I can't pay", and you said, "Fine, you assured me you will pay, we'll leave it open as to when you are going to pay me".
A. Yes.
Q. A few minutes later you said, oh, we talked about offsetting that $3 million against the amounts payable for the CDC shares.
A. Yes, understood. I mean, I had --(unclear -- simultaneous speakers) --
Q. My question to you is this: the two are inconsistent, so tell us which one happened?
A. I think it's consistent because he come to me, he cannot pay, it's very simple. I say, okay, we just offset it, you know, one day, what I have advanced you.
Q. So you say --
A. So what's inconsistent about it?
Q. Let me show you the inconsistency. I'm finding your

11:06 evidence so that I can read back to you what you said.

Your Honour, I'll find it.

Line 23, my question was:

So Dato said, according to you, he couldn't pay you, and he assured you that he will pay it back; right.?

Answer: Yes.

Question: What was your response to that?

Answer: It's fine.

Question: So do I understand your evidence, and please be as clear as you can be, that the position in February, at the end of that conversation with Dato, was that it was kept open as to when he would repay the $3 million.

Answer: Yeah, it's like our advances before, like, when he came to me for CDC shares, the same thing. He knows --

Question: The answer to my question, 'yes'?

Answer: Yes."

So, Mr Sia, you told this court that when Dato said he couldn't pay the $3 million, it was left open when he would repay it. A few moments ago, you changed your position and you said it was discussed that it would be offset against the CDC payments. Do you understand the meaning of the word "inconsistency", Mr Sia?

A. Yes, I do. It's not inconsistent. He cannot pay so

11:09 I can, you know, offset with other things.

COURT: Is that your understanding now, or then?

A. Then.

MR SINGH: Then why are there two versions? On the one hand, you pay me when you can --

A. Yes.

Q. -- on the other hand --

A. We can always offset because I still had advances with him -- still got balances --

Q. Mr Sia, I haven't finished my question --

A. -- but I didn't tell you that.

Q. Why are there two versions -- on the one hand --

A. What's the two versions? They lead up to the same thing, right? Owe me money -- how many version is there to be? It's the same thing. You pay me later or what I advance you, add it up, then we offset it. The same money.

Q. Do you want to say anything more?

A. No.

Q. Why are there two versions?

A. I disagree with there's the two versions. It end up; my understanding it's the same thing.

Q. So at the end of this discussion, was there an agreement in relation to the repayment of the $3 million?

A. Yeah, basically, I will pay you. That's what he told

11:10 me.

Q. Be very careful, because you might inadvertently give us yet another version --

A. No. It's the same.

Q. To be fair to you, I'm going to ask you to think carefully about this question. At the end of that discussion between you and Dato, was there an agreement in relation to how the $3 million would be repaid and when?

A. Yes. It could be offset when he has money. I mean, you know, we just put it into our -- I mean, our account, our advances, just tally it up together, that's all.

Q. And how would it be repaid?

A. We never discussed it.

COURT: His answer is it would be repaid, put into our account.

MR SINGH: Tally up with the other advances.

A. Tally up the advances.

COURT: But that's not offsetting, that's repayment.

MR SINGH: That's right. That's repayment.

As his Honour has understood your answer, and as I did, too, at the end of the discussion, there would be repayment by Dato of the $3 million, just as there would be repayment for the remaining $8.5 million; correct?

11:11 A. Yes, when he can.
Q. Not an offset; correct?
A. Okay, okay, yeah, you can call it repayment or offset.
Q. No, no --
COURT: They mean specific things, so what is your understanding -- that he owes you $3 million, at some stage he would pay you back?
A. Yes.
COURT: Including all that 8-point-something million he owes you anyway?
A. Yes.
COURT: That means there would be payment of some sort in due course?
A. Yes.
MR SINGH: Not offset.
COURT: Not offset. Correct? So I owe you, you owe me, we balance out, net off.
A. Okay.
MR SINGH: Is that correct?
A. I use "offset" because Dynasty bought some shares -- I mean, CDC shares.
Q. Thank you. I'm still asking you to tell us -- as his Honour has pointed out, we get the impression from your evidence that at the end of the discussion, the agreement was that Dato will some day pay back the

11:12 $8.5 million, as opposed to an offset. Is that correct?
A. Yes.
Q. Thank you. Then the CDC transaction was done about the same time, right? You can't remember when --
A. Mm-hmm.
Q. -- right? Was there any further discussion with Dato, either before or at or after the CDC transaction, in relation to the amounts that you say he owed you? I'm still talking about February. I'm not going beyond February 1996.
A. I don't remember. Not at that time.
Q. Thank you. I'd like you to look at 2AB, your affirmation of June 2000. Do you remember I showed you paragraph 4 at page 481 and page 482?
A. Yes.
Q. Could you go, please, to page 487? I'm going to read to you paragraphs 12, 13, and 14.
A. Yes.
Q. Paragraph 12, and the heading is "Collateral Agreement":

12. The agreement for the sale and purchase of the Sale Shares [the CDC shares] was, in due course, reduced to writing. However, prior to the execution of the various sale and purchase agreements, it was also orally agreed between myself on behalf of [Dynasty] and Dato Low] on behalf of all the [sellers] that:-

11:14 (a) Save as to the initial payment of 1% of the purchase price which would be paid directly to each of the seven ... all subsequent payments in relation to the sale and purchase of the Sale Shares would be made to [Dato Low] or to his nominee(s);

(b) each of the Second to Seventh Plaintiffs should look solely to [Dato Low] for his or her respective share of the ... purchase price ...

(c) payment of the said balance of the purchase price could be made by either the defendant [Dynasty] to reduce the amount owed by [Dato Low] to me or myself on behalf of the Defendant, to either the First Plaintiff or to his nominee(s).

13. There was also a mutual understanding that part of the said purchase price to be received by [Dato Low] would be applied towards setting off the outstanding personal advances that he still owes to me."

So do you see another case of two versions?

A. Where is the two version?

Q. We spent about half an hour this morning trying to understand what happened, and you said, at the end of the discussion in February, at the time of this agreement relating to CDC shares, there was no agreement to offset. The agreement was Dato would repay me in due course. In this affidavit that you filed in June 2000,

11:16 you say something which is directly opposite. You say that the agreement was to offset. Do you see the inconsistency?
A. No, that's what I've said from the beginning, it's offset.
Q. Answer my question, please. Do you see the inconsistency?
A. No, there's no inconsistency.
Q. Thank you. So in your evidence it is not inconsistent to say that the agreement was that he would repay me the loans on the one hand and on the other hand that they would be offset; that's not inconsistent? Correct?
A. Yes.
Q. Thank you very much.
COURT: Did you understand what you say in paragraph 13? When you say a setting off --
A. Yeah.
COURT: Remember, this is an S&P agreement between the vendors and Dynasty --
A. Yes.
COURT: -- under which Dynasty has to make the payments.
A. Yes.
COURT: And the plaintiff has a personal indebtedness to you of some amounts.
A. Mm-hmm. Yes.

11:17 COURT: So in paragraph 13, when you say set off, what does that mean?
A. Set off that --
COURT: Either you can say when Dynasty pays you for your shares, when you get the money, can you please pay me back. That's one possibility. The other possibility is I don't have to pay you and we just walk --
A. It's flexible. Basically, at that time --
COURT: What are you saying in paragraph 13?
A. Yes, basically, at that time is that he just set off, I don't have to pay you, you can just take the money and we can, you know, set off, or the money that you advance me.
COURT: Remember, this is a transaction between a BVI company and Dynasty with the vendors to purchase shares.
A. Yes.
COURT: When you say set off, it means what? I don't have to pay you all these amounts that are due under the S&P?
A. Yes. Yeah, not all. I mean, you can set off up to the amount that you owe me.
COURT: Nothing of that sort is provided for in the S&P.
A. It's not provided for in the S&P.
COURT: And this was your understanding --
A. My understanding -- yes --
COURT: -- at the time when you signed the S&P?

11:18 A. Yes, of course. Your Honour, let me explain why -- the time I signed the S&P is that he approached me to buy this company and told me that I could get an instant management control of the Hong Kong listed company, and also it's a good company, and then as soon as I have bought in, we called an EGM immediately and we got our EGM, I think it's less than 60 days -- that was quite fast at those time -- and we fail, we lost, we didn't get management control and the share, of course, was suspended.

So he know he got me into this mess. He just never, never, like, asked for any payment at that time.

COURT: I'm trying to understand paragraph 13. It is your evidence in this document that even then there was an understanding between the two, which is not recorded. Now you say it's mutual; the plaintiff denies any such understanding. But the point that's made here is there's an S&P between Dynasty and the vendors under which amounts are payable.

The second is the plaintiff owes you some money, and you say set off. "Set off" can mean two things -- when Dynasty pays you for your shares, then you have money, you pay me. That's one understanding. The other is, no, Dynasty doesn't have to pay, you just net off what you owe me.

11:20 A. Yes.

COURT: Which is it? What are you saying in paragraph 13?

A. Set off. Dynasty don't -- I don't have to pay Dynasty, you can set off the advances that I gave you. The second one.

MR SINGH: Thank you. You have just now confirmed that you have given two inconsistent stories to this court. In your evidence, you said Dato Low was to repay the money and not offset. In your statement in Hong Kong, you talk about an offset, in other words, a netting off without any movement of moneys. I suggest to you again, Mr Sia, that you are making up your evidence as you go along.

A. I disagree. You see, you say offset, it says set off, repayment, it's all -- for -- to me, it's all the same.

Q. That's exactly my point.

A. Yes.

Q. Thank you. Let's move on.

A. Yeah.

Q. You are also aware that there is yet another document that you signed in Hong Kong which we intend to rely on, because we referred to it in these proceedings before today, it's also quoted or referred to in Dato's affidavit of evidence-in-chief. This is at the same budged, 2AB, page 535. This is an affirmation that you

11:22 filed in the winding up proceedings of Dynasty; correct?
A. Yes.
Q. So that you will be able to refresh your memory about the date on which you signed this, please turn to page 559. Is that your signature?
A. Yes.
Q. You signed it on 14 January 2008?
A. Yes.
Q. After you read it?
A. Yes.
Q. And satisfied yourself that the contents were true?
A. Yes. Not word by word, though. I read it, but not word by word.
Q. Yes, we have, I think in the course of yesterday and today, acquired a better understanding of the manner in which you approach words. Could we now look at page 538? At paragraph 8, in opposition to the petition --
A. Excuse me. Where is that again?
Q. Paragraph 8 at the bottom of page 538.
A. Okay.
Q. Right?
A. Yes.
Q. You say:
"In any event, there are a number of bases upon

11:23 which I believe this Petition should be struck out; the provisional liquidators discharged; and/or the Petition dismissed."

A. Yes.

Q. "In short ..."

Go over the page. You give there six reasons why the petition should be struck out and the provisional liquidators should be removed; correct?

A. Yes.

Q. One of the things you say in (iv) is:

"There was a lack of full and frank disclosure in making application for the appointment of the Provisional Liquidators ..."

Correct?

A. Yes.

Q. In other words, you were telling the court that Dato Low, who had applied for the appointment of the provisional liquidator, had not informed the court in Hong Kong of all the material facts; correct?

A. Yes.

Q. And that you were seeking, therefore, by this affirmation, to inform the court of the truth; correct?

A. Yes.

Q. So, pursuant to that, and on that basis you swore this affidavit or affirmation; correct -- or at least signed

11:25 it?

A. Yes.

Q. Could you go, please, to paragraph 11 at page 540.

A. Yes.

Q. It says:

"The Petitioner has not in any way suggested I carried out my previous relationship with him in a dishonest or less than frank manner. Indeed, the Petitioner at one stage owed me personally some US$8.5 million which debt in fact led to the discussions, dealt with in more detail below, resulting in the Company purchasing shares from the Petitioner (and others) which led to the events underlying this proceeding. I would like to elaborate on the moneys owed to me by Dato Low."

Then you talk about the gambling trips:

"On these trips, Dato Low regularly made losses and I would advance to him gambling chips and cash to help him out, on the understanding that he would repay me at a later date. In addition, the Petitioner would from time to time ask me to help him out in relation to his business transactions. For example, in late 1995, I advanced [S$3 million] (around HK$16 million at that time) to the Petitioner, which advance he 'secured' by issuing a post-dated cheque in my favour. I was never

11:26 able to present that cheque for payment as the Petitioner informed me that there were insufficient funds in his account to honour it. In total, I made advances to the Petitioner of some US$8.5 million. Despite numerous assurances from the Petitioner that he had the intention and ability to repay me, I have never received the money. There is now produced and shown to me ... a copy of the Chase Manhattan Bank cheque ..."

The cheque is at page 561; correct?

A. Yes.

Q. Go back to page 540, please.

A. Yes.

Q. Paragraph 12:

"In all the circumstances, I believe that the Petitioner has been so far from frank with the Court as to say he has misled the Court. I believe that the current actions are simply part of a personal vendetta by the Petitioner against me to try to prolong the agony caused by my bankruptcy."

I want to give you again a reference to the date. This is January 2008.

A. Yes.

Q. In January 2008, you considered that Dato Low was on a personal vendetta against you; correct?

11:28 A. Yes.
Q. You also explained to the court that by doing what he was doing, he was prolonging the agony that you were suffering; correct?
A. At that time, yes.
Q. The agony was caused to you by your bankruptcy; correct?
A. Yes.
Q. And that would have been quite painful.
A. Yes.
Q. It would also have been embarrassing for someone like you.
A. Disagree.
Q. All right. Let's stick with "painful". How was it painful, if it was not embarrassing?
A. Painful, because you cannot live like you used to live again. That's all.
Q. Could you elaborate on that, please?
A. Elaborate on that? Like, life changed. I mean, at this moment how to tell you -- when your money and then you are bankrupt, of course there is -- you know, a big change. At this moment I just cannot tell you, and I do not want to remember all those things right now. I try to put it behind me anyway.
Q. I don't mean to dredge it up.
A. Okay.

11:29 Q. I don't mean to re-open wounds --
A. Okay.
Q. -- but it's quite important that I understand and the court knows how you felt when you filed this affidavit.
A. I filed this affidavit, it's 10 years after my bankruptcy.
Q. Yes, and you talked about prolonging the agony caused by the bankruptcy; right?
A. Yes.
Q. So let me put it this way, and you tell me whether you agree or disagree. All right?
A. Mm-hmm.
Q. The bankruptcy had, as you said, caused you a great deal of pain; correct?
A. Not a great deal of pain, just pain. Please don't keep changing and put words in my mouth, okay?
Q. I beg your pardon. It had caused you to change your lifestyle; right?
A. Yes.
Q. It had caused you sufficient agony that you don't even want to talk about it today; correct?
A. I just said the agony was right now, not earlier, okay?
Q. Do you agree with what I said?
A. It was pain earlier.
Q. Yes, it caused you pain to the extent that you don't

11:30 want to even talk about it now; correct?

A. So you forget the word "agony"?

Q. Yes.

A. Okay, good, thanks.

Q. Do you agree?

A. Yes.

Q. And that bankruptcy took place in what year?

A. 1998.

Q. 10 years later --

A. Yes.

Q. -- you felt that Dato Low was going after you on a personal vendetta; correct?

A. Yes. Can I explain why I say that?

Q. Please do.

A. Because, like, he's been suing me, suing the company related to me, and by 2008, you know -- I mean, I look at it, it's just things that, you know, why keep continuing doing this -- you know, this lawsuit and all that? It's -- it's something that -- what do you call it -- of course, it's agony.

Q. And you felt that Dato was being personal.

A. Yes, at that time, yes.

Q. And, as you say, he was trying to prolong your agony.

A. Yes.

Q. And, by this time, you already knew about the worldwide

11:32 Mareva injunction against you.
A. Yes.
Q. And that would have affected you; right?
A. Not much.
Q. But it did affect you.
A. Not much.
Q. Well --
A. Yes, not much.
Q. Yes, all right. To what extent did it affect you?
A. To what extent? I don't know. Nothing much, because I do not have the asset. It affect a lot of my co-directors, Mr Lee Howe Yong though, and I think at that time he was selling some of his property in Hong Kong and then he end up -- I don't know -- cannot sell it or whatever.
Q. So you felt a personal responsibility for this?
A. No.
Q. So, as I understand your evidence, the Mareva injunction was irrelevant to you.
A. A little bit. Not much.
Q. You have to be precise.
A. Just by precise --
Q. By how much?
A. By not much.
Q. Yes, so what is that "not much"? How did it affect you,

11:33 even if it was not much?
A. It's a Mareva injunction. I mean, I don't have any asset and all that, so it wouldn't affect me much.
Q. We can go on talking --
A. Yes --
Q. -- about "much". Could you be precise?
A. But not much.
Q. Let me ask you the questions in this way -- did it affect you, "yes" or "no"?
A. A little bit, yes. A little bit.
Q. How?
A. I cannot even describe. It's not much. Like, I don't know, not much.
Q. How did it affect you? I'm not asking you --
A. It affected maybe legally, you know, injunct my -- whatever -- injunct my assets that I don't have much.
Q. So whatever little assets you had, had been the subject of the injunction; right?
A. Yes, of course.
Q. Did it also cause you to lose face in the public domain?
A. Lose face?
Q. Did people know about it?
A. I don't know.
Q. Surely your fellow directors knew about it; right?
A. Fellow directors where?

11:34 Q. You just mentioned fellow directors.
A. No, in -- my fellow directors in Hong Kong.
Q. Yes.
A. So he has a Mareva injunction, too, so, what, was he embarrassed, too?
Q. I'm not asking about that.
A. I don't know. I mean --
Q. Were you affected reputationally by that injunction?
A. No.
Q. Not at all?
A. I don't think so.
Q. So did you not know it was suggested that you are the type of person who will hide assets and that is why the injunction was granted?
A. That's what they said. I'm not there to defend him.
Q. So the fact that it was said that you are that kind of person didn't affect you at all?
A. I have people said worse about me, so -- I know what I am.
Q. So, at this stage you had this Mareva injunction. Dato had already appointed a provisional liquidator and had caused you agony as part of what you considered to be a personal vendetta; right? Do you want me to repeat my question?
A. No. Yes.

11:35 Q. You agree. Thank you. So you agree with my question, right? I just want that for the record.
A. Yes, and -- yes.
Q. Thank you. This is six months before you sent the first letter of 10 July. Isn't that correct?
A. Yes.
Q. So, six months before you sent that letter, your view was this man has inflicted agony on me as part of a personal vendetta; right?
A. Yes.
Q. And six months before you sent that letter, you called the transaction an advance of $3 million; correct?
A. Yes.
Q. Thank you. But six months later, so as to exact revenge on Dato for what he had done to you, you changed your story to hurt him.
A. What story did I change to hurt him?
Q. Do you agree or disagree?
A. Disagree.
Q. I will now show you.
A. Okay.
Q. According to your evidence-in-chief, you found out about Dato's coal mining business on 29 June 2008, and I'm looking at paragraph 68 of your affidavit.
A. Yes.

11:37 Q. Then, if you go to paragraph 80 of your affidavit of evidence, you said that you asked a friend to obtain the IPO prospectus in Jakarta, and your friend managed to obtain a copy for you; correct?
A. Yes.
Q. Who is that friend?
A. My Indonesian friend, his name is Jackie -- he's Indonesian. His Chinese name is Fu, Jackie Fu.
Q. What does he do?
A. Businessman.
Q. Then you say, at paragraph 81:
"Mr Hutapea ..."
That's your lawyer from Hotman Paris; right?
A. Yes.
Q. "... made copies of parts of the said draft Prospectus in Bahasa Indonesia. It was pointed out to me that according to the draft Prospectus, the Plaintiff was said to be the 'controlling shareholder' and 'President commissioner' of PT Bayan."
Right?
A. Yes.
Q. Did you read the prospectus yourself or any part of it?
A. I just look at the front page, just browse it.
Q. You browsed the prospectus, right?
A. Mm-hmm.

11:38 Q. So you would have learnt that the IPO involved the issue of shares by Bayan Resources as well as the sale of shares by certain vendors; correct?
A. I never look at the detail, just browse it, the front page and ...
Q. Could you answer my question?
A. No.
Q. Is it your evidence that you did not know that -- you did not know that the IPO involved the issue of shares by the company as well as the sale of shares by --
A. No, I browse it. I know that, you know, the plaintiff is selling some of his shares.
Q. Thank you. So you were aware in late June and early July that the plaintiff would be selling some of his shares as part of the IPO; right?
A. Yes.
Q. If you go to paragraph 82 of your evidence-in-chief, you said:

"I told Mr Hutapea that I wanted to commence a claim for my share against the Plaintiff in Indonesia. I was advised that in Indonesia the proper step before initiating legal proceedings in the courts was to first issue a warning letter (somasi) to give the Plaintiff a chance to honour his obligation. If the Plaintiff kept to his promise, there would be no need to proceed

11:40 with a court action. If the Plaintiff refused, Mr Hutapea would proceed to prepare a claim in the Indonesian courts."

Right?

A. Yes.

Q. So you would have given Mr Hutapea all the facts so that he could advise you on your claim; correct?

A. Yes.

Q. You told him -- I shouldn't say that because that's a communication between you and your lawyers. Your claim as at late June 2008 and early July 2008 was that that you are entitled to 50 per cent; correct?

A. Yes.

Q. 50 per cent of what?

A. Of the company that I started funding in 1995.

Q. So your position then, and it was very clear to you, was that you wanted to claim 50 per cent of the entire capital of the company, not just 50 per cent of Dato's shares; correct?

A. 50 per cent of his share, of the plaintiff's shares.

Q. I see. So your claim was for 50 per cent of the shares in the name of Dato; correct?

A. At that time, I really not sure how many share he own, so I just assumed that he own 100 per cent.

Q. It doesn't matter whether it was 100 per cent or what --

11:42 A. It matters to me. If he owns 100 per cent, the company IPO, he own 100 per cent, half of that. Of course it matters.
Q. In your mind, you believed that your claim was to 50 per cent of whatever shares were in Dato's name; correct?
A. In his name, yes. By that -- at that time, I thought that he owns 100 per cent of the company.
Q. Yes, but let's leave aside what you thought about what he owned, but you agree with me that at that time, in your mind, your claim was to 50 per cent of whatever shares were in Dato's name; right?
A. And company.
Q. Sorry?
A. In his name, the plaintiff's name and the company -- and his company.
Q. Therefore, you are saying, in your mind --
A. Overall 50 per cent, yes.
Q. Sorry?
A. Yeah, the overall 50 per cent.
Q. You are now clarifying, to give you the benefit of the doubt, that at that time you believed your claim was to 50 per cent of all the shares issued by the company; correct?
A. Yes.
Q. Regardless of whose name the shares were in; correct?

11:43 A. Yes.
COURT: Are you sure that's your answer?
A. Yes, because --
COURT: The answer to the question?
A. Yes.
COURT: It's one thing to say 50 per cent of all the shares that the plaintiff owned and another to say 50 per cent of all the shares of the company.
A. Because I understand that the other shareholder probably is his nominee anyway. It was his secretary. The other shareholder probably was his nominee, so -- the other shareholder of PT Bayan.
COURT: He's assuming that the other shareholders are also his nominees.
MR SINGH: That's what he's saying.
COURT: All right.
MR SINGH: So you are saying that you were aware of who the shareholders were at that time; correct, for you to come to the conclusion that they were his nominees?
A. I browse it, I saw it and knowing that --
Q. "Yes" or "no", sir?
A. Yes.
Q. So you looked at the prospectus, you looked at the names of the shareholders, you concluded that they were all nominees of Dato Low and, therefore, you believed in

11:44 your mind that you had a claim to 50 per cent of all the shares of the company; correct?
A. Yes.
Q. I assume you would have given those instructions and communicated that belief to Mr Hutapea.
A. Yes, and also I gave my lawyer, Mr Hutapea, the power of attorney to act, so -- according to Indonesian law.
Q. I show you the power of attorney that you have just referred us to. It's at volume 6 of the defendant's bundle of documents at page 1712 -- I'm sorry, it's at page 1709, which is the Bahasa version which bears your signature.
A. Yes.
Q. This is dated 9 July 2008, the day before the first letter; correct?
A. Yes.
Q. And this power of attorney was prepared after you had given your instructions about your claim to Mr Hutapea; right?
A. Yes. During that time, during the same time, yes.
Q. The same time.
A. Mm-hmm.
Q. In other words, having read the prospectus, having learnt about who the shareholders were, having come to the conclusion they were Dato Low's nominees, you

11:46 communicated that to Mr Hutapea, and this power of attorney was then signed; right, for him to then issue the first letter of 10 July?

A. I went to see him in the morning, talked to him and I was going to come back after lunch and prepare the power of attorney.

Q. After the power of attorney was signed, then Mr Hutapea sent off the demand; right, the following day?

A. Yes.

Q. Now go to the English version, which is at page 1712. Do you see the word "Special" there?

A. Yes.

Q. It says:

"For and on behalf of the Principal ..."

That's you, right?

A. Yes.

Q. "... to make, submit Subpoena Letter either in Civil or Criminal way against PT Bayan Resources and its company group and also against Mr Dato Low ... that is located at ... Jakarta ... in relation with returning the right of the Principal upon minimum 50% ... of all shares and interests registered under name Dato Low ... in PT Bayan Resources and its company group including to collect the investment from the Principal in PT Bayan Resources through Mr Dato Low ... and also Subpoena for all the

11:48 bill and claim damages that suffered by the Principal."

Mr Sia, you told us that you believed your claim was for 50 per cent of everything, but it would appear that you told your lawyer something different.

A. I did not tell my lawyer something different. How do you know I tell my lawyer something different? I gave him a power of attorney to do this.

Q. You told your lawyer, on the basis of which he prepared this power of attorney which you signed, that your claim was to 50 per cent of the shares registered in Dato Low's name.

A. This is how he put it, yes.

Q. Do you see the inconsistency --

A. What inconsistency?

Q. -- between -- Mr Sia, give me a minute. Do you see the inconsistency between what you told the court on the stand and this document at page 1712 of 6AB; "yes" or "no"?

A. No. Disagree what did I tell -- told the court? All the shares, and then this is what my lawyer put it out. That's how he wrote it.

Q. Mr Sia, all of these things point to the fact that you are making up this agreement.

A. I don't agree. I totally disagree with you.

Q. Let me finish.

11:49 A. Okay.
Q. You are making up this agreement, you are changing your story, you are creating new evidence on such important issues. Do you agree or disagree?
A. I disagree.
Q. Then we will look at your first demand letter, which is in the bundle of publications and republications, tab 1, page 1. Look at the claim that was made at page 2. It is a claim to 50 per cent of all the shares, not just Dato's shares. Do you see that?
A. Yes.
Q. So you have a situation where your attorney was authorised to claim only 50 per cent of Dato Low's shares, but the demand was for 50 per cent of everything.
A. I didn't say that I asked him to just claim for the plaintiff's shares. I said earlier the other shareholders, I think, are his nominee, so this is what the lawyer put in to claim about, you know, 50 per cent of all the share, company shares.
Q. Mr Sia, this was a reckless, malicious and false demand on the basis --
A. By who?
Q. -- of what is stated in the power of attorney itself.
A. Wait, I don't understand that. Can you repeat that

11:51 again?

Q. On the basis of your own document, the power of attorney asking to claim for 50 per cent of Dato's shares, or shares registered in Dato's name, this demand is reckless, malicious and false.

A. Disagree. What reckless about it? What malicious about it and what's false about it?

MR SINGH: Your Honour, can we stand down the matter for 10 minutes for the benefit of the transcriber?

(11.54 am)

(A short adjournment)

(12.05 pm)

MR SINGH: If it please your Honour.

Mr Sia, you are aware, aren't you, that after the first letter was sent on 10 July, the firm of SRS in Indonesia asked Mr Hutapea for the power of attorney?

A. Yes.

Q. You're also aware, aren't you, that the power of attorney was not given, despite that request?

A. Yes. This is depend -- I leave it to the attorney.

Q. But did you not find it strange that a request for the power of attorney, which is a very simple, straightforward request, which can easily be met, was not acceded to?

A. You know what, counsel, I don't think so, because

12:14 I leave it to my attorney. I don't think it's strange or anything.

Q. But --

A. You probably would do the same.

Q. Do you know what the reason was for not --

A. I have no idea.

Q. For not giving the power of attorney?

A. I don't know why he didn't.

Q. But you would have seen the letter from SRS asking for the power of attorney; correct?

A. My lawyer reviewed that. I have a copy probably.

Q. So you would have wondered, wouldn't you, whether it was going to be given?

A. No, I left it to my lawyer.

Q. Did you know that it was not given?

A. I don't know. I left -- I leave it to my lawyers to do that.

Q. Can you answer my question --

A. No, I don't know.

Q. -- did you know, in July, that it had not been given?

A. Probably, yes.

Q. So if you knew that it had not been given, did you ask your lawyer why?

A. No. I gave him the power of attorney, tell him to, you know, do whatever is necessary.

12:16 Q. Let me tell you why the power of attorney was not given.
A. You know why my lawyer not given?
Q. Let me tell you why it was not given. Can you turn to the power of attorney at 6DB, page 1712.
A. You mean the -- try to delay. Part of the the thing they do.
Q. Sorry, you said something under your breath.
A. Maybe -- I don't know -- you try to point out that I said in my affidavit or something, that tried to delay or something. I don't know. That's what my lawyer told me then.
Q. Your lawyer told you "try to delay"?
A. Yeah, probably, yes.
Q. What do you mean?
A. Anyway, please go ahead with your question, you know.
Q. But what do you mean when you say your lawyer told you "try to delay"?
A. I don't know. Maybe the other side tried to delay the matters.
Q. How does the other side try to delay the matters?
A. I don't know.
Q. Look at the power of attorney at page 1712.
A. Mm-hmm.
Q. Isn't it true that it was not given because it would have shown that the claim was inconsistent with your

12:17 power of attorney?

A. I don't know. I don't think so. I disagree.

Q. Isn't it true that it was also not given because it would have shown what you wanted to do, which is -- and I'm going to read from the second paragraph under the heading "Special":

"... submit all request letter and protest letter against all government agencies and related agencies including ... (Bapepam), Indonesia Stock Exchange, Department of Energy and Mineral Resources ... Government of the Republic of Indonesia and also make and submit Criminal Report to the Police ... on suspicion of embezzlement fraud ..."

Go over the page:

"... Agent is given authority, face the Officials on the entire Government institutions and agencies of the Republic of Indonesia and all State Officials [in the various courts] including ... (Bapepam), Indonesia Stock Exchange, Department of Energy and Mineral Resources ... without any exception ..."

Isn't it correct that you didn't want the other side to see what your gameplan was?

A. What do you mean?

Q. You had written a letter of 10 July to Dato Low and Bayan Resources, but you had already decided by then to

12:18 take this to all the government departments and agencies and you didn't want Bayan Resources and Dato Low to know about it.

A. I gave this power of attorney to my lawyer. He prepared this power of attorney.

Q. Isn't it the case that before the first letter went, you had already planned that it didn't matter how Dato and Bayan Resources were going to reply, you were going to make sure that you would embarrass Dato and stop this IPO at all costs by doing all these various things set out in this power of attorney?

A. Disagree. Never intend to embarrass him. If I want the whole world to know, I will go to the media already.

Q. That is the reason why the simple request for the power of attorney was not acceded to, isn't it?

A. No, you have to ask my lawyer about that.

Q. I'm going to show you in a moment -- perhaps this afternoon -- how every step was planned; every step of the way, Mr Sia, was planned with a view to inflict the greatest amount of damage on Dato Low for what you thought he had done to you. Okay?

A. If you can, sure.

Q. All right. You knew that there was going to be an IPO; correct?

A. Yes.

12:20 Q. You also knew that the IPO was both domestic and international.
A. Mm-hmm. Yes.
Q. Good. You knew, as you had agreed with me before the break, that Dato would be one of the vendors.
A. Yes.
Q. And if he sold the shares, he would stand to gain millions of dollars -- hundreds of millions of dollars.
A. I don't know how much he gained. I don't know.
Q. Could you not have calculated the number of shares with the anticipated price?
A. Yeah. I mean ...
Q. Yes. Thank you.
A. Yes.
Q. You also knew that if you make a claim to the shares, then the IPO might be derailed or affected.
A. I don't know to what extent, no.
Q. I didn't ask you to what extent.
A. Okay, I don't know then.
Q. Could you answer my question? You also knew that if you make a claim to the shares, that the IPO might be derailed or affected.
A. No.
Q. Is it your evidence here that before you sent the letter of 10 July, you had no idea that if you made a claim to

12:22 the shares, 50 per cent of Bayan Resources, it would have an impact on the IPO?

A. I mean, that is not what in my mind.

Q. I didn't ask you whether it was in your mind.

A. I don't know.

Q. I'm asking you whether you knew.

A. I'm not sure, I mean probably.

Q. You've given us three answers -- "no", "I'm not sure" and "probably".

A. Yes, mm-hmm. I look at, yeah.

Q. I would like, if you don't mind, a clear answer.

A. Mm-hmm.

Q. I'm going to repeat the question so that --

A. You don't have to. You can answer for me, you know -- it seems like, put all the word into my mouth.

COURT: No, witness. You may not accept the words he puts in your mouth but you can give an answer with the words that you are comfortable with.

A. Okay, thank you.

MR SINGH: So you knew, didn't you, before you sent the letter of 10 July, that if you made a claim to 50 per cent of Bayan Resources' shares, it would have an impact on the IPO.

A. I'm not sure.

Q. Is that your answer?

12:23 A. Yes, that is my answer -- I'm not sure.
Q. So can I understand from that, that it didn't cross your mind at all?
A. Not at that time. I just want to protect my interest. That's what in my mind.
Q. You didn't know, as a person who had been in the corporate world for so many years, that if you made a claim for 50 per cent of the shares of a company that's going for an IPO, it would have an impact on the IPO? You didn't know that?
A. Yes, but as I said, at that time, that was -- that's not in my mind.
Q. So now I think I understand your answer.
A. Yes. I have my priority.
Q. Yes.
A. Protect my own interests.
Q. Yes. So your answer is, and please tell me if I'm putting words in your mouth with which you don't agree --
A. Mm-hmm.
Q. -- you were aware before 10 July that if you made a claim for 50 per cent of the shares of Bayan Resources, that would have an impact on the IPO of Bayan Resources, but that was not your intention when you made the claim. Would that be right?

12:24 A. Yes.
Q. Thank you.
COURT: Counsel, before you move on, just now you asked him a question about the price at the time. If you are looking at the red herring, there would be no price there.
MR SINGH: It would just be a range, your Honour, at that time.
COURT: Would there be a range?
MR SINGH: Yes.
You also knew -- and I'm now talking about just before 10 July, when the letter went out -- that the investing public would have an interest in knowing if there was a claim by someone to 50 per cent of the shares of Bayan Resources; correct?
A. Before the letter went out?
Q. Yes.
A. Sorry, what's the question again?
Q. You knew, just before 10 July, when the first letter went out, that the investing public would have an interest in knowing if there was a claim by someone to 50 per cent of the shares of Bayan Resources.
A. Anybody, a potential investor, I'm sure they will be interested to find out.
Q. So the answer is "yes", right?

12:26 A. Yes.
Q. Thank you. The reason the potential investor would be interested to find out is that this is a material fact, that there's a claim to 50 per cent of Bayan Resources; correct?
A. I don't know it's a material fact or not, but yes.
Q. You have to decide what your answer is. You said "I don't know but yes". Which is it?
A. Yes.
Q. Thank you. It would be material because the investor would not want to buy into company or buy from the vendor if later there's going to be a dispute as to the ownership of the shares; correct?
A. I don't know. You have to ask the investors.
Q. It's a matter of common sense.
A. No. It's up to them on the risk if they want to do that.
Q. All right. You tell us, then, why would it be material for a potential investor, since you agreed with me it would be. You tell us.
A. No, I mean, I don't know. I mean, material -- they should just find out more.
Q. Why?
A. But it's still up to the investor whether they want to invest the risk.

12:27 Q. Mr Sia, we can waste time.
A. I'm not wasting time. I'm just answering your question immediately. How can I waste time?
Q. Tell us why it would be material to a potential investor that there's a claim for 50 per cent of the shares of the company that's going for an IPO. Tell us.
A. I just told you.
Q. I'm asking you again, tell us why would it be material.
A. Material, like, somebody claiming the company's shares and whoever want to invest in the company, they should -- I mean, they take it at their own risk.
Q. Thank you very much. The risk is that they buy the shares either from the vendor or from the company, and later there's a claim over the ownership; correct?
A. Maybe, yeah. Maybe there's claim, maybe not. I don't know.
Q. Is it "maybe" or "yeah"?
A. I don't know. It's up to the investor to ask me what the investor would think.
Q. I'm asking you, having regard to your own --
A. I would --
Q. -- experience --
A. I will answer "yes" or "no". I will look at the company first, then I will decide.
Q. I'm going to repeat what you said.

12:28 A. But this is what I said now. I don't keep changing that.

Q. "... somebody claiming the company's shares and whoever want to invest in the company, they should -- I mean, they take it at their own risk."

What is the risk?

A. I don't know. They have to analyse themselves, evaluate; maybe no risk.

COURT: You may want to rephrase it. Someone says, I own half the company shares. Is that material, do you think?

A. Is that material?

COURT: If you say you own 70 per cent or 80 per cent and somebody says, I own half of that, in a listed company, do you think that's material? Would that be material?

A. Yes.

COURT: Why would it be material?

A. Because it might change over shareholders.

COURT: Change control?

A. Yes.

COURT: This is not I own 10 shares, it's I own half the company.

A. The majority, yes.

COURT: So it is material, because it raises the question of who owns this company, who controls it, right?

12:29 A. Yes.
COURT: Yes.
MR SINGH: Thank you very much.
A. Thank you.
Q. It's material because, as his Honour pointed out, and you agreed, it raises the issue of who owns the company, who controls the company and also whether this IPO is even approved, in the first place, by the persons who actually own and control the company; correct?
A. This -- yes.
Q. Thank you. Of course, none of that claim of yours was disclosed in the preliminary documents, the preliminary prospectus and the preliminary offering memorandum; correct? That's a fact. We know it was not disclosed.
A. Yeah, I --
Q. Correct?
A. Yes.
Q. So, as you accepted earlier, the claim for 50 per cent would be a material fact and, as far as you knew, it was something that had to be disclosed; correct?
A. Yes, if the company don't disclose -- like you said, the company didn't disclose -- I don't know, so -- it's beyond my control, that one.
Q. So you were aware that if you make a claim for 50 per cent of the shares through a lawyer, then that fact has

12:30 to be disclosed to the investing public?

A. Yes.

Q. You also knew that that claim could not have been resolved by any court before the IPO went ahead; correct?

A. I don't know.

Q. You are very well acquainted with legal processes. In Indonesia, it takes some time to go to court and resolve issues, then there are appeals and then appeals. It takes a number of years, doesn't it?

A. Yeah, possible.

Q. So you knew that if you made a claim for 50 per cent of the shares, either of the company or of Dato Low's shares, that claim could not be resolved by the courts before the IPO was slated to go ahead; right?

A. Yes.

Q. Therefore, at the very least, there would be uncertainty over the outcome of that claim; right?

A. Yes.

Q. Why was it, in your mind, necessary to take this matter of your claim to Bapepam and the other agencies?

A. Because my lawyer's advise -- recommend.

Q. But you're not a person who has no clue about how the markets work or the corporate world revolves or rotates. Why did you think it was necessary to take your claim to

12:32 all these agencies?

A. This is my recommendation from my lawyer.

Q. He didn't recommend that in addition to making a claim, you should go on a Ferris wheel ride. He said you should also, according to you, go to these agencies. Why did you think he was recommending that?

A. This is -- I don't know. Maybe it's the procedure in Indonesia.

Q. You don't know?

A. I don't know.

Q. But why to Bapepam? Why not --

A. Because --

Q. Why not to another agency, for example, the Ministry of Foreign Affairs?

A. I don't know. I think he just wrote to people that involved in the deals.

Q. So, as between you and your lawyer, it had been decided that this claim should be brought to the attention of the people and agencies involved in the deal; correct?

A. Recommended by my lawyer, yes.

Q. And these people included Bapepam, the Indonesian Stock Exchange and the IPO team; right?

A. That was recommended.

Q. So the answer is "yes"; right?

A. Yes.

12:34 Q. Please --
A. Yes.
Q. -- could you answer the question? Yes, thank you.
A. Yes, recommended by my lawyer, yeah.
Q. What did you want Bapepam to do after you drew their attention to this claim?
A. I don't know -- a response.
Q. How? What did you want them to do? Be specific, please.
A. I don't know. I don't know what they will do.
Q. I didn't ask you what they will do, I asked you what you wanted them to do.
A. Write -- probably write them to look into the matters.
Q. For what? To do what?
A. To look into the matters of this claim.
Q. With a view to doing what? So that they have reading material at night or to do something about it?
A. They look at it, see whatever necessary they want to do.
Q. What did you --
A. I don't know what is the outcome. I don't know. I don't know what I really want. Send it to them, let's see what is the answer.
Q. But did you not ask them to do something?
A. I don't know. My lawyer just send the letter to inform them.

12:35 Q. You are aware of the letter, right, that was sent to Bapepam?
A. I aware of the addressee, yeah.
Q. You were aware of the contents of the letter that was sent to Bapepam?
A. Yes.
Q. So what did you want them to do?
A. I want them to respond.
Q. That's all?
A. Yeah, respond and see what they can do. What -- they -- -- their response, yes.
Q. To do what?
A. I don't know.
COURT: You can show him the letter.
MR SINGH: Go to this bundle, please, at tab 3. Look at the heading of the letter, the caption:

"Request Not To Proceed With [IPO]."

Right? Now do you remember?
A. Now that I look at it, yes.
Q. So you wrote a letter, through your lawyers, to Bapepam, the Indonesian Stock Exchange and the IPO team, Merrill Lynch, Macquarie Securities, Macquarie Konsultan and Trimegah, requesting them not to proceed with the IPO; correct?
A. Yes.

12:36 Q. Why?
A. Recommended by my lawyer that --
Q. I didn't ask you who recommended it. I asked you why.
A. Why? Not to proceed, so -- I don't know -- maybe we have time to -- we have time to review it on the claim.
Q. Time to review what?
A. The claim.
Q. Who would review your claim?
A. Bapepam.
Q. So you wanted Bapepam to decide who is right and who is wrong?
A. No, of course not. We just wanted to get their attention to it.
Q. Yes, but why not proceed with the IPO? That's what I'm trying to understand. You knew Bapepam --
A. They --
Q. Sorry.
A. Okay.
Q. You knew Bapepam would not decide who is right or wrong; they are not a court of law.
A. Of course, yes.
Q. You had made a claim, and you wanted them to stop the IPO; right?
A. Yes.
Q. Was it a request for a temporary halt or a permanent

12:37 halt?

A. I don't remember.

Q. Read the letter.

MR GIAM: Your Honour, I don't want to interrupt my learned friend, but when you refer to a translated letter and refer to the translation, there are two translations, and I think it is only fair that he shows both translations.

MR SINGH: Your Honour, I'm happy for my learned friend's client to read as many translations as he wants. It was not put to Dato Low that the translation that is in Dato Low's affidavit is incorrect, so if my learned friend --

COURT: Which is the word that you are drawing his attention to?

MR SINGH: Yes. Is it "Request to restrain" -- look at tab 3A, the caption:

"Request to restrain Bayan Resources ... from going ... IPO due to the ongoing dispute ..."

COURT: In the earlier one, it's "Request Not To Proceed".

MR SINGH: "Request Not To Proceed." Then if you go to page 25 of your own translation, Mr Sia, the last paragraph:

"... we are requesting [Bapepam], Indonesia Stock Exchange, Merrill Lynch [et cetera] prohibit Bayan

12:40 Resources ... from going public ..."

Okay? That's your own translation.

A. Mm-hmm. So what's the difference between "prohibit" and "stop"?

Q. You should ask your lawyer that because I didn't draw your attention to it.

A. So you draw a stop.

Q. Yes.

A. Okay.

Q. Now that you've refreshed your memory, you agree with me, don't you, that you wanted Bapepam to stop the process; correct?

A. Yes.

Q. Therefore, you believed that the process could be stopped by Bapepam and/or the Indonesian Stock Exchange and/or the IPO team to whom this letter was addressed; correct?

A. Correct, but they didn't.

Q. Thank you. So these people that you sent the letters to were people who you had told -- and if you now go to page 13 of the bundle -- that you would sue them if they didn't stop it; correct?

A. Yes. Yes.

Q. Was the IPO stopped?

A. No.

12:41 Q. Did you sue Bapepam, IDX or any of the IPO team?
A. No. Not yet, I mean. We are -- we have draft prepared for that.
Q. Go to page 12, paragraph 4, the last paragraph, just above the word "And":
"Based on the above facts, we would like to inform you that IN A SHORT TIME WE WOULD PROCEED WITH CIVIL AND CRIMINAL LEGAL SUIT AGAINST PT BAYAN ... AND DATO LOW ..."
In the short time in July, did you sue or issue a police report or file a police report?
A. No. May I explain why I didn't do it yet?
Q. You can, but let me just finish my series of questions.
A. Sure.
Q. Did you do it in August?
A. We were preparing the draft. We had a prepared draft for that.
Q. So the answer is "no"?
A. Not in August, no.
Q. Did you do it in September?
A. No.
COURT: Before --
A. It's a bit slow in Indonesia.
COURT: Just to close the loop, when these letters were written, beyond the first letter did you file any court

12:43 action in Indonesia claiming your shares against the plaintiff?

A. Not at that time, your Honour. At that time my lawyer has a draft prepared, and I'm a businessman, and for me to all sue the authority and the investment bank --

COURT: It's a very simple question. You say you own 50 per cent of the shares, and you sent a warning to the plaintiff, and the question is: At that time, prior to the second and third letters, did you file any civil or criminal action against the plaintiff with respect to these shares?

A. No.

COURT: All right.

MR SINGH: Thank you.

So here you have already briefed your lawyer; your lawyer's power of attorney sets out his understanding of the case. It's a very simple agreement. In 1995 he came to you in desperate need, you gave him $3 million.

A. Yes.

Q. It's two paragraphs, the contract, apparently: In consideration of the $3 million, you will give me 50 per cent of a business which is going to be worth $500 million in seven to eight years when it goes for IPO. Two paragraphs. No suit at all before the letter was sent --

12:44 A. No, I just explained. I mean, at that time we already prepared the draft, and I just a little bit reluctant to sue everybody. But also the IPO has went ahead, so we not in a hurry -- yes. We just have to make sure --
Q. You are waiting for an oral agreement?
A. Yes.
Q. Regardless of whether the IPO goes ahead or not, you want your shares; right?
A. Yes, we are preparing the, you know, the suit and the complaint.
Q. So why wasn't this two-paragraph agreement filed as a claim before you sent the letters?
A. A claim before I sent the letters? That's why we sent the letters, to claim.
Q. 10 July you sent the letter, you got no response.
A. Yeah.
Q. Why didn't you file the claim in the Indonesian court?
A. I don't know. Recommend by my lawyer -- did you write a second letter.
Q. Why?
A. I don't know why.
Q. Why not just send the boy down to the Indonesian District Court in South Jakarta and file it?
A. I don't know the procedure that time. You should go down to the court to do the complaint. I have no idea.

12:45 Q. Weren't you anxious --
A. No.
Q. -- that no claim was being filed?
A. No. It -- you know, it's an Indonesian procedure.
Q. Why wasn't this two-paragraph agreement put in a document and taken to the police station and say, "Here, criminal complaint for fraud and embezzlement"? Why? Between 10 July and the next letter, 15 July, why was that not done?
A. I don't know.
Q. You don't know?
A. Yes.
Q. You have half of a company worth $1.05 billion to $1.4 billion, according to how you valued it, and you were not anxious for the claim to be made?
A. Counsel, I say very clear already, you keep changing it. My lawyer said that is the procedure in Indonesia -- you send first letter and then second letter and then third letter. Now it's my complaint, you want me to tell you all that?
Q. Now you are saying your lawyer told you --
A. I say that from day one -- I mean, not day one, earlier, when you start this question. You keep changing it.
Q. So now you're telling us that your lawyer, Mr Hutapea, told you that you cannot ma make a claim in court unless

12:47 three letters are sent?

A. He didn't tell me that. Why you keep saying he tell me that? He said -- he told me this is an Indonesian proceedings, so I left it -- I leave it to him. I leave it to him. Do you get that? Or you still don't get it? You still want to change all your question and try to, what, entrap me?

COURT: That's his job.

A. Huh?

COURT: That's his job.

A. Yeah -- I mean. That's why when he asked me "yes" or "no", I don't dare to answer, your Honour, you know. I have to be careful, try to confuse me more.

COURT: If you are confused, ask him for clarification or ask him to simplify.

A. Keep telling me about wording, wording, you know, my English is not that good. If I'm that good, I probably can stand there, too, like him.

MR SINGH: Can I?

A. Sure, please.

Q. Thank you. What did your lawyer tell you? How many letters do you need to send? 50? 78? 82? Before you file claim or go to the police?

A. He just -- this is the normal Indonesian procedure. We going to have an Indonesian expert here next week, so

12:48 you ask them.
Q. So after --
A. Don't ask me Indonesian law. I don't know.
Q. After the first letter was sent, did you ask him, are we filing the claim?
A. No. I told you, I leave it to him.
Q. After the second letter was sent, did you ask him, are we filing a claim?
A. I leave the matter to the lawyer. How come your client can leave the matter to the lawyer and I cannot?
Q. Would you answer my question? After the second letter was sent, did you ask your lawyer, are we now filing the claim and filing the police report?
A. No, I didn't ask him. I leave it to him.
Q. After the third letter was sent, did you ask that question of your lawyer?
A. No. I didn't. I leave it to him.
Q. After the IPO went ahead on 12 July, did you tell your lawyer, now can we file?
A. After that, he was preparing --
Q. 12 August, I beg your pardon.
A. -- preparing the draft, yes.
Q. So you told him to file?
A. Yes.
Q. And he was preparing the draft?

12:49 A. Yes.
Q. How many pages does it take to file a police report of an oral agreement that spans two short paragraphs?
A. I don't know.
Q. So you had the 12 August, and I can count the number of days to 31 August. Nothing was done.
A. 12 August?
Q. To 31 August.
A. 12 August to 31 August?
Q. Yes, to the end of the month, no police complaint.
A. No.
Q. Here is a man who had, according to you, defrauded you of half a billion dollars.
A. Yeah, the -- the IPO went ahead. There's no rush immediately. We just want to make sure everything, you know, according to -- with the -- the civil lawsuit, before I filed the criminal complaint.
Q. But you didn't file the civil lawsuit.
A. We are preparing. At that time in Indonesia, it's almost the same time as now in Singapore, you have a Puasa month. The whole town is slowed down, and after that you have the new year's. And after that, right away, in October, early, I get a summons in Singapore.
Q. I know you want to rush to October.
A. No --

12:50 Q. But I'm interested in August --
A. -- I'm not rushing to October.
Q. And Lebaran is one week in Indonesia.
A. Okay, and how about the Puasa month? You know that is all slow down. Here is one day, Lebaran, I know -- at least you know it's one week.
Q. Then we go to September and, as I calculate it, there are 30 days in that month. Puasa is over, Lebaran is over --
A. No, it's not over.
Q. So in Indonesia, Puasa is 60 days, is it?
A. No -- I don't know. Do you know that from somewhere?
Q. Mr Sia --
A. No, the Puasa, I think we check -- I mean the month in that year was 1 October, if I -- in 2000 -- whatever.
Q. So if it was 1 October, August was not Puasa. Why wasn't it filed then?
A. I don't know. It just slow. I mean, maybe just slow. I don't know.
Q. Mr Sia, I suggest to you --
A. And I told earlier, too -- I mean, the IPO went ahead. It's not in the rush -- the lawyer don't feel the rush.
Q. Let me suggest to you --
A. No, I don't need you to suggest anything. Just tell me.
Q. Let me tell you that your gameplan was very simple --

12:51 fix Dato Low; having fixed him, the job is done; nothing more needs to be done.
A. Fix what, though? I don't understand what you are saying. Fix what?
Q. Did you not know that Dato Low did not sell his shares as the vendor in the IPO? Did you know that?
A. Yeah, he said so, but he sold it to his -- you know -- he probably has a deal with his nominee anyway.
Q. Did you not know in August, when the IPO went ahead, that Dato was not one of the sellers?
A. Yes, but his nominee just sold more at that time.
Q. So --
A. So?
Q. You achieved your objective of achieving revenge --
A. I did not achieve my objective.
Q. Having achieved --
A. You have your partner, your ex-secretary sell more for you. They just offset it.
Q. So having achieved that objective, there was no need for you to do anything more.
A. What objective did I get? Just three letters and never filed -- what objective? Why shouldn't do anything more? We preparing the lawsuit.
Q. Isn't it remarkable that a person who claims to have -- when did you come out of bankruptcy?

12:52 A. Sometime it's early 2009.

Q. Half a billion dollars would help a bankrupt, wouldn't it?

A. Sure if I can get it, of course.

Q. And yet you didn't sue.

A. I prepared, I say, how many times do I have to tell you? Why do I have to keep saying what I already said?

MR SINGH: Your Honour, I'm moving on to a slightly different point. Would this be a convenient time?

COURT: Yes.

(12.54 pm)

(The luncheon adjournment)

(2.48 pm)

MR SINGH: May it please your Honour.

Good afternoon, Mr Sia.

A. Good afternoon.

Q. Mr Sia, could you pick up your evidence-in-chief, please, and turn to paragraph 160. Can you read that to yourself, please?

A. Yes.

Q. This morning you said that your claim for 50 per cent was material and the fact of your claim had to be disclosed to the public. Do you remember that?

A. Yes.

Q. Here at paragraph 160, you say:

14:49 "... the ... public would have an interest to know the full facts (including my claim for 50% ...) before they decided as to whether they should purchase shares in PT Bayan."

How would the public come to know about your claim?

A. I don't know. Unless the company announce it.

Q. So the company, which is Bayan Resources, had to announce it; right?

A. It's up to them.

Q. Could you answer my question? If it is a material fact, then it is something that Bayan Resources had to disclose; correct?

A. It's up to the company.

Q. My question is not whether the company has an option or not. My question is: do you agree that a company that's going for an IPO has to disclose material facts?

A. I don't agree. It's up to the company.

Q. So if the company doesn't disclose material facts, then the company can get into trouble; right? You knew that at least.

A. Yes.

Q. Yes?

A. Mm-hmm.

Q. Is that "yes" or "no"?

A. Yes. I don't know, I mean, I know Indonesian law --

14:50 I mean, I don't know.
Q. You just said "yes" and now you are saying --
A. No, I said no -- I mean, I don't know.
Q. So which is it, "yes" or "I don't know"?
A. I don't know.
Q. So now it's "I don't know"?
A. Yeah. Yes.
Q. Can I then take you to the bundle of pleadings. Do you have your bundle of pleadings?
A. Yes.
Q. Could you turn to your defence and counterclaim?
A. Sorry.
Q. Do you have it?
A. No. Sorry, not yet.
Q. Tab 2. This is your defence and counterclaim. You would have read this document before it was filed?
A. Yes.
Q. And you would have approved of it contents before it was filed; right?
A. Yes.
Q. I'd like you to go to page 51 of the bundle, which is page 11 of the defence.
A. Yes.
Q. Paragraph 11C, and this is what you say:
"The Defendant [that's you] will rely on the

14:53 defences of self-defence and public interest as provided for under Article 1376 of the Indonesian Civil Code ... read together with Article 310 of the Indonesian Criminal Code ... as set out in paragraph 4 above. The publication of the said letter to PT Bayan Resources was for the purpose and with the intention of protecting the Defendant's legal rights and preventing prejudice to the Indonesian investing public."

Okay?

A. Yes.

Q. Could you explain to this court the meaning of the words here:

"The publication of the said letter ..."

-- and this is the first letter:

"... was for the purpose and with the intention of ... preventing prejudice to the Indonesian investing public."

A. Sorry, where is that again? 11C?

Q. Yes, the last three lines:

"The publication of the said letter to PT Bayan Resources was for the purpose and with the intention of ... preventing prejudice to the Indonesian investing public."

A. Yes.

Q. How was that going to be achieved? How was that purpose

14:54 going to be achieved?

A. How that purpose -- when I send the letter to the company, it's up to the company whether they want to publicise it to the public or not.

Q. But if it's up to the company --

A. If they do, then they will know -- the public will know.

Q. If it's up to the company whether it wants to publicise it, how would that prevent prejudice to the Indonesian investing public?

A. Sorry, can you repeat that question again?

Q. If you stop writing and listen to my question, you might remember it. Okay? The letter to Bayan Resources could achieve the purpose of preventing prejudice to the Indonesian investing public only if the investing public found out about the claim; correct?

A. Yes.

Q. And the way that the investing public would find out about the claim is if the company discloses the fact of the claim; correct?

A. Yes.

Q. So when you say that the publication of the letter to Bayan Resources was for the purpose and with the intention of preventing prejudice to the Indonesian investing public, you are there saying that the purpose of your letter and your intention in sending it was to

14:56 ensure that the investing public in Indonesia would come to know about your claim; right?

A. Yes.

Q. You were aware, both yourself and after consultation with your lawyers, that that would be achieved by raising a material fact, which is the claim, in a letter to Bayan Resources so that it is obliged to publish the claim to the investing public in Indonesia; right?

A. I don't get that. Can you repeat that, please?

Q. If the purpose and intention was to ensure that the public would come to know about your claim, then that would be achieved by sending your demand to Bayan Resources, knowing that Bayan Resources would have to disclose that claim to the investing public in Indonesia; correct?

A. Correct, if they announce it to the public.

Q. Thank you. Earlier you had said that you knew that there were the domestic IPO and the international IPO. Likewise, the purpose and intention, you say --

A. I don't know. You told me that.

Q. I'm not going to go back to that. You had already agreed that you knew about it.

A. Okay.

Q. That, likewise, you knew that if you made the claim to Bayan Resources, Bayan Resources would have had to

14:58 notify the investing public, both locally and internationally, about the fact of your claim; right?

A. Yes, they have to, but it's up to them.

Q. Thank you. You know that, as was intended by you, the fact of your claim was then made known to the investing public in Indonesia and in Singapore; correct?

A. When, though? What date?

Q. I can show you the newspaper articles and the prospectus, if you wish. Do you want me to do that?

A. Yes, in which prospectus?

Q. Sure. I'll show it to you. If you go to the bundle of publications and republications, the grey bundle, you will see at tab 7 the plaintiff's English translation of what appeared in the newspaper called Bisnis Indonesia -- I'm sorry Suara Pembaruan, which is not Bisnis Indonesia but a different newspaper in Indonesia.

A. 7A, you said?

Q. 7 and 7A, sir. 7 is our version of the English translation, 7A, I believe, is your version. That's for Suara Pembaruan. Then if you go to 8 and 8A, you will find what appeared in Bisnis Indonesia, the following day on 6 August. The first one was 5 August, this one is 6 August.

If you go to tab 9, you will see the Bayan Resources final prospectus. Tab 9 is our English translation, tab

15:00 9A is yours. Do you see the portions that we have marked in yellow?
A. Page?
Q. I'm now at page 57.
A. Yes. What date is this?
Q. This is the final prospectus, 6 August 2008.
A. Mm-hmm.
Q. Okay?
A. 2008?
Q. Yes.
A. Okay.
Q. Tab 9A is your version of it.
A. 2008, what date, though? Sorry.
Q. 6 August, sir.
A. 6 August.
Q. Yes.
A. This is after the third letters.
Q. After the third letter, yes, and before the IPO.
A. Okay.
Q. All right? That's for Indonesia, and in Singapore you will see at tab 12, you will see an e-mail among members of Merrill Lynch Singapore, including others, about your demand letter, the third letter. Do you see that?
A. Yes.
Q. That's tab 12. If you go to tab 13, you will see

15:03 an e-mail sent to prospective investors, of 24 July, enclosing a soft copy of Bayan Resources' pricing supplement to the preliminary offering memorandum. The portions are highlighted and the relevant portion is highlighted in that enclosure.

A. Excuse me, highlighted where? Here? This page?

Q. Is yours not highlighted?

A. Tab 13?

Q. Tab 13. Could you go to page 77? Do you see the section "Recent Developments"?

A. Yes.

Q. And the reference to your letter of 10 July and to your letter of 21 July?

A. Yes.

Q. To complete my narration, if you go to tab 14 you see the hard copy of the pricing supplement to the preliminary offering memorandum, also 24 July, and the relevant part of it is, likewise, the same section at page 87.

A. Again, slow down, please, counsel.

Q. I'm sorry.

A. This is, what, 83? 83 is --

Q. Page 83 is the hard copy of the pricing supplement.

A. Okay.

Q. And go to page 87.

15:04 A. This is --

Q. That's the one. Go to page 87. You will see at page 87 a reference to your two letters and the claim made by you. Do you see that?

A. Yes. Similar?

Q. Yes. Then, finally, at tab 15 -- are you at tab 15?

A. Yeah.

Q. These are pages 5 and 7 of the international final offering memorandum, and the relevant page is page 93. Do you see that?

A. Yes.

Q. What I have shown you, pursuant to your question about where these appear, is where the company had in Indonesia and in Singapore informed the investing public, as well as Merrill Lynch Singapore, about the claim that you had made. All right? That's what I was showing you.

A. After -- I mean, at the final document? At the final document?

Q. No, in all these documents that I took you through --

A. Yes. I only saw this document way after, right after -- I mean, I don't know when -- after the IPO. Right?

Q. I don't know when you saw this document but for my purposes that's not relevant for now.

A. Okay. So, never seen this document before the IPO.

15:06 Q. Okay.
A. Yeah.
Q. Now I'm talking about the documents from tab 7 onwards.
A. Counsel, excuse me. Can you ask me that part by part of this document, rather than put all of them together?
Q. I will be happy to do that.
A. Please do that.
Q. Yes.
COURT: He's trying to show you that all these documents contain a disclosure about your claim.
A. Yes.
MR SINGH: You know that, right? You know that the company --
A. Yes.
Q. -- disclosed your claim to the investing public in Indonesia and Singapore by way of advertisements in Indonesia in two newspapers, as well as by way of the pricing supplements, the final prospectus and the final offering memorandum.
A. Mm-hmm.
Q. Yes?
A. Yes.
Q. As you earlier said, and I'm going to ask you, these disclosures were, as intended by you, to prevent prejudice to the investing public; correct?

15:08 A. Yes.
Q. Thank you. You had earlier said that you are not familiar with the rules and regulations in Indonesia.
A. Yes.
Q. Can I ask you to pick up the bundle of pleadings again and go to your defence, please? That's at tab 2. Do you have it?
A. Yes.
Q. Could you go to paragraph 17B of the defence?
A. Is it page -- I mean number 55?
Q. Yes, it is.
A. Okay.
Q. If you go to subparagraph (2) at page 56, this is what you say -- do you have it, subparagraph (2) beginning with the words:

"Further or alternatively, the Letter to the 3rd Parties ..."

This is the letter of 21 July:

"... was the first step or initiating document in a regulatory process of a quasi-judicial nature and was necessary in order to secure a compliance with the Indonesian capital market laws and regulations."

Right?
A. Yes.
Q. Could you explain that to this court? What did you mean

15:10 by the letter of 21 July being the first step or initiating document in a regulatory process of a quasi-judicial nature necessary to secure compliance with Indonesian capital market laws and regulations?

A. Okay.

Q. If that's too much, shall I break it down for you?

A. Sure.

Q. All right. Can you explain why was the third letter, dated 21 July, necessary to secure compliance with Indonesian capital market laws and regulations?

A. I know -- according to the lawyer send it out.

Q. That is why I asked you earlier whether you read it and then whether you were okay with the contents. This is your document which you had approved. I'm asking you the question --

MR GIAM: Your Honour, this is a question of law that the lawyers should deal with, rather than the witness.

MR SINGH: It is not a question of law. It's a statement of a letter being sent because it was necessary to achieve compliance with some laws.

MR GIAM: That will be left to the Indonesian expert, your Honour.

MR SINGH: With respect, this is the purpose of the letter. The Indonesian lawyer cannot come and tell us why that letter was sent. That's what I want to know. Only

15:12 the witness can tell us why he sent that letter, in light of his statement at paragraph 2.

A. Why I send that statement is advised by my lawyer, recommended by the lawyer.

Q. Yes, but you also say that it was necessary to secure compliance with Indonesian capital market laws.

A. Yes.

Q. Could you explain --

A. Yeah, that's recommended by my lawyer to say whatever -- exactly what it is here.

Q. But that is correct, isn't it -- what you say there is correct, isn't it, from your point of view?

A. Based on the lawyer recommendation, yes.

Q. Right. So when you talk about your "lawyer recommendation", are you talking about Mr Hutapea or are you talking about your lawyers in Singapore?

A. I think at that time --

MR GIAM: Is this line of questioning correct, your Honour, because, firstly, it's a matter of law; and, secondly, what the lawyers tell him, I'm not too sure it's a proper question for him to answer.

MR SINGH: I didn't ask him what the lawyers told him. He just said it was recommended by his lawyer to put this in --

A. Yes, this is --

15:13 Q. I just want --

A. -- my lawyer file this for the defence.

Q. Having filed this, and having approved it and confirming that it is correct, I want to ask you to explain to this court how did you think that that letter would secure compliance with the laws?

A. I don't know. This is recommended. I have been saying that some times, and -- recommended by the lawyer, so --

Q. Let me help you. Let's go down to that same page under "Particulars of Qualified Privilege." Do you see that?

A. Yes.

Q. You say:

"By reason of the matters pleaded in paragraph 8 ..."

This is where your describe your claim:

"... the Defendant had an interest in the shareholding of PT Bayan Resources. The 3rd Parties to whom the Words complained of were sent were: Bapepam-LK - head of the Indonesian Capital Market and Financial Institutions ... (Indonesia's Capital Market regulator); the Managing Director of the Indonesian Stock Exchange; Merrill Lynch; PT Trimegah ... Macquarie Securities ... who were all interested in the listing of PT Bayan, had duties to perform in connection with the said listing and had an interest and duty in receiving the Words ..."

15:15 So I'm asking you, why do you say that these people had duties to perform in connection with the listing?

A. They are the -- they are the regulatory and the -- when -- the IPO team.

Q. So let's take it one at a time.

A. Mm-hmm.

Q. What was the duty, in your mind, of Bapepam in connection with this listing in relation to which they had to receive your third letter?

A. I don't know. As I said from beginning is that my lawyer recommend to write to these people.

Q. Your lawyer may have recommended many things, but take the responsibility for authorising him to do so. Now that you have done so, and have been sued for doing it, you have said that the letters were sent to persons who had duties to perform in connection with the listing, so now I want to understand from you what these duties are. Let's start with Bapepam.

A. Okay.

Q. Okay?

A. Yes.

Q. What were Bapepam's duties in connection with the listing for which it had to receive your third letter?

A. I don't know. They are the Indonesian regulatory body, and my lawyer recommend to write to them.

15:16 Q. As the Indonesian regulatory body, what was the duty of Bapepam in this IPO of Bayan Resources?
A. I don't know actual -- the responsibility of Bapepam.
Q. Are you saying that you sent the letter not knowing whether Bapepam had any interest or duty to receive the letter?
A. I send it through my lawyer.
Q. I'm asking you the question --
A. But recommend by my lawyer and sent to Bapepam.
Q. I'm asking you -- and it is your state of mind and not your lawyer's state of mind that matters -- are you saying that you sent the letter not knowing whether Bapepam had any interest or duty to receive the letter?
A. We send -- my lawyer send the lawyer because they think Bapepam is part of the whole process.
Q. What process?
A. I don't know. The IPO process, you have to go to Indonesia Bapepam.
Q. Why?
A. Why? I don't know. I just say that lawyer recommend to me these are the people we should send it to.
Q. Do you mean to say that when your lawyers said, send it to these people, you didn't ask why and it didn't cross your mind why?
A. I gave them power of attorney to do --

15:18 Q. Answer my question.

A. To do the necessary.

Q. You didn't ask why and it didn't cross your mind why; is that your answer?

A. Never cross my mind, yeah.

Q. And you didn't ask.

A. No.

Q. But you must have known that Bapepam had the right to stop the IPO; correct?

A. Possible, yes.

Q. It's either "yes" or "possible"; which is it?

A. Yes.

Q. Good. How did you know that that Bapepam had the right to stop the IPO?

A. My lawyer told me.

Q. What else could Bapepam do in relation to the IPO?

A. I don't know.

Q. You see --

A. They stop the IPO -- beside that, what can they do? I don't know.

Q. Did you not know at that time that Bapepam could, as an option, instead of stopping the IPO, impose conditions before the IPO could proceed?

A. I don't know.

Q. You didn't know at that time?

15:19 A. At that time, no.
Q. Not at all?
A. Not at all, yeah.
Q. Do you know now?
A. Now I still don't know, because the Bapepam stop the IPO or allowed the sale of the share, I don't know.
Q. Did you know then, before the letter was sent to Bapepam, that Bapepam could withhold the effective statement?
A. I don't know. They could probably. They could -- I don't know.
Q. Thank you. So you knew?
A. No, I don't.
Q. You said, "I don't know. They could probably. They could --"
A. Yeah, they could or they don't have to, but did they? Did they stop my IPO?
Q. Answer my question, Mr Sia.
A. Yes, I tried to -- I try to understand you.
Q. Did you know that?
A. Know what? Bapepam -- I mean --
Q. Did you know then, before the letter was sent to Bapepam, that Bapepam could withhold the effective statement?
A. They could.

15:20 Q. Thank you.
A. But did they? I mean, you know, it's up to them.
Q. So you were aware that if a claim is drawn to Bapepam's attention, Bapepam can withhold the effective statement and release it only if certain conditions were fulfilled; correct?
A. Yes, they could, but did we get anything from Bapepam saying that they stop it or any condition they want?
Q. Thank you. Therefore -- I'm sorry, let me rephrase that.
A. Mm-hmm.
Q. The type of conditions that Bapepam would impose really depends on Bapepam; right?
A. Yes.
Q. And you were aware that those conditions could range from saying no to an IPO or saying yes to an IPO, provided the company did certain things; right?
A. Yes, they could do that.
Q. You were aware that one of the things that Bapepam could do was say, "You can go ahead with the IPO provided Mr A or Mr X or Ms A or Ms X does not sell his shares, because the shares are the subject of a claim"; correct?
A. Correct, but until now we never seen that.
Q. Thank you. But you go on to say that not only Bapepam had an interest, but the IPO team, too, had an interest,

15:22 and duty to perform in connection with the IPO, which is why you sent the third letter to them.

A. It is why my lawyers send the letters, yes.

Q. Thank you. What was the IPO's team's interest in receiving the letter and what were the duties they had to perform after receiving that letter?

A. I don't know. It depend on the IPO team. It depend on the investment banker. I don't know.

Q. Let me go through the whole rigmarole again. The IPO team comprises, among others, the underwriter, the selling agents, correct?

A. Yes.

Q. The IPO team has a responsibility to advise the company on various aspects of the IPO; right?

A. Yes.

Q. And the IPO team has the responsibility where it is aware of material facts, to inform the company to disclose those facts; correct?

A. Not necessary, no.

Q. No? All right. You knew, at that time -- and when I talk about at that time, you know I'm talking about before your letter of 21 July -- that if the IPO team considered a fact to be material, it was their duty to draw the company's attention to that fact, because the IPO team cannot help the company, mislead the

15:24 public; correct? That's the --

A. It all depend. The IPO team, the investment banker, it depend. Some of them desperate for the fees, they work with you.

Q. You seem to know quite a bit --

A. It's not quite a bit.

Q. -- about how this works.

A. That's a fact, you know.

Q. Let's talk about honest IPO bankers, okay?

A. It's still the same.

Q. Let's talk about honest IPO bankers.

A. We talking about all -- these are all honest IPO banker, too I don't try to say anything else, but you talk with them, negotiate with them.

Q. Are you suggesting that, in 2008, you had any information to suggest that Merrill Lynch or Macquarie were less than straightforward about these things?

A. No, I did not. I just say that before you ask this question, no.

Q. Good. Let's go back to my earlier question.

A. But it's a business deal. It's up to them with the company.

Q. An honest IPO team would inform the company to disclose a material fact, where that material fact comes to the attention of the IPO team; correct?

15:25 A. Yes.
COURT: You don't have to go through all this. The underwriters, they are on the hook themselves.
MR SINGH: That's right.
COURT: So honesty is not necessary here.
MR SINGH: It's only because he said some -- for the fees being also --
A. It's not only the fees. I mean, they can impose certain condition.
MR SINGH: Right.
COURT: An underwriter --
A. -- identified by the major shareholder.
COURT: -- or the lead manager of an IPO has exposure if they declare a document without material disclosure.
MR SINGH: You knew that, right, that if the IPO team is aware of a material fact and knows that the company is not disclosing it, the IPO team comprising the investment bankers would themselves be exposed to claims and penalties; correct?
A. Yes.
Q. So I understand you to be saying, and tell me if I'm wrong, that when you sent the 21 July letter to Merrill Lynch, Macquarie and Trimegah, you were aware that if you drew their attention to a material fact, they had to make sure that there would be disclosure of that

15:26 material fact to the investing public; correct?

A. Yes.

Q. Thank you. You were also aware, when you sent the 21 July letter, that if Bapepam was concerned about this material fact, then the IPO team had to work with Bapepam and the company Bayan Resources to find a solution for the IPO to go through; correct?

A. Correct. Can I ask a question, counsel?

Q. You can save your questions until after you get off the stand. All right? I will ask the questions, you give the answers. Okay?

A. When I get off the stand?

Q. Yes, then can you ask questions of your counsel.

A. No, no. I like to ask these -- the reason why I say it's up to the company and IPO team -- may I explain?

COURT: You can clarify.

A. Is that I read from one of the -- I think one of the prospectus, and I like to ask you is that if the major shareholder has a lawsuit, is that a material fact?

MR SINGH: Mr Sia --

A. Didn't disclose?

Q. I'm going to suggest to you that you are feigning ignorance. Do you understand what I said?

A. Yeah.

Q. You can disagree with me.

15:28 A. Yeah, of course I disagree with you.

Q. All right. Has your question been answered?

A. No.

Q. Okay, good. Let's move on.

COURT: You are suggesting that if a major shareholder has a lawsuit, it is not discloseable in your view?

A. No, I saying that you should disclose that, too, right? If a major shareholder has a lawsuit, you should disclose that, too, as an IPO team -- if you know that the major shareholder of a company has a lawsuit.

COURT: It's not simply a major shareholder of a company has a lawsuit. The subject matter of the lawsuit is the ownership of majority control or significant control of the listed company.

A. Yes. Let's say the company -- I mean, the major shareholder has a lawsuit going on, ongoing lawsuit, and when they disclose, normally the IPO team or the underwriter will say that -- or the attorney will say that -- declare that they have no lawsuit, while they have -- having -- still having a lawsuit.

COURT: The subject matter here is very simple. The subject matter of a lawsuit is ownership of half of the shares of the company.

A. No, no. I'm talking about the other lawsuit that the company made saying that -- declare that there are no

15:29 lawsuit at all for any major shareholder. This was -- this is not my lawsuit. They are -- they were having another lawsuit with somebody else, and if there is a material fact, major company has a lawsuit, I think in their prospectus they should mention that.

COURT: If it was material and they didn't, they would be exposed to regulatory and civil claims anyway.

A. Yeah, but I don't -- I saw that they never, never -- I read it somewhere, they never announced that -- or what you call it -- declared. They just said the major shareholder of the company do not have any lawsuit, why are they still having one. That's why I said it's up to them, even though they want to disclose or not disclose. You know, I mean, it's really up to the company how they negotiate with or talk to the IPO team.

I'm talking about this particular company, too, your Honour. It's not an example for any other company. This particular company existing major shareholder has a lawsuit, and I think it's from their attorney, declare that there are no lawsuit during this time at all.

So -- by reading that, if you ask me whether the investment bank should disclose this and all that, I say I really don't know. If they can -- if the shareholder, or major shareholder of the company can identify the -- what you call it -- the investment banker or the

15:31 underwriter, they might not announce it. They might, you know, agree with it. That's what I'm saying. That's all. Thank you, your Honour.

MR SINGH: Mr Sia, now that we've established your state of knowledge, I'm going to take you through your thought process just before you went to see your Indonesian lawyer, Mr Hutapea, and just before you sent the letters. For that, so that we don't have any controversy, I'm going to ask you to turn to page 57 of the bundle of pleadings.

A. Yeah.

Q. Do you see that?

A. Yes.

Q. You say somewhere just below the middle of the page:

"The Defendant will rely in support of his case on equalled qualified privilege upon the Plaintiff's own averment that the substance of the Defendant's legal claim against the Plaintiff for a 50% shareholding in [Bayan Resources] was a material fact which under the applicable market laws and regulations was required to be disclosed to potential investors, wherever located."

Okay? We already have your evidence earlier this morning, and a bit after lunch, about your belief that a claim to 50 per cent of the shares is a material fact that needs to be disclosed by the company.

15:32 A. Yes, but it's up to them, as I say.

Q. Mr Sia, you say you found out about this IPO some time towards the end of June 2008; correct?

A. Some time around there, yeah.

Q. You would have known from the draft that you got -- do you remember your friend went to get a draft?

A. No, I didn't get the draft before that, no.

Q. No, after that you asked a friend to get a draft --

A. Yes, after.

Q. And you would have known the timetable; correct?

A. Didn't really, you know, carefully look at the timetable.

Q. Whether you did carefully look at it or not, you were aware of the rough schedule of the IPO timetable; correct?

A. Never actually look at it, no.

Q. Let me put it in another way, to save time --

COURT: 29 June, you discovered about this IPO.

A. Yes.

COURT: A few weeks later, you received some document, or at least an information memorandum draft, and your first letter to the plaintiff's lawyers was on 10 July, the second was on the 14th and the third was on 21 July.

A. Yes. It's when I went to Indonesia on 9 July that that's the date I received the Indonesian preliminary

15:34 IPO report.

COURT: June?

A. No, July. When -- one day before I -- I mean, the same day, when I arrived in Jakarta.

COURT: 9 July?

A. No -- yeah, the 9th.

COURT: 9 July is when you signed your power of attorney for your lawyers?

A. Yeah, yeah, that is the day that I received the Indonesian prospectus, draft Indonesian prospectus. Not earlier.

MR SINGH: I want you to go to 2AB, page 670.

A. Yes.

Q. This is an affirmation you filed in Hong Kong on 28 July 2008, after your third letter. All right?

A. Yes.

Q. This was for the purposes of declaring your assets under the Mareva injunction, all right?

A. Yes.

Q. Go to page 672.

A. Yes.

Q. Look at what you say at paragraph 10.

A. Yes.

Q. "My assets of an individual value of HK$10,000 or more are as follows..."

15:36 Look at (vi).

A. Yes.

Q. "A claim to 50% of the equity interest in PT Bayan Resources ... an Indonesian company. According to the Preliminary Offering Memorandum dated July 4, 2008 issued by the company in respect of a planned forthcoming IPO, a 50% stake would have an estimated valued of between US$1.02 billion and US$1.4 billion. The claim is expected to be made in the Indonesian court against Low Tuck Kwong and this company."

So it's quite clear from this document that you had already received the preliminary offering memorandum dated 4 July.

A. No. Read it again, counsel. I said at this time I got this thing, not July dated -- the IPO document is dated 4 July; it's not the day when I received it.

Q. When did you receive it then?

A. I received it -- the first one is 9 July, when I arrived in Indonesia.

Q. Yes. So on 9 July, you had already received the draft preliminary offering memorandum; right?

A. Yes, preliminary, yes, on the 9th, that dated 4 July.

Q. And that draft -- I'm going to show you that draft now -- sorry, I'll get a copy for you. Turn, please, to 6AB, page 1603. Do you see the draft?

15:39 A. Yes.

Q. Was this the draft that you would have seen, because it's also dated 4 July, at the top of page 1603?

A. The first one I saw was the Indonesian one, not this one.

Q. The Indonesian version of this; right?

A. Yes.

Q. That's at page 1198. Could you go to that, volume 5AB? Keep 6AB open but let's go to page 1198. Do you have it?

A. Yes.

Q. Is that the one you saw on 9 July?

A. Yes.

Q. The first page of that document would have told you what the timing was, right? Look at the top, effective statement 26 July?

A. Yes.

Q. Right?

A. I just did see that.

Q. IPO, 8 August; right? Do you see that? Mr Sia, do you see that?

A. Where? On the right side?

Q. Right at the top of the page of page 1198.

A. In Indonesian?

Q. Yes.

15:41 A. Yeah.
Q. In Bahasa.
A. Mm-hmm.
Q. That would have told you the indicative dates of the process to IPO; correct?
A. Yes.
Q. On 9 July, when you saw this document, you knew that you had about one month to do something about this IPO; correct?
A. What do you mean by do something about the IPO?
Q. Let me put it in a non-controversial way. You had one month to make a claim.
A. Yes.
Q. So you go and see your lawyer; right?
A. Yes.
Q. You were also aware that just six months ago, you had, on an affirmation, said that $3 million had been advanced in late 1995 and had not been repaid; correct?
A. Six months ago, that would be --
Q. In January 2008.
A. Oh, yes.
Q. So you had to now -- again I'm trying to be non-controversial -- give instructions about what your claim was; correct? Instructions to your lawyer.
A. Yes.

15:43 Q. It would have occurred to you that if you said, "My claim is for the repayment of the $3 million loan", that was not going to be material; correct?
A. Yeah, but it's not for the loan.
Q. And so you couldn't keep running with that story of the $3 million loan; you had to change the story.
A. No, it's always the same.
Q. And you had to figure out now how do you --
A. No, it's always the same. Why do you have to ask me questions that, you know -- and change the whole meaning? Basically, it's just very simple. I mean, you help a friend during those time, that's what it was.
Q. So you had to figure out how do you make a claim which would be material and would have an impact on the IPO; right?
A. Making a claim, yes.
Q. You may have misunderstood my question because implicit in it was criticism, so I should tell you very fairly that I'm suggesting to you that you had to fabricate a claim. You said "yes", and you may want to reconsider that answer.
A. Okay. No, disagree then.
Q. And the claim you had to fabricate was a claim which you believed would stop the IPO and therefore deprive the plaintiff of the benefits of the IPO.

15:44 A. No, disagree. The claim is just very simple -- investment in the deal fail and now I found out it's not.

Q. You then decided to be as vague as possible so that you didn't have to tie yourself down to any particular story. Do you agree?

A. Disagree. What do you mean by be vague about it?

Q. You weren't yet sure that you could use the $3 million loan for the purposes of your claim.

A. No, it's never a loan. I don't know how often do you want to do that, until I slip and say "yes"?

Q. That would help.

A. Why don't you just tell me to do that?

COURT: But you're holding up well.

A. It won't be long, your Honour. I -- it's very, very -- so, anyway. Okay, please go ahead. Sorry.

MR SINGH: So we look at your power of attorney and your first letter of 10 July. Let's look at that.

A. Tell me where is it?

Q. The power of attorney is in volume 6 of the defendant's bundle of documents, and your first letter is in tab 1 of the bundle of publications and republications.

A. Yes.

Q. If you look at your power of attorney, there's no mention that this 50 per cent was for the $3 million;

15:47 correct?

A. Correct. It's very clear that time the lawyer say it's not necessary.

Q. If you look at your first letter of 10 July -- go to the other bundle.

A. Yeah.

Q. There is no mention of the $3 million.

A. The first letter?

Q. Yes.

A. Yes, that's what the lawyer recommend. We shall put it in, then we don't have this question today, you know.

Q. Let's see how you fudged your story. On my version of the translation --

A. You fudge for me then. Okay.

Q. -- at tab 1, paragraph 1.

A. Yes.

Q. "In 1995 and early 1996, Mr Dato Low ... had a financial crisis.

2. Due to the financial crisis, Mr Dato Low ... persuaded our Client to invest and provide facilities in the Coal Mining Business in Indonesia.

Mr Dato Low ... assured our Client that if our Client invested and provided the facilities for the coal mining establishment, the investment value would be worth [US$500 million] ... within 7 to 8 years,

15:48 particularly when the coal mining business is listed in Indonesia Stock Exchange.

Based on the said proposal, Mr Dato Low ... persuaded our client to invest and provide facilities for the coal mining business. Hence, Dato Low Tuck Kwong has received certain sums of money from our Client to finance and obtain concession right for the coal mining. Mr Dato Low Tuck Kwong guaranteed ... 50% ... of the total shares in the coal mining business.

The good relationship and serious financial crisis faced by Mr Dato Low Tuck Kwong had then prompted our Client to invest and provide funds ... to finance the establishment of the coal mining business and to obtain coal mining Concession Rights. The company was named PT Bayan Resources ..."

Let's go through it carefully.

One, no mention of $3 million; correct?

A. Yes.

Q. Two, the date of this transaction was either 1995 or early 1996; correct?

A. Yes, but I point it out very specifically, it's 1995/1996, one investment. It's not that various of investment during those times. Why you keep saying that I never mentioned it?

Q. Mr Sia, you had an affirmation filed six months ago

15:50 about the $3 million transaction.

A. Yes.

Q. But you weren't sure that that was --

A. Very sure.

Q. Let me finish. You weren't sure that that would do the trick for you, so you hedged and you said, 1995/1996. Isn't that what happened?

A. No.

Q. All right.

A. Disagree.

Q. Let's go on. Look at the paragraph after paragraph 2:

"Dato Low ... assured our Client that if our Client invested and provided the facilities for the coal mining business ... investment would be worth [US$500 million] within 7 to 8 years ..."

A. Yes. That time I heard this, I thought it was a joke anyway. But go ahead.

Q. You had seen the prospectus, which valued the business at 1.02 billion.

A. Yes, today -- I mean when they went IPO, but not at that time.

Q. And so you realised 50 per cent of that is $500 million.

A. Yes.

Q. And that's where the $500 million number came from.

A. No.

15:51 Q. Right?
A. This is presented to me, 1995.
Q. "Yes" or "no", sir?
A. No.
Q. But there's more to it.
A. Yes. You can put that way.
Q. Within seven to eight years, right?
A. That's what I was told, yes.
Q. So at this stage, nothing about the details that I have mentioned to you, and you said the company was named Bayan Resources.
A. Today, yes.
Q. But, sir, there was no Bayan Resources in 1995.
A. At that time, yes, I understand that, yes.
Q. So in your hurry to create this claim, you made a mistake.
A. What mistake?
Q. By saying that during the agreement, when he set up the company, it was named Bayan Resources.
A. No, I never say that. Where did I say that? Point it to me, please.
Q. Then your second letter -- go to tab 2, please?
COURT: The last line of the second last paragraph, page 2, "The company was named PT Bayan".
A. Today, yes.

15:52 MR SINGH: Go to tab 2, your second letter of 15 July. You had heard nothing from Dato Low or Bayan in response to your first letter; correct?

A. Yes.

Q. They had asked Mr Hutapea for the power of attorney; correct?

A. Yes.

Q. Mr Hutapea, we know, did not send the power of attorney; right?

A. Yes.

Q. If you go to the power of attorney -- it's quite important that we look at it. It's at 6DB. Do you remember I told you that there was an inconsistency in your claim between the claim to 50 per cent of all the shares and 50 per cent to the shares registered in the name of Dato Low?

A. Yes.

Q. Look at this -- look at the fourth line under the heading "Special":

"... in relation with returning the right of the Principal upon minimum 50% ..."

Why minimum and why not 50 per cent?

A. Minimum, because at that time I say 50 per cent, I could have said 100 per cent because I started up the whole thing.

15:54 Q. That's not my question and I'm going to give you time to rethink your answer.
A. Well, he told me 50 per cent, yes.
Q. If he told you 50 per cent, why did you tell your lawyers minimum 50 per cent?
A. This is the letter written by --
Q. It's the lawyer --
A. Yeah. He wrote it this way, yes.
Q. That your best answer, that this is the lawyer?
A. Yes, the lawyer wrote this way.
Q. You hadn't heard anything from the first letter and you were getting anxious, because no impact on the IPO, as far as you could see and no disclosure to the public; correct? That must be a fact. You would have seen that there was no impact on the IPO --
A. I thought he did disclose it to the news earlier --
Q. We're talking about the 10 July letter and the reaction to it. As far as you could see, as far as your lawyers could see, indeed as far as anybody could see, there was no disclosure to the public about this claim; correct?
A. I don't know about the disclosure, but earlier there's some publication or in the news, Suara something.
Q. That's 5 August.
A. Okay.
Q. So after you sent the letter of 12 July, the only

15:56 reaction you got was a request for the power of attorney but no impact, as far as you could see, on the IPO; correct?

A. Sorry? Say that again?

Q. I'll repeat it. After you sent the letter of 10 July -- I said the 12th, I beg your pardon -- 10 July, the only reaction you got --

A. I thought you said 10 earlier -- oh, you allowed to make mistakes.

Q. It's a mistake I made.

A. Okay. Sorry.

Q. After you sent the letter of 10 July, the only reaction you got was a request for the power of attorney, but as far as you could see, there was no impact on the IPO; correct?

A. We just send the letter out. What do you mean by "no impact"?

Q. There was no --

A. It won't happen in three days, right? I mean, the impact, anything, I mean.

Q. So nothing happened, right?

A. Yeah.

Q. Thank you.

A. Yes.

Q. We have already gone through, in the morning, the fact

15:57 that despite the fact that nothing happened, no claim was filed, no criminal report lodged; right? That's a fact.

A. Yes. We were preparing the draft, yes.

Q. Then, on 15 July, the second letter goes to Bayan Resources, Dato Low and SRS, right?

A. Yes.

Q. And it's in identical terms to the first letter, right?

A. Yes.

Q. Again here, you are hedging because there's no reference to $3 million and you are talking about an arrangement or agreement in 1995 and early 1996.

A. Yes, this is what recommended, you know, to write letter like this.

Q. But if you look at the first letter in the bundle at page 2, tab 1, you will see this is what your lawyers said, the last paragraph:

"Based on the legal facts above, our Client thus claims his rights to 50% ... of total shares of PT Bayan Resources and group. If the demand is not granted immediately, our Client shall proceed with civil and criminal legal suit..."

A. Yes.

Q. Why wasn't that done?

A. We are -- been preparing it.

15:58 Q. No, you already said, if you are not going to give it to me immediately, I'm suing you and going to the police.

A. Okay. I don't know. I mean what's immediately? One day or one week? Immediately. But -- just -- we were preparing the draft.

Q. Then the second letter, the same threat --I'm at page 7 of tab 2:

"If the demand is not granted immediately, our Client shall proceed with civil and criminal legal suit ..."

Right?

A. Yes, you keep telling me it's a threat, but this is written by my lawyer. I think if there's a threat, I don't think he will write it.

Q. We know that despite this second letter, Dato Low and Bayan Resources did not reply; right?

A. Yes.

Q. They did not accede to the demand; correct?

A. Yes, nothing was done. Nothing happened.

Q. Nothing happened, including the filing of a suit or a criminal report; right? Nothing happened.

A. At that time, yes, no.

Q. And no impact, as far as you could see, on the IPO; right?

A. I don't know the impact or not, counsel. This is what

16:00 my lawyer wrote in Indonesia. This is the procedure. That's what he told me. You going have three Indonesian expert, please ask them next week. I wouldn't know you have to write three letters to certain people. You going to get nowhere if you keep asking me that.
Q. So your gameplan to torpedo the IPO had not worked, and we are now just after 15 July; correct?
A. I disagree what you say.
Q. You then had to figure out what else to do, given that the gameplan had not worked; right?
A. No. This is the lawyer recommending me to do. In Indonesia this is how you do it. Why you keep telling me my gameplan? I just want to protect my interest.
Q. So it was decided to raise the stakes.
A. What -- raise what stake? The letter is still the same.
Q. Therefore, the third letter was sent. Okay? Can you go to tab 3?
A. It's that the page 11?
Q. Yes, it is.
A. Okay.
Q. This letter is not merely a request to Bapepam and the others that they help you get your 50 per cent shares, it was a request that the IPO be stopped; right?
A. Yes.
Q. Let's go to page 12. Again no mention of the

16:02 $3 million; correct?

A. Correct. This is what he recommend, no need to put it in.

Q. Then at paragraph 1 on page 12, and this is our version of the 21 July letter:

"For your information, our Client is the financing and facilitating party to Mr Dato Low Tuck Kwong in the establishment of the coal mining business and obtaining concession rights for the coal mine, currently referred to as PT Bayan Resources."

You must have known that even that statement was problematic.

A. No. I looked at it, it's correct. Currently, it's Bayan Resources.

Q. Because you would have seen from the draft prospectus that Bayan Resources only came into being in 2004 and before that, the investments were by Dato Low and others independently into different mining businesses which, over time, were then acquired by Bayan Resources to give us that very helpful chart that your lawyer produced.

A. Disagree. You're just misleading me. This is just a business he started in the coal mining business. Very clear. How he do it, I don't know and I didn't ask.

Q. Can I ask you to go to Eddie Chin's affidavit of evidence-in-chief and turn to paragraph 10? You would

16:04 have read this affidavit, right, before today?
A. Briefly.
Q. Yes, and you would have seen that Mr Chin painstakingly explained when each of these companies was set up, owned by whom and when Dato Low came into the picture in relation to each of them; right?
A. Yeah, but why is it relevant to me?
Q. At paragraph 11 are also mentioned the non-coal mining companies which Bayan Resources owned, those in trading and other activities -- sorry, as well as mining, I beg your pardon. Right?
A. Yes.
Q. So in your letter, although this so-called agreement was, according to you, in 1995/1996, you ignored everything and all the investments made in the interim and went straight for the final product. Correct?
A. Yes, because I provided since 1995/1996. That was what he told me. This is what he offered me.
Q. So you never stopped to ask yourself, okay, there was an agreement, $3 million for a mining business, which was the first mining business he entered into; okay, that's the one, I should have 50 per cent in. You didn't ask yourself that, right?
A. No.
Q. The reason you didn't ask yourself that is this: first,

16:06 there was no such agreement.

A. Okay.

Q. You disagree, right? Yes?

A. Yes.

Q. Second, for you to block the IPO and to punish Dato, you had to find a way to link your claim to BR and so you did a magical jump --

A. How do you do that?

Q. You did it -- from 1995 to 2008, and said "I now have 50 per cent of BR and its group." Isn't that what you did?

A. As I said, I started up the business. How he get there, on which way, I don't know.

Q. If you had just claimed 50 per cent of the first coal mining business, it would have been not material, it would have been one of the subsidiaries under a vast organisation below BR, but that wasn't good enough for you. You had to raise it to the top to kill the IPO and to hurt Dato.

A. No. Disagree.

Q. Mr Sia, you are a very clever man.

A. You are more clever, I think.

Q. And you are also, with respect, a very unscrupulous man.

A. I disagree.

MR GIAM: Your Honour, I think my learned friend should

16:08 refrain from making remarks like this throughout his cross-examination, where he talks about unscrupulous and fudged and all that. I don't think that that's proper, your Honour, when you cross-examine, abuse a witness in this manner.

MR SINGH: Your Honour, my case is that the agreement was fabricated.

A. Yes, I understand, but you keep using that word I don't understand --

MR SINGH: Please. I'm entitled to --

MR GIAM: You are not entitled to insult the witness.

MR SINGH: Can I finish, please? I'm not entitled to insult the witness but I'm entitled to suggest to him that he has devised this, concocted it and contrived it to mislead this court, and if that's not unscrupulous, I don't know what is.

A. I don't. I keep telling you because you do not like my answer. Just like I don't understand your question that much.

Q. I suggest to you that you fully understand my questions.

A. Yes, I try. I answer you, right?

Q. Let's go back to your third letter at page 12, paragraph 4.

A. You keep going back and forward.

Q. Yes, paragraph 4:

16:09 "The good relationship and serious financial crisis faced by Mr Dato Low ... had then prompted our Client to invest and provide funds for Mr Dato Low ... to finance the establishment of the coal mining business and to obtain coal mining Concession Rights. The company was named PT Bayan Resources."

Mr Sia --

A. Yes.

Q. -- you got that wrong.

A. It's part of the English I wrote wrong or my lawyer translate it wrong? Which part? Which part?

Q. Then skipping --

A. Please tell me which part. Don't just go to another question.

Q. Skipping the next paragraph --

A. Okay.

Q. -- the following paragraph reads:

"Our client warned Mr Dato Low ... through Warning Letter dated 10 July 2008 ... and warning letter dated 15 July 2008 ... however, we have not received any reply from PT Bayan Resources and Mr Dato Low ... to date. We only received a Letter from the Legal Representative of PT Bayan Resources which does not answer the core issue of our warning letter ...

Based on the facts above, we would like to inform

16:10 you that in a short time, we would proceed with civil and criminal legal suit against PT Bayan Resources and group and Mr Dato Low ..."

When you said this, you must have intended for the recipients of this letter to believe that you would, in a short time, commence civil and criminal legal suits; correct?

A. That was recommended by my lawyer.

Q. Is the answer "yes"?

A. That was recommended by my lawyer.

Q. Whatever the recommendation might have been, you must have intended for the recipients of this letter to believe that you would, in a short time, commence civil and criminal legal suits; correct?

A. My lawyer recommended this is how he will put it, he will write it this way.

Q. And you intended for the recipients to believe that; right?

A. I don't know. This is what my lawyer send out. This is the content of the letter.

Q. Could you answer my question?

A. It's the content of the letter, so it's up to the recipient whether they want to believe it or not.

Q. Did you intend for the recipients to believe that?

A. Why do I send letters out? Why do lawyers send letters

16:12 out? I don't know. Of course, they want to get answer.
Q. Mr Sia --
A. Inform them.
Q. -- you continue to evade the question --
A. Mm-hmm.
Q. -- or you can answer it, because I'm going to press the point -- did you intend for the recipients to believe that in a short time you would be suing and reporting to the police?
A. This is recommended by my lawyer. This is how he wrote it.
Q. Is the answer "yes" or "no"?
A. This is -- I just told you the answer. I can --
Q. I've not --
A. Give you the "yes" or "no" -- I cannot give you "yes" or "no" answer. This is what my answer is.
Q. Now that your lawyer had recommended that you say this, did you intend for the recipients to believe it?
A. I really don't know. I hope so. I don't know.
COURT: If you received such a letter yourself, how would you read it?
A. I read it, yes. Look at it, okay, you know, I might get a lawsuit.
MR SINGH: So you intended for them to believe it; right?
A. They believe or not, I don't know.

16:13 Q. I didn't ask you whether they did or didn't. I asked you whether you intended for them to believe it.

COURT: The question is very simple. When you approved the sending out of such a letter by your lawyers, did you expect the recipient to take it as you've said --

A. Yeah, look at it seriously, of course -- treat it seriously. It's a letter from the lawyer.

COURT: Yes, but it's approved by you and it says, if you don't comply, civil and criminal proceedings will follow shortly, or immediately. So do you understand that to mean that the recipient receiving that letter would understand it for what it says?

A. Yes.

COURT: Yes.

MR SINGH: Thank you, your Honour.

A. Thank you.

Q. If we go on:

"Therefore we would like to request Bapepam, PT Bursa Efek Indonesia, Merrill Lynch [et cetera] not to proceed with the go public process ... and/or its group, so as to prevent further damage to the third party and to avoid legal suit from our client."

This is what you did -- you said, "I am going to sue in a short while, and because I'm going to sue, stop the IPO." Correct?

16:14 A. Yes.
Q. Thank you. Not only did you say that, over the page you said, "And if you don't stop the IPO, I'm going to sue you too"; right?
A. Yes, that's what my lawyer recommend.
Q. Right. So on 21 July, you threatened two sets of legal suits, one against BR and Dato Low, and the other against the addressees of this letter, if the IPO was not stopped, but you didn't sue despite the fact that it was not stopped; right?
A. I told you we were preparing the draft at that time.
Q. Thank you. You enclosed with this letter, at page 13, the earlier warning letters and the request for the power of attorney; right?
A. Yes.
Q. 21 July, you heard nothing back. The 22nd, 23rd, 24th, nothing; correct?
A. Yes.
Q. When did you first see a reaction?
A. Reaction on what?
Q. To the claims you made. When did you see that there was now something that was happening? Was it in the newspapers, was it in the pricing supplement, was it in the final prospectus, someone came to you and said, "They have now disclosed it"?

16:16 A. No, I don't remember that.
Q. So you're saying you might have seen it, but you can't remember when?
A. Yes.
Q. So it would be right to say that you and/or your lawyer would have been monitoring the reaction to these letters; correct?
A. I didn't -- I wasn't in Indonesia, I didn't monitor that. I think my lawyer also in Indonesia, he's too busy to monitor this.
Q. Then who was monitoring this for you?
A. Nobody.
Q. But why?
A. What do you mean why?
Q. Because you had said, "If you don't stop the IPO I'm going to sue you", so you needed to know whether the IPO was going to stop, so you needed to monitor it.
A. Yes, he did --
Q. So who was monitoring it?
A. My lawyer was preparing the draft at that time.
Q. That's not my question. My question is who was monitoring it, because you yourself had said, "If it doesn't stop, I'm going to sue", unless your --
A. My lawyer -- okay, I take it back. My lawyer must be monitoring it then at that time.

16:17 Q. So you changed your evidence?
A. I didn't change. I mean, you asked me more clear now. Don't keep changing back and forward. The first time I might not get what you asking me.
Q. So your lawyer would have monitored developments and kept you updated?
A. Yes.
Q. He would have told you, ha, there's been disclosure now of that claim; correct?
A. Yes.
Q. And he would have sent you copies of those disclosures.
A. No.
Q. He would have told you that the result of the letters was that Dato Low had to withdraw his vendor shares; correct?
A. I don't remember.
Q. It's such an important thing --
MR GIAM: Your Honour, are we not going into the realms of privilege?
MR SINGH: All right. I'll rephrase my question.
You would have learnt from some source that as a result of the letters and the disclosure, Dato Low was no longer selling his shares; correct?
A. Yes.
Q. Thank you. I want you to go to your evidence-in-chief.

16:19 COURT: Are you moving on from where you were, the three letters?
MR SINGH: Yes, I'm moving on from that.
COURT: Can I clarify this?
We are still at paragraphs 147 to 154 of your affidavit.
A. 147, yes, to -- my affidavit. Okay, yes, your Honour.
COURT: Can you clarify this -- you say, first of all, in paragraph 148, "My letters were to recover what was rightfully due to me."
A. Yes, your Honour.
COURT: Then you jump to paragraph 157, the three letters, the effects for republication -- I am trying to understand what is it that you are saying. When you wrote the third letter to Bapepam and the Exchange, you could not predict what they could do.
A. Yes.
COURT: Right?
A. Yes, your Honour.
COURT: But they could do a few things.
A. Yes.
COURT: When you sent the plaintiff the first letter, he might call you and say, "Let's cut a deal. Let's sort this out." The first letter you sent to him, alone, and the company; the second letter you sent to him and his

16:20 lawyer; the third letter you go to Bapepam; right?
A. Yes.
COURT: So each time a letter is sent -- the first letter is -- you could cut a deal, let's talk.
A. Yes.
COURT: Right? The second time you send the same letter, but this time copied to his lawyer. Right?
A. Yes.
COURT: Also we can talk, but no talk, either by him or his lawyers.
A. Yes.
COURT: Correct? The third letter you send to Bapepam and the Exchange and the IPO team.
A. Yes.
COURT: What are the possibilities that could happen? One, they can now talk to you and get you to withdraw. Right?
A. Yes.
COURT: Two, Bapepam may say, well, no IPO.
A. Yes.
COURT: All right? Three, in any event, that claim of yours needs to be disclosed beyond Bapepam, the Exchange and the IPO team.
A. Yes.
COURT: Right? They have to be disclosed. The moment you

16:22 receive something like that, you cannot say, let's sort it out, and keep quiet, because already you have the red herrings and a book is being run on the shares.

A. Yes.

COURT: So you understand at each stage, that whatever Bapepam does, a disclosure of your claim will come out.

A. Yes.

COURT: All right?

A. Yes.

COURT: So look at paragraph 159. You say, "I did not intend for republication."

"I do not agree that the republications were the natural and probable consequence ..."

I don't understand that.

A. Which line again?

COURT: Paragraph 159.

A. You know, at that time I do not intend to -- you know, to know or to foresee all this republication.

COURT: No. The question is you were chairman of a listed company in Hong Kong also, so you are familiar with listed companies.

A. Yes.

COURT: So if you send something of this nature, either you would have a settlement, they talk; secondly, Bapepam says no IPO.

16:24 A. Yes.

COURT: Whatever they do, it would be necessary for them to disclose the fact that you have made a claim on those shares.

A. Yes.

COURT: And that disclosure will go through the book running process and the red herring prospectus.

A. Yes.

COURT: So I don't quite understand -- you may say, "I did not intend that specifically".

A. I did not intend to go for this publication and, you know -- as I said, for me the whole thing is --

COURT: It may not have been your specific intent, but it's certainly one of the things that could arise from your letters.

A. Yeah. By that time, I only think of one thing, just to protect my interests, your Honour. That's all.

COURT: I understand, but the point is when you say, "I do not intend", you are not saying, I could not have foreseen, it was beyond contemplation.

A. At that time in my mind, probably I didn't see all these thing would happen.

COURT: Carry on.

MR SINGH: Thank you, your Honour.

Mr Sia.

16:25 A. Yes.
Q. You had your passport just now, right? I'm going to check something. There was a lot of bad blood between you and Dato Low after 1996/1997; correct?
A. No.
Q. No. All right.
A. After 1998.
Q. After 1998, was it?
A. Yes.
Q. After 1998. According to your evidence, and I won't trouble you to pick it up unless you want to, the relationship between you and Dato deteriorated in early 1998.
A. Yes.
Q. There were arguments and disagreements; correct?
A. Yes.
Q. I think you even suggested that Dato was abusive to you.
A. Yes.
Q. We don't accept that, but that's what you suggest; right?
A. Mm-hmm.
Q. Then Dato sued you in Singapore, the other shareholders sued you in Singapore, then in Hong Kong; correct -- in Singapore against you, but in Hong Kong against Dynasty; right?

16:27 A. Yes.
Q. By the time of the suits, 1999 or so, the friendship had been damaged; correct?
A. Yes.
Q. Then Dato obtained judgment against Dynasty in April 2001 in Hong Kong; right?
A. Yes.
Q. That was about the time when you had already gone into bankruptcy and were facing other problems; correct?
A. Yes. Yes, correct.
Q. In addition to the bankruptcy, you had other issues in the United States; right?
A. Yes.
Q. Then, when you got out of prison in 2004, in a matter of years, the provisional liquidator was appointed and he came after you; correct?
A. Yes.
Q. You believed that the provisional liquidator was doing it on behalf of Dato; right?
A. I'm not sure at that time, but now, yes, he admit that. Before, he didn't admit to that.
Q. Did you not believe that he was behind it, at that time? I'm asking you about your state of mind.
A. I suspect, yes.
Q. A Mareva injunction was obtained, you tried to set it

16:28 aside, you failed; correct?

A. Yes.

Q. Isn't it true that the court in Hong Kong dismissed your application to set aside the Mareva injunction on 13 June 2008?

A. Yes. Sorry, you said dismissed?

Q. Yes.

A. Dismissed the Mareva injunction?

Q. No, dismissed your application.

A. Dismissed my application, yes.

Q. Yes? And a few days later, you found out about this IPO; correct?

A. Yes.

COURT: Two weeks.

MR SINGH: He says 29 June.

COURT: 29 June.

MR SINGH: I'm just going to show him something else, your Honour.

Could I ask you to look at 4AB1151? Could you turn, please, to page 1150?

A. Yes.

Q. Page 1150 is an English translation of an article in Bisnis Indonesia on 18 June.

A. Yes.

Q. I'm so sorry, the translation is over the page, at

16:31 page 1152.

A. Yes.

Q. At page 1150 is the translation of the article in the Indonesian newspaper at page 1149.

A. Yes.

Q. That article at page 1149, which is translated at page 1150, said that there would be an IPO of Bayan Resources; correct?

A. Yes.

Q. It also said, if you go down to the last but one paragraph that Dato Low had 75 per cent of that company; right?

A. Sorry. Page 1151?

Q. Page 1150.

A. The last line?

Q. The last but one paragraph, beginning with the word:

"Now, the company shares ..."

Do you see that?

A. Yes.

Q. It also said below the last paragraph under "Related News", that the offer IPO price was in the range of Rp5,600 to Rp7,000 per share.

A. Yes.

Q. Then at page 1151 there was an advertisement in Bisnis Indonesia of 18 June, and at page 1152 is the English

16:32 translation, and that would have given the reader information about the proposed date of the IPO, 8 August.

A. Yes.

Q. As well as the selling shareholders. You can take your time and look at it, the first paragraph, Dato Low, Jenny Quantero and Engki Wibowo.

A. Yes.

Q. Then at the bottom is a table of the number of shares held by each of the selling shareholders.

A. Yes.

Q. Then at page 1153 you have another publication, this time on Bloomberg, about the Bayan Resources IPO. Do you see that, page 1153?

A. Okay.

Q. Then at page 1155 is another report. This is in the Daily Kontan about the Bayan Resources IPO. Then at page 1157, in the daily Bisnis Indonesia, this time on the 19th, a further report on the Bayan IPO, and in the last column at the bottom, the last but one paragraph, Dato Low's name. Yes?

A. Yes.

Q. And additional articles -- and I'm going to ask you to scan through page 1158, Reuters, 1159, 2 July, et cetera, et cetera. Okay?

16:35 A. Yeah.
Q. Given that this was now publicly being reported, you would have known about this proposed IPO; correct?
A. No. Disagree.
Q. Sorry?
A. Disagree.
Q. You disagree.
A. May I explain, your Honour?
Q. Yes, please.
A. Okay, if you look at it, these are all dated 18, 19.
Q. 17 to 19.
A. Okay, 17, 18, 19. That was the time, I think I find out because I had a drink with this guy from Merrill Lynch, a Chris Clower. He was busy with his BlackBerry and then I say -- only two of us, so I ask him why he's so busy. He says, "I'm doing an IPO for Indonesia coal mining business." So I heard that and the next thing, the phone -- his phone, he has to go outside because in the bar he not allowed to use the phone. He went out there to use the phone. I went out with him and because the convenience store or something just right next to the bar, so I was selecting some wine and -- you know, tried to buy some wine and I overheard him on the phone, mention about a name called "Dato Low". So I just wait there and when he hang up the phone, I asked him, you

16:36 doing a coal mining for a Dato Low? He said TK Low. He's not sure at that time.

So he say, you know, let me find out. So he messaged his people, I don't know who, and say, yeah, that was Dato TK Low. But after that, he told me he just feel uncomfortable to continue the conversation. So what we did, we just didn't talk about it any more that night.

Q. When was that?

A. That was -- I think I have a date -- I think 19 July -- 18, 19, around there.

Q. Are you saying that around the time of these articles you would have read these articles and --

A. No, I never read this article.

Q. You never read these articles?

A. Never.

Q. The date you gave in your affidavit about that discussion with Mr Clower is 29 June.

A. Yeah.

Q. Okay?

A. Probably after that, yeah.

Q. But it was already out in public.

A. Public, where? In Indonesia?

Q. Yes.

A. I don't know. I am not there. Even if I'm there,

16:37 I won't read this kind of -- I mean, listing.
Q. So can I take it from you that the first time you heard about the IPO was from Mr Clower and not from market talk?
A. No.
Q. Do you agree with me?
A. Yes.
Q. You are very clear in your mind about this --
A. That's the first time I found out. Very clear.
Q. And it was not market talk?
A. You can refer to -- you know, to him talking to me is market talk or -- you know. We having a drink.
Q. Do you consider a dinner with a friend market talk?
A. Yeah, possible, if he's in the market.
Q. Right.
COURT: This conversation you just spoke about was on 29 June?
A. Yes, your Honour.
MR SINGH: Yes.
A. And also, let me say this, counsel, is that if you look at this, even if I -- if I would have read this, seen this in the newspaper, I wouldn't know which company and what -- whose company, if printed in Indonesia, like that.
Q. How is it that you remember having that dinner on

16:38 29 June?

A. We didn't have a dinner, we had a drink.

Q. Sorry. How was it that you remember having drinks on 29 June?

A. How? Because after that, the next day, you know, I called some friends, asking them.

Q. Yes, but why 29 June?

A. It just happened that day, I happened to call -- I think that was a Sunday or something, just went out for a drink.

Q. What document do you have? A diary that says you had drinks with him on the 29th -- why that specific --

A. Okay, I found out later on, on my American Club statement.

Q. Right.

A. Yeah. So I don't go there every day, so during end of June, that was the day I was there. I think one week before that or one week after, I don't think I was there. So -- you know, I quite clear it's that day.

Q. So from the time this action started, you were very clear that you found out from Mr Clower?

A. Yes.

Q. From the time this action started, you were very clear that you found out from Mr Clower on 29 June over drinks at the American Club?

16:40 A. Yes.

Q. I want you to go to the bundle of pleadings.

A. Excuse me? Which volume?

Q. Tab 2, the bundle of pleadings. Look at page 48 of the bundle, paragraph 8j). It says:

"Thereafter, sometime in or around June/July 2008 it came to the Defendant's attention through market talk and the Indonesian Offering Memorandum for PT Bayan Resources that there was going to be an initial public offering of the coal mining business on the Indonesia Stock Exchange through PT Bayan Resources."

If you always knew --

A. Yes, that's exactly -- thank you for pointing it out.

Q. If you always knew, from the time this action was commenced, that you learnt of it on 29 June, at the American Club --

A. Yes.

Q. -- isn't it curious that in your defence you say it was through market talk in or around June/July 2008?

A. Yes. I have -- first I found out with Chris Clower and then the next day I call, you know, people that work in Macquarie -- what should I say, investment bank talk? What's the right word? Please?

Q. To go on, I want to show you an affidavit that you filed on 5 May 2009, your seventh affidavit.

16:42 A. It's okay. One moment, please.
Q. Look at paragraph 44. Again, you say:
"Sometime in or about June/July it came to my attention from market talk ..."
That's an extraordinary thing to say if, as you now claim, you've always known it was on 29 June at the American Club over drinks with Christopher Clower.
A. Yes, counsel, but thank you for pointing it out, because with Chris Clower, he didn't tell much, so I find out next few days. So what's wrong with that?
Q. The only thing wrong with that --
A. It's the market talk.
Q. -- you changed your evidence.
A. No, what evidence changed? Please let me know -- please let me know. Just don't let me know I changed my evidence. I'd like to know.
Q. Let's go to the bundle of pleadings, please.
A. Okay.
Q. Do you remember I referred you to paragraph 8j) at tab 2?
A. Yeah, page 41.
Q. Paragraph 8j) is at page 48. Do you see that?
A. Yes.
Q. You see you said:
"... in or around June/July 2008 it came to the

16:45 Defendant's attention ..."

A. Which paragraph? Paragraph 48?

Q. Yes, paragraph 8j).

A. Thanks. Yes.

Q. I want you to go, in the bundle of pleadings that's before you, to tab 5.

A. How about this one, page 48?

Q. No, just go to tab 5. Don't worry about that. Go to page 164, paragraph 12. Do you see the reference to paragraph 8j) of the amended defence?

A. Paragraph 12?

Q. Yes.

A. Yes? What?

Q. We asked you, in relation to that paragraph --

A. Wait, paragraph 12?

Q. Yes.

A. Okay, thank you.

Q. How did it come to your attention that there was going to be an IPO and the exact date and month when it came to your attention. Your answer over the page was:

"There was market talk sometime in or around June/July 2008 about this and sometime from 2 July 2008 to 10 July 2008 ..."

You obtained a copy of the Indonesian prospectus for PT Bayan Resources. When we asked for the exact date

16:46 and month, you said:

"See answer ... above."

Meaning some time in or around June/July 2008. So, Mr Sia, this evidence about Christopher Clower which came out for the first time a few days ago in your evidence-in-chief is also made up.

A. Where is it made up?

MR SINGH: Your Honour, would this be a convenient time?

COURT: Have you finished your question with him?

MR SINGH: On that point I've finished, yes.

A. Where is it made up? Okay.

Where is it made up? Okay.

COURT: Do you want to complete your sentence or comment?

A. Yeah, I want to ask. I mean, he just throw the question at me.

COURT: He's asking the questions, but -- (unclear - simultaneous speakers).

A. -- he asked me the question -- ask that again. He said I made up these -- saying that I heard it late June/July, in 2008, it was made up.

MR SINGH: Yes.

A. How was it made up?

Q. You deny it, right?

A. Yes.

MR SINGH: Good. That's on the record.

16:48 A. Yeah, because --

MR SINGH: Your Honour, I understand that tomorrow you are sitting in the Court of Appeal?

COURT: Yes, the Court of Appeal in the afternoon.

MR SINGH: So we'll just have the morning session?

COURT: But if you want to start earlier or finish later, that's fine.

MR SINGH: No, we are fine with the morning session.

(4.46 pm)

(The hearing adjourned to Thursday, 16 August 2012 at 10.00 am)

I N D E X

P A G E

MR SUKAMTO SIA (on prior oath) ........................1

Further examination-in-chief by MR GIAM ..........1

Cross-examination by Mr Singh (continued) ........3